# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA L. RUCKMAN, | : | Case No.: 5:21-cv-00923-JRA |
| | : | |
| Plaintiff, | : | Judge Bridget Meehan Brennan |
| | : | |
| v. | : | |
| | : | |
| PHH MORTGAGE CORPORATION d/b/a | : | **NOTICE OF FILING OF** |
| PHH MORTGAGE SERVICING, *et al.*, | : | **DEPOSITION TRANSCRIPT** |
| | : | |
| Defendants. | : | |
| | : | |

Defendant PHH Mortgage Corporation ("PHH"), by and through undersigned counsel, hereby gives Notice of Filing of the attached deposition transcript of Plaintiff Angela L. Ruckman, held on January 4, 2022.

Respectfully Submitted,

Dated: February 25, 2022

*/s/ Sarah A. Wilson*
Sarah A. Wilson
John R. Wirthlin
BLANK ROME, LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Tel: (513) 362-8748
Fax: (513) 362-8777
Email:  sarah.wilson@blankrome.com
　　　　john.wirthlin@blankrome.com
*Counsel for Defendant PHH Mortgage
Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that an exact copy of the foregoing document was electronically filed and served via the ECF system on February 25, 2022.

*/s/ Sarah A. Wilson*
Sarah A. Wilson

1          UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF OHIO

3              EASTERN DIVISION

4    _____

5    ANGELA L. RUCKMAN,

6          Plaintiff,

7      v.                           Case No.

8    PHH MORTGAGE CORPORATION D/B/A     5:21-cv-00923-

9    PHH MORTGAGE SERVICING, ET AL.,    JRA

10         Defendants.

11   _____

12         VIDEOCONFERENCE DEPOSITION OF

13             ANGELA RUCKMAN

14   DATE:        Tuesday, January 4, 2022

15   TIME:        10:14 a.m.

16   LOCATION:    Remote Proceeding

17                116 Park Avenue West

18                Mansfield, OH 44902

19   REPORTED BY:  Michael R. Rennillo, Notary Public

20   JOB NO.:     5011406

21

22

23

24

25

Page 2

```
 1        A P P E A R A N C E S
 2 ON BEHALF OF PLAINTIFF ANGELA L. RUCKMAN:
 3    MARC DANN, ESQUIRE
 4    DAN SOLAR, ESQUIRE (by videoconference)
 5    Dann Law Firm
 6    15000 Madison Avenue
 7    Cleveland, OH 44107
 8    mdann@dannlaw.com
 9
10 ON BEHALF OF DEFENDANT PHH MORTGAGE CORPORATION D/B/A
11 PHH MORTGAGE SERVICING:
12    SARAH A. WILSON, ESQUIRE (by videoconference)
13    JOHN WIRTHLIN, ESQUIRE (by videoconference)
14    Blank Rome, LLP
15    1700 PNC Center, 201 East Fifth Street
16    Cincinnati, OH 45202
17    sarah.wilson@blankrome.com
18
19 ON BEHALF OF DEFENDANT CLUNK HOOSE CO., LPA:
20    ASHLEY MUELLER, ESQUIRE (by videoconference)
21    Clunk Paisley Hoose Company
22    4500 Courthouse Boulevard
23    Stow, OH 44224
24    amueller@clunkhoose.com
25
```

Page 3

```
 1           I N D E X
 2 EXAMINATION:                         PAGE
 3    By Ms. Wilson            5
 4    By Ms. Mueller           54
 5
 6        E X H I B I T S
 7 NO.    DESCRIPTION                   PAGE
 8 Exhibit 1    Deposition Notice           N/A
 9 Exhibit 2    Complaint for Damages       8
10 Exhibit 3    Mortgage                   10
11 Exhibit 4    Approval for Permanent
12    Modification                        15
13 Exhibit 5    Email, 12/07/20            16
14 Exhibit 6    Emails, 01/07/21 - 01/12/21    22
15 Exhibit 7    Loan Modification Agreement    26
16 Exhibit 8    Decision on Request for
17    Mortgage Assistance                 28
18 Exhibit 9    Kroger Receipt             31
19 Exhibit 10   Account Error Report       34
20 Exhibit 11   Email, 03/08/21            35
21 Exhibit 12   Discovery Responses        42
22 Exhibit 13   Affidavit                  43
23 Exhibit 14   Interrogatory Responses    N/A
24
25           (Exhibits attached.)
```

Page 4

```
 1        P R O C E E D I N G S
 2        THE REPORTER:  Good morning.  My name
 3 is Michael Rennillo; I am the reporter assigned by
 4 Veritext to take the record of this proceeding.  We
 5 are now on the record at 10:14 a.m.
 6        This is the deposition of Angela
 7 Ruckman taken in the matter of Angela L. Ruckman vs.
 8 PHH MORTGAGE CORPORATION on January 4, 2022, at
 9 Holiday Inn Suites, 116 Park Avenue West, Mansfield,
10 Ohio 44902.
11        I am a notary authorized to take
12 acknowledgements and administer oaths in Ohio.
13        Additionally, absent an objection on
14 the record before the witness is sworn, all parties
15 and the witness understand and agree that any
16 certified transcript produced from the recording of
17 this proceeding:
18    - is intended for all uses permitted
19        under applicable procedural and
20        evidentiary rules and laws in the same
21        manner as a deposition recorded by
22        stenographic means; and
23    - shall constitute written stipulation
24        of such.
25        At this time will everyone in
```

Page 5

```
 1 attendance and appearing remotely please identify
 2 yourself for the record, beginning with the witness.
 3        MS. RUCKMAN:  Angela Ruckman.
 4        MS. WILSON:  Sarah Wilson for PHH.
 5        MS. MUELLER:  Ashley Mueller for Clunk
 6 Hoose.
 7        MR. WIRTHLIN:  Excuse me.  John
 8 Wirthlin, also for PHH.
 9        MR. SOLAR:  Dan Solar for Angela
10 Ruckman.
11        THE REPORTER:  Mr. Dann?
12        MR. DANN:  Marc Dann for the plaintiff.
13        THE REPORTER:  Thank you.  Hearing no
14 objection, I will now swear in the witness.  Ms.
15 Ruckman, would you please raise your right hand for
16 me?  Thank you very much.
17 WHEREUPON,
18        ANGELA RUCKMAN,
19 called as a witness, and having been first duly sworn
20 to tell the truth, the whole truth and nothing but the
21 truth, was examined and testified as follows:
22        THE REPORTER:  Thank you very much.
23        EXAMINATION
24 BY MS. WILSON:
25    Q   Good morning, Ms. Ruckman.  Again, my name
```

2 (Pages 2 - 5)

Page 6

1 is Sarah Wilson.  We spoke a couple weeks ago.  We
2 started a deposition and now we're going to,
3 hopefully, conclude it today.
4       I just want to reiterate the ground rules to
5 make sure we're on the same page.  Please let me
6 finish speaking before you answer and we need verbal
7 responses.  Do you understand those rules?
8    A   Yes.
9    Q   Are you physically able to testify today?
10    A   Yes.
11    Q   Are you mentally able to testify today?
12    A   Yes.
13    Q   Are you under the influence of any drugs or
14 alcohol?
15    A   No.
16    Q   Is there any reason today that would prevent
17 you from testifying?
18    A   No.
19    Q   As a reminder, we can take breaks during the
20 deposition, just let me know.  I just ask that you
21 finish answering the question that I've asked before
22 we take a break.
23       Since the last time that we spoke, have you
24 done anything to prepare or review for this
25 deposition?

Page 7

1    A   No.
2    Q   Okay.  Did you discuss the deposition that
3 we started last time with anybody else?
4    A   No.
5    Q   Did you review any documents for the
6 deposition?
7    A   No.
8    Q   And did you bring any documents with you
9 today?
10    A   No.
11    Q   Okay.  So we're going to jump right in.  The
12 first couple questions might seem a little duplicative
13 but I want to make sure we have a clear record.
14       What claims are you bringing against PHH in
15 this case?
16       MR. DANN:  Didn't we already go through
17 this?
18       MS. WILSON:  Yes.  But I'm -- it's
19 unclear how much was on the record.  It's just the
20 first -- it's two or three questions.
21       MR. DANN:  I object and I'm going to
22 ask her not to answer questions that have been already
23 asked.  And the whole -- we were doing this for your
24 convenience and enough's enough already.  Just get on
25 with this continued deposition, please.

Page 8

1       MS. WILSON:  Okay.  Well, then we'll go
2 to what's labeled Exhibit 2, the Federal Complaint
3 because we did not get through that at the last
4 deposition or it was not clear for the record.
5       (Exhibit 2 was marked for
6       identification.)
7       MS. WILSON:  I will share my screen if
8 that's what is necessary.  Should we go off the record
9 for a second?
10       THE REPORTER:  Please standby.  Going
11 off the record at 10:18.
12       (Off the record.)
13       THE REPORTER:  We are back on the
14 record at 10:19 a.m.
15 BY MS. WILSON:
16    Q   Ms. Ruckman, I am sharing my screen right
17 now, which is Exhibit 2.  This is -- I will tell you,
18 this is the Complaint for Damages.
19       We started to discuss this last time before
20 the deposition ended.  Is this a document you're
21 familiar with?
22    A   Yes.
23    Q   Okay.  Have you seen -- so you've seen the
24 document before?
25    A   Yes.

Page 9

1    Q   Did you review this document for accuracy
2 before it was filed with the court on May 4, 2021?
3    A   Yes.
4    Q   Did you review it carefully?
5    A   Yes.
6    Q   Did you understand that you had an
7 obligation to present truthful and accurate
8 information to the court?
9    A   Yes.
10    Q   Did you verify the facts set forth from the
11 document were truthful and accurate?
12    A   Yes.
13    Q   Did you make any edits or corrections to the
14 draft complaint before it was filed?
15    A   No.
16    Q   Are there any paragraphs in this that you
17 think are incorrect currently?
18    A   Not to my knowledge.
19    Q   How much time did you spend reviewing this
20 document?
21    A   I'm not sure.
22    Q   Did you rely on counsel for any facts set
23 forth in the document?
24    A   Yes.
25    Q   Which facts?

3 (Pages 6 - 9)

Page 10

1    A    My attorney would have knowledge of any of
2  the federal and state ordinances.
3    Q    Anything else?
4    A    I'm not sure.  They -- they know the law
5  better than I do.
6    Q    Okay.  I'm going to show you what now I'll
7  call Exhibit 3.
8         (Exhibit 3 was marked for
9          identification.)
10   Q    I'll tell you that this is a copy of your
11 mortgage or that is what I'm claiming it is.  Is this
12 something you recognize?  If you want to take --
13        MR. DANN:  And I'm just pulling the
14 full document --
15        MS. WILSON:  If you want to take a
16 minute to review it, please do.
17        MR. DANN:  Yeah.  I'm going to pull the
18 full document for her on my iPad, okay?
19        MS. WILSON:  Okay.
20        MR. DANN:  This is Exhibit 3?
21        MS. WILSON:  Yes.
22        MR. DANN:  Okay.  Then that way she can
23 scroll it.  The way -- that was one of the problems.
24 Except that it didn't come through.  You're going to
25 have to scroll it because this one didn't come

Page 11

1  through.  Here it is.
2         MS. WILSON:  Oh, okay.  Yeah.  I can
3  scroll it.
4  BY MS. WILSON:
5    Q    Okay.  I'm now looking at page 12 of this
6  document that I'm saying -- that I've introduced as
7  the mortgage.
8         Did you say -- have you -- do you recognize
9  this document?
10   A    Looks like the original mortgage.
11   Q    Okay.  Is that your signature in front of
12 you on page 12?
13   A    Yes.  Yeah.
14   Q    Okay.  Now, under the mortgage, you have to
15 make a monthly payment, correct?
16   A    Yes.
17        MR. DANN:  Objection.
18   Q    Did you make all of your payments under this
19 monthly mortgage?
20        MR. DANN:  Objection.
21        MS. WILSON:  As a reminder, you still
22 need to respond even though he objected unless he
23 tells you not to.
24        MR. DANN:  You can answer if you made
25 any payments on your mortgage.

Page 12

1         THE WITNESS:  Yes.  I made payments
2  under the mortgage, yes.
3  BY MS. WILSON:
4    Q    Did you make all of your payments under the
5  mortgage?
6         MR. DANN:  Objection.
7    A    I mean, I've been in the house -- what?
8  It's almost 16 years.  I would say yes.  I don't have
9  100 percent, you know, I did file bankruptcy, so I
10 would say I missed a few.
11   Q    Do you recall when you stopped making timely
12 payments?
13   A    It's not a question of I stopped on purpose.
14 I mean, I did file bankruptcy.
15   Q    Do you recall when that was?
16   A    I filed bankruptcy two times.  I don't
17 recall the exact dates.
18   Q    Do you recall the years?  The general time
19 frame?
20   A    No.  Not at this time.
21   Q    Has your loan ever become more than 60 days
22 past due?
23   A    Yes.
24   Q    Do you recall when that was?
25   A    No, I don't.  Not at this time.

Page 13

1    Q    Okay.  HSBC Bank filed a foreclosure action
2  against you in the year 2020 due to your failure to
3  make timely payments.  Is that correct?
4    A    In 2020?  It's possible.
5    Q    Do you recall a foreclosure action being
6  filed against you?
7    A    Yes.
8    Q    Do you recall how many payments behind you
9  were at the time?
10   A    No.
11   Q    Did the foreclosure action being filed, did
12 that cause you any kind of stress?
13   A    Not necessarily.  In the beginning, no.
14   Q    It didn't -- did it cause you any anxiety?
15   A    In the beginning, no.
16   Q    When you say "in the beginning," can you
17 elaborate on that?
18   A    I had filed bankruptcy and it was my
19 bankruptcy lawyer that did not file for the
20 modification, which then started the proceeding for
21 the foreclosure.
22        So in the beginning, no, I was not stressed
23 out because I thought the bankruptcy lawyer was taking
24 care of things.
25   Q    Okay.  And when did you determine that that

4 (Pages 10 - 13)

1 had not happened?

2    A    After the bankruptcy was completed.  It was,
3 you know, over with and then that's when I found out
4 when the foreclosure was being filed, that the
5 bankruptcy lawyer never filed the modification.

6        That's when I had to start the modification
7 process.

8    Q    Do you recall a time frame for that?

9    A    It was in 2020.  I don't know the exact
10 dates.  But I started the modification process, if I
11 recall, I think August of 2020.

12    Q    Okay.  And did you have any fear that you
13 were going to lose your home at that time?

14    A    At that time, no.

15    Q    Okay.  And so you said you started the
16 modification process.  Can you walk us through that?

17    A    I filed the paperwork -- like I said, I'm
18 pretty positive it was in august of 2020 -- turned
19 everything in that they needed, the financials, any
20 documents they needed.

21        Was granted the beginning where I think it
22 was, like, you make three payments of the -- regarding
23 the modification and then it's supposed to go through
24 to where the modification is granted and the new
25 paperwork is started.

1        And that's what I had done.  In the
2 meantime, the foreclosure was filed in Richland
3 County -- the courthouse.

4        But the modification was granted, so I
5 started making the payments even though we were
6 dealing with the foreclosure in the Richland County
7 Courts.  But I was still making my modification
8 payments.

9    Q    Okay.  So you were approved -- I'm going to
10 share my screen again.  I'm sorry.  I'm on the wrong
11 page.  So this is Exhibit 4.

12        (Exhibit 4 was marked for
13        identification.)

14    Q    Does this document look familiar to you?

15    A    Yes.

16    Q    Okay.  Do you recall -- I'll say that this
17 is the Approval for the Permanent Modification -- do
18 you recall receiving this document?

19    A    Yes.

20    Q    Do you remember when you received the
21 document?

22    A    It was late November by the time I received
23 it.  If I --

24    Q    Did you -- go ahead.  I'm sorry.  I didn't
25 mean to interrupt you.

1    A    By the time I had received everything, I had
2 asked for an extension.  I don't recall the exact
3 dates.

4        Like I said, we were dealing with the
5 magistrate at the Richland County Courts and I do
6 recall -- like I said, I don't recall the exact dates
7 in front of me.

8        I had asked for an extension so I could
9 speak to a lawyer regarding the terms of the permanent
10 modification.

11    Q    Okay.  So when you received this, you did
12 not -- and further down, there's paperwork that has to
13 be signed and sent back.  You did not immediately sign
14 and send it back, correct?

15    A    I'd ask the courts for -- when we had went
16 to the next court date -- for an extension so that I
17 could speak with a lawyer regarding the terms of the
18 modification.

19    Q    Okay.  The next thing I'm going to show you
20 is Exhibit 5.

21        (Exhibit 5 was marked for
22        identification.)

23    Q    These are emails between you and -- I'm
24 seeing that they're emails between you and Diane
25 Bennett.  I'll let you look through these for a

1 minute, but is this your email address at the top of
2 this document?

3    A    Yes.

4    Q    aruckman419@gmail.com?

5    A    Yes.  I have two different emails but that
6 is one of mine.

7    Q    Okay.  I'll give you a second to look
8 through these emails.  It looks like that on November
9 23rd, you were told you had an extension.  Is that the
10 extension you were discussing?

11    A    Okay.

12    Q    Are you familiar with these emails?

13    A    Yes.

14    Q    Okay.  And you request an extension
15 discussed with a lawyer -- attorney?

16    A    Yes.

17    Q    And it looks like the extension was granted
18 until the 31st of December?

19    A    Yes.

20    Q    And you understood that you had to return
21 the executed documents to PHH by the 31st of December?

22    A    Yes.

23    Q    Okay.  In this top email, December 7th, it
24 says, "Our client has reviewed your counteroffer and
25 it has been rejected."

Page 18

1     What was that counteroffer?  Do you recall?
2     A    I had asked if we could possibly discuss
3 raising the monthly payments to try to get the balloon
4 payment down a little bit so that I was not facing
5 such a large balloon payment.
6         That was one of the suggestions.  And there
7 was another suggestion.  I don't recall the second one
8 but I was just trying to get the balloon payment down
9 so that in 15 years it wasn't so large.
10        And their office -- I forget the gentleman
11 out of the lawyer's office -- says that he had taken
12 both offers to PHH and they refused.
13    Q    When you say "lawyers office," was that
14 through Mr. Dann's office or a different --
15    A    Clunk.  Clunk.  PHH's lawyer who is handling
16 this.  It wasn't Diane Bennett that I had been talking
17 to.  It was a gentleman out of the same office as her.
18    Q    Okay.  Had you spoken with a lawyer at this
19 point?
20    A    I had spoken to a lawyer just to get advice
21 on the loan modification to explain some of the -- the
22 wording and stuff so I understood everything with the
23 balloon payment.  I was not with Dann Law at that
24 time, no.
25    Q    Okay.  And who was that attorney?

Page 19

1         MR. DANN:  Objection.  Go ahead and
2 answer.
3    A    I -- trying to think of his name.
4 Underwood.  Attorney Underwood was his name.
5    Q    And where is he located?
6    A    Here in Mansfield.
7    Q    Okay.  And you made that counteroffer after
8 you had received the approval for the loan mod,
9 correct?
10    A    Yes.  'Cause I was concerned about the
11 balloon payment.
12    Q    Okay.  And then what did you do next after
13 the counteroffer was denied?
14    A    I had signed -- I don't know the exact date,
15 but I went and I had no choice but to sign the papers
16 and send them back -- back in if I wanted to keep my
17 house.
18    Q    And when did that occur?  I know you said
19 you don't know the exact date but --
20    A    Like I said, I -- I don't recall the exact
21 date that I did it.  I went to the bank, had them
22 notarized, and sent them in.  I mailed them in.
23    Q    And do you know what month that was?
24    A    It would've been December 'cause they were
25 due back before December 31st.

Page 20

1    Q    Where -- what bank did you go get them
2 notarized at?
3    A    At Richland Bank.
4    Q    Do you remember what day of the week it was?
5    A    No.
6    Q    What time of day?
7    A    It would've been in the daytime 'cause they
8 close at five.
9    Q    Do you know if you were helped by a man or a
10 woman?
11    A    It would've been a woman.
12    Q    Did you know this woman?  Whoever
13 notarized --
14    A    No.  At the time with -- no.  At the time
15 with COVID, they were not doing things in person.  You
16 had to go through the drive-thru, send your documents
17 through the tube, they'd notarize them, and send them
18 right back.  So I have no idea who did it.
19    Q    Did they ask for any kind of identification?
20    A    Your driver's license.
21    Q    Do you know if they kept any kind of log?
22    A    Each notary kept their own individual log.
23    Q    Have you gone and asked them if they have a
24 log of notarizing this document?
25    A    Yes.  I went to Richland Bank and because

Page 21

1 employees come and go, they said each notary keeps
2 their own log.  The bank themselves do not keep a log
3 on top of the notary logs.
4         We've already tried to figure out which one
5 did it and we have not been able to discover who
6 would've notarized back in December of 2020.
7    Q    Did you keep a copy of that document?
8    A    No.  'Cause at that time I did not realize
9 it was going to come down to this to where I needed a
10 copy of that document.  I have not --
11    Q    Do you have any sort -- do you have any sort
12 of tracking number?
13    A    No.  No.  Like I said, at that time I did
14 not realize it was going to come down to this to where
15 I would need copies of those documents.
16        I have never kept copies before, so I didn't
17 realize I was going to have to have a copy now.
18    Q    And how did you say you sent that back to
19 PHH?
20    A    United States Postal Service.
21    Q    Regular mail?
22    A    Yes.
23    Q    Did you ask for any kind of tracking
24 information?
25    A    No.

6 (Pages 18 - 21)

1  Q   Okay. I'm now showing you what I'm calling
2  Exhibit 6 and these are emails from January 2021.
3          (Exhibit 6 was marked for
4          identification.)
5  Q   I can give you a few minutes to look through
6  these, see if you're familiar with them.
7          MS. WILSON: Mark, does -- can she
8  scroll through them or am I scrolling through them for
9  her?
10         MR. DANN: Which one is it, Sarah? I'm
11 sorry.
12         MS. WILSON: Exhibit 6.
13         MR. DANN: 6? Okay. I'll pull it up
14 for her. So these are emails?
15         MS. WILSON: Emails between Ms. Ruckman
16 and Ms. Bennett.
17         MR. DANN: If you could scroll too,
18 that'll help me.
19         MS. WILSON: Okay.
20 BY MS. WILSON:
21 Q   Have you been able to look at those emails?
22 A   Yes.
23 Q   I -- it's actually on -- I have it up here
24 on the screen. On January 7th it says, "I sent
25 another request for modification approximately three

1  and a half weeks ago." Why did you request another
2  modification?
3  A   I was told that possibly by sending in a
4  request for another modification, that I might get
5  different terms.
6  Q   So were you rejecting the original
7  modification that had been offered to you?
8  A   It wasn't a rejection. I was told I could
9  go ahead and sign and send that one in, but I could
10 also request another modification to where they might
11 offer something different.
12 Q   And were you told that by someone other than
13 your attorney?
14 A   When I called PHH direct.
15 Q   Do you know when you called PHH?
16 A   Obviously, it would've been, I mean, if I
17 sent the paperwork three and a half weeks prior to
18 January 7th, then it would've been three and a half
19 weeks prior to January 7th I would've called PHH, so
20 it would've been sometime in December.
21 Q   Do you recall who you spoke to?
22 A   No. It would've just been calling the
23 customer service number and asking them.
24 Q   So did you submit new information?
25 A   I just submitted the initial paperwork but I

1  never sent the financials in.
2  Q   And how did you -- do you have copies of
3  what you submitted?
4  A   No. Again, at that time I did not realize
5  this was going to be the outcome, so I didn't realize
6  I had to keep copies of things.
7  Q   Okay. I'm now looking at the January 11th
8  email in this grouping and it says at the bottom,
9  "Will you be sending updated documents for me to
10 sign?" What did you mean by that?
11 A   When I was talking to -- I think this one
12 was to Ms. Bennett -- because all the paperwork
13 regarding the modification was all dated in November
14 and if we had had these extensions and this and that,
15 wouldn't they want updated contract paperwork with
16 current dates?
17 Q   Okay. So did you think that the other
18 paperwork was no longer valid?
19 A   Well, this was where we were getting into
20 when they claimed that they had never received the
21 paperwork before the December 31st deadline.
22     And, you know, sending in a new application
23 for modification, we were still discussing that one.
24     And then we were coming up on the -- they
25 didn't receive the first set of modification papers

1  and so that's why I was asking if we need an updated
2  current date.
3  Q   Okay. I'm just scrolling up. So on January
4  12th, you state that you're waiting on a permanent
5  modification. Was that something different than what
6  you said you already sent in?
7  A   I said that these were all regarding the
8  permanent modification paperwork.
9     Like I said, the effective date is, you
10 know, that's why I worded it, you know, it's effective
11 November 1st as the effective date.
12 Q   So you thought that they would send you
13 potentially new paperwork?
14 A   Well, I was asking about the date as being
15 an effective date. You know, when you sign a
16 contract, usually you have the correct dates.
17 Q   And what did you think the correct date
18 should be?
19 A   That's what I was inquiring about. That if
20 I'm resigning documents with a different date compared
21 to what the paperwork is stating as an effective date.
22     That's what I was discussing with her.
23 Q   Okay. And now, if you look at this January
24 12th email from Diane Bennett, she says that if you
25 want to try, you need to sign and notarize the

Page 26

1 documents and send them overnight mail and keeping the
2 tracking information.  Do you see that?
3     A    Mm-hmm.
4     Q    Okay.
5         MR. DANN:  Is that a yes?
6         THE WITNESS:  Yes.
7 BY MS. WILSON:
8     Q    And is that what you did?
9     A    For the second set of notarized documents,
10 yes.
11     Q    Okay.  I'm going to show you what I have as
12 Exhibit 7.
13         (Exhibit 7 was marked for
14         identification.)
15     Q    I'll scroll through this but the important
16 part is, is that your signature?
17     A    Yes.
18     Q    And what's the date on that?
19     A    January 12, 2021.
20     Q    And this is the notary section of the same
21 document?
22     A    Yes.
23     Q    Okay.  And where did you get this notarized?
24     A    Possibly the bank.  I don't recall.
25     Q    And where did you get this paperwork that

Page 27

1 was signed?
2     A    I don't recall at this time.
3     Q    Is it possible that is the original
4 paperwork that was sent to you?
5     A    I don't recall.  I don't know.  I doubt it,
6 I mean, unless I made a copy -- if I downloaded a
7 copy.  I don't know.  I don't know if Diane sent me a
8 new copy.  I don't know.
9     Q    Did you -- throughout this process, did you
10 have access to a printer?
11     A    Do I -- I have three printers in my office
12 at home.
13     Q    Okay.  And how did you send this PHH?  Did
14 you do regular mail or --
15     A    This one, I -- I don't recall if
16 overnighted it or if I did the priority two days.  I'm
17 not sure.  I don't recall.
18     Q    Do you have that tracking information?
19     A    Currently?  No.
20     Q    Did you send it in a way that would have
21 tracking information this time?
22     A    Yes.
23     Q    Did you receive any other information, after
24 you sent this in, that the modification would be
25 implemented?

Page 28

1     A    Could you repeat that?
2     Q    So you had this notarized on January 12th.
3 When did you know how soon after that you sent it to
4 PHH?
5     A    How soon did they receive it?
6     Q    No.  How soon did you send it?
7     A    Within, I mean, probably within 15, 20
8 minutes.  I remember going straight down and having it
9 mailed out.
10     Q    So on the 12th?
11     A    Yeah.
12     Q    And then what did you -- what happened after
13 that?
14     A    I'm pretty positive I notified Diane that I
15 had sent it.
16     Q    Okay.  Now, I'm going to show you what I'll
17 call Exhibit 8.
18         (Exhibit 8 was marked for
19         identification.)
20     Q    It's a letter to you from NewRez dated the
21 14th, so two days letter.  Is this a document you're
22 familiar with?
23     A    No.
24     Q    Do you need a minute to look through it?
25         MR. DANN:  I'm sorry.  What exhibit is

Page 29

1 that?
2         MS. WILSON:  It's just --
3         MR. DANN:  Sarah, I'm sorry.  We're
4 having a hard time hearing you.
5         MS. WILSON:  I'm sorry.  Exhibit 8.
6         MR. DANN:  Okay.  I just want to open
7 the full thing for her.
8         THE WITNESS:  Okay.  I'm familiar with
9 this after reading it through my lawyer but I never
10 personally received this at my home.
11 BY MS. WILSON:
12     Q    Okay.  Is that your name and address on the
13 letter?
14     A    Yes.
15     Q    And does this letter say that your
16 modification was denied?
17     A    Yes.
18     Q    Okay.  So what did you do after you --
19 you're saying you never received this letter?
20     A    No.
21     Q    Okay.  Then what did you do after you sent
22 in the paperwork on the 12th?
23     A    Continued making my payments and then we
24 went to court on January 29th by phone 'cause of
25 COVID.  And on January 29th, the courts were notified

8 (Pages 26 - 29)

Page 30

1 that I had been making all my payments and that the
2 modification went through.
3       And they were waiting on PHH to sign their
4 portion of the document and the courts did not set a
5 new court date and stated that they would just wait
6 for the copy of the permanent modification and then
7 they would dismiss the case.  And that was on January
8 29th.
9    Q   Okay.  And then, had you made a payment
10 between when you sent in the paperwork and that
11 hearing?
12   A   Yep.
13   Q   Okay.  Can you explain the process of how
14 you made those payments to PHH?
15   A   Through Krogers.
16   Q   Okay.  So can you kind of walk me through
17 the process?  Did you, like, take cash to Kroger, did
18 you --
19   A   Debit card.
20   Q   Okay.
21   A   All my payments -- my trial payments and the
22 modification payments, you go to Krogers.  The very
23 first one I made, I told them I needed to pay my
24 mortgage company.
25       They asked what the mortgage company name

Page 31

1 was and I told them.  And pretty much they just pulled
2 up on a screen, you give them your account number and
3 they run it through, and you pay with your debit card
4 and they give you a receipt.
5       And the money is there within twenty-four --
6 well, within 24 hours with Western Union and then
7 within one to two days with CheckFreePay.  They use
8 the same processor to make the payment.
9    Q   Okay.  I'm going to show you Exhibit 9.
10       (Exhibit 9 was marked for
11       identification.)
12   Q   Just so we're all, you know, documenting
13 with what you're just discussing, is Exhibit 9, is
14 this the Kroger receipt that you're discussing?
15   A   Mm-hmm.
16   Q   Okay.
17   MR. DANN:  Is that a yes?
18   THE WITNESS:  Yes.  I'm sorry.
19 BY MS. WILSON:
20   Q   And why did you choose to make your payments
21 through Kroger?
22   A   From the beginning, I was told to use
23 Western Union to make the payments and CheckFreePay is
24 basically a subsidiary of Western Union.
25       And Krogers or Walmart were supposedly the

Page 32

1 only two local to me that could make the payments.
2    Q   And who told you to make payments that way?
3    A   PHH.  It's on their paperwork.
4    Q   And were there any other options for making
5 payments that you're aware of?
6    A   I don't recall on the paperwork.  But that
7 was the main thing, was how to make the payments for
8 the modification.
9    Q   All right.  I'm going to go back to Exhibit
10 4, which is your approval for the loan modification.
11       Is this the paperwork part you were
12 discussing?  This is page 6 of Exhibit 4.
13   A   If I recall, with the trial paperwork there
14 was a different page if I recall.  And with the trial
15 paperwork, that was asking more for the Western Union
16 to be used.
17   Q   Okay.  Is this the paperwork for payment
18 starting for the December?
19   A   Yeah.  But I'm thinking there was a
20 different paper that was recommended with the trial
21 paperwork.
22   Q   Okay.
23   A   Because it was asking more for the Western
24 Union to be used.
25   Q   Okay.  I'm going to go back to Exhibit 9

Page 33

1 that we just talked about.  Now, this is not Western
2 Union, correct?  This payment?
3    A   Nope.
4    Q   It's CheckFreePay?
5    A   Yes.  Which is a subsidiary of Western
6 Union.
7    Q   And how do you know that it's a subsidiary
8 of Western Union?
9    A   Krogers.
10   Q   Okay.
11   A   They use the -- they use the same processor.
12 CheckFreePay is only a $1.50 fee.  Western Union is
13 $10.  When the very first time that I had to make the
14 payment, I wasn't even given the option.
15       I just came in, said I need to pay my
16 mortgage.  They asked who it was with, I said PHH,
17 they pulled it up, ran it through.  I did not even --
18 wasn't even aware that there was a choice.
19       Did it for several months, a payment went
20 through.  And then, like, making payment number 4 or
21 so I was then asked and that's when I said, "Well,
22 what's the difference?"
23       And they said, "Nothing really.  With
24 Western Union, it's there overnight.  With -- or with
25 CheckFreePay, it's there, like, the very next day or

9 (Pages 30 - 33)

1 maybe day number 2."

2     That's when I was told there was a

3 difference.  But since at the time, my payments were

4 going through, there was never an issue, I stayed with

5 CheckFreePay because it was cheaper.

6   Q   Okay.  Did you have any issues with paying

7 through Kroger?

8   A   I didn't, no.

9   Q   Okay.  I'm going to show you Exhibit 10,

10 which is -- this looks like there was a payment that

11 was returned.

12     (Exhibit 10 was marked for

13     identification.)

14   I'll give you a moment.  I don't want to --

15   A   That's -- that's a payment that PHH

16 rejected.

17   Q   Right.  How were you notified of that?

18   A   Krogers called me and told me that they had

19 received an error report and asked me to come in.

20   Q   Okay.  Did they return your payment to you?

21   A   Yes.  First, I contacted Diane Bennett.

22   Q   Okay.  This is -- I'll say this is dated the

23 25th of February.  Were you -- did you get called

24 right away or can you tell me a little bit more of the

25 time frame?

1   A   That Krogers contacted me?

2   Q   Yes.

3   A   As soon as they were notified, they

4 contacted me.

5   Q   Okay.  So then did -- you were contacted and

6 then can you walk me through what happened next?

7   A   As soon as they contacted me and told me

8 that PHH rejected the payment, I then contacted Diane

9 Bennett and asked her why my payment was rejected.

10   Q   Okay.

11   A   And then she -- she told me she would check

12 into it and get back with me.  And then I called

13 Krogers back and told them that I would get back with

14 them as soon as I knew what was going on.

15   Q   Okay.  Now, we're on Exhibit 11.

16     (Exhibit 11 was marked for

17     identification.)

18   Q   I'm going to give you a few minutes to look

19 through these because I believe this is what you were

20 just discussing.

21   These are marked emails between you and

22 Diane Bennett.  If you want to take some time, I can

23 scroll through them or you can.

24     MR. DANN:  Which one is that, Sarah?

25     MS. WILSON:  It's Exhibit 11.  I sent

1 you an updated one this morning.

2     MR. DANN:  Oh, that's the new one.

3 Okay.  It's going to take me a second.

4     THE WITNESS:  Okay.

5     MS. WILSON:  While we're doing that,

6 are you doing okay?  Do you need a break or anything?

7     THE WITNESS:  I'm fine.

8     MS. WILSON:  Okay.

9     MR. DANN:  Okay.  This is the March

10 6th, March 8th email?  Is that right?

11     THE WITNESS:  Yeah.

12     MS. WILSON:  It starts on -- yes.

13     THE WITNESS:  Yeah.

14 BY MS. WILSON:

15   Q   Okay.  You've reviewed these?

16   A   Yes.

17   Q   And you agree these are emails between you

18 and Ms. Bennett?

19   A   Yes.

20   Q   Okay.  It looks like on March 6th, which is

21 the bottom of the first page, you told her that you

22 were notified today by Kroger.

23     Is that -- the notification -- the document

24 I just showed you?  I can show you again.  Exhibit 10.

25   A   Yes.

1   Q   And then Ms. Bennett, on March 8th, told

2 you, you needed to make a payment of 873.93 for the

3 modification to be implemented.

4   A   Yes.

5   Q   And then -- so that was March 8th.  And then

6 on March 23rd, she breaks down the payments that were

7 received and she again states that you need to send

8 873.93, correct?

9   A   Yep.

10   Q   And on the last page, this was actually a

11 few days before that, she again says 873.93, and the

12 funds need to be received by the 25th of March.

13   A   Mm-hmm.

14     MR. DANN:  Is that a yes?

15     THE WITNESS:  Yes.

16 BY MS. WILSON:

17   Q   Okay.  Did you send in 873.93?

18   A   No.

19   Q   And why not?

20   A   'Cause I sent her copies of all the receipts

21 showing that I was current on all my payments and that

22 the only payment that was in question was the one

23 payment that was refused by PHH.

24     And so I went back to Krogers, they refunded

25 that payment that was rejected, and then I turned

Page 38

1 around and resent that one payment and then sent a
2 copy of that receipt to Ms. Bennett.
3      And she had had all the other copies of the
4 receipts to show that I had paid all my payments and
5 was current.
6   Q   So before the 25th in the month of March,
7 you did not send the 873.93?
8   A   No. 'Cause there was only one payment in
9 question which was the one payment that PHH rejected,
10 so I resent that payment.
11   Q   And did you confirm that that was received?
12   A   I don't recall if I -- with Ms. Bennett if
13 it was received. I just -- I sent a copy of the
14 receipt to Ms. Bennett to show that I resent the one
15 payment that PHH rejected.
16   Q   Okay. Did you check with Kroger to see if
17 they had been any -- the payment had been rejected at
18 that point?
19   A   No. 'Cause Krogers would've notified me if
20 there was any other payments that were rejected.
21   Q   Okay. Did Kroger notify you of any other
22 rejected payments after that February?
23   A   No.
24   Q   Did they end up having to reimburse you any
25 other funds?

Page 39

1   A   Yes.
2   Q   And when was that?
3   A   I don't have the exact date. I'm thinking
4 it was July of 2021. I don't have the exact dates in
5 front of me.
6   Q   So there were other payments that were
7 rejected?
8   A   Eventually, it -- it came down to where I
9 did have to go back to Krogers. I don't know what the
10 circumstances was, but it took both law firms being
11 involved, going back and forth, and eventually, I did
12 go to Krogers and did get -- get some of the money
13 back, yes.
14   Q   Do you recall how much money that was?
15   A   I don't have the exact figure in front of me
16 but I'm thinking it was three payments if I recall.
17   Q   And that money was given to you by Kroger,
18 correct?
19   A   Yes.
20   Q   That money did not come to you directly from
21 PHH?
22   A   No.
23   Q   Okay. And how did you -- so you said that
24 Kroger would've let you know if there were rejected
25 payments?

Page 40

1   A   That's how they did the first payment that
2 was rejected. You have a copy of the email.
3   Q   But it turned out they actually were
4 holding -- eventually, you found out they were holding
5 three additional payments?
6   A   It wasn't a question of holding. We -- we
7 don't -- I don't know the circumstances, the policies,
8 procedures.
9      But like I said, it eventually came down to
10 both law firms being involved, going back and forth,
11 and me going to Krogers several times, that eventually
12 we tracked the money down with the help of
13 CheckFreePay.
14      And Krogers did have to reimburse me, like I
15 said, I think it was three -- three of the payments
16 they did refund to me.
17   Q   Okay. And those came from CheckFreePay not
18 Western Union, correct?
19   A   Yes.
20   Q   Okay.
21      MS. WILSON: Can we take a five-minute
22 break? Is that okay with everybody?
23      THE REPORTER: Sure. Going off the
24 record at 11:05 a.m.
25      (Off the record.)

Page 41

1      THE REPORTER: We are back on the
2 record at 11:21 a.m.
3 BY MS. WILSON:
4   Q   Okay. Ms. Ruckman, I just wanted to go back
5 to something that you had said about whether or not
6 you sent that 873.93 in.
7   A   Mm-hmm.
8   Q   What I'm looking at is page 3 of
9 Exhibit 11 --
10   A   Mm-hmm.
11      MR. DANN: Is that a yes?
12      THE WITNESS: Yes.
13 BY MS. WILSON:
14   Q   -- email to Angela Ruckman from Diane
15 Bennett because you had you said that you sent all the
16 receipts and everything in to Ms. Bennett, correct?
17   A   Mm-hmm.
18   Q   This email right here, it looks -- she is
19 breaking down all the payments that were received by
20 PHH, correct?
21   A   Yes.
22   Q   And she'd still said that you owe 873.93?
23   A   Yes.
24   Q   But you did not send that amount in?
25   A   No.

11 (Pages 38 - 41)

Page 42

1    Q   Okay.  I just wanted to confirm that.  Okay.
2  So moving on, we're now going to look at Exhibit 12.
3           (Exhibit 12 was marked for
4           identification.)
5    Q   These are your discover responses --
6  discovery.  Do you all need a few minutes to look
7  through that or is this something you're familiar
8  with?
9    A   Yes.  I'm familiar with it.
10   Q   Okay.  And these are the interrogatory
11 responses that your counsel prepared in this case?
12   A   Yes.
13   Q   And you understand that you had an
14 obligation to present truthful and accurate
15 information?
16   A   Yes.
17   Q   And you did sign the verification page -- I
18 thought it was --
19        MR. DANN:  We'll stipulate --
20        MS. WILSON:  -- but you signed the
21 verification page for these, correct?
22        MR. DANN:  We'll stipulate that she
23 signed the verification page to her discovery.
24        MS. WILSON:  Did you go through all of
25 these responses with your counsel?

Page 43

1    A   I didn't hear you, Ms. Wilson.  What was
2  that?
3    Q   I'm sorry.  And you went through these
4  responses with your counsel before they were sent --
5    A   Yes.  Yes.
6    Q   Okay.  I'm sorry.  Just give me one second.
7  I thought I had the right page.
8        I just want to verify, right here your
9  request for admission Number 1, it says "Admit that
10 you did not make payments in 2021 using Western Union
11 Quick Collect," and you admitted that.  Is that
12 correct?
13   A   Yes.
14   Q   Okay.  Are you aware that you had previously
15 stated in an affidavit, which I'm going to show you,
16 that you did use Western Union Quick Collect for all
17 of your payments?
18   A   I'm not aware.
19   Q   Okay.  Exhibit 13, this is an affidavit that
20 was attached to your complaint.
21        (Exhibit 13 was marked for
22        identification.)
23   Q   I'll give you a minute or two to go through
24 that.  But I was specifically referring to paragraph
25 16 and paragraph 12.

Page 44

1    A   Okay.
2    Q   Would you say that those paragraphs are not
3  correct?
4    A   They're worded incorrectly.
5    Q   Okay.  Is there anything -- when you say --
6  you said they're worded correctly?
7    A   Incorrectly.
8    Q   Incorrectly.  Is there anything else in this
9  affidavit that you think is worded incorrectly?
10   A   Not to my knowledge at this time.
11   Q   Okay.  All right.  What are the damages that
12 you're claiming in this case?
13   A   Emotional and mental stress.
14   Q   Do you have out-of-pocket costs that you're
15 claiming?
16   A   Missing work-related.
17   Q   Can you give more --
18   A   Lawyer -- legal fees.
19   Q   Do you have documents to support those
20 amounts?
21   A   My lawyer has the legal fees to be
22 addressed, obviously.  Time off of work, I can submit
23 that, yes.
24   Q   Yes, please do that.  Have you been making
25 payments to your attorneys?

Page 45

1    A   I have made a payment to my attorney, yes.
2    Q   Just one?
3    A   Yes, at this time.
4    Q   Are you on any kind of payment plan?
5        MR. DANN:  Objection.  Go ahead and
6  answer.
7    A   I can make payments monthly, so I would
8  state yes.
9    Q   How much are you paying or have you paid?
10   A   I don't care to disclose the arrangements
11 between me and my lawyer at this time.
12   Q   Are you requesting legal fees in this
13 matter?
14   A   On behalf of my lawyer, yes.
15   Q   We need documentation to support the request
16 for --
17   A   My lawyer has that.
18        MR. DANN:  Sarah, we can send you the
19 fee agreements.  Do you want that?
20        MS. WILSON:  I just need to know the
21 damages.  We can update that.
22 BY MS. WILSON:
23   Q   What other -- okay -- out-of-pocket costs
24 besides your legal fees?  What are those?  What else?
25   A   Time missed from work.

12 (Pages 42 - 45)

Page 46

1    Q    How much time have you missed from work?
2    A    Roughly combined since last March to now
3  would probably be equivalent if I added it all up --
4  like I said, I have a lot of it wrote down at home --
5  combined I would say probably looking about 40 hours'
6  worth of work.
7         And I make 21.76 an hour.  So that would be
8  work-related.
9    Q    And why did you miss that time?
10   A    Between emails, phone calls, having to track
11 down money, having to make myself available for my
12 lawyers, et cetera, regarding this issue.
13   Q    Okay.  When you say "track down money," can
14 you elaborate on that?
15   A    Spent a lot of time between lawyers and
16 having to go to Krogers trying to figure out where
17 missing payments were.
18   Q    And who held that money that you were --
19   A    Krogers did but PHH for many months.  I
20 mean, Ms. Bennett should be testifying to that that
21 she didn't even know that PHH had rejected other
22 payments.
23        Nobody knew until it came down, I think,
24 until June or July during the summertime, that they
25 had been rejecting payments all along and did not

Page 47

1  notify anybody.
2    Q    Okay.  Your -- can you explain your
3  emotional damages?
4    A    My emotional damage was a lot of stress, not
5  knowing if I was going to have a home.  Day to day not
6  knowing am I going to have a home?
7         That home, you know, I finished raising my
8  children in that house.  You know, I have pets in that
9  house.  That's all I have is my home.
10        I think anybody would be stressed knowing
11 are you going to lose your home?  That home was --
12   Q    And when did that -- I'm sorry.
13   A    When did the stress that?  The stress
14 started immediately come, I would say, March is really
15 when the stress started.
16        Thinking that you have a modification that
17 their lawyers, you know, told on January 29th that
18 everything was a done deal, we were just waiting on
19 PHH to finish signing the modification.
20        And then you find out in March that all of a
21 sudden, payments are being rejected but you're holding
22 on to receipts that state that you're paid in full and
23 you're paying like you're supposed to.
24        And now, all of a sudden, you're facing a
25 foreclosure that was filed.  That's when the stress

Page 48

1  started.
2    Q    Okay.  So foreclosure was filed a year
3  before that, correct?
4    A    But I also had a modification that I did the
5  trial payments and was making the regular payments and
6  was doing everything that I was supposed to be doing
7  and the courts in Richland County were being told by
8  PHH's law firm that I was doing everything that the
9  modification asked me to do.
10        And I was paying like I was supposed to, had
11 my receipts, and it wasn't until March that the first
12 payment that I was notified was being rejected.
13 January 29th, they told the courts that it was a done
14 deal, that the modification went through, they were
15 waiting for PHH to sign.
16        So to my knowledge, come January 29th, the
17 modification was done.  We were just waiting for PHH
18 to sign and my house was safe.  The foreclosure
19 would've been dismissed.  It was March that we found
20 out that first payment was rejected and everything was
21 going downhill.
22        That's when my stress started.  That's when
23 the emotional distress started.
24   Q    Okay.  And it's your understanding that it
25 was a done deal even without PHH signing?

Page 49

1    A    That's what they told the courts on January
2  29th.  January 29th is when they told them.
3    Q    And who's "they?"
4    A    The law firm representing PHH when we had
5  the court -- our last court hearing with the
6  magistrate.
7    Q    Okay.  Have you been treated with any
8  doctors or medical professionals for the emotional
9  distress you're claiming in this action?
10   A    Yes.
11   Q    And who have you sought treatment with?
12   A    Dr. Molina was one of my doctors.
13   Q    And how long have you been treated?  Been
14 treated by Dr. Molina?
15   A    I've been seeing Dr. Molina for -- well, I
16 was seeing him for about three years.  And then I'm no
17 longer seeing him.  I now have a trauma therapist that
18 I see her once a week.
19        And then my primary care doctor, he's taken
20 over the depression part and the PTSD.  And I see my
21 trauma therapist, she handles the rest, the PTSD and
22 anxiety.
23   Q    Okay.  And who's your trauma therapist?
24   A    Her first name's Holly.  You should have all
25 that information.

13 (Pages 46 - 49)

Page 50

1    Q    And how long have you been seeing Holly?
2    A    Two months now.
3    Q    Okay.  And when you say "PTSD," what is
4  that?  Have you been diagnosed with PTSD?
5    A    Yes.
6    Q    When were you diagnosed with PTSD?
7    A    When?
8    Q    Yes.
9    A    About four years ago.
10    Q    So before this matter?  Before this --
11    A    Yes.  And my PTSD and anxiety was somewhat
12  under control, and when this all started this past
13  March, it made everything a lot worse.
14    Q    Okay.  Were you experiencing stress in
15  October 2020?
16    A    Everybody experiences stress.
17    Q    Were you hospitalized in October 2020?
18    A    Yes.
19    Q    And what were you hospitalized for?
20    A    I became extremely sick over the summertime.
21  It started roughly in the end of May going into June
22  of 2020.
23    Q    Okay.  And did they determine the cause of
24  that?
25    A    In May and June, I started having severe

Page 51

1  edema in my legs, and then I ended up starting to lose
2  weight.  And then I had two leg wounds that were
3  leaking water due to the edema and then my weight
4  started spiraling downhill to the point I was roughly
5  80 pounds.
6         And all my doctors kept saying that I was
7  okay.  I went to the ER twice and was sent home.  A
8  well-check was even done on me and I was sent home.
9  And then I made it to another emergency room which
10  then sent me down to OSU.
11         And at that point, I was 77 pounds.  And
12  they did different MRIs, different tests on me.  I had
13  broken ribs where I'd fallen twice.  And at that
14  point, they determined my body was not absorbing fat
15  or nutrients and that's when I was hospitalized for
16  roughly three and a half weeks.
17    Q    Are they -- was there any mention of any
18  kind of anxiety or stress at that time?
19    A    Diagnosed, you mean, down there at OSU?
20    Q    Yes.
21    A    I will have a permanent diagnosis of PTSD,
22  anxiety, and depression for the rest of my life.
23    Q    And when were you diagnosed with depression?
24    A    I think I was -- it was all diagnosed
25  roughly four years ago.  I should've been diagnosed

Page 52

1  February 7, 2013, but I didn't seek out help until
2  about four years ago.  Four or five years ago.
3    Q    Okay.  You said that was for anxiety,
4  depression, and PTSD?
5    A    Yes.
6    Q    But in this matter, you're claiming
7  emotional stress as a result of action by PHH?
8    A    I'm claiming that what their actions did
9  made this -- my situation with my medical condition --
10  a lot worse.
11         My medical condition was pretty much stable,
12  livable, doable, tolerable, until their actions what
13  took place.
14    Q    Okay.  Are you taking any medications for
15  this?
16    A    Yes.
17    Q    Have you taken any medications for this in
18  the past?
19    A    Yes.
20    Q    Okay.  I'm sorry.  By past, meaning, pre-
21  2021?
22    A    Yeah.  Yes.
23    Q    Has your medication changed?
24    A    Yes.
25    Q    Okay.  What -- can you explain the changes

Page 53

1  to me?
2    A    I no longer take four or five medications
3  for it.  I now only take two as of three months ago.
4  Roughly, I think, three or four months ago.
5    Q    And what symptoms do attribute to PHH?
6    A    An increase in my anxiety and stress.  Daily
7  living with PTSD and anxiety, you tend to isolate more
8  because of the stress/anxiety levels.
9    Q    Were you still able to work?
10    A    My work hours went down.  It's hard to be
11  around people when your stress level is extremely
12  high.
13    Q    Have you had high-stress levels in the past;
14  meaning pre-2021?
15    A    I have but not to that degree.
16    Q    Are there any other out-of-pocket direct
17  expenses that you're attributing to PHH?
18    A    No.
19         MS. WILSON:  All right.  That's all I
20  have.  Ashley, were you going to ask questions?
21  Sorry, you're on mute.
22         MS. MUELLER:  Can I have a couple
23  minutes and then I'll come back and just ask a few
24  questions?
25         THE REPORTER:  Sure thing.

14 (Pages 50 - 53)

Page 54

1          MS. WILSON:  Yes.  If we could go off
2   the record for a couple minutes?
3          THE REPORTER:  Sure thing.  Going off
4   the record at 11:39.
5          (Off the record.)
6          THE REPORTER:  We are back on the
7   record at 11:44 a.m.
8          EXAMINATION
9   BY MS. MUELLER:
10  Q    Good morning, Ms. Ruckman.  My name is
11  Ashley Mueller and I'm an attorney that is
12  representing the law firm, Clunk Hoose.  I just wanted
13  to ask a few additional questions.
14          This shouldn't take too long at all.  The
15  same rules apply for the questions that I ask as
16  applied when attorney Wilson was asking you earlier.
17  Do you understand that?
18  A    Yes.
19  Q    Can you explain to me what damages you are
20  alleging against Clunk Hoose?
21  A    It would be the same damages of emotional
22  stress and mental stress.
23  Q    And can you explain to me where that stems
24  from?
25  A    It would be from Diane Bennett and her

Page 55

1   emails.  She seemed to be taking charge and taking the
2   rein being the communicator between your office and
3   PHH.  She was the one that was answering all the
4   questions.
5          You know, she was the one that was stating
6   how much money was owed and what I should and should
7   not be doing, what paperwork was received/not
8   received, and, like I said, she seemed to be the one
9   representing your office and PHH.
10  Q    Can you tell me what led to your -- the
11  monetary default on the note and mortgage in July of
12  2019?
13  A    I started the bankruptcy proceedings with my
14  lawyer and at that time she is the one that had told
15  me to hold off making payments because she was going
16  to start a loan modification process within my
17  bankruptcy, so I had trusted my lawyer at that time
18  that was doing my bankruptcy.
19  Q    So your lawyer advised you to stop making
20  payments?
21  A    Yes.  At that time because she was going to
22  be doing a loan modification.
23  Q    Were you having problems making your monthly
24  payments at that time?
25  A    At that specific time, not 100 percent

Page 56

1   making the payments.  There was some financial issues
2   going on due to some medical stuff going on and some
3   work things.
4          That's when I reached out to her regarding
5   doing a bankruptcy.  And that's when she had told me
6   to, you know, not make payments to the credit cards,
7   the loan company, the mortgage company, that she was
8   going to start the bankruptcy and work things out with
9   everybody, which would put me in a better financial
10  situation.
11          It was then a little bit later on down the
12  road that I found out that she did not do everything
13  that she was supposed to be doing.
14  Q    So you had a lot of financial obligations
15  around that time that you were trying to handle?
16  A    It was not a lot of financial obligation.
17  It was just a few that I needed to handle and take
18  care of, and I needed her assistance.
19  Q    Was the decision to file a bankruptcy
20  stressful at all for you?
21  A    No.  It was actually more of a relief.
22  Q    So were you having stress prior to the
23  decision to file the bankruptcy?
24  A    Not really stressful.  It was just more just
25  knowing things that, you know, had some situations in

Page 57

1   life and knowing that there was resolutions and a way
2   to -- a way to answer and take care of some matters in
3   life.
4          I mean, people go through things in life and
5   I was fortunate to find a solution.
6   Q    I know that at the first deposition you said
7   you worked for Medicaid, correct?
8   A    I'm a subcontract for the state of Ohio and
9   I get paid by Medicaid.  I don't work directly for
10  Medicaid.
11  Q    Okay.  And you have worked in that job since
12  2007?
13  A    Yes.
14  Q    And is that a stressful job?
15  A    No.
16  Q    Have you had physical interactions with some
17  of the people that you work with or for?
18  A    I have to.  That's my job.
19  Q    So part of your job is getting into a
20  physical fight with the people that you work for?
21  A    No.
22  Q    Do you recall sending an email to Diane
23  Bennett at my office stating that you had gone to the
24  hospital because you were physically assaulted by one
25  of your clients?

15 (Pages 54 - 57)

Page 58

1    A   It's the way you're wording it.  That I "get
2 into a fight with my clients" is not accurate.  We
3 don't fight.
4        Yes, if you have a client that has
5 behaviors, it is possible that you can be assaulted
6 but it's not a fight.
7        You have to understand the population of
8 people that I work with.
9    Q   So you have been physically assaulted by
10 your clients while you're working?
11   A   I think since 2007, I would say I probably
12 have been maybe hit or maybe kicked to the point that
13 I've had to seek medical treatment maybe three times
14 since 2007.
15   Q   And is that stressful?
16   A   No.  Because that's part of the training
17 with this job that I have to do.  It's expected.  We
18 know that this is a possibility even if they don't
19 have a behavior add-on with their ISPs.
20        We know that any of these type of people can
21 be potentially capable of doing it.  Just kind of like
22 you know what you're walking into.
23   Q   Okay.  I want to jump over to your
24 hospitalization in October 2020.
25   A   Okay.

Page 59

1    Q   Were you voluntarily admitted to that
2 hospital in October 2020?
3    A   Voluntarily?  When I was first taken down, I
4 don't know the exact date.
5        I think I was there six days on one side of
6 the hospital and then I had to  be -- I was basically
7 forced onto the other side and then probated because I
8 had asked to come closer back to Mansfield, so I could
9 be closer to my grandson so that he could come see me
10 because they felt that I was not taking my medical
11 serious enough, that I needed to stay to be admitted.
12       So they forced me to stay another, like, two
13 and a half weeks.  But what they didn't realize is
14 that I was the one that took my medical seriously
15 because nobody here in Mansfield from June to October
16 took my medical seriously.
17       That's why I dropped to 77 pounds.  And but
18 I made it to a different ER that actually got me the
19 help, so -- but the courts didn't see it that way.
20 But I did come home about two and a half weeks later
21 once I got my weight up.
22   Q   Were your doctors concerned about anything
23 else besides your weight while you were in the
24 hospital?
25   A   My mental health because I wanted to come

Page 60

1 home.  They didn't feel that I was taking my medical
2 seriously enough.
3    Q   So the doctors were concerned about your
4 mental health?
5    A   Because I -- they -- their excuse to the
6 court was that I was not taking my medical serious
7 enough.
8        That I was not comprehending the
9 dangerousness of me having to stay and continue
10 gaining weight under medical care even though I asked
11 to even come home to a nursing home, intermediate care
12 facility, something closer because I wanted to be near
13 my grandson.
14   Q   Were they concerned about your PTSD when you
15 were there?
16   A   Not in general.  I mean, it was never
17 discussed.  I mean, we didn't have groups or anything.
18 It was pretty much you stayed on this one side, you
19 ate, slept, whatever you wanted to do.
20       I mean, that was it.  If they were so
21 concerned about something you think that you would
22 have individual counseling or something, but we
23 didn't.
24   Q   Was being involuntarily admitted to the
25 hospital in October 2020 a stressful situation for

Page 61

1 you?
2    A   Stressful to the point -- only because I
3 wanted to be near my grandson.  And I was -- what?  An
4 hour and 12 minutes away.
5    Q   Okay.  So it was a stressful situation then,
6 correct?
7    A   Not being -- not being in the hospital but
8 being away from my grandson.  I think we need to
9 clarify that.
10   Q   Did your doctor show concern that you were
11 not able to care for yourself in October 2020?
12   A   No.  In the first, probably, four or five
13 days, yes.  Because I had two leaking leg wounds, was
14 77 pounds, and extremely weak, yes.  And broken ribs
15 and a bruised tailbone.
16   Q   And what led to all of that?  Your physical
17 injuries?
18   A   From falling.
19   Q   How did you fall?
20   A   As we discussed earlier, when it all started
21 in June when I had two leaking leg wounds, the edema,
22 and my weight started going down.
23       And I had, like, four doctors telling me
24 there was nothing wrong with me plus the ER.
25   Q   Okay.  So are you saying that you fell

16 (Pages 58 - 61)

Page 62

1 because you were weak?
2    A    Yes.  When you start losing weight and you
3 have severe edema and two leaking leg wounds, yes.
4    Q    And the doctors determined that you were
5 losing all of this weight because your body wasn't
6 able to absorb protein.  Is that correct?
7    A    What I was told from OSU was that my body
8 had stopped absorbing fat, minerals, vitamins, et
9 cetera.
10    Q    While you were in the hospital in October
11 2020, were you sleeping well?
12    A    Off and on.
13    Q    And did you have chronic pain when you were
14 admitted in the hospital during that time?
15    A    Yes.
16    Q    Did you have difficulty sleeping because of
17 that pain?
18    A    Yes.
19    Q    Do you still have difficulty sleeping
20 because of that pain?
21    A    I wouldn't say just, I mean, that pain.  I
22 do have pain in certain areas of my body but I
23 wouldn't say that pain.  My ribs have healed, my
24 tailbone has healed, my knee has healed.
25         I mean, I do have other medical issues but

Page 63

1 the broken bones and stuff have healed.
2    Q    So are you in any chronic pain right now?
3    A    Yes, I have pain.
4    Q    And so some of this, maybe new pain, does
5 that affect your sleeping habits?
6    A    Not necessarily.  There's different things
7 that affect my sleeping habits.
8    Q    Okay.  Can you explain what would affect
9 your sleep?
10    A    Anything could affect my sleep, from the
11 temperature of the house, what I've ate, noise
12 outside.  I mean, there's different things that can
13 affect your sleep.
14    Q    So at this time, what kind of stress are you
15 feeling due to the emails that you had with Diane back
16 in -- starting in July 2020 through, I think, March
17 2021?
18    A    I mean, I don't have any stress currently
19 today regarding those emails.  I mean, that's
20 something that took place back then.  I mean, the
21 modification has went through, so I know my house is
22 safe, that I own my house.
23         So to sit here and ask if I stress today
24 over an email that took place last year -- the emails
25 are, I mean, in my opinion, correct and honest.  What

Page 64

1 I wrote was the honest truth.  So I can't say that I
2 have stress today over an email that took place a year
3 ago.
4    Q    Did the stress -- was the stress alleviated
5 once the modification went through in --
6    A    Well, of course.
7    Q    -- in July?
8    A    Once the modification went through, yes, the
9 stress was alleviated.
10    Q    Are there any other damages that you're
11 claiming against Clunk Hoose that we haven't talked
12 about today?
13    A    That would then be relayed to my attorney.
14 Like I said, you know, he's the one that knows the
15 laws, the ordinances, you know, federal and state.
16         Those things would come to him.  And any
17 legal fees, that would then come on to my legal team.
18    Q    Well, I'm asking you what damages you have
19 suffered.  Not what your attorney has suffered.
20    A    Oh.  What I've suffered would be anything
21 work-related, costs, and mental and emotional.
22         MS. MUELLER:  I don't have any more
23 questions.
24         MR. DANN:  No questions for the
25 plaintiff.

Page 65

1         MS. WILSON:  I have no additional
2 questions.
3         MR. DANN:  We'll read.
4         THE REPORTER:  Thank you very much.
5 You'll read.  Ms. Wilson, would you like a transcript
6 on this?
7         MS. WILSON:  Yes, please.
8         THE REPORTER:  Ten days good?
9         MS. WILSON:  Yes.
10         THE REPORTER:  Thank you.  Mr. Dann,
11 transcript?
12         MR. DANN:  No.
13         THE REPORTER:  Thank you.  No order.
14 Anybody else?  Everybody else covered?  We're going
15 off the record at 12:01.
16         (Signature reserved.)
17         (Whereupon, at 12:01 p.m., the
18         proceeding was concluded.)
19
20
21
22
23
24
25

17 (Pages 62 - 65)

Page 66

1          CERTIFICATE OF DEPOSITION OFFICER
2          I, MICHAEL R. RENNILLO, the officer before
3   whom the foregoing proceedings were taken, do hereby
4   certify that any witness(es) in the foregoing
5   proceedings, prior to testifying, were duly sworn;
6   that the proceedings were recorded by me and
7   thereafter reduced to typewriting by a qualified
8   transcriptionist; that said digital audio recording of
9   said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in the
16  outcome of this action.

17          MICHAEL R. RENNILLO
18          Notary Public in and for the
19              State of Ohio
20
21  [X] Review of the transcript was requested.
22
23
24
25

Page 67

1           CERTIFICATE OF TRANSCRIBER
2           I, CHRISTIAN ATCHLEY, do hereby certify that
3   this transcript was prepared from the digital audio
4   recording of the foregoing proceeding, that said
5   transcript is a true and accurate record of the
6   proceedings to the best of my knowledge, skills, and
7   ability; that I am neither counsel for, related to,
8   nor employed by any of the parties to the action in
9   which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13
14          CHRISTIAN ATCHLEY
15
16
17
18
19
20
21
22
23
24
25

Page 68

1               Veritext Legal Solutions
                   1100 Superior Ave
2                     Suite 1820
                  Cleveland, Ohio 44114
3                 Phone: 216-523-1313
4   January 17, 2022
5   To: Marc Dann, Esq.
6   Case Name: Ruckman, Angela L. v.
           PHH Mortgage Corporation, etc., et al.
7
    Veritext Reference Number: 5011406
8
    Witness:  Angela Ruckman      Deposition Date:  1/4/2022
9
    Dear Sir/Madam:
10
    The deposition transcript taken in the above-referenced
11
    matter, with the reading and signing having not been
12
    expressly waived, has been completed and is available
13
    for review and signature.  Please call our office to
14
    make arrangements for a convenient location to
15
    accomplish this or if you prefer a certified transcript
16
    can be purchased.
17
    If the errata is not returned within thirty days of your
18
    receipt of this letter, the reading and signing will be
19
    deemed waived.
20
21  Sincerely,
22
23  Production Department
24
25  NO NOTARY REQUIRED IN CA

Page 69

1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 5011406
3   CASE NAME: Ruckman, Angela L. v.
           PHH Mortgage Corporation, etc., et al.
    DATE OF DEPOSITION: 1/4/2022
4   WITNESS' NAME: Angela Ruckman
5   In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7   I have made no changes to the testimony
    as transcribed by the court reporter.
8   _____
9   Date         Angela Ruckman
10  Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13  They signed the foregoing Sworn
            Statement; and
14  Their execution of this Statement is of
            their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18  _____
    Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25

18 (Pages 66 - 69)

Page 70

1       DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 5011406
3    CASE NAME: Ruckman, Angela L. v.
         PHH Mortgage Corporation, etc., et al.
     DATE OF DEPOSITION: 1/4/2022
4    WITNESS' NAME: Angela Ruckman
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date       Angela Ruckman
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21  I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
      Notary Public
24
       _____
25    Commission Expiration Date

---

Page 71

1       ERRATA SHEET
     VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 5011406
3  PAGE/LINE(S) /     CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
  _____    _____
20 Date       Angela Ruckman
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23    _____
      Notary Public
24
    _____
25  Commission Expiration Date

19 (Pages 70 - 71)

**[00923 - additional]**

| 0 |
|---|
| **00923**  1:8 |
| **01/07/21**  3:14 |
| **01/12/21**  3:14 |
| **03/08/21**  3:20 |

| 1 |
|---|
| **1**  3:8 43:9 |
| **1.50**  33:12 |
| **1/4/2022**  68:8 69:3 |
| 70:3 |
| **10**  3:10,19 33:13 |
| 34:9,12 36:24 |
| **100**  12:9 55:25 |
| **10:14**  1:15 4:5 |
| **10:18**  8:11 |
| **10:19**  8:14 |
| **11**  3:20 35:15,16 |
| 35:25 41:9 |
| **1100**  68:1 |
| **116**  1:17 4:9 |
| **11:05**  40:24 |
| **11:21**  41:2 |
| **11:39**  54:4 |
| **11:44**  54:7 |
| **11th**  24:7 |
| **12**  3:21 11:5,12 |
| 26:19 42:2,3 |
| 43:25 61:4 |
| **12/07/20**  3:13 |
| **12:01**  65:15,17 |
| **12th**  25:4,24 28:2 |
| 28:10 29:22 |
| **13**  3:22 43:19,21 |
| **14**  3:23 |
| **14th**  28:21 |
| **15**  3:12 18:9 28:7 |
| **15000**  2:6 |
| **16**  3:13 12:8 43:25 |
| **17**  68:4 |

| 1700  2:15 |
|---|
| **1820**  68:2 |
| **1st**  25:11 |

| 2 |
|---|
| **2**  3:9 8:2,5,17 34:1 |
| **20**  28:7 69:16 |
| 70:22 71:22 |
| **2007**  57:12 58:11 |
| 58:14 |
| **201**  2:15 |
| **2013**  52:1 |
| **2019**  55:12 |
| **2020**  13:2,4 14:9 |
| 14:11,18 21:6 |
| 50:15,17,22 58:24 |
| 59:2 60:25 61:11 |
| 62:11 63:16 |
| **2021**  9:2 22:2 |
| 26:19 39:4 43:10 |
| 52:21 53:14 63:17 |
| **2022**  1:14 4:8 68:4 |
| **21.76**  46:7 |
| **21018**  66:16 |
| **216-523-1313**  68:3 |
| **22**  3:14 |
| **23rd**  17:9 37:6 |
| **24**  31:6 |
| **25th**  34:23 37:12 |
| 38:6 |
| **26**  3:15 |
| **26979**  67:14 |
| **28**  3:17 |
| **29th**  29:24,25 30:8 |
| 47:17 48:13,16 |
| 49:2,2 |

| 3 |
|---|
| **3**  3:10 10:7,8,20 |
| 41:8 |
| **31**  3:18 |

| 31st  17:18,21 |
|---|
| 19:25 24:21 |
| **34**  3:19 |
| **35**  3:20 |

| 4 |
|---|
| **4**  1:14 3:11 4:8 9:2 |
| 15:11,12 32:10,12 |
| 33:20 |
| **40**  46:5 |
| **42**  3:21 |
| **43**  3:22 |
| **44107**  2:7 |
| **44114**  68:2 |
| **44224**  2:23 |
| **44902**  1:18 4:10 |
| **4500**  2:22 |
| **45202**  2:16 |

| 5 |
|---|
| **5**  3:3,13 16:20,21 |
| **5011406**  1:20 68:7 |
| 69:2 70:2 71:2 |
| **54**  3:4 |
| **5:21**  1:8 |

| 6 |
|---|
| **6**  3:14 22:2,3,12,13 |
| 32:12 |
| **60**  12:21 |
| **6th**  36:10,20 |

| 7 |
|---|
| **7**  3:15 26:12,13 |
| 52:1 |
| **77**  51:11 59:17 |
| 61:14 |
| **7th**  17:23 22:24 |
| 23:18,19 |

| 8 |
|---|
| **8**  3:9,16 28:17,18 |
| 29:5 |

| 80  51:5 |
|---|
| **873.93**  37:2,8,11 |
| 37:17 38:7 41:6 |
| 41:22 |
| **8th**  36:10 37:1,5 |

| 9 |
|---|
| **9**  3:18 31:9,10,13 |
| 32:25 |

| a |
|---|
| **a.m.**  1:15 4:5 8:14 |
| 40:24 41:2 54:7 |
| **ability**  66:10 67:7 |
| **able**  6:9,11 21:5 |
| 22:21 53:9 61:11 |
| 62:6 |
| **absent**  4:13 |
| **absorb**  62:6 |
| **absorbing**  51:14 |
| 62:8 |
| **access**  27:10 |
| **accomplish**  68:15 |
| **account**  3:19 31:2 |
| **accuracy**  9:1 |
| **accurate**  9:7,11 |
| 42:14 58:2 66:9 |
| 67:5 |
| **acknowledge** |
| 69:11 70:16 |
| **acknowledgeme...** |
| 4:12 |
| **act**  69:14 70:20 |
| **action**  13:1,5,11 |
| 49:9 52:7 66:12 |
| 66:16 67:8,12 |
| **actions**  52:8,12 |
| **add**  58:19 |
| **added**  46:3 |
| **additional**  40:5 |
| 54:13 65:1 |

**additionally** 4:13
**address** 17:1
  29:12
**addressed** 44:22
**administer** 4:12
**admission** 43:9
**admit** 43:9
**admitted** 43:11
  59:1,11 60:24
  62:14
**advice** 18:20
**advised** 55:19
**affect** 63:5,7,8,10
  63:13
**affidavit** 3:22
  43:15,19 44:9
**affixed** 69:15
  70:21
**ago** 6:1 23:1 50:9
  51:25 52:2,2 53:3
  53:4 64:3
**agree** 4:15 36:17
**agreement** 3:15
**agreements** 45:19
**ahead** 15:24 19:1
  23:9 45:5
**al** 1:9 68:6 69:3
  70:3
**alcohol** 6:14
**alleging** 54:20
**alleviated** 64:4,9
**amount** 41:24
**amounts** 44:20
**amueller** 2:24
**angela** 1:5,13 2:2
  4:6,7 5:3,9,18
  41:14 68:6,8 69:3
  69:4,9 70:3,4,13
  71:20
**answer** 6:6 7:22
  11:24 19:2 45:6

57:2
**answering** 6:21
  55:3
**anxiety** 13:14
  49:22 50:11 51:18
  51:22 52:3 53:6,7
  53:8
**anybody** 7:3 47:1
  47:10 65:14
**appear** 69:11
  70:15
**appearing** 5:1
**appended** 70:11
  70:18
**applicable** 4:19
**application** 24:22
**applied** 54:16
**apply** 54:15
**approval** 3:11
  15:17 19:8 32:10
**approved** 15:9
**approximately**
  22:25
**areas** 62:22
**arrangements**
  45:10 68:14
**aruckman419**
  17:4
**ashley** 2:20 5:5
  53:20 54:11
**asked** 6:21 7:23
  16:2,8 18:2 20:23
  30:25 33:16,21
  34:19 35:9 48:9
  59:8 60:10
**asking** 23:23 25:1
  25:14 32:15,23
  54:16 64:18
**assaulted** 57:24
  58:5,9

**assigned** 4:3
**assignment** 69:2
  70:2 71:2
**assistance** 3:17
  56:18
**atchley** 67:2,15
**ate** 60:19 63:11
**attached** 3:25
  43:20 70:7
**attendance** 5:1
**attorney** 10:1
  17:15 18:25 19:4
  23:13 45:1 54:11
  54:16 64:13,19
  66:14 67:10
**attorneys** 44:25
**attribute** 53:5
**attributing** 53:17
**audio** 66:8 67:3
**august** 14:11,18
**authorize** 70:11
**authorized** 4:11
**available** 46:11
  68:12
**ave** 68:1
**avenue** 1:17 2:6
  4:9
**aware** 32:5 33:18
  43:14,18

**b**

**b** 1:8 2:10 3:6
**back** 8:13 16:13
  16:14 19:16,16,25
  20:18 21:6,18
  32:9,25 35:12,13
  35:13 37:24 39:9
  39:11,13 40:10
  41:1,4 53:23 54:6
  59:8 63:15,20
**balloon** 18:3,5,8
  18:23 19:11

**bank** 13:1 19:21
  20:1,3,25 21:2
  26:24
**bankruptcy** 12:9
  12:14,16 13:18,19
  13:23 14:2,5
  55:13,17,18 56:5,8
  56:19,23
**basically** 31:24
  59:6
**beginning** 5:2
  13:13,15,16,22
  14:21 31:22
**behalf** 2:2,10,19
  45:14
**behavior** 58:19
**behaviors** 58:5
**believe** 35:19
**bennett** 16:25
  18:16 22:16 24:12
  25:24 34:21 35:9
  35:22 36:18 37:1
  38:2,12,14 41:15
  41:16 46:20 54:25
  57:23
**best** 66:10 67:6
**better** 10:5 56:9
**bit** 18:4 34:24
  56:11
**blank** 2:14
**blankrome.com**
  2:17
**body** 51:14 62:5,7
  62:22
**bones** 63:1
**bottom** 24:8 36:21
**boulevard** 2:22
**break** 6:22 36:6
  40:22
**breaking** 41:19

**breaks**  6:19 37:6
**bring**  7:8
**bringing**  7:14
**broken**  51:13
  61:14 63:1
**bruised**  61:15

**c**

**c**  2:1 4:1
**ca**  68:25
**call**  10:7 28:17
  68:13
**called**  5:19 23:14
  23:15,19 34:18,23
  35:12
**calling**  22:1 23:22
**calls**  46:10
**capable**  58:21
**card**  30:19 31:3
**cards**  56:6
**care**  13:24 45:10
  49:19 56:18 57:2
  60:10,11 61:11
**carefully**  9:4
**case**  1:7 7:15 30:7
  42:11 44:12 68:6
  69:3 70:3
**cash**  30:17
**cause**  13:12,14
  19:10,24 20:7
  21:8 29:24 37:20
  38:8,19 50:23
**center**  2:15
**certain**  62:22
**certificate**  66:1
  67:1 70:11
**certification**  69:1
  70:1
**certified**  4:16
  68:15
**certify**  66:4 67:2

**cetera**  46:12 62:9
**change**  70:8 71:3
**changed**  52:23
**changes**  52:25
  69:7 70:7,9
**charge**  55:1
**cheaper**  34:5
**check**  35:11 38:16
  51:8
**checkfreepay**  31:7
  31:23 33:4,12,25
  34:5 40:13,17
**children**  47:8
**choice**  19:15 33:18
**choose**  31:20
**christian**  67:2,15
**chronic**  62:13 63:2
**cincinnati**  2:16
**circumstances**
  39:10 40:7
**civil**  69:5 70:5
**claimed**  24:20
**claiming**  10:11
  44:12,15 49:9
  52:6,8 64:11
**claims**  7:14
**clarify**  61:9
**clear**  7:13 8:4
**cleveland**  2:7 68:2
**client**  17:24 58:4
**clients**  57:25 58:2
  58:10
**close**  20:8
**closer**  59:8,9 60:12
**clunk**  2:19,21 5:5
  18:15,15 54:12,20
  64:11
**clunkhoose.com**
  2:24
**collect**  43:11,16

**combined**  46:2,5
**come**  10:24,25
  21:1,9,14 34:19
  39:20 47:14 48:16
  53:23 59:8,9,20,25
  60:11 64:16,17
**coming**  24:24
**commission**  69:19
  70:25 71:25
**communicator**
  55:2
**company**  2:21
  30:24,25 56:7,7
**compared**  25:20
**complaint**  3:9 8:2
  8:18 9:14 43:20
**completed**  14:2
  68:12
**comprehending**
  60:8
**concern**  61:10
**concerned**  19:10
  59:22 60:3,14,21
**conclude**  6:3
**concluded**  65:18
**condition**  52:9,11
**confirm**  38:11
  42:1
**constitute**  4:23
**contacted**  34:21
  35:1,4,5,7,8
**continue**  60:9
**continued**  7:25
  29:23
**contract**  24:15
  25:16
**control**  50:12
**convenience**  7:24
**convenient**  68:14
**copies**  21:15,16
  24:2,6 37:20 38:3

**copy**  10:10 21:7
  21:10,17 27:6,7,8
  30:6 38:2,13 40:2
**corporation**  1:8
  2:10 4:8 68:6 69:3
  70:3
**correct**  11:15 13:3
  16:14 19:9 25:16
  25:17 33:2 37:8
  39:18 40:18 41:16
  41:20 42:21 43:12
  44:3 48:3 57:7
  61:6 62:6 63:25
**corrections**  9:13
  70:17
**correctly**  44:6
**costs**  44:14 45:23
  64:21
**counsel**  9:22 42:11
  42:25 43:4 66:11
  66:14 67:7,10
**counseling**  60:22
**counteroffer**
  17:24 18:1 19:7
  19:13
**county**  15:3,6 16:5
  48:7 69:10 70:15
**couple**  6:1 7:12
  53:22 54:2
**course**  64:6
**court**  1:1 9:2,8
  16:16 29:24 30:5
  49:5,5 60:6 69:7
**courthouse**  2:22
  15:3
**courts**  15:7 16:5
  16:15 29:25 30:4
  48:7,13 49:1
  59:19
**covered**  65:14

**covid**  20:15 29:25
**credit**  56:6
**current**  24:16 25:2
  37:21 38:5
**currently**  9:17
  27:19 63:18
**customer**  23:23
**cv**  1:8

**d**

**d**  1:8 2:10 3:1 4:1
**daily**  53:6
**damage**  47:4
**damages**  3:9 8:18
  44:11 45:21 47:3
  54:19,21 64:10,18
**dan**  2:4 5:9
**dangerousness**
  60:9
**dann**  2:3,5 5:11,12
  5:12 7:16,21
  10:13,17,20,22
  11:17,20,24 12:6
  18:23 19:1 22:10
  22:13,17 26:5
  28:25 29:3,6
  31:17 35:24 36:2
  36:9 37:14 41:11
  42:19,22 45:5,18
  64:24 65:3,10,12
  68:5
**dann's**  18:14
**dannlaw.com**  2:8
**date**  1:14 16:16
  19:14,19,21 25:2,9
  25:11,14,15,17,20
  25:21 26:18 30:5
  39:3 59:4 68:8
  69:3,9,19 70:3,13
  70:25 71:20,25
**dated**  24:13 28:20
  34:22

**dates**  12:17 14:10
  16:3,6 24:16
  25:16 39:4
**day**  20:4,6 33:25
  34:1 47:5,5 69:16
  70:22 71:22
**days**  12:21 27:16
  28:21 31:7 37:11
  59:5 61:13 65:8
  68:17
**daytime**  20:7
**deadline**  24:21
**deal**  47:18 48:14
  48:25
**dealing**  15:6 16:4
**dear**  68:9
**debit**  30:19 31:3
**december**  17:18
  17:21,23 19:24,25
  21:6 23:20 24:21
  32:18
**decision**  3:16
  56:19,23
**deed**  69:14 70:20
**deemed**  68:19
**default**  55:11
**defendant**  2:10,19
**defendants**  1:10
**degree**  53:15
**denied**  19:13
  29:16
**department**  68:23
**deposition**  1:12
  3:8 4:6,21 6:2,20
  6:25 7:2,6,25 8:4
  8:20 57:6 66:1
  68:8,10 69:1,3
  70:1,3
**depression**  49:20
  51:22,23 52:4

**description**  3:7
**determine**  13:25
  50:23
**determined**  51:14
  62:4
**diagnosed**  50:4,6
  51:19,23,24,25
**diagnosis**  51:21
**diane**  16:24 18:16
  25:24 27:7 28:14
  34:21 35:8,22
  41:14 54:25 57:22
  63:15
**difference**  33:22
  34:3
**different**  17:5
  18:14 23:5,11
  25:5,20 32:14,20
  51:12,12 59:18
  63:6,12
**difficulty**  62:16,19
**digital**  66:8 67:3
**direct**  23:14 53:16
**directly**  39:20
  57:9
**disclose**  45:10
**discover**  21:5 42:5
**discovery**  3:21
  42:6,23
**discuss**  7:2 8:19
  18:2
**discussed**  17:15
  60:17 61:20
**discussing**  17:10
  24:23 25:22 31:13
  31:14 32:12 35:20
**dismiss**  30:7
**dismissed**  48:19
**distress**  48:23 49:9
**district**  1:1,2

**division**  1:3
**doable**  52:12
**doctor**  49:19
  61:10
**doctors**  49:8,12
  51:6 59:22 60:3
  61:23 62:4
**document**  8:20,24
  9:1,11,20,23 10:14
  10:18 11:6,9
  15:14,18,21 17:2
  20:24 21:7,10
  26:21 28:21 30:4
  36:23
**documentation**
  45:15
**documenting**
  31:12
**documents**  7:5,8
  14:20 17:21 20:16
  21:15 24:9 25:20
  26:1,9 44:19
**doing**  7:23 20:15
  36:5,6 48:6,6,8
  55:7,18,22 56:5,13
  58:21
**doubt**  27:5
**downhill**  48:21
  51:4
**downloaded**  27:6
**dr**  49:12,14,15
**draft**  9:14
**drive**  20:16
**driver's**  20:20
**dropped**  59:17
**drugs**  6:13
**due**  12:22 13:2
  19:25 51:3 56:2
  63:15
**duly**  5:19 66:5

**duplicative** 7:12

**e**

**e** 2:1,1 3:1,6 4:1,1
**earlier** 54:16
61:20
**east** 2:15
**eastern** 1:3
**edema** 51:1,3
61:21 62:3
**edits** 9:13
**effective** 25:9,10
25:11,15,21
**elaborate** 13:17
46:14
**email** 3:13,20 17:1
17:23 24:8 25:24
36:10 40:2 41:14
41:18 57:22 63:24
64:2
**emails** 3:14 16:23
16:24 17:5,8,12
22:2,14,15,21
35:21 36:17 46:10
55:1 63:15,19,24
**emergency** 51:9
**emotional** 44:13
47:3,4 48:23 49:8
52:7 54:21 64:21
**employed** 66:11
66:14 67:8,11
**employee** 66:13
67:10
**employees** 21:1
**ended** 8:20 51:1
**enough's** 7:24
**entered** 70:9
**entire** 69:5 70:5
**equivalent** 46:3
**er** 51:7 59:18
61:24

**errata** 68:17 70:7
70:10,18 71:1
**error** 3:19 34:19
**es** 66:4
**esq** 68:5
**esquire** 2:3,4,12
2:13,20
**et** 1:9 46:12 62:8
68:6 69:3 70:3
**eventually** 39:8,11
40:4,9,11
**everybody** 40:22
50:16 56:9 65:14
**evidentiary** 4:20
**exact** 12:17 14:9
16:2,6 19:14,19,20
39:3,4,15 59:4
**examination** 3:2
5:23 54:8
**examined** 5:21
**excuse** 5:7 60:5
**executed** 17:21
70:10
**execution** 69:14
70:19
**exhibit** 3:8,9,10,11
3:13,14,15,16,18
3:19,20,21,22,23
8:2,5,17 10:7,8,20
15:11,12 16:20,21
22:2,3,12 26:12,13
28:17,18,25 29:5
31:9,10,13 32:9,12
32:25 34:9,12
35:15,16,25 36:24
41:9 42:2,3 43:19
43:21
**exhibits** 3:25
**expected** 58:17
**expenses** 53:17

**experiences** 50:16
**experiencing**
50:14
**expiration** 69:19
70:25 71:25
**explain** 18:21
30:13 47:2 52:25
54:19,23 63:8
**expressly** 68:12
**extension** 16:2,8
16:16 17:9,10,14
17:17
**extensions** 24:14
**extremely** 50:20
53:11 61:14

**f**

**facility** 60:12
**facing** 18:4 47:24
**facts** 9:10,22,25
**failure** 13:2
**fall** 61:19
**fallen** 51:13
**falling** 61:18
**familiar** 8:21
15:14 17:12 22:6
28:22 29:8 42:7,9
**fat** 51:14 62:8
**fear** 14:12
**february** 34:23
38:22 52:1
**federal** 8:2 10:2
64:15
**fee** 33:12 45:19
**feel** 60:1
**feeling** 63:15
**fees** 44:18,21
45:12,24 64:17
**fell** 61:25
**felt** 59:10
**fifth** 2:15

**fight** 57:20 58:2,3
58:6
**figure** 21:4 39:15
46:16
**file** 12:9,14 13:19
56:19,23
**filed** 9:2,14 12:16
13:1,6,11,18 14:4
14:5,17 15:2
47:25 48:2
**financial** 56:1,9,14
56:16
**financially** 66:15
67:11
**financials** 14:19
24:1
**find** 47:20 57:5
**fine** 36:7
**finish** 6:6,21 47:19
**finished** 47:7
**firm** 2:5 48:8 49:4
54:12
**firms** 39:10 40:10
**first** 5:19 7:12,20
24:25 30:23 33:13
34:21 36:21 40:1
48:11,20 49:24
57:6 59:3 61:12
**five** 20:8 40:21
52:2 53:2 61:12
**follows** 5:21
**forced** 59:7,12
**foreclosure** 13:1,5
13:11,21 14:4
15:2,6 47:25 48:2
48:18
**foregoing** 66:3,4
67:4 69:13 70:18
**forget** 18:10
**forth** 9:10,23
39:11 40:10

**fortunate** 57:5
**found** 14:3 40:4
  48:19 56:12
**four** 31:5 50:9
  51:25 52:2,2 53:2
  53:4 61:12,23
**frame** 12:19 14:8
  34:25
**free** 69:14 70:20
**front** 11:11 16:7
  39:5,15
**full** 10:14,18 29:7
  47:22
**funds** 37:12 38:25
**further** 16:12
  66:13 67:9

**g**

**g** 4:1
**gaining** 60:10
**general** 12:18
  60:16
**gentleman** 18:10
  18:17
**getting** 24:19
  57:19
**give** 17:7 22:5 31:2
  31:4 34:14 35:18
  43:6,23 44:17
**given** 33:14 39:17
**gmail.com** 17:4
**go** 7:16 8:1,8
  14:23 15:24 19:1
  20:1,16 21:1 23:9
  30:22 32:9,25
  39:9,12 41:4
  42:24 43:23 45:5
  46:16 54:1 57:4
**going** 6:2 7:11,21
  8:10 10:6,17,24
  14:13 15:9 16:19
  21:9,14,17 24:5

26:11 28:8,16
  31:9 32:9,25 34:4
  34:9 35:14,18
  36:3 39:11 40:10
  40:11,23 42:2
  43:15 47:5,6,11
  48:21 50:21 53:20
  54:3 55:15,21
  56:2,2,8 61:22
  65:14
**good** 4:2 5:25
  54:10 65:8
**grandson** 59:9
  60:13 61:3,8
**granted** 14:21,24
  15:4 17:17
**ground** 6:4
**grouping** 24:8
**groups** 60:17

**h**

**h** 3:6
**habits** 63:5,7
**half** 23:1,17,18
  51:16 59:13,20
**hand** 5:15
**handle** 56:15,17
**handles** 49:21
**handling** 18:15
**happened** 14:1
  28:12 35:6
**hard** 29:4 53:10
**healed** 62:23,24,24
  63:1
**health** 59:25 60:4
**hear** 43:1
**hearing** 5:13 29:4
  30:11 49:5
**held** 46:18
**help** 22:18 40:12
  52:1 59:19

**helped** 20:9
**hereto** 66:15 67:11
**high** 53:12,13
**hit** 58:12
**hmm** 26:3 31:15
  37:13 41:7,10,17
**hold** 55:15
**holding** 40:4,4,6
  47:21
**holiday** 4:9
**holly** 49:24 50:1
**home** 14:13 27:12
  29:10 46:4 47:5,6
  47:7,9,11,11 51:7
  51:8 59:20 60:1
  60:11,11
**honest** 63:25 64:1
**hoose** 2:19,21 5:6
  54:12,20 64:11
**hopefully** 6:3
**hospital** 57:24
  59:2,6,24 60:25
  61:7 62:10,14
**hospitalization**
  58:24
**hospitalized** 50:17
  50:19 51:15
**hour** 46:7 61:4
**hours** 31:6 46:5
  53:10
**house** 12:7 19:17
  47:8,9 48:18
  63:11,21,22
**hsbc** 13:1

**i**

**idea** 20:18
**identification** 8:6
  10:9 15:13 16:22
  20:19 22:4 26:14
  28:19 31:11 34:13
  35:17 42:4 43:22

**identify** 5:1
**immediately** 16:13
  47:14
**implemented**
  27:25 37:3
**important** 26:15
**incorporated**
  70:12
**incorrect** 9:17
**incorrectly** 44:4,7
  44:8,9
**increase** 53:6
**individual** 20:22
  60:22
**influence** 6:13
**information** 9:8
  21:24 23:24 26:2
  27:18,21,23 42:15
  49:25
**initial** 23:25
**injuries** 61:17
**inn** 4:9
**inquiring** 25:19
**intended** 4:18
**interactions** 57:16
**interested** 66:15
  67:12
**intermediate**
  60:11
**interrogatory**
  3:23 42:10
**interrupt** 15:25
**introduced** 11:6
**involuntarily**
  60:24
**involved** 39:11
  40:10
**ipad** 10:18
**isolate** 53:7
**isps** 58:19

**issue** 34:4 46:12
**issues** 34:6 56:1
  62:25

**j**

**january** 1:14 4:8
  22:2,24 23:18,19
  24:7 25:3,23
  26:19 28:2 29:24
  29:25 30:7 47:17
  48:13,16 49:1,2
  68:4
**job** 1:20 57:11,14
  57:18,19 58:17
**john** 2:13 5:7
**jra** 1:9
**july** 39:4 46:24
  55:11 63:16 64:7
**jump** 7:11 58:23
**june** 46:24 50:21
  50:25 59:15 61:21

**k**

**keep** 19:16 21:2,7
  24:6
**keeping** 26:1
**keeps** 21:1
**kept** 20:21,22
  21:16 51:6
**kicked** 58:12
**kind** 13:12 20:19
  20:21 21:23 30:16
  45:4 51:18 58:21
  63:14
**knee** 62:24
**knew** 35:14 46:23
**know** 6:20 10:4
  12:9 14:3,9 19:14
  19:18,19,23 20:9
  20:12,21 23:15
  24:22 25:10,10,15
  27:5,7,7,8 28:3

31:12 33:7 39:9
  39:24 40:7 45:20
  46:21 47:7,8,17
  55:5 56:6,25 57:6
  58:18,20,22 59:4
  63:21 64:14,15
**knowing** 47:5,6,10
  56:25 57:1
**knowledge** 9:18
  10:1 44:10 48:16
  66:10 67:6
**knows** 64:14
**kroger** 3:18 30:17
  31:14,21 34:7
  36:22 38:16,21
  39:17,24
**krogers** 30:15,22
  31:25 33:9 34:18
  35:1,13 37:24
  38:19 39:9,12
  40:11,14 46:16,19

**l**

**l** 1:5 2:2 4:7 68:6
  69:3 70:3
**labeled** 8:2
**large** 18:5,9
**late** 15:22
**law** 2:5 10:4 18:23
  39:10 40:10 48:8
  49:4 54:12
**laws** 4:20 64:15
**lawyer** 13:19,23
  14:5 16:9,17
  17:15 18:15,18,20
  29:9 44:18,21
  45:11,14,17 55:14
  55:17,19
**lawyer's** 18:11
**lawyers** 18:13
  46:12,15 47:17

**leaking** 51:3 61:13
  61:21 62:3
**led** 55:10 61:16
**leg** 51:2 61:13,21
  62:3
**legal** 44:18,21
  45:12,24 64:17,17
  68:1 71:1
**legs** 51:1
**letter** 28:20,21
  29:13,15,19 68:18
**level** 53:11
**levels** 53:8,13
**license** 20:20
**life** 51:22 57:1,3,4
**line** 70:7 71:3
**listed** 70:7,17
**listing** 70:7
**little** 7:12 18:4
  34:24 56:11
**livable** 52:12
**living** 53:7
**llp** 2:14
**loan** 3:15 12:21
  18:21 19:8 32:10
  55:16,22 56:7
**local** 32:1
**located** 19:5
**location** 1:16
  68:14
**log** 20:21,22,24
  21:2,2
**logs** 21:3
**long** 49:13 50:1
  54:14
**longer** 24:18 49:17
  53:2
**look** 15:14 16:25
  17:7 22:5,21
  25:23 28:24 35:18
  42:2,6

**looking** 11:5 24:7
  41:8 46:5
**looks** 11:10 17:8
  17:17 34:10 36:20
  41:18
**lose** 14:13 47:11
  51:1
**losing** 62:2,5
**lot** 46:4,15 47:4
  50:13 52:10 56:14
  56:16
**lpa** 2:19

**m**

**madam** 68:9
**madison** 2:6
**magistrate** 16:5
  49:6
**mail** 21:21 26:1
  27:14
**mailed** 19:22 28:9
**main** 32:7
**making** 12:11 15:5
  15:7 29:23 30:1
  32:4 33:20 44:24
  48:5 55:15,19,23
  56:1
**man** 20:9
**manner** 4:21
**mansfield** 1:18 4:9
  19:6 59:8,15
**marc** 2:3 5:12 68:5
**march** 36:9,10,20
  37:1,5,6,12 38:6
  46:2 47:14,20
  48:11,19 50:13
  63:16
**mark** 22:7
**marked** 8:5 10:8
  15:12 16:21 22:3
  26:13 28:18 31:10
  34:12 35:16,21

[marked - offered]

42:3 43:21
**matter**  4:7 45:13
  50:10 52:6 68:11
**matters**  57:2
**mdann**  2:8
**mean**  12:7,14
  15:25 23:16 24:10
  27:6 28:7 46:20
  51:19 57:4 60:16
  60:17,20 62:21,25
  63:12,18,19,20,25
**meaning**  52:20
  53:14
**means**  4:22
**medicaid**  57:7,9
  57:10
**medical**  49:8 52:9
  52:11 56:2 58:13
  59:10,14,16 60:1,6
  60:10 62:25
**medication**  52:23
**medications**  52:14
  52:17 53:2
**mental**  44:13
  54:22 59:25 60:4
  64:21
**mentally**  6:11
**mention**  51:17
**michael**  1:19 4:3
  66:2,17
**midwest**  71:1
**mine**  17:6
**minerals**  62:8
**minute**  10:16 17:1
  28:24 40:21 43:23
**minutes**  22:5 28:8
  35:18 42:6 53:23
  54:2 61:4
**missed**  12:10
  45:25 46:1

**missing**  44:16
  46:17
**mm**  26:3 31:15
  37:13 41:7,10,17
**mod**  19:8
**modification**  3:12
  3:15 13:20 14:5,6
  14:10,16,23,24
  15:4,7,17 16:10,18
  18:21 22:25 23:2
  23:4,7,10 24:13,23
  24:25 25:5,8
  27:24 29:16 30:2
  30:6,22 32:8,10
  37:3 47:16,19
  48:4,9,14,17 55:16
  55:22 63:21 64:5
  64:8
**molina**  49:12,14
  49:15
**moment**  34:14
**monetary**  55:11
**money**  31:5 39:12
  39:14,17,20 40:12
  46:11,13,18 55:6
**month**  19:23 38:6
**monthly**  11:15,19
  18:3 45:7 55:23
**months**  33:19
  46:19 50:2 53:3,4
**morning**  4:2 5:25
  36:1 54:10
**mortgage**  1:8,9
  2:10,11 3:10,17
  4:8 10:11 11:7,10
  11:14,19,25 12:2,5
  30:24,25 33:16
  55:11 56:7 68:6
  69:3 70:3
**moving**  42:2

**mris**  51:12
**mueller**  2:20 3:4
  5:5,5 53:22 54:9
  54:11 64:22
**mute**  53:21

**n**

**n**  2:1 3:1,8,23 4:1
**name**  4:2 5:25
  19:3,4 29:12
  30:25 54:10 68:6
  69:3,4,15 70:3,4
  70:21
**name's**  49:24
**near**  60:12 61:3
**necessarily**  13:13
  63:6
**necessary**  8:8
**need**  6:6 11:22
  21:15 25:1,25
  28:24 33:15 36:6
  37:7,12 42:6
  45:15,20 61:8
**needed**  14:19,20
  21:9 30:23 37:2
  56:17,18 59:11
**neither**  66:11 67:7
**never**  14:5 21:16
  24:1,20 29:9,19
  34:4 60:16
**new**  14:24 23:24
  24:22 25:13 27:8
  30:5 36:2 63:4
**newrez**  28:20
**noise**  63:11
**nope**  33:3
**northern**  1:2
**notarize**  20:17
  25:25
**notarized**  19:22
  20:2,13 21:6 26:9
  26:23 28:2

**notarizing**  20:24
**notary**  1:19 4:11
  20:22 21:1,3
  26:20 66:18 68:25
  69:10,18 70:15,23
  71:23
**note**  55:11
**notice**  3:8
**notification**  36:23
**notified**  28:14
  29:25 34:17 35:3
  36:22 38:19 48:12
**notify**  38:21 47:1
**november**  15:22
  17:8 24:13 25:11
**number**  21:12
  23:23 31:2 33:20
  34:1 43:9 68:7
**numbers**  70:7
**nursing**  60:11
**nutrients**  51:15

**o**

**o**  4:1
**oaths**  4:12
**object**  7:21
**objected**  11:22
**objection**  4:13
  5:14 11:17,20
  12:6 19:1 45:5
**obligation**  9:7
  42:14 56:16
**obligations**  56:14
**obviously**  23:16
  44:22
**occur**  19:18
**october**  50:15,17
  58:24 59:2,15
  60:25 61:11 62:10
**offer**  23:11
**offered**  23:7

**offers** 18:12
**office** 18:10,11,13
  18:14,17 27:11
  55:2,9 57:23
  68:13
**officer** 66:1,2
**official** 69:15
  70:21
**oh** 1:18 2:7,16,23
  11:2 36:2 64:20
**ohio** 1:2 4:10,12
  57:8 66:19 68:2
**okay** 7:2,11 8:1,23
  10:6,18,19,22 11:2
  11:5,11,14 13:1,25
  14:12,15 15:9,16
  16:11,19 17:7,11
  17:14,23 18:18,25
  19:7,12 21:7 22:1
  22:13,19 24:7,17
  25:3,23 26:4,11,23
  27:13 28:16 29:6
  29:8,12,18,21 30:9
  30:13,16,20 31:9
  31:16 32:17,22,25
  33:10 34:6,9,20,22
  35:5,10,15 36:3,4
  36:6,8,9,15,20
  37:17 38:16,21
  39:23 40:17,20,22
  41:4 42:1,1,10
  43:6,14,19 44:1,5
  44:11 45:23 46:13
  47:2 48:2,24 49:7
  49:23 50:3,14,23
  51:7 52:3,14,20,25
  57:11 58:23,25
  61:5,25 63:8
**once** 49:18 59:21
  64:5,8

**open** 29:6
**opinion** 63:25
**option** 33:14
**options** 32:4
**order** 65:13
**ordinances** 10:2
  64:15
**original** 11:10
  23:6 27:3
**osu** 51:10,19 62:7
**outcome** 24:5
  66:16 67:12
**outside** 63:12
**overnight** 26:1
  33:24
**overnighted** 27:16
**owe** 41:22
**owed** 55:6

## p

**p** 2:1,1 4:1
**p.m.** 65:17
**page** 3:2,7 6:5
  11:5,12 15:11
  32:12,14 36:21
  37:10 41:8 42:17
  42:21,23 43:7
  70:7 71:3
**paid** 38:4 45:9
  47:22 57:9
**pain** 62:13,17,20
  62:21,22,23 63:2,3
  63:4
**paisley** 2:21
**paper** 32:20
**papers** 19:15
  24:25
**paperwork** 14:17
  14:25 16:12 23:17
  23:25 24:12,15,18
  24:21 25:8,13,21
  26:25 27:4 29:22

30:10 32:3,6,11,13
  32:15,17,21 55:7
**paragraph** 43:24
  43:25
**paragraphs** 9:16
  44:2
**park** 1:17 4:9
**part** 26:16 32:11
  49:20 57:19 58:16
  70:9
**parties** 4:14 66:12
  66:14 67:8,11
**pay** 30:23 31:3
  33:15
**paying** 34:6 45:9
  47:23 48:10
**payment** 11:15
  18:4,5,8,23 19:11
  30:9 31:8 32:17
  33:2,14,19,20
  34:10,15,20 35:8,9
  37:2,22,23,25 38:1
  38:8,9,10,15,17
  40:1 45:1,4 48:12
  48:20
**payments** 11:18
  11:25 12:1,4,12
  13:3,8 14:22 15:5
  15:8 18:3 29:23
  30:1,14,21,21,22
  31:20,23 32:1,2,5
  32:7 34:3 37:6,21
  38:4,20,22 39:6,16
  39:25 40:5,15
  41:19 43:10,17
  44:25 45:7 46:17
  46:22,25 47:21
  48:5,5 55:15,20,24
  56:1,6
**people** 53:11 57:4
  57:17,20 58:8,20

**percent** 12:9 55:25
**permanent** 3:11
  15:17 16:9 25:4,8
  30:6 51:21
**permitted** 4:18
**person** 20:15
**personally** 29:10
  69:11 70:15
**pets** 47:8
**phh** 1:8,9 2:10,11
  4:8 5:4,8 7:14
  17:21 18:12 21:19
  23:14,15,19 27:13
  28:4 30:3,14 32:3
  33:16 34:15 35:8
  37:23 38:9,15
  39:21 41:20 46:19
  46:21 47:19 48:15
  48:17,25 49:4
  52:7 53:5,17 55:3
  55:9 68:6 69:3
  70:3
**phh's** 18:15 48:8
**phone** 29:24 46:10
  68:3
**physical** 57:16,20
  61:16
**physically** 6:9
  57:24 58:9
**place** 52:13 63:20
  63:24 64:2
**plaintiff** 1:6 2:2
  5:12 64:25
**plan** 45:4
**please** 5:1,15 6:5
  7:25 8:10 10:16
  44:24 65:7 68:13
**plus** 61:24
**pnc** 2:15
**pocket** 44:14
  45:23 53:16

**point** 18:19 38:18
51:4,11,14 58:12
61:2
**policies** 40:7
**population** 58:7
**portion** 30:4
**positive** 14:18
28:14
**possibility** 58:18
**possible** 13:4 27:3
58:5
**possibly** 18:2 23:3
26:24
**postal** 21:20
**potentially** 25:13
58:21
**pounds** 51:5,11
59:17 61:14
**pre** 52:20 53:14
**prefer** 68:15
**prepare** 6:24
**prepared** 42:11
67:3
**present** 9:7 42:14
**pretty** 14:18 28:14
31:1 52:11 60:18
**prevent** 6:16
**previously** 43:14
**primary** 49:19
**printer** 27:10
**printers** 27:11
**prior** 23:17,19
56:22 66:5
**priority** 27:16
**probably** 28:7
46:3,5 58:11
61:12
**probated** 59:7
**problems** 10:23
55:23

**procedural** 4:19
**procedure** 69:5
70:5
**procedures** 40:8
**proceeding** 1:16
4:4,17 13:20
65:18 67:4
**proceedings** 55:13
66:3,5,6,9 67:6
**process** 14:7,10,16
27:9 30:13,17
55:16
**processor** 31:8
33:11
**produced** 4:16
**production** 68:23
**professionals** 49:8
**protein** 62:6
**ptsd** 49:20,21 50:3
50:4,6,11 51:21
52:4 53:7 60:14
**public** 1:19 66:18
69:10,18 70:15,23
71:23
**pull** 10:17 22:13
**pulled** 31:1 33:17
**pulling** 10:13
**purchased** 68:16
**purpose** 12:13
**put** 56:9

**q**

**qualified** 66:7
**question** 6:21
12:13 37:22 38:9
40:6
**questions** 7:12,20
7:22 53:20,24
54:13,15 55:4
64:23,24 65:2
**quick** 43:11,16

**r**

**r** 1:19 2:1 4:1 66:2
66:17
**raise** 5:15
**raising** 18:3 47:7
**ran** 33:17
**reached** 56:4
**read** 65:3,5 69:5,6
69:12 70:5,6,17
**reading** 29:9
68:11,18
**realize** 21:8,14,17
24:4,5 59:13
**really** 33:23 47:14
56:24
**reason** 6:16 70:8
71:3
**recall** 12:11,15,17
12:18,24 13:5,8
14:8,11 15:16,18
16:2,6,6 18:1,7
19:20 23:21 26:24
27:2,5,15,17 32:6
32:13,14 38:12
39:14,16 57:22
**receipt** 3:18 31:4
31:14 38:2,14
68:18
**receipts** 37:20
38:4 41:16 47:22
48:11
**receive** 24:25
27:23 28:5
**received** 15:20,22
16:1,11 19:8
24:20 29:10,19
34:19 37:7,12
38:11,13 41:19
55:7,8
**receiving** 15:18

**recognize** 10:12
11:8
**recommended**
32:20
**record** 4:4,5,14
5:2 7:13,19 8:4,8
8:11,12,14 40:24
40:25 41:2 54:2,4
54:5,7 65:15 66:9
67:5 70:9
**recorded** 4:21
66:6
**recording** 4:16
66:8 67:4
**reduced** 66:7
**reference** 68:7
69:2 70:2
**referenced** 68:10
69:11 70:15
**referring** 43:24
**refund** 40:16
**refunded** 37:24
**refused** 18:12
37:23
**regarding** 14:22
16:9,17 24:13
25:7 46:12 56:4
63:19
**regular** 21:21
27:14 48:5
**reimburse** 38:24
40:14
**rein** 55:2
**reiterate** 6:4
**rejected** 17:25
34:16 35:8,9
37:25 38:9,15,17
38:20,22 39:7,24
40:2 46:21 47:21
48:12,20

**rejecting** 23:6
  46:25
**rejection** 23:8
**related** 44:16 46:8
  64:21 66:11 67:7
**relative** 66:13
  67:10
**relayed** 64:13
**relief** 56:21
**rely** 9:22
**remember** 15:20
  20:4 28:8
**reminder** 6:19
  11:21
**remote** 1:16
**remotely** 5:1
**rennillo** 1:19 4:3
  66:2,17
**repeat** 28:1
**report** 3:19 34:19
**reported** 1:19
**reporter** 4:2,3
  5:11,13,22 8:10,13
  40:23 41:1 53:25
  54:3,6 65:4,8,10
  65:13 69:7
**representing** 49:4
  54:12 55:9
**request** 3:16 17:14
  22:25 23:1,4,10
  43:9 45:15 70:9
  70:11
**requested** 66:21
**requesting** 45:12
**required** 68:25
**resent** 38:1,10,14
**reserved** 65:16
**resigning** 25:20
**resolutions** 57:1
**respond** 11:22

**responses** 3:21,23
  6:7 42:5,11,25
  43:4
**rest** 49:21 51:22
**result** 52:7
**return** 17:20
  34:20
**returned** 34:11
  68:17
**review** 6:24 7:5
  9:1,4 10:16 66:21
  68:13 69:1 70:1
**reviewed** 17:24
  36:15
**reviewing** 9:19
**ribs** 51:13 61:14
  62:23
**richland** 15:2,6
  16:5 20:3,25 48:7
**right** 5:15 7:11
  8:16 20:18 32:9
  34:17,24 36:10
  41:18 43:7,8
  44:11 53:19 63:2
**road** 56:12
**rome** 2:14
**room** 51:9
**roughly** 46:2
  50:21 51:4,16,25
  53:4
**ruckman** 1:5,13
  2:2 4:7,7 5:3,3,10
  5:15,18,25 8:16
  22:15 41:4,14
  54:10 68:6,8 69:3
  69:4,9 70:3,4,13
  71:20
**rules** 4:20 6:4,7
  54:15 69:5 70:5
**run** 31:3

**S**

**s** 2:1 3:6 4:1 70:8,8
  71:3
**safe** 48:18 63:22
**sarah** 2:12 5:4 6:1
  22:10 29:3 35:24
  45:18
**sarah.wilson** 2:17
**saying** 11:6 29:19
  51:6 61:25
**says** 17:24 18:11
  22:24 24:8 25:24
  37:11 43:9
**screen** 8:7,16
  15:10 22:24 31:2
**scroll** 10:23,25
  11:3 22:8,17
  26:15 35:23
**scrolling** 22:8 25:3
**seal** 69:15 70:21
**second** 8:9 17:7
  18:7 26:9 36:3
  43:6
**section** 26:20
**see** 22:6 26:2
  38:16 49:18,20
  59:9,19
**seeing** 16:24 49:15
  49:16,17 50:1
**seek** 52:1 58:13
**seen** 8:23,23
**send** 16:14 19:16
  20:16,17 23:9
  25:12 26:1 27:13
  27:20 28:6 37:7
  37:17 38:7 41:24
  45:18
**sending** 23:3 24:9
  24:22 57:22
**sent** 16:13 19:22
  21:18 22:24 23:17

24:1 25:6 27:4,7
  27:24 28:3,15
  29:21 30:10 35:25
  37:20 38:1,13
  41:6,15 43:4 51:7
  51:8,10
**serious** 59:11 60:6
**seriously** 59:14,16
  60:2
**service** 21:20
  23:23
**servicing** 1:9 2:11
**set** 9:10,22 24:25
  26:9 30:4
**severe** 50:25 62:3
**share** 8:7 15:10
**sharing** 8:16
**she'd** 41:22
**sheet** 70:7,10,18
  71:1
**should've** 51:25
**show** 10:6 16:19
  26:11 28:16 31:9
  34:9 36:24 38:4
  38:14 43:15 61:10
**showed** 36:24
**showing** 22:1
  37:21
**sick** 50:20
**side** 59:5,7 60:18
**sign** 16:13 19:15
  23:9 24:10 25:15
  25:25 30:3 42:17
  48:15,18
**signature** 11:11
  26:16 65:16 66:16
  67:14 68:13
**signed** 16:13 19:14
  27:1 42:20,23
  69:13 70:18

| | | | t |
|---|---|---|---|

**signing** 47:19 48:25 68:11,18
**sincerely** 68:21
**sir** 68:9
**sit** 63:23
**situation** 52:9 56:10 60:25 61:5
**situations** 56:25
**six** 59:5
**skills** 66:10 67:6
**sleep** 63:9,10,13
**sleeping** 62:11,16 62:19 63:5,7
**slept** 60:19
**solar** 2:4 5:9,9
**solution** 57:5
**solutions** 68:1 71:1
**somewhat** 50:11
**soon** 28:3,5,6 35:3 35:7,14
**sorry** 15:10,24 22:11 28:25 29:3 29:5 31:18 43:3,6 47:12 52:20 53:21
**sort** 21:11,11
**sought** 49:11
**speak** 16:9,17
**speaking** 6:6
**specific** 55:25
**specifically** 43:24
**spend** 9:19
**spent** 46:15
**spiraling** 51:4
**spoke** 6:1,23 23:21
**spoken** 18:18,20
**stable** 52:11
**standby** 8:10
**start** 14:6 55:16 56:8 62:2

**started** 6:2 7:3 8:19 13:20 14:10 14:15,25 15:5 47:14,15 48:1,22 48:23 50:12,21,25 51:4 55:13 61:20 61:22
**starting** 32:18 51:1 63:16
**starts** 36:12
**state** 10:2 25:4 45:8 47:22 57:8 64:15 66:19 69:10 70:15
**stated** 30:5 43:15
**statement** 69:13 69:14 70:19,19
**states** 1:1 21:20 37:7
**stating** 25:21 55:5 57:23
**stay** 59:11,12 60:9
**stayed** 34:4 60:18
**stems** 54:23
**stenographic** 4:22
**stipulate** 42:19,22
**stipulation** 4:23
**stop** 55:19
**stopped** 12:11,13 62:8
**stow** 2:23
**straight** 28:8
**street** 2:15
**stress** 13:12 44:13 47:4,13,13,15,25 48:22 50:14,16 51:18 52:7 53:6,8 53:11,13 54:22,22 56:22 63:14,18,23 64:2,4,4,9

**stressed** 13:22 47:10
**stressful** 56:20,24 57:14 58:15 60:25 61:2,5
**stuff** 18:22 56:2 63:1
**subcontract** 57:8
**submit** 23:24 44:22
**submitted** 23:25 24:3
**subscribed** 69:10 70:14 71:21
**subsidiary** 31:24 33:5,7
**sudden** 47:21,24
**suffered** 64:19,19 64:20
**suggestion** 18:7
**suggestions** 18:6
**suite** 68:2
**suites** 4:9
**summertime** 46:24 50:20
**superior** 68:1
**support** 44:19 45:15
**supposed** 14:23 47:23 48:6,10 56:13
**supposedly** 31:25
**sure** 6:5 7:13 9:21 10:4 27:17 40:23 53:25 54:3
**swear** 5:14
**sworn** 4:14 5:19 66:5 69:10,13 70:14,18 71:21
**symptoms** 53:5

**t** 3:6
**tailbone** 61:15 62:24
**take** 4:4,11 6:19 6:22 10:12,15 30:17 35:22 36:3 40:21 53:2,3 54:14 56:17 57:2
**taken** 4:7 18:11 49:19 52:17 59:3 66:3,12 67:9 68:10
**talked** 33:1 64:11
**talking** 18:16 24:11
**team** 64:17
**tell** 5:20 8:17 10:10 34:24 55:10
**telling** 61:23
**tells** 11:23
**temperature** 63:11
**ten** 65:8
**tend** 53:7
**terms** 16:9,17 23:5
**testified** 5:21
**testify** 6:9,11
**testifying** 6:17 46:20 66:5
**testimony** 69:6,7 70:6,9,12
**tests** 51:12
**thank** 5:13,16,22 65:4,10,13
**therapist** 49:17,21 49:23
**thing** 16:19 29:7 32:7 53:25 54:3
**things** 13:24 20:15 24:6 56:3,8,25

57:4 63:6,12
64:16
**think**  9:17 14:11
  14:21 19:3 24:11
  24:17 25:17 40:15
  44:9 46:23 47:10
  51:24 53:4 58:11
  59:5 60:21 61:8
  63:16
**thinking**  32:19
  39:3,16 47:16
**thirty**  68:17
**thought**  13:23
  25:12 42:18 43:7
**three**  7:20 14:22
  22:25 23:17,18
  27:11 39:16 40:5
  40:15,15 49:16
  51:16 53:3,4
  58:13
**time**  1:15 4:25
  6:23 7:3 8:19 9:19
  12:18,20,25 13:9
  14:8,13,14 15:22
  16:1 18:24 20:6
  20:14,14 21:8,13
  24:4 27:2,21 29:4
  33:13 34:3,25
  35:22 44:10,22
  45:3,11,25 46:1,9
  46:15 51:18 55:14
  55:17,21,24,25
  56:15 62:14 63:14
**timely**  12:11 13:3
**times**  12:16 40:11
  58:13
**today**  6:3,9,11,16
  7:9 36:22 63:19
  63:23 64:2,12
**told**  17:9 23:3,8,12
  30:23 31:1,22

32:2 34:2,18 35:7
  35:11,13 36:21
  37:1 47:17 48:7
  48:13 49:1,2
  55:14 56:5 62:7
**tolerable**  52:12
**top**  17:1,23 21:3
**track**  46:10,13
**tracked**  40:12
**tracking**  21:12,23
  26:2 27:18,21
**training**  58:16
**transcribed**  69:7
**transcriber**  67:1
**transcript**  4:16
  65:5,11 66:21
  67:3,5 68:10,15
  69:5,12 70:5,11,17
**transcriptionist**
  66:8
**trauma**  49:17,21
  49:23
**treated**  49:7,13,14
**treatment**  49:11
  58:13
**trial**  30:21 32:13
  32:14,20 48:5
**tried**  21:4
**true**  66:9 67:5
**trusted**  55:17
**truth**  5:20,20,21
  64:1
**truthful**  9:7,11
  42:14
**try**  18:3 25:25
**trying**  18:8 19:3
  46:16 56:15
**tube**  20:17
**tuesday**  1:14
**turned**  14:18
  37:25 40:3

**twenty**  31:5
**twice**  51:7,13
**two**  7:20 12:16
  17:5 27:16 28:21
  31:7 32:1 43:23
  50:2 51:2 53:3
  59:12,20 61:13,21
  62:3
**type**  58:20
**typewriting**  66:7

**u**

**unclear**  7:19
**understand**  4:15
  6:7 9:6 42:13
  54:17 58:7
**understanding**
  48:24
**understood**  17:20
  18:22
**underwood**  19:4,4
**union**  31:6,23,24
  32:15,24 33:2,6,8
  33:12,24 40:18
  43:10,16
**united**  1:1 21:20
**update**  45:21
**updated**  24:9,15
  25:1 36:1
**use**  31:7,22 33:11
  33:11 43:16
**uses**  4:18
**usually**  25:16

**v**

**v**  1:7 68:6 69:3
  70:3
**valid**  24:18
**verbal**  6:6
**verification**  42:17
  42:21,23

**verify**  9:10 43:8
**veritext**  4:4 68:1,7
  71:1
**videoconference**
  1:12 2:4,12,13,20
**vitamins**  62:8
**voluntarily**  59:1,3
**vs**  4:7

**w**

**wait**  30:5
**waiting**  25:4 30:3
  47:18 48:15,17
**waived**  68:12,19
**walk**  14:16 30:16
  35:6
**walking**  58:22
**walmart**  31:25
**want**  6:4 7:13
  10:12,15 24:15
  25:25 29:6 34:14
  35:22 43:8 45:19
  58:23
**wanted**  19:16 41:4
  42:1 54:12 59:25
  60:12,19 61:3
**water**  51:3
**way**  10:22,23
  27:20 32:2 57:1,2
  58:1 59:19
**we've**  21:4
**weak**  61:14 62:1
**week**  20:4 49:18
**weeks**  6:1 23:1,17
  23:19 51:16 59:13
  59:20
**weight**  51:2,3
  59:21,23 60:10
  61:22 62:2,5
**went**  16:15 19:15
  19:21 20:25 29:24
  30:2 33:19 37:24

43:3 48:14 51:7
53:10 63:21 64:5
64:8
**west**  1:17 4:9
**western**  31:6,23
31:24 32:15,23
33:1,5,8,12,24
40:18 43:10,16
**wilson**  2:12 3:3
5:4,4,24 6:1 7:18
8:1,7,15 10:15,19
10:21 11:2,4,21
12:3 22:7,12,15,19
22:20 26:7 29:2,5
29:11 31:19 35:25
36:5,8,12,14 37:16
40:21 41:3,13
42:20,24 43:1
45:20,22 53:19
54:1,16 65:1,5,7,9
**wirthlin**  2:13 5:7,8
**witness**  4:14,15
5:2,14,19 12:1
26:6 29:8 31:18
36:4,7,11,13 37:15
41:12 66:4 68:8
69:1,4,11 70:1,4
70:15
**woman**  20:10,11
20:12
**worded**  25:10 44:4
44:6,9
**wording**  18:22
58:1
**work**  44:16,22
45:25 46:1,6,8
53:9,10 56:3,8
57:9,17,20 58:8
64:21
**worked**  57:7,11

**working**  58:10
**worse**  50:13 52:10
**worth**  46:6
**would've**  19:24
20:7,11 21:6
23:16,18,19,20,22
38:19 39:24 48:19
**wounds**  51:2
61:13,21 62:3
**written**  4:23
**wrong**  15:10 61:24
**wrote**  46:4 64:1

**x**

**x**  3:1,6 66:21

**y**

**yeah**  10:17 11:2
11:13 28:11 32:19
36:11,13 52:22
**year**  13:2 48:2
63:24 64:2
**years**  12:8,18 18:9
49:16 50:9 51:25
52:2,2
**yep**  30:12 37:9

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA L. RUCKMAN, | : | Case No.: 5:21-cv-00923-JRA |
| | : | |
| Plaintiff, | : | Judge John R. Adams |
| | : | |
| v. | : | |
| | : | |
| PHH MORTGAGE CORPORATION d/b/a | : | **NOTICE OF DEPOSITION OF** |
| PHH MORTGAGE SERVICING, *et al.*, | : | **ANGELA L. RUCKMAN** |
| | : | |
| Defendants. | : | |

PLEASE TAKE NOTICE that Defendant PHH Mortgage Corporation ("PHH"), will take the deposition of Plaintiff Angela L. Ruckman, on **Thursday, December 16, 2021 at 10:00 a.m.** The deposition will take placer remotely via Zoom.

The deposition will be taken before a notary public or other officer authorized to administer oaths, and shall proceed in accordance with R. Civ. P. 28.

Angela L. Ruckman is to bring all documents related to this case, or to be relied upon for her testimony and in support of her claims in this action.

Respectfully Submitted,

Dated: December 3, 2021

/s/ *Sarah Alford Wilson*
Sarah A. Wilson
John R. Wirthlin
BLANK ROME, LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Tel: (513) 362-8748
Fax: (513) 362-8777
Email:  sarah.wilson@blankrome.com
john.wirthlin@blankrome.com
*Counsel for Defendant PHH*

EXHIBIT

1

## **CERTIFICATE OF SERVICE**

I certify that an exact copy of the foregoing document was sent via electronic mail on December 3, 2021 to all counsel for record.

*/s/ Sarah A. Wilson*
Sarah A. Wilson

SNSC is the Principal Insured under a certain policy of insurance with Underwriters at Llyod's of London. It is unclear at this time whether this action is covered under the policy, as the insurer has not accepted coverage. To extent required under Rule 26(e), SNSC will supplement its initial disclosures if and when there is a coverage determination.

Respectfully Submitted,

Dated: August 27, 2021

*/s/ Sarah Alford Wilson*
Sarah Alford Wilson
Edward W. Chang (admitted PHV)
BLANK ROME, LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Tel: (513) 362-8748
Fax: (513) 362-8769
Email: SWilson@blankrome.com
         EChang@blankrome.com
*Counsel for Defendant SNSC*

AD 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| ANGELA L. RUCKMAN | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No.  5:21-CV-923 |
| PHH MORTGAGE CORPORATION | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  CLUNK, HOOSE CO., L.P.A.
c/o KF Statutory Service Corp.
1111Superior Ave. East, Suite 2500
Cleveland, OH 44114

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Marc E Dann
Dann Law
P.O. Box 6031040
Cleveland, OH 44103

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

SANDY OPACICH, CLERK OF COURT

Date:  05/04/2021

s/M. Lebron
_Signature of Clerk or Deputy Clerk_

EXHIBIT
2

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 5:21-CV-923

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT CLEVELAND

| | |
|---|---|
| **ANGELA L. RUCKMAN**<br>837 South Main Street<br>Mansfield, OH 44907<br><br>Plaintiff,<br><br>v.<br><br>**PHH MORTGAGE CORPORATION**<br>**d/b/a PHH MORTGAGE SERVICING,**<br>c/o Corporation Service Company<br>50 W. Broad St., Ste. 1330<br>Columbus, OH 43215<br><br>and<br><br>**CLUNK, HOOSE CO., L.P.A.**<br>c/o KF Statutory Service Corp.<br>1111 Superior Ave. East, Suite 2500<br>Cleveland, OH 44114<br><br>Defendants. | Civil Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiff Angela L. Ruckman, through counsel, states as follows for her *Complaint for Damages* (the "Complaint") against Defendants PHH Mortgage Corporation d/b/a PHH Mortgage Servicing and Clunk, Hoose Co., L.P.A.:

### INTRODUCTION

1.  Plaintiff reached an agreement with the servicer and owner of her mortgage loan to modify the terms of the same and cure the default thereunder. Plaintiff fully performed on her obligations thereunder, but the owner of her mortgage loan refused to honor the agreement and moved forward with foreclosure proceedings through the loan's servicer and their foreclosure and collections counsel. Plaintiff consequently had to hire counsel to defend against the

foreclosure proceedings which should have been resolved through the agreement and fears that she will unjustly lose her home which has caused her tremendous stress and anxiety.

## PARTIES, JURISDICTION, AND VENUE

2.     Plaintiff Angela L. Ruckman ("Plaintiff" or "Ruckman") is the owner of the real property and improvements located thereupon located at and commonly known as 837 South Main Street, Mansfield, OH 44907 (the "Home").

3.     Ruckman currently occupies and maintains the Home as her primary, principal residence and has maintained the Home as such for all times relevant to the causes of action pleaded in this Complaint.

4.     On August 24, 2005, Ruckman. executed a promissory note in the amount of \$83,400 (the "Note") and a mortgage on the Home purportedly securing the Note (the "Mortgage") (collectively, the "Loan"). *See*, a copy of the Loan, attached as **Exhibit 1**.

5.     Defendant PHH Mortgage Corporation d/b/a PHH Mortgage Servicing ("Defendant" or "PHH") is a foreign corporation registered to do business in the State of Ohio, with its corporate headquarters located at 4000 Chemical Road, Suite 200, Plymouth Meeting, PA 19462.

6.     PHH is the current servicer of the Loan and has serviced the Loan at all times relevant to the causes of action pleaded in this Complaint.

7.     PHH services the Loan on behalf of the purported assignee of the Loan, non-Party HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 ("HSBC") and has acted with its authority or otherwise on its behalf in relation to the Loan at all times relevant to the causes of action pleaded in this Complaint.

8.      Defendant Clunk, Hoose Co., L.P.A. ("Defendant" or "Clunk") is a law firm located in Stow, OH, which was retained by HSBC to initiate foreclosure proceedings against Ruckman to attempt to collect a debt allegedly owed on the Loan in the Court of Common Pleas for Richland County, Ohio, Case No. 2020 CV 0169 (the "Foreclosure").

9.      PHH is not a party to the Foreclosure.

10.     Jurisdiction is conferred by 28 U.S.C. § 1331 as this action primarily arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* (RESPA) and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692k(d), *et seq.*

11.     This Court has supplemental jurisdiction to hear any state law statutory and common law claims pleaded, *infra*, or that otherwise may arise pursuant to 28 U.S.C. § 1367.

12.     Venue is appropriate within this District pursuant to 28 U.S.C. § 1391(b) as: (1) A substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District; and, (2) the Home, the property that is the subject of the action, is located within this District.

## SUMMARY OF CAUSES OF ACTION

13.     Ruckman files this action in substantial part to enforce regulations promulgated by the Consumer Financial Protection Bureau (CFPB) and implemented pursuant to 12 U.S.C. § 2605(f) that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

14.     In January 2013, the CFPB issued final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

15.     Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013) which became effective on January 10, 2014.

16.     Mortgage servicers are prohibited from failing "to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

17.     Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties[1]." 12 U.S.C. § 2605(k)(1)(C).

18.     The Loan is a "federally related mortgage loan" as said term is defined by 12 C.F.R. § 1024.2(b).

19.     PHH is subject to the aforesaid regulations and does not qualify for the exemption for "small servicers", as defined in 12 C.F.R. § 1026.41(e)(4).

20.     PHH is not a "qualified lender", as defined in 12 C.F.R. § 617.700.

21.     Ruckman asserts a claim for relief against PHH for violations of the specific rules under RESPA and Regulation X, as set forth, *infra*.

---

[1] "The Bureau believes that standard servicer duties are those typically undertaken by servicers in the ordinary course of business. Such duties include not only the obligations that are specifically identified in section 6(k)(1)(C) of RESPA, but also those duties that are defined as "servicing" by RESPA, as implemented by this rule, as well as duties customarily undertaken by servicers to investors and consumers in connection with the servicing of a mortgage loan. *These standard servicer duties are not limited to duties that constitute "servicing," as defined in this rule, and include, for example*, duties to comply with investor agreements and servicing program guides, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance (e.g., hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, *and to work with investors and borrowers on options to mitigate losses for defaulted mortgage loans*." 78 Fed. Reg. 10696, 10739 (emphasis added).

22.     Ruckman has a private right of action under RESPA pursuant to 12 U.S.C. § 2605(f), for the violations claimed, *infra*, and such actions provide for remedies including actual damages, statutory damages, and attorneys' fees and costs.

23.     Ruckman is a "consumer", as that term is defined by 15 U.S.C. § 1692a(3), and a person affected by a violation of the FDCPA, and other violations, with standing to bring this claim under 15 U.S.C. § 1692.

24.     Clunk is a "debt collector" as defined by 15 U.S.C. § 1692a(6) as Clunk began collecting on the Loan when the Loan was in default. Clunk regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another, such as HSBC.

25.     The Loan is a "debt" as that term is defined by the FDCPA as the underlying debt sought to be collected by Clunk was a residential mortgage the primary purpose of which was for personal, family, or household use.

26.     Ruckman asserts a claim for relief against Clunk for violations of the specific rules under the FDCPA, as set forth, *infra*.

27.     Ruckman further asserts a state law statutory claim for violations of the Residential Mortgage Lending Act, R.C. 1322.01, *et seq.* (RMLA).

28.     Ruckman is a "buyer" as defined by R.C.1322.01(H), as she is an individual whose loan is serviced by a mortgage servicer, PHH.

29.     PHH is a mortgage servicer under the RMLA as it "holds the servicing rights, records mortgage payments on its books, or performs other functions to carry out the mortgage holder's obligations or rights under the mortgage agreement." R.C. 1322.01(AA).

30.     PHH is subject to the requirements of the RMLA and does not qualify for the exemptions listed in R.C. 1322.04.

## STATEMENT OF FACTS

31.     Ruckman, suffering from a financial setback, became delinquent on her obligations under the Loan.

32.     HSBC, represented by Clunk, filed the complaint to initiate the Foreclosure on March 5, 2020.

33.     In July 2020, Ruckman submitted a loss mitigation application to PHH through Clunk (the "Application"). *See*, a copy of an *Affidavit of Angela Ruckman* filed in the Foreclosure along with the pertinent exhibits cited *infra*, attached as **Exhibit 2** at ¶ 4.

34.     Prior to the Application, Ruckman had not previously submitted a complete loss mitigation application to PHH. *See*, Exhibit 2.

35.     PHH sent correspondence dated August 4, 2020 acknowledging that the Application was complete as of July 31, 2020. *See*, Exhibit 2 at ¶ 5.

36.     Upon a review of the Application, PHH offered a trial loan modification to Ruckman requiring her to timely remit three (3) trial plan payments of $469.15 in and for the months of September, October, and November 2020 (the "Trial Plan"). *See*, Exhibit 2 at ¶¶ 6-7.

37.     Ruckman timely remitted all payments due under the Trial Plan. *See*, *id*. at ¶ 7.

38.     PHH sent correspondence dated November 6, 2020 approving Ruckman for and containing a permanent modification agreement for the Loan (the "Modification"). *See*, **Exhibit 2** at ¶¶ 7-8; Exhibit 2 at Ex. A.

39.     The Modification provided, *inter alia*, that the Loan would be modified effective as of November 1, 2020 and that Ruckman was to remit monthly payments thereunder in the amount of $469.12. *See*, Exhibit 2 at ¶ 8; Exhibit 2 at Ex. A

40.     Ruckman requested and received an extension of time to execute and return the Modification due to a delay in the delivery of the same and PHH advised that if Ruckman timely remitted the payment due December 1, 2020, she could return the executed Modification at any point prior to January 1, 2021. *See*, Exhibit 2 at ¶¶ 9-11.

41.     On November 30, 2020, Ruckman timely remitted a payment in the amount of $470.00 in satisfaction of the payment due under the Modification for December 1, 2020 via money order in compliance with PHH's express written instructions for the same. *See*, Exhibit 2 at ¶¶ 12-13; Exhibit 2 at Ex. B and C.

42.     Ruckman properly executed the Modification and timely mailed the same to PHH in December 2020. *See*, Exhibit 2 at ¶¶ 12-14.

43.     Ruckman continued to remit timely payments to PHH in satisfaction of her obligations under the Modification and in accordance with PHH's express written instructions for the same, specifically:

    a.  A payment in the amount of $470.00 on January 4, 2021 in satisfaction of the payment due on and for January 1, 2020;

    b.  A payment in the amount of $470.00 on February 11, 2021 in satisfaction of the payment due on and for February 1, 2020; and,

    c.  A payment in the amount of $470.00 on February 22, 2021 in satisfaction of the payment due on and for March 1, 2020.

*See*, Exhibit 2 at ¶¶ 15-16, 19-20; Exhibit 2 at Ex. D, E, F.

44. On January 29, 2021, at a hearing with Magistrate Andrea Clark in the Foreclosure, HSBC and Clunk acknowledged receipt of the executed Modification and the payments for the months of December 2020 and January 2021. *See*, Exhibit 2 at ¶ 17.

45. PHH refused to accept or otherwise rejected Ruckman's February 11, 2021 payment and Ruckman received notice dated February 25, 2021 informing her of the same. *See*, Exhibit 2 at ¶ 22.

46. On March 3, 2021, Clunk, through Diane Bennett ("Bennett"), Clunk's Loss Mitigation Department Coordinator, emailed Ruckman to indicate that the last payment PHH received was for the January payment and that Ruckman needed to make the February 2021 and March 2021 payments immediately. *See*, Exhibit 2 at ¶ 21; Exhibit 2 at Ex. G.

47. On March 3, 2021, Clunk, through Bennett, emailed the client to confirm that PHH would "reverse the denial" of the Modification and accept the past due amounts if Ruckman remitted the same. *See*, Exhibit 2 at ¶ 24; Exhibit 2 at Ex. G.

48. At no point in time did Ruckman receive a written denial from PHH concerning the Application or the Modification. *See*, Exhibit 2 at ¶ 18.

49. Ruckman sent receipts of her February 11, 2021 and February 21, 2021 payments in response to Bennett. *See*, Exhibit 2 at ¶ 25; Exhibit 2 at Ex. G.

50. Despite having already acknowledged receipt of the December 2020 and January 2021 payments as of *January 29, 2021*, Bennett emailed Ruckman to state that the $470.00 payment remitted *February 22, 2021* was applied to the payment due for January 1, 2021—in direct conflict to prior acknowledgments in the Foreclosure—and that she "didn't see any extra receipts in your file indicating that a Jan pmt was made other that the receipts above that you purchased on 2/22 almost one month behind". *See*, Exhibit 2 at ¶ 26; Exhibit 2 at Ex. G.

*Ruckman v. PHH Mortgage Corp. etc.* et al.
Complaint for Damages: Page 8

51.     Ruckman emailed Bennett on March 10, 2021 to see if there has been any update as to the tracking of the payments remitted to PHH and Bennett responded that the "receipts were received and sent to PHH for review". *See*, Exhibit 2 at ¶¶ 28-29; Exhibit 2 at Ex. K.

52.     On March 19, 2021, Bennett emailed Ruckman claiming that PHH "cannot confirm receipt of payments" and that the "receipts you provided do not show that payment was sent to and received by PHH" from Ruckman for February 2021 and March 2021 despite the receipts showing proof of remittance in accordance with PHH's express written instructions for the same and despite such payments being remitted in the same manner as the payments Ruckman remitted on November 30, 2020 and January 4, 2021. *See*, Exhibit 2 at ¶¶ 30-31, 34; Exhibit 2 at Ex. K.

53.     On or about March 21, 2021, Ruckman resubmitted the previously rejected payment from February 11, 2021, and emailed Bennett on March 22, 2021 to advise of the same. *See*, Exhibit 2 at ¶ 34; Exhibit 2 at Ex. M.

54.     Through the March 22, 2021 email, Ruckman also advised that there had been no notice issued that any other payments, including the February 22, 2021 payment, had been refused, rejected, or otherwise declined. *See*, Exhibit 2 at ¶ 34; Exhibit 2 at Ex. M.

55.     Bennett replied with an email stating she would forward Ruckman's receipt of the resubmission of the February 11, 2021 payment to PHH, but she also stated that she expected the Modification to be denied because "[a]fter all, signed documents and payments were all due in November 2020"—an inaccurate statement. *See*, Exhibit 2 at ¶ 35; Exhibit 2 at Ex. L.

56.     Ruckman responded in turn to address Bennett's misrepresentations regarding her payments under the Modification, stating:

> Per krogers, phh needs to use the reference numbers on the receipts
> to track payments received. Maybe it was posted to another

*Ruckman v. PHH Mortgage Corp. etc.* et al.
Complaint for Damages: Page 9

> account? **You claim 2 payments were missing, but the only denied payment was the February payment paid on 2/11. That was resubmitted yesterday. No other payments have been returned which means all other payments were received and accepted by PHH. I have made every payment. All paperwork was signed. Krogers can not track a payment that was sent after it was received. The other alleged missing payment has not been applied to my or was applied to another account. I have my receipts showing I paid. I dont know what more I can do.**

*See*, Exhibit 2 at ¶ 36 (emphasis added); Exhibit 2 at Ex. L (emphasis added).

57. Ruckman, in furtherance of her satisfaction of her obligations under the Modification, submitted a payment on March 20, 2021 in the amount of $470.00 in satisfaction of the payment due April 1, 2021 and in accordance with PHH's express written instructions for the same. *See*, Exhibit 2 at ¶ 39; Exhibit 2 at Ex. O.

58. Ruckman remitted all payments due under the Modification from December 2020 through April 2021 in a timely manner and each in accordance with PHH's express written instructions for the same. *See*, Exhibit 2 at ¶ 40.

59. PHH has not sent and Ruckman has not received any notice from PHH, Clunk, or HSBC to cease making monthly payments to PHH as previously instructed or otherwise changing such payment instructions. *See*, Exhibit 2 at ¶ 41.

60. PHH has not sent and Ruckman has not received any written notice that the Application or Modification was denied or stating the reason for any such denial or stating Ruckman's right to appeal any such denial. *See*, Exhibit 2 at ¶ 44.

61. On March 30, 2021, Plaintiff filed a motion for summary judgment against Ruckman in the Foreclosure.

62. Ruckman, in turn, reasonably determined that she had no other option than to hire counsel to represent her in defense of the Foreclosure.

63.    Ruckman retained and incurred costs and fees to retain DannLaw to represent her in the Foreclosure and which filed motions to enlarge the time to respond to HSBC's motion for summary judgment and to seek enforcement of the Modification.

## IMPACT AND DAMAGES

64.    Had PHH and Clunk (collectively, "Defendants") acted appropriately, the Loan would have been modified as agreed per the Modification thereby curing the alleged default on the Loan and leading to a dismissal of the Foreclosure which would have precluded any need for Ruckman to hire counsel to represent her in defense of the Foreclosure.

65.    Due to Defendants' actions, Ruckman has unnecessarily been deprived of the agreed upon Modification that would save her Home from foreclosure judgment and sale.

66.    Defendants' improper actions have further caused Ruckman to suffer from other damages including:

a.   The loss of funds, the loss of use funds, and the time loss of funds in the amount of $3,757.45—three (3) payments of $469.15 due under the TPP and five (5) payments of $470.00 remitted in excess of Ruckman's monthly obligation of $469.12 under the Modification—without receiving the benefit of the Modification which would have been implemented and boarded but for Defendants' improper actions;

b.   Loss of time and money for continued defense of the Foreclosure which would not still be pending but for Defendants' actions in mishandling the loss mitigation processes concerning the Loan in violation of RESPA and Regulation X and mortgage servicing guidelines and otherwise

misrepresenting the status of the Loan and the amounts due thereunder in violation of the FDCPA;

c. Legal fees, costs, and expenses incurred in defense of the Foreclosure since Defendants' wrongful conduct including the preparation of and filing of motions in defense of the motion for summary judgment and in attempts to have the Court enforce the Modification;

d. Improper fees and charges imposed on the Loan due to the unnecessarily continued Foreclosure for which Ruckman will likely become personally obligated should she eventually obtain a loan modification or which otherwise negatively impact any equity in the Home to which she is entitled;

e. Continued harm to Ruckman's credit and a delay in the rehabilitation of her credit and as the implementation of the Modification would have afforded her the opportunity to begin the process of rehabilitating her credit standing; and,

f. Severe emotional distress driven by Defendants' actions and by the tangible fear that Defendants' refusal to properly handle the loss mitigation process related to the Loan will result in the imminent loss of her Home to foreclosure sale, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress above and beyond the emotional distress caused by the Foreclosure from which she was suffering prior to the conduct alleged in this complaint.

## PATTERN AND PRACTICE OF PHH'S VIOLATIONS OF RESPA AND REGULATION X

67.    PHH's actions are part of a pattern and practice of behavior in violation of Plaintiff's rights and in abdication and contravention of PHH's obligations under the mortgage servicing regulations set forth in Regulation X of RESPA.

68.    As of the filing of this Complaint, consumers, nationally, have lodged:

a. Seven Hundred Seventy-Six (776) consumer complaints against PHH specifically concerning the issue identified on the CFPB's consumer complaint database as "loan modification, collection, foreclosure" related to mortgages;

b. Seven Hundred Forty-Four (744) consumer complaints against PHH specifically concerning the issue identified on the CFPB's consumer complaint database as "loan servicing, payments, escrow account" related to mortgages; and,

c. Three Hundred Four (304) consumer complaints against PHH specifically concerning the issue identified on the CFPB's consumer complaint database as "trouble during payment process" related to mortgages.

Each such complaint is filed and cataloged in the CFPB's publicly accessible online database (accessible at http://www.consumerfinance.gov/data-research/consumer-complaints/).

69.    Plaintiff has reviewed the CFPB's consumer complaint database and has identified other similar RESPA violations by PHH as alleged by other consumers. Plaintiff has reviewed fifteen (15) consumer complaints attached hereto and identified as **Composite Exhibit 3**. The date, details, and a narrative disclosed by the consumer is set forth in each complaint. The complaints evidence conduct showing that Rushmore has engaged in a pattern or practice of violating RESPA with respect to other borrowers.

*Ruckman v. PHH Mortgage Corp. etc.* et al.
Complaint for Damages: Page 13

## COUNT ONE: AGAINST PHH
### VIOLATIONS OF 12 C.F.R. § 1024.41(g) AND 12 U.S.C. § 2605(k)

70.     Ruckman restates and incorporates all of her statements and allegations contained

in paragraphs 1 through 69 in their entirety, as if fully rewritten herein.

71.     12 C.F.R. § 1024.41(a) explicitly provides that "[a] borrower may enforce the

provisions of this section pursuant to section 6(f) of RESPA (12 U.S.C. 2605(f))."

72.     If a borrower submits a complete loss mitigation application more than

thirty-seven (37) days prior to a foreclosure sale, then a servicer is prohibited from moving for

judgment unless:

> (1)   The servicer has sent written notice pursuant to paragraph
> (c)(1)(ii), stating that the borrower is not eligible for any loss
> mitigation options and the borrower has not requested an
> appeal, or the borrower's appeal has been denied;
>
> (2)   The borrower rejects all loss mitigation options offered by
> the servicer; or,
>
> (3)   The borrower fails to perform under an agreement on a loss
> mitigation option.

12 C.F.R. § 1024.41(g).

73.     Comment 1 of the Official CFPB Interpretations to 12 C.F.R. § 1024.41(g)

provides:

> The prohibition on a servicer moving for judgment or order of sale
> includes making a dispositive motion for foreclosure judgment,
> such as a motion for default judgment, judgment on the pleadings,
> or summary judgment, which may directly result in a judgment of
> foreclosure or order of sale. A servicer that has made any such
> motion before receiving a complete loss mitigation application has
> not moved for a foreclosure judgment or order of sale if the
> servicer takes reasonable steps to avoid a ruling on such motion or
> issuance of such order prior to completing the procedures required
> by § 1024.41, notwithstanding whether any such action
> successfully avoids a ruling on a dispositive motion or issuance of
> an order of sale.

Supplement I to Part 1024.

74.     Ruckman submitted the Application in July 2020 and PHH acknowledged it was complete as of July 31, 2020. *See*, Exhibit 2 at ¶¶ 4-5.

75.     Upon a review of the Application, PHH offered the Trial Plan to Ruckman and Ruckman remitted all payment due thereunder. *See*, Exhibit 2 at ¶¶ 6-7.

76.     PHH sent correspondence dated November 6, 2020 approving Ruckman for and containing the Modification. *See*, Exhibit 2 at ¶¶ 7-8; Exhibit 2 at Ex. A.

77.     PHH has not sent and Ruckman has not received any written notice that the Application or Modification was denied or stating the reason for any such denial or stating Ruckman's right to appeal any such denial. *See*, Exhibit 2 at ¶ 44.

78.     Ruckman has not rejected the Modification.

79.     Ruckman dutifully performed and fully satisfied her obligations under the Modification. *See*, Exhibit 2 at ¶¶ 9-17, 40; Exhibit 2 at Ex. D, E, F, M, and O.

80.     Despite Ruckman's performance and PHH failure to send a written denial in accordance with the requirements of 12 C.F.R. § 1024.41(c)(1)(ii), Plaintiff filed a motion for summary judgment against Ruckman in the Foreclosure on March 30, 2021.

81.     PHH actions in moving for summary judgment on March 30, 2021 were in violation of 12 C.F.R. § 1024.41(g) and 12 U.S.C. § 2605(k)(1)(E) and, as a result, Ruckman has suffered actual damages as detailed, *supra*, including but not limited to fees incurred in defense of the motion for summary judgment and in moving to enforce the Modification in the Foreclosure.

82.     PHH's actions are part of a pattern and practice of behavior in conscious disregard for Ruckman's rights.

83.     PHH's conduct as pled, *supra*, shows a conscious disregard for Plaintiff's rights.

84.     As a result of PHH's actions, PHH is liable to Ruckman for statutory damages and actual damages as further described, *supra*. 12 U.S.C. § 2605(f)(1).

85.     Additionally, Ruckman requests reasonable attorneys' fees and costs incurred in connection with this action. 12 U.S.C. § 2605(f)(3).

## COUNT TWO: AGAINST CLUNK
## VIOLATIONS OF THE FDCPA, 15 U.S.C. §§ 1692, *et seq.*

86.     Ruckman restates and incorporates all of her statements and allegations contained in paragraphs 1 through 69 in their entirety, as if fully rewritten herein.

87.     Ruckman is a "consumer" as she is a natural person and resident of Richland County, Ohio, obligated or allegedly obligated to pay the Loan. 15 U.S.C. § 1692a(3).

88.     The Loan is a "debt" because it is an obligation or alleged obligation of Ruckman to pay money arising out of a transaction primarily for personal, family, or household purposes as Ruckman purchased the Home for her primary, principal residence and the Loan provided financing for the same. 15 U.S.C. § 1692a(5).

89.     Clunk is a "debt collector" because it regularly collects or attempts to collect on the Loan and other mortgage loans. 15 U.S.C. § 1692a(6).

90.     Clunk's actions in moving for summary judgment in the Foreclosure despite having actual knowledge that such actions constitute violations of 12 C.F.R. § 1024.41(g) and in making misstatements regarding the status of Ruckman's payments under the Modification, constitute the use of false representations or deceptive means to collect or attempt to collect on the Loan. 15 U.S.C. § 1692e(10).

91.     Clunk's actions in filing the motion for summary judgment in the Foreclosure despite having actual knowledge that such actions constitute violations of 12 C.F.R. §

1024.41(g), constitute the use of unfair or unconscionable means to collect or attempt to collect on the Loan. 15 U.S.C. § 1692f.

92.      Clunk's actions in moving for summary judgment in the Foreclosure despite having actual knowledge that such actions constitute violations of 12 C.F.R. § 1024.41(g) and in making misstatements and misrepresentations regarding the status of Ruckman's payments under the Modification, constitute the use of conduct, the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt of unfair or unconscionable means to collect or attempt to collect on the Loan. 15 U.S.C. § 1692d.

93.      Due to Clunk's actions, Ruckman has suffered actual damages as detailed, *supra*, including but not limited to fees incurred in defense of the motion for summary judgment and in moving to enforce the Modification in the Foreclosure.

94.      As a result of Clunk's actions, Clunk is liable to Ruckman for actual damages and statutory damages. 15 U.S.C. § 1692k(a)(1).

95.      Additionally, Ruckman requests reasonable attorneys' fees and costs incurred in connection with this action. 15 U.S.C. § 1692k(a)(3)

## COUNT THREE: AGAINST PHH
### VIOLATIONS OF THE RMLA, R.C. 1322.01, *et seq.*

96.      Ruckman restates and incorporates all of her statements and allegations contained in paragraphs 1 through 69 in their entirety, as if fully rewritten herein.

97.      "No person ... shall act as a ... mortgage servicer ... without first having obtained a certificate of registration from the superintendent of financial institutions for the principal office and every branch office to be maintained by the person for the transaction of business as a ... mortgage servicer ... in this state." R.C. 1322.07(A).

98.     PHH, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

99.     PHH is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued it certificates of registration, License Nos. RM.804016.000,     RM.804016.016-BR,     RM.804016.018-BR,     RM.804016.021-BR, RM.804016.024-BR, and RM.804016.025-BR. R.C. 1322.01(GG).

100.    Ruckman is a buyer as defined by the RMLA, as the Loan is serviced by PHH, a mortgage servicer. R.C. 1322.01(H).

101.    A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.* cannot:

> (B) Make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations; [or]
>
> (C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings[.]

R.C. 1322.40.

102.    PHH, in omitting or misrepresenting facts throughout the loss mitigation process, failing to accept and apply Ruckman's payments in furtherance of the Modification, in misrepresenting the payment status under the Modification, and in moving for foreclosure judgment despite Ruckman's performance under the Modification, engaged in a continued course of misrepresentations by making false or misleading statements of a material fact. R.C. 1322.40(B).

103.    PHH's conduct in improperly handling the loss mitigation process for the Loan and for omitting or misrepresenting facts throughout the same, failing to provide proper

responses to the NOE, and failing to timely correct the errors asserted through the NOE constitutes violations of R.C. 1322.40(C).

104. PHH's conduct caused Ruckman to suffer actual damages, as further described, *supra*.

105. As a result of PHH's conduct, PHH is liable to Ruckman for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.52.

106. A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, is required to comply with all duties imposed by other statutes or common law and:

        (3) Act with reasonable skill, care, and diligence; [and]
        (4) Act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan[.]

R.C. 1322.45(A).

107. A registrant, licensee, or person required to be registered or licensed under R.C. 1322 cannot waive or modify its duties under R.C. 1322.45(A). R.C. 1322.45(C).

108. PHH's conduct in omitting or misrepresenting facts throughout the loss mitigation process, failing to accept and apply Ruckman's payments in furtherance of the Modification, in misrepresenting the payment status under the Modification, and in moving for foreclosure judgment despite Ruckman's performance under the Modification, constitutes violations of R.C. 1322.45(A)(3)-(4).

109. As a result of PHH's conduct, PHH is liable to Ruckman for actual damages, as further described, *supra*, as well as reasonable attorneys' fees and costs incurred in connection with this action and punitive damages. R.C. 1322.45(D).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Angela L. Ruckman prays that this Court grant judgment against Defendant PHH Mortgage Corporation d/b/a PHH Mortgage Servicing and award her the following:

A.    Actual damages from Defendant PHH Mortgage Corporation d/b/a PHH Mortgage Servicing in an amount to be determined at trial for the allegations contained in Counts One and Three.

B.    An award of statutory damages of Two Thousand Dollars ($2,000.00) from Defendant PHH Mortgage Corporation d/b/a PHH Mortgage Servicing for each violation of RESPA contained in Count One;

C.    For punitive damages against Defendant PHH Mortgage Corporation d/b/a PHH Mortgage Servicing as to Count Two;

D.    For attorney's fees and costs as to Counts One and Three;

E.    For such other relief which this Court may deem appropriate.

**WHEREFORE**, Plaintiff Angela L. Ruckman prays that this Court grant judgment against Defendant Clunk, Hoose Co., L.P.A. and award her the following:

A.    Actual damages from Defendant Clunk, Hoose Co., L.P.A. g in an amount to be determined at trial for the allegations contained in Count Two.

B.    An award of statutory damages of One Thousand Dollars ($2,000.00) from Defendant Clunk, Hoose Co., L.P.A. for each violation of the FDCPA contained in Count Two;

C.    For attorney's fees and costs as to Count Two;

D.    For such other relief which this Court may deem appropriate.

Respectfully submitted,

*Ruckman v. PHH Mortgage Corp. etc.* et al.
Complaint for Damages: Page 20

/s/ Marc E. Dann, Esq.

Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Michael A. Smith Jr. (0097147)
Dann Law
P.O. Box 6031040
Cleveland, OH 44103
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiff Angela L. Ruckman*

## JURY DEMAND

Plaintiff Angela L. Ruckman hereby requests a trial by jury on all issues, with the

maximum number of jurors permitted by law.

*/s/Marc E. Dann, Esq.*

Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Michael A. Smith Jr. (0097147)
Dann Law
*Counsel for Plaintiff Angela L. Ruckman*

EXHIBIT 

O.R. 1556 PAGE 0091

200500015866
Filed for Record in
RICHLAND
SARAH M DAVIS
08-26-2005 At 12:16 pm.
MORTGAGE 140.00
OR Book 1556 Page 91 - 106
200500015866
SOUTHERN TITLE
6108

After Recording Return To:
OWNIT MORTGAGE SOLUTIONS, INC.
27349 AGOURA ROAD, SUITE 100
AGOURA HILLS, CALIFORNIA 91301
Loan Number: ████████

████████  [Space Above This Line For Recording Data]

# MORTGAGE

MIN: ████████

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated AUGUST 24, 2005 , together with all Riders to this document.
(B) "Borrower" is ANGELA L. RUCKMAN, A SINGLE WOMAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is OWNIT MORTGAGE SOLUTIONS, INC.

Lender is a  CALIFORNIA CORPORATION                                organized
and existing under the laws of  CALIFORNIA
Lender's address is  27349 AGOURA ROAD, SUITE 100, AGOURA HILLS,
CALIFORNIA 91301

(E) "Note" means the promissory note signed by Borrower and dated AUGUST 24, 2005
The Note states that Borrower owes Lender EIGHTY-THREE THOUSAND FOUR HUNDRED AND
00/100                                 Dollars (U.S. $ 83,400.00           ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
SEPTEMBER 1, 2035       .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes

DocMagic eForms 800-649-1362
www.docmagic.com

Page 1 of 13

RUCKMAN 000013

EXHIBIT

3

O.R. 1556 PAGE 0092

(H)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower (check box as applicable]:

- [X] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] Other(s) [specify]
- [ ] 1-4 Family Rider
- [ ] Biweekly Payment Rider

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  "Escrow Items" means those items that are described in Section 3.

(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

COUNTY                          of                          RICHLAND
[Type of Recording Jurisdiction]                 [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 028-90-056-15-000

Situated in the City of Mansfield, County of Richland and State of Ohio:  And being Lot Number Nineteen Thousand Eight Hundred Three (#19803) of the consecutively numbered lots in said City(formerly known as Lot #4 in Brentwood Allotment.)

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                          Page 2 of 13

DocMagic *EFORMS* 800-649-1362
www.docmagic.com

RUCKMAN 000014

O.R. 1556 PAGE 0093

which currently has the address of 837 SOUTH MAIN STREET

[Street]

MANSFIELD                                    44907
                                             , Ohio                    ("Property Address"):

[City]                                       [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038 01/01
With Authorized Changes                        Page 3 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

RUCKMAN 000015

O.R. 1556 PAGE 0094

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                                    Page 4 of 13

DocMagic *eForms* 800-649-1362
www.docmagic.com

RUCKMAN 000016

O.R. 1556 PAGE 0095

shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes
Page 5 of 13
DocMagic ℰℱℴ𝓇𝓂𝓈 800-649-1362
www.docmagic.com

RUCKMAN 000017


O.R. 1556 PAGE 0096

or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  Borrower's Loan Application.  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate    protect Lender's interest in the

OHIO–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                                          Page 6 of 13

DocMagic ⑩ 800-649-1362
www.docmagic.com

OR 1556 PAGE 0097

Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                     Page 7 of 13

Doc          Doc          800-649-138,
             M1           www.pic.com

RUCKMAN 000019

O.R. 1556 PAGE 0098

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                     Page 8 of 13

DocMagic eForms 800-649-1362
www.docmagic.com

RUCKMAN 000020

O.R. 1556 PAGE 0099

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                                    Page 9 of 13

DocMagic EZFms 800-649-1362
www.docmagic.com

RUCKMAN 000021

O.R. 1556 PAGE 0100

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                                    Page 10 of 13

DocMagic EForms 800-649-1362
www.docmagic.com

RUCKMAN 000022

O.R. 1556 PAGE 0101

information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances.  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                                    Page 11 of 13

DocMagic EFarms 800-649-1362
www.docmagic.com

RUCKMAN 000023

O.R. **1556** PAGE **0102**

in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, RICHLAND County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument. It being intended by this Section 24 to acknowledge, affirm and comply with the provision of § 5301.233 of the Revised Code of Ohio.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Executed this 24th day of AUGUST, 2005

_____ (Seal)       _____ (Seal)
ANGELA L. RUCKMAN          -Borrower                                              -Borrower


_____ (Seal)       _____ (Seal)
                                  -Borrower                                              -Borrower


_____ (Seal)       _____ (Seal)
                                  -Borrower                                              -Borrower


OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                     Page 12 of 13

DocMagic *eForms* 800-649-1362
www.docmagic.com

RUCKMAN 000024

O.R. 1556 PAGE 0103

(Execution in accordance with Chapter 5301 of the Revised Code.)

State of Ohio                          )
                                       ) ss.
County of    Richland                  )

The foregoing instrument was acknowledged before me this AUGUST 24, 2005
by  ANGELA L. RUCKMAN

_____
Signature of Person Taking Acknowledgment

Title _____

Serial Number, if any _____

My commission expires: _____

LAURIE J.
HALL
NOTARY PUBLIC,
STATE OF OHIO
My Commission
Expires
April 12, 2010

This Instrument Prepared By:
OWNIT MORTGAGE SOLUTIONS, INC.
10300 ALLIANCE DR., SUITE 125
CINCINNATI, OH 45242

OHIO--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3036 01/01
With Authorized Changes                    Page 13 of 13

DocMagic ℰℱℴⓡⓜⓢ 800-649-1362
www.docmagic.com

RUCKMAN 000025

O.R. 1556 PAGE 0104

MIN: ████████████  Loan Number: ████████

# ADJUSTABLE RATE RIDER
(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 24th day of AUGUST, 2005 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to OWNIT MORTGAGE SOLUTIONS, INC., A CALIFORNIA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and located at:

837 SOUTH MAIN STREET, MANSFIELD, OHIO 44907

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 8.125 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the 1st day of SEPTEMBER, 2007 and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

---

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                    Page 1 of 3

DocMagic ☎ 800-649-1362
www.docmagic.com

RUCKMAN 000026

O.R. 1556 PAGE 0105

(C) **Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding SEVEN AND 125/1000 percentage points ( 7.125 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) **Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.125 % or less than 8.125 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND 000/1000 percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 14.125 %. My interest rate will never be less than 8.125 %.

(E) **Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) **Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

B.  **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan

MULTISTATE ADJUSTABLE RATE RIDER--LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family--Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01          Page 2 of 3

DocMagic ℰℱℴℛℳℱ 800-649-1362
www.docmagic.com

RUCKMAN 000027

O.R. **1556** PAGE **0106**

assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
ANGELA L. RUCKMAN            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

MULTISTATE ADJUSTABLE RATE RIDER–LIBOR SIX-MONTH INDEX
(AS PUBLISHED IN *THE WALL STREET JOURNAL*)
Single Family–Fannie Mae MODIFIED INSTRUMENT
Form 3138 1/01                   Page 3 of 3

DocMagic *€Formas* 800-649-1362
www.docmagic.com

RUCKMAN 000028

REPRESENTATION OF PRINTED DOCUMENT

 **NewRez**

PHH000188

11/06/2020

| Respond to this offer no later than: |
| :---: |
| **11/24/2020** |

ANGELA RUCKMAN
837 S MAIN ST
MANSFIELD, OH 44907

| **Account Information** |
| :--- |
| **Account Number:** ▇▇▇▇▇ |
| **Property Address:** |
| 837 S MAIN ST |
| MANSFIELD, OH 44907 |
| We are here to help! |
| The Account Relationship Manager: |
| Vanessa George |
| RMA@mortgagefamily.com |
| Online: |
| www.mortgagequestions.com |

### APPROVAL FOR PERMANENT MODIFICATION
#### PLEASE READ CAREFULLY

Dear ANGELA RUCKMAN:

**Congratulations!** The above referenced account is approved for a modification. This letter will explain the next steps necessary to accept the modification offer.

Below is important information about our decision regarding mortgage assistance, with additional details on the following pages. However, do not forget **time is of the essence** to accept this modification as this offer will expire if we do not receive a response by 11/24/2020 .

**What needs to be done:**
1. To accept the modification, the following must be done:
    a. The Modification Agreement must be signed and
    b. All pages of the signed copies should be returned to us in the enclosed, prepaid envelope by 11/24/2020

**What will we do:**
1. The account is approved for a Mortgage Modification with monthly payments in the amount of $469.12**.** The offer details are enclosed. All materials should be carefully read.
2. If the Modification Agreement has notary provisions at the end, the enclosed Modification should only be signed in the presence of a notary public and other witnesses (if applicable).  All documents must be executed and the signatures must be exactly as the names are typed.  Please retain one copy and return the other original Modification Agreement.

**The following additional documents are enclosed:**

- Summary of the Modification
- Additional Assistance Available

- Legal Disclosures
- Instructions for Making the Payment
- Modification Agreement

Vanessa George has been assigned as the Relationship Manager and will be the designated representative for resolution, inquiries and submission of documents.

*OCWN_PLS_FNL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property.  It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

Page 1
INTERNET REPRINT

NMLS # 2726
**CONFIDENTIAL**

| **EXHIBIT** |
| :---: |
| 4 |

REPRESENTATION OF PRINTED DOCUMENT



PHH000189

**For any questions**, we can be reached Monday through Friday 8:00am to 9:00pm ET at 800-750-2518, to speak with the assigned Relationship Manager, Vanessa George. If Vanessa George is not available, another dedicated member of our Home Retention Department will be available to answer any questions.

Our Customer Care Center is also available, toll free at 800-449-8767, Monday through Friday 8:00 am to 9:00 pm, Saturday 8:00 am to 5:00 pm ET to answer any inquiries.



Sincerely,

Loan Servicing

*OCWN_PLS_FNL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property.  It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT

NMLS #2726

CONFIDENTIAL

PHH000190

# ❖ NewRez

## <u>SUMMARY OF THE MORTGAGE MODIFICATION OFFER</u>

- **FIRST MODIFIED PAYMENT DUE DATE:** The first modified monthly payment will begin on 12/01/2020.
- The modified interest rate is 2.875% and will be fixed for the remaining term of the mortgage account.
- **NEW MODIFIED PAYMENT:** The modified monthly mortgage payment amount is as follows:

|  |  |
|---|---|
| **Modified Monthly Payment** | |
| Principal and Interest | $301.17 |
| Escrow* | $167.95 |
| **Total Modified Monthly Payment** | **$469.12** |

*The escrow payment may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts, or other escrow expenses. Therefore, the total monthly payment may change accordingly. We will send a notification if there are any adjustments made to the total monthly payment.

- **NEW PRINCIPAL BALANCE:** Any past due amounts as of the modification effective date, including unpaid interest, real estate taxes, insurance premiums, and certain assessments paid to a third party on behalf of the above referenced account, will be added to the mortgage account balance.

- **ESCROW ACCOUNT:** The terms of the Modification Agreement require the servicer to set aside a portion of the new monthly payment in an escrow account for payment of the property taxes, insurance premiums and other required fees. Any prior waiver of escrows by the lender of this account is no longer in effect. PHH Mortgage Services will draw on this account to pay real estate taxes and insurance premiums as they come due. Please note the escrow payment amount will adjust if the taxes, insurance premiums and/or assessment amounts change, so the amount of the monthly payment PHH Mortgage Services must place in escrow will also adjust as permitted by law. This means the monthly payment may change. The initial monthly escrow payment will be included in the loan payment noted in the enclosed Agreement; there is no need to remit this amount separately.

- **NO FEES:** There are no fees under the Modification Program.

- **AGREEMENT:** The account holder(s) must **sign and return the Modification Agreement to us** in the enclosed, pre-paid envelope by the due date which is 11/24/2020 : If the Modification Agreement has notary provisions at the end, the enclosed Loan Modification Agreement should not be signed unless in the presence of a notary and other witnesses (if applicable). All of the documents must be executed and the signatures must be exactly as the names are typed.  One copy should be retained for personal records and all other original Modification Agreements should be returned.

*OCWN_PLS_FNL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property.  It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

9-814-BIZ58-0000094-001-04-000-001-000-000

NMLS # 2726

INTERNET REPRINT

CONFIDENTIAL

PHH000191

# NewRez

## ADDITIONAL ASSISTANCE IS AVAILABLE

If financial hardship is being experienced, housing counseling may be a way to help manage finances. We recommend contacting a HUD-approved agency for assistance in keeping the home. This assistance is available at no charge.

| | | |
|---|---|---|
| HUD Approved Housing Counseling | (800) 569-4287 | www.HUD.gov |
| Homeowner's HOPE Hotline Number | (888) 995-4673 | https://995hope.org/ |
| Fannie Mae Assistance Program | (800) 232-6643 | www.knowyouroptions.com |
| Consumer Financial Protection Bureau (CFPB) | (855) 411-2372 | www.consumerfinance.gov/mortgagehelp/ |
| Freddie Mac Assistance Program | | http://myhome.freddiemac.com/ |

To submit a qualified written request, a notice of error or a request for information, the following address must be used:

PHH Mortgage Services
PO Box 66002
Lawrenceville, NJ 08648

*OCWN_PLS_FNL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT NMLS #2726
CONFIDENTIAL

REPRESENTATION OF PRINTED DOCUMENT

PHH000192



## ADDITIONAL LEGAL DISCLOSURES

**Notice Regarding Bankruptcy:** Please be advised that if you are part of an active Bankruptcy case or if you have received an Order of Discharge from a Bankruptcy Court, this letter is in no way an attempt to collect either a pre-petition, post-petition or discharged debt. If your bankruptcy case is still active, no action will be taken in willful violation of the Automatic Stay. If you have received an Order of Discharge in a Chapter 7 case, any action taken by us is for the sole purpose of protecting our lien interest in the underlying mortgaged property and is not an attempt to recover any amounts from you personally. Finally, if you are in an active Chapter 11, 12 or 13 bankruptcy case and an Order for Relief from the Automatic Stay has not been issued, you should continue to make payments in accordance with your plan.

**Notice Regarding Tax Consequences of Mortgage Assistance Options:** The acceptance of a Modification, Short Sale, or Deed-in-Lieu of Foreclosure may result in federal, state, or local tax consequences and/or affect one's eligibility for any public assistance benefits. We cannot provide advice on these impacts and encourage a tax professional be contacted to discuss any questions.

To submit a qualified written request, a notice of error or a request for information, use the following address:

PHH Mortgage Services
PO Box 66002
Lawrenceville, NJ 08648-

*9-814-BIZ58-0000094-001-06-000-001-000-000*

*OCWN_PLS_FNL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property.  It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT

NMLS # 2726
**CONFIDENTIAL**

PHH000193



## PAYMENT REMITTANCE INFORMATION

**PLEASE DON'T FORGET:**
1. All checks should be payable to PHH Mortgage Services.
2. Always include the account number with the payment.

| Overnight Mail |
| --- |
| **Money Order, Personal Check, or Certified Check** |
| **Send To**: PHH Mortgage Services<br>1 Mortgage Way SV22<br>Mt Laurel, NJ 08054 |
| **Reference:** PHH Mortgage Account #  |

| Regular Mail |
| --- |
| **Money Order, Personal Check, or Certified Check** |
| **Send To**: PHH Mortgage Services<br>1 Mortgage Way SV22<br>Mt Laurel, NJ 08054 |
| **Reference:** PHH Mortgage Account #  |

| Money Gram |
| --- |
| **Receiver Code:** 7440<br>**Payable to:** PHH Mortgage<br>**City:** Mt Laurel<br>**State:** New Jersey<br>**Reference:** PHH Mortgage Account #<br>**Agent Locator:** (800) 926-9400 |

| Western Union |
| --- |
| **By WUQC: Western Union Quick Collect**<br>**Code City:** PHHUS<br>**State:** NJ<br>**Reference:** PHH Mortgage Account # |

9-814-BIZ58-0000094-001-07-000-001-000-000

*OCWN_PLS_FNL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

NMLS # 2726

**CONFIDENTIAL**

REPRESENTATION OF PRINTED DOCUMENT

PHH000194



Loan Number: ██████████

Investor Loan Number: ██████████

This document was prepared by PHH Mortgage Corporation

After Recording Return To:
PHH Mortgage Corporation
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838

_____ [Space Above This Line For Recording Data] _____

# LOAN MODIFICATION AGREEMENT

Borrower (s):  ANGELA RUCKMAN

<u>THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $22,644.26, TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.</u>

BALLOON PAYMENT DISCLOSURE
THIS MODIFICATION AGREEMENT INCLUDES A BALLOON PAYMENT, WHICH MEANS THAT EVEN IF YOU MAKE ALL THE SCHEDULED PAYMENTS WHEN DUE, THE LOAN WILL NOT BE PAID IN FULL AT THE END OF ITS TERM. AS A RESULT, ON THE MATURITY DATE OUTLINED WITHIN THIS AGREEMENT, YOU WILL BE REQUIRED TO REPAY, IN  A SINGLE PAYMENT, THE ENTIRE REMAINING PRINCIPAL BALANCE PLUS ALL ACCRUED BUT UNPAID INTEREST AND ALL OTHER AMOUNTS OWING ON THAT DATE (INCLUDING BUT NOT LIMITED TO  ALL ADVANCES MADE BY LOAN SERVICER UNDER THE TERMS OF THE SECURITY INSTRUMENT).

*CAUTION TO BORROWER: NO OBLIGATION TO REFINANCE* – LOAN SERVICER HAS NO OBLIGATION TO REFINANCE THIS LOAN OR MAKE YOU A NEW LOAN ON THE MATURITY DATE. IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST THE PROPERTY TO MAKE THE BALLOON PAYMENT. ASSUMING ANOTHER LENDER MAKES YOU A NEW LOAN ON THE MATURITY DATE, YOU WILL PROBABLY BE CHARGED INTEREST AT THE MARKET RATE PREVAILING AT THAT TIME.  SUCH INTEREST RATE MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN.  YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN.  IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE PROPERTY AND ALL OF THE EQUITY THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING WHETHER TO AGREE TO THE TERMS OF THIS LOAN MODIFICATION.

9-814-BIZS8-0000094-001-08-000-001-000-000

INTERNET REPRINT

**CONFIDENTIAL**

PHH000195

The debtor, ANGELA RUCKMAN, and HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 through the servicer of the underlying mortgage loan agreement, PHH Mortgage Corporation, have agreed to modify the terms of said underlying mortgage loan agreement. HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 is the owner of the loan and retains all rights to collect payments as per the underlying mortgage loan agreement. PHH Mortgage Corporation, remains servicer for said underlying mortgage loan agreement.

This Loan Modification Agreement ("Agreement"), made this 6th day of November, 2020 ("Modification Agreement Date"), between ANGELA RUCKMAN ("Borrower") and PHH Mortgage Corporation, Lender/Servicer or Agent for Lender/Servicer ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 08/24/2005 and recorded in the Records of Richland County, OH and (2) the Note, bearing the same date as, and secured by, the Security Instrument (collectively, "Loan Documents"), which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at 

### 837 S MAIN ST
### MANSFIELD, OH 44907

The real property described being set forth as follows:

(Legal Description Attached, if applicable, for Recording Only)

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

Representations:

1. Borrower is experiencing a financial hardship and as a result, 1) is or will be in default under the Loan Documents and 2) does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Loan Documents.
2. Under penalty of perjury, if required by the Lender, borrower provided Lender with full and complete information that, when provided, accurately stated borrower's income, expenses, and assets. To the extent requested by Lender, borrower provided documents that supported that information.
3. Borrower has made any and all required trial period plan payments or down payments.
4. Borrower currently has sufficient income to support the financial obligations under the Loan Documents, as modified by this Agreement.
5. Borrower understands that property title may be reviewed as a precondition to the modification.

Acknowledgements and Preconditions to the Modification:

1. Lender has no obligation to make any modification of the Loan Documents if any of the requirements under this Agreement are not met.
2. Prior to the Modification Effective Date (defined as 11/01/2020), if Lender determines that any of the representations above are no longer true and correct, 1) the Loan Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Loan Documents.
3. The Loan Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

Modified Loan Terms:

1. If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Loan Documents will automatically become modified on 11/01/2020. If Borrower has failed to make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

The new Maturity Date will be 10/01/2035.

Borrower understands that in order to reach an affordable payment under this modification, the loan may have been re-

9-814-BIZ58-0000094-001-09-000-001-000-000

CONFIDENTIAL

PHH000196

amortized beyond the maturity date. This means that if all payments are made in accordance with the loan terms, when Borrower reaches the maturity date, there will be an outstanding amount still due.

This amount includes an interest-bearing balloon payment in the amount of $22,644.26 ("Balloon Payment") which is due when the loan reaches maturity, sold, refinanced or otherwise accepted by the Lender as paid in full. Borrower specifically acknowledges that this is a balloon modification and therefore Borrower will have a balloon payment due at maturity in the approximate amount of $22,644.26.



BALLOON PAYMENT: THIS MORTGAGE LOAN CONTAINS A BALLOON PAYMENT PROVISION. A BALLOON PAYMENT IS A SCHEDULED LUMP SUM USUALLY DUE AT THE END OF THE MORTGAGE LOAN TERM THAT IS SIGNIFICANTLY LARGER THAN THE OTHER REGULARLY SCHEDULED PERIODIC PAYMENTS. IF YOU CANNOT PAY THE BALLOON PAYMENT WHEN DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN TO MAKE THE BALLOON PAYMENT OR YOU MAY LOSE YOUR PROPERTY THROUGH FORECLOSURE. BEFORE DECIDING TO TAKE THIS LOAN, CONSIDER YOUR ABILITY TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE.  THE BALLOON PAYMENT ON THE MORTGAGE LOAN YOU HAVE APPLIED FOR IS DUE 179 MONTHS FROM THE DATE YOUR MORTGAGE LOAN BEGINS.

CAUTION TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY FOR YOU TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY FOR THIS PURPOSE AND YOU MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN THAT YOU OBTAIN AT THIS TIME.

2. The current Unpaid Principal Balance is $51,720.69. The New Principal Balance of the Note will be $58,552.36 (the "New Principal Balance"). This includes amounts and arrearages that are past due as of the Modification Effective Date (including, but not limited to, unpaid and any previously deferred principal and interest, fees, escrow advances and other costs, collectively, "Unpaid Amounts") excluding any fees, costs and/or corporate advances not added to the account as of the Modification Agreement Date and amounts not added to the New Principal Balance due to investor and/or mortgage insurer restrictions less any amounts paid to the Lender but not previously credited to the Loan.  Any amounts not added to the New Principal Balance will remain on the account until paid and will become due when the interest-bearing balance is paid in full or upon maturity as applicable pursuant to State or Federal law.

3.  The New Principal Balance may represent the sum of the "Deferred Principal Balance" (if applicable), the "Principal Forgiveness" (if applicable) and the "Interest Bearing Principal Balance." The Interest Bearing Principal Balance is $58,552.36.  Borrower understands that by agreeing to add the Unpaid Amounts to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement.  Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the New Principal Balance, which would not happen without this Agreement.

4. Borrower promises to pay the New Principal Balance, plus interest, and any future fees/costs to the order of the Lender. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 2.875%, beginning 11/01/2020. Borrower promises to make monthly payments of principal and interest of U.S. $301.17, beginning on 12/01/2020 and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.  Borrower promises to also pay any applicable monthly escrow payments as outlined in this Agreement.  The initial monthly escrow amount is $167.95. The yearly rate of 2.875% will remain in effect until principal and interest are paid in full.  If on 10/01/2035 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full all amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) The Maturity Date.

The initial monthly escrow amount is $167.95. The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total

9-814-BIZ58-0000094-001-10-000-001-000-000

CONFIDENTIAL

monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate (%) | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* (adjusts periodically) | Total Monthly Payment* (adjusts periodically) | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 14.92 | 2.875 | 11/01/2020 | $301.17 | $167.95 | $469.12 | 12/01/2020 | 179 |



*The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

## Additional Agreements:

1. Transfer of Property. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

2. Original Loan Document Conditions. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument and Note, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument and Note; however, if applicable, the following terms and provisions are forever canceled, null and void, as of 11/01/2020:

   a. all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

   b. all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

3. Borrower understands and agrees that:
   a. Default Under the Modification. All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

   b. Original Loan Document Conditions. All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law.  Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender. Borrower agrees that the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

9-814-BIZ58-0000094-001-11-000-001-000-000

CONFIDENTIAL

PHH000198

c.  Modification Does Not Constitute Release. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

d.  Costs and Expenses. All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender or not permitted per State or federal law.

e.  Agreement to Provide Any Additional Modification Documents. Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower. Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement.  Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature.  At Lender's option, this Agreement will be void and of no legal effect upon notice of such error.  If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement.  Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement.

f.  Agreement of Use of Non-Public Information. Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower  information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's  loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

g.  Consent to Contact. Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

4.  Escrow Account. By this section, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked and Borrower has been advised of the amount needed to fully fund the Escrow Account.

Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items."  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all

INTERNET REPRINT

CONFIDENTIAL

9-814-BIZ58-0000094-001-12-000-001-000-000

REPRESENTATION OF PRINTED DOCUMENT

PHH000199

purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.



The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds.  Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

5.  Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

6.  Inclusion of Exhibits. Borrower authorizes Lender to attach an Exhibit A to this Agreement, which may include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk (or other recordation office) to allow for recording if and when Lender seeks recordation.

7.  Errors and Omissions. That if any documents related to the loan documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary.  All documents the Lender requests of Borrower under this section shall be referred to as "Documents."  Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement.  At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

8.  Final Agreement. This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower. This Modification constitutes the entire agreement between the Lender

CONFIDENTIAL

PHH000200

and Borrower and supersedes all previous negotiations and discussions between the Borrower and the Lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms.  There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

9.  Additional Events of Default.  Without limiting the other events of default set forth in the Loan Documents, Borrower will be in default under this Agreement and under the Loan Documents upon the occurrence of any one or more of these events:

   a.  Any material representation or warranty made by you in the Loan Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

   b.  Borrower fails to make the New Monthly Payments as required by this Agreement.

   c.  Borrower sells or conveys any interest in the Property without Lender's prior written consent.

   d.  Breach of any of the terms or provisions of this Agreement.



10.  Consequences of Default.  If Borrower defaults under this Agreement or the Loan Documents after the Modification Effective Date (your "Default"), Lender may, in addition to the remedies provided by the Loan Documents, subject only to applicable law, institute any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against Borrower under the Loan Documents and/or this Agreement.

11.  Mortgage Insurance. Borrower understands that the mortgage insurance premiums on the Loan, if applicable, may increase as a result of the capitalization which may result in a higher total monthly payment.  Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

12.  Credit Reporting. Lender is required to report factual information to the credit reporting agencies. Lender may report information about the account to credit bureaus.  Late payments, missed payments, or other defaults on the account may be reflected in the credit report.

13.  No Novation.  Borrower expressly agrees that this Agreement is not a new loan from Lender but simply the modification of the existing obligations under the Loan Documents.  Neither Borrower nor Lender has any intention to extinguish or discharge the indebtedness or the liens evidenced by the Loan Documents.

14.  Discharged Bankruptcy. Notwithstanding anything to the contrary contained in this Agreement, Borrower and Lender acknowledge the effect of a discharge in bankruptcy that has been granted to Borrower prior to the execution of this Agreement and that Lender may not pursue Borrower for personal liability.  However, Borrower acknowledges that Lender retains certain rights, including but not limited to the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances.  The parties agree that the consideration for this Agreement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of Borrower's default thereunder.  Nothing in this Agreement shall be construed to be an attempt to collect against Borrower personally or an attempt to revive personal liability.

9-814-BIZ58-0000094-001-14-000-001-000-000

**CONFIDENTIAL**

## BORROWER ACKNOWLEDGEMENT

**IMPORTANT – Do NOT sign this Agreement unless you are in the presence of a notary. If extenuating circumstances prevent one notary signature, separately signed and notarized agreements will be accepted; however, the agreements must be returned in the same package to PHH Mortgage Corporation.**

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

_____          _____
Date                             ANGELA RUCKMAN

CONFIDENTIAL

PHH000202

State of _____

County of _____

On this ___ day of _____ , _____ , before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _____

9-814-BIZ58-0000094-001-16-000-001-000-000

CONFIDENTIAL

REPRESENTATION OF PRINTED DOCUMENT

PHH000203

# LENDER ACKNOWLEDGEMENT

### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

PHH Mortgage Corporation

_____

Authorized Signer


_____

Date


State of _____

County of _____

On this ___ day of _____, _____, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of PHH Mortgage Corporation., said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.


_____
Notary Public

My Commission Expires: _____

9-814-BIZ58-0000094-001-17-000-001-000-000

CONFIDENTIAL

REPRESENTATION OF PRINTED DOCUMENT

PHH000204



Loan Number: ▮▮▮▮▮▮▮

Investor Loan Number: ▮▮▮▮▮▮▮

This document was prepared by PHH Mortgage Corporation

After Recording Return To:
PHH Mortgage Corporation
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838

_____ [Space Above This Line For Recording Data] _____

## LOAN MODIFICATION AGREEMENT

Borrower (s):  ANGELA RUCKMAN

<u>THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $22,644.26, TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.</u>

BALLOON PAYMENT DISCLOSURE
THIS MODIFICATION AGREEMENT INCLUDES A BALLOON PAYMENT, WHICH MEANS THAT EVEN IF YOU MAKE ALL THE SCHEDULED PAYMENTS WHEN DUE, THE LOAN WILL NOT BE PAID IN FULL AT THE END OF ITS TERM. AS A RESULT, ON THE MATURITY DATE OUTLINED WITHIN THIS AGREEMENT, YOU WILL BE REQUIRED TO REPAY, IN  A SINGLE PAYMENT, THE ENTIRE REMAINING PRINCIPAL BALANCE PLUS ALL ACCRUED BUT UNPAID INTEREST AND ALL OTHER AMOUNTS OWING ON THAT DATE (INCLUDING BUT NOT LIMITED TO  ALL ADVANCES MADE BY LOAN SERVICER UNDER THE TERMS OF THE SECURITY INSTRUMENT).

*CAUTION TO BORROWER: NO OBLIGATION TO REFINANCE* – LOAN SERVICER HAS NO OBLIGATION TO REFINANCE THIS LOAN OR MAKE YOU A NEW LOAN ON THE MATURITY DATE. IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST THE PROPERTY TO MAKE THE BALLOON PAYMENT. ASSUMING ANOTHER LENDER MAKES YOU A NEW LOAN ON THE MATURITY DATE, YOU WILL PROBABLY BE CHARGED INTEREST AT THE MARKET RATE PREVAILING AT THAT TIME.  SUCH INTEREST RATE MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN.  YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN.  IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE PROPERTY AND ALL OF THE EQUITY THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING WHETHER TO AGREE TO THE TERMS OF THIS LOAN MODIFICATION.

9-814-BIZ58-0000094-001-18-000-001-000-000

INTERNET REPRINT

**CONFIDENTIAL**

PHH000205

The debtor, ANGELA RUCKMAN, and HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 through the servicer of the underlying mortgage loan agreement, PHH Mortgage Corporation,  have agreed to modify the terms of said underlying mortgage loan agreement. HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 is the owner of the loan and retains all rights to collect payments as per the underlying mortgage loan agreement.  PHH Mortgage Corporation, remains servicer for said underlying mortgage loan agreement.

This Loan Modification Agreement ("Agreement"), made this 6th day of November, 2020 ("Modification Agreement Date"), between ANGELA RUCKMAN ("Borrower") and PHH Mortgage Corporation, Lender/Servicer or Agent for Lender/Servicer ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 08/24/2005 and recorded in the Records of Richland County, OH and (2) the Note, bearing the same date as, and secured by, the Security Instrument (collectively, "Loan Documents"), which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at 

837 S MAIN ST
MANSFIELD, OH 44907

The real property described being set forth as follows:

(Legal Description Attached, if applicable, for Recording Only)

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

Representations:

1. Borrower is experiencing a financial hardship and as a result, 1) is or will be in default under the Loan Documents and 2) does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Loan Documents.
2. Under penalty of perjury, if required by the Lender, borrower provided Lender with full and complete information that, when provided, accurately stated borrower's income, expenses, and assets. To the extent requested by Lender, borrower provided documents that supported that information.
3. Borrower has made any and all required trial period plan payments or down payments.
4. Borrower currently has sufficient income to support the financial obligations under the Loan Documents, as modified by this Agreement.
5. Borrower understands that property title may be reviewed as a precondition to the modification.

Acknowledgements and Preconditions to the Modification:

1. Lender has no obligation to make any modification of the Loan Documents if any of the requirements under this Agreement are not met.
2. Prior to the Modification Effective Date (defined as 11/01/2020), if Lender determines that any of the representations above are no longer true and correct, 1) the Loan Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Loan Documents.
3. The Loan Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

Modified Loan Terms:

1. If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Loan Documents will automatically become modified on 11/01/2020.  If Borrower has failed to make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

   The new Maturity Date will be 10/01/2035.

   Borrower understands that in order to reach an affordable payment under this modification, the loan may have been re-

9-814-BIZS8-0000094-001-19-000-001-000-000

CONFIDENTIAL

PHH000206

amortized beyond the maturity date. This means that if all payments are made in accordance with the loan terms, when Borrower reaches the maturity date, there will be an outstanding amount still due.

This amount includes an interest-bearing balloon payment in the amount of $22,644.26 ("Balloon Payment") which is due when the loan reaches maturity, sold, refinanced or otherwise accepted by the Lender as paid in full. Borrower specifically acknowledges that this is a balloon modification and therefore Borrower will have a balloon payment due at maturity in the approximate amount of $22,644.26.

BALLOON PAYMENT: THIS MORTGAGE LOAN CONTAINS A BALLOON PAYMENT PROVISION. A BALLOON PAYMENT IS A SCHEDULED LUMP SUM USUALLY DUE AT THE END OF THE MORTGAGE LOAN TERM THAT IS SIGNIFICANTLY LARGER THAN THE OTHER REGULARLY SCHEDULED PERIODIC PAYMENTS. IF YOU CANNOT PAY THE BALLOON PAYMENT WHEN DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN TO MAKE THE BALLOON PAYMENT OR YOU MAY LOSE YOUR PROPERTY THROUGH FORECLOSURE. BEFORE DECIDING TO TAKE THIS LOAN, CONSIDER YOUR ABILITY TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE.  THE BALLOON PAYMENT ON THE MORTGAGE LOAN YOU HAVE APPLIED FOR IS DUE 179 MONTHS FROM THE DATE YOUR MORTGAGE LOAN BEGINS.

CAUTION TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY FOR YOU TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY FOR THIS PURPOSE AND YOU MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN THAT YOU OBTAIN AT THIS TIME.

2.  The current Unpaid Principal Balance is $51,720.69. The New Principal Balance of the Note will be $58,552.36 (the "New Principal Balance"). This includes amounts and arrearages that are past due as of the Modification Effective Date (including, but not limited to, unpaid and any previously deferred principal and interest, fees, escrow advances and other costs, collectively, "Unpaid Amounts") excluding any fees, costs and/or corporate advances not added to the account as of the Modification Agreement Date and amounts not added to the New Principal Balance due to investor and/or mortgage insurer restrictions less any amounts paid to the Lender but not previously credited to the Loan.  Any amounts not added to the New Principal Balance will remain on the account until paid and will become due when the interest-bearing balance is paid in full or upon maturity as applicable pursuant to State or Federal law.

3.   The New Principal Balance may represent the sum of the "Deferred Principal Balance" (if applicable), the "Principal Forgiveness" (if applicable) and the "Interest Bearing Principal Balance." The Interest Bearing Principal Balance is $58,552.36.  Borrower understands that by agreeing to add the Unpaid Amounts to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement.  Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the New Principal Balance, which would not happen without this Agreement.

4.  Borrower promises to pay the New Principal Balance, plus interest, and any future fees/costs to the order of the Lender. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 2.875%, beginning 11/01/2020. Borrower promises to make monthly payments of principal and interest of U.S. $301.17, beginning on 12/01/2020 and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.  Borrower promises to also pay any applicable monthly escrow payments as outlined in this Agreement.  The initial monthly escrow amount is $167.95. The yearly rate of 2.875% will remain in effect until principal and interest are paid in full.  If on 10/01/2035 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full all amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) The Maturity Date.

The initial monthly escrow amount is $167.95. The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total

9-814-BIZ58-0000094-001-20-000-001-000-000

INTERNET REPRINT



**CONFIDENTIAL**

PHH000207

monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Borrower's payment schedule for the modified Loan is as follows:



| Years | Interest Rate (%) | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* (adjusts periodically) | Total Monthly Payment* (adjusts periodically) | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 14.92 | 2.875 | 11/01/2020 | $301.17 | $167.95 | $469.12 | 12/01/2020 | 179 |

*The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Additional Agreements:

1. Transfer of Property. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

2. Original Loan Document Conditions. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument and Note, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument and Note; however, if applicable, the following terms and provisions are forever canceled, null and void, as of  11/01/2020:

   a. all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

   b. all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

3. Borrower understands and agrees that:
   a. Default Under the Modification. All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

   b. Original Loan Document Conditions. All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law.  Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender. Borrower agrees that the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

9-814-BIZ58-0000094-001-21-000-001-000-000

CONFIDENTIAL

c.  Modification Does Not Constitute Release. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

d.  Costs and Expenses. All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender or not permitted per State or federal law.

e.  Agreement to Provide Any Additional Modification Documents. Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower. Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement.  Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature.  At Lender's option, this Agreement will be void and of no legal effect upon notice of such error.  If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement.  Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement.



f.  Agreement of Use of Non-Public Information. Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower  information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's  loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

g.  Consent to Contact. Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

4.  Escrow Account. By this section, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked and Borrower has been advised of the amount needed to fully fund the Escrow Account.

Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items."  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all

CONFIDENTIAL

PHH000209

purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount.  Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.



The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds.  Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

5.   Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

6.   Inclusion of Exhibits. Borrower authorizes Lender to attach an Exhibit A to this Agreement, which may include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk (or other recordation office) to allow for recording if and when Lender seeks recordation.

7.   Errors and Omissions. That if any documents related to the loan documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary.  All documents the Lender requests of Borrower under this section shall be referred to as "Documents."  Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement.  At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

8.   Final Agreement. This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower. This Modification constitutes the entire agreement between the Lender

CONFIDENTIAL

REPRESENTATION OF PRINTED DOCUMENT

PHH000210

and Borrower and supersedes all previous negotiations and discussions between the Borrower and the Lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms.  There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

9.  Additional Events of Default.  Without limiting the other events of default set forth in the Loan Documents, Borrower will be in default under this Agreement and under the Loan Documents upon the occurrence of any one or more of these events:

    a.  Any material representation or warranty made by you in the Loan Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

    b.  Borrower fails to make the New Monthly Payments as required by this Agreement.



    c.  Borrower sells or conveys any interest in the Property without Lender's prior written consent.

    d.  Breach of any of the terms or provisions of this Agreement.

10.  Consequences of Default.  If Borrower defaults under this Agreement or the Loan Documents after the Modification Effective Date (your "Default"), Lender may, in addition to the remedies provided by the Loan Documents, subject only to applicable law, institute any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against Borrower under the Loan Documents and/or this Agreement.

11.  Mortgage Insurance. Borrower understands that the mortgage insurance premiums on the Loan, if applicable, may increase as a result of the capitalization which may result in a higher total monthly payment.  Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

12.  Credit Reporting. Lender is required to report factual information to the credit reporting agencies. Lender may report information about the account to credit bureaus.  Late payments, missed payments, or other defaults on the account may be reflected in the credit report.

13.  No Novation.  Borrower expressly agrees that this Agreement is not a new loan from Lender but simply the modification of the existing obligations under the Loan Documents.   Neither Borrower nor Lender has any intention to extinguish or discharge the indebtedness or the liens evidenced by the Loan Documents.

14.  Discharged Bankruptcy. Notwithstanding anything to the contrary contained in this Agreement, Borrower and Lender acknowledge the effect of a discharge in bankruptcy that has been granted to Borrower prior to the execution of this Agreement and that Lender may not pursue Borrower for personal liability.  However, Borrower acknowledges that Lender retains certain rights, including but not limited to the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances.  The parties agree that the consideration for this Agreement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of Borrower's default thereunder.  Nothing in this Agreement shall be construed to be an attempt to collect against Borrower personally or an attempt to revive personal liability.

CONFIDENTIAL

REPRESENTATION OF PRINTED DOCUMENT

PHH000211

## BORROWER ACKNOWLEDGEMENT

**IMPORTANT – Do NOT sign this Agreement unless you are in the presence of a notary. If extenuating circumstances prevent one notary signature, separately signed and notarized agreements will be accepted; however, the agreements must be returned in the same package to PHH Mortgage Corporation.**

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

_____          _____
Date                                                     ANGELA RUCKMAN

9-814-BIZ58-0000094-001-25-000-001-000-000

**CONFIDENTIAL**

State of _____

County of _____

On this ___ day of _____ , _____ , before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____

Notary Public

My Commission Expires: _____



9-814-BIZ58-0000094-001-26-000-001-000-000

CONFIDENTIAL

REPRESENTATION OF PRINTED DOCUMENT

PHH000213

# Lender Acknowledgement

### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

PHH Mortgage Corporation

_____

Authorized Signer

_____

Date

State of _____

County of _____

On this \_\_ day of _____, \_\_\_\_, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of PHH Mortgage Corporation., said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____

Notary Public

My Commission Expires: _____

9-814-BIZ58-0000094-001-27-000-001-000-000

CONFIDENTIAL

## Ashley E. Mueller

**Subject:**          2020 CV 0169    CH file 20-00349  Modification

**From:** Diane S. Bennett
**Sent:** Monday, December 7, 2020 11:53 AM
**To:** 'aruckman419@gmail.com'
**Subject:** RE: 2020 CV 0169 CH file 20-00349 Modification

Good Morning:

Our client has reviewed your counter offer and it has been rejected, terms of the offer cannot be changed.
The investor does  not allow maturity date extensions, and in order for our client to provide a monthly payment you can afford,  the balloon payment is necessary on the final modification.
You do have the option of  refinancing the balloon payment with another lender before it becomes due.
If you reapply, there is no guarantee there will be a better offer, typically, the first offer is the best, but you are welcome to reapply if you choose.

**From:** Diane S. Bennett
**Sent:** Tuesday, December 01, 2020 3:26 PM
**To:** 'aruckman419@gmail.com'
**Subject:** RE: 2020 CV 0169 CH file 20-00349 Modification

Hello Angela:
The investor has granted an extension until 12/31/20 for PHH to receive the signed permanent mod docs from you.

**From:** Diane S. Bennett
**Sent:** Monday, November 30, 2020 3:38 PM
**To:** 'aruckman419@gmail.com'
**Subject:** RE: 2020 CV 0169 CH file 20-00349 Modification

Hello:

Just a reminder that the permanent mod docs need to be returned to our client by 12/1/20.  At the very least, you need to get your payment sent in so they know you plan to accept.
Have you met with an attorney?

**From:** Diane S. Bennett
**Sent:** Monday, November 23, 2020 2:08 PM
**To:** 'aruckman419@gmail.com'
**Subject:** FW: 2020 CV 0169 CH file 20-00349 Modification

Hello Angela:

Our client has put a request in for an extension on returning the signed modification documents; however, the <u>first payment still needs to be received by 12/1/20.</u>



1

EXHIBIT
5

The monthly payment of $301.17 is for the principal and interest, but only a portion of the $301.17 will be applied to the unpaid principal balance;  once the loan matures after 179 payments whatever amount of the unpaid principal that is remaining is in the balloon payment.

It's a way of getting your payments low enough that you can afford them and be able to keep your house.

**Ashley E. Mueller**

| | |
|---|---|
| **From:** | Diane S. Bennett |
| **Sent:** | Tuesday, January 12, 2021 2:26 PM |
| **To:** | 'aruckman419@neo.rr.com' |
| **Subject:** | RE: 2020 CV 0169    CH file 20-00349  Modification |

I am waiting on a response from our client if that is still available to you.
If you want to try to accept it, you need to sign, notarize(if required) and return the original signed documents to them as soon as possible via overnight mail – keep the tracking information or send it to me.  Documents are rarely re-drafted.  Nov first would be the correct effective date.

This is the overnight mailing address:
PHH Mortgage Services
Attn: Modifications
5720 Premier Park Drive
West Palm Beach, FL 33407

**From:** aruckman419@neo.rr.com [mailto:aruckman419@neo.rr.com]
**Sent:** Tuesday, January 12, 2021 2:22 PM
**To:** Diane S. Bennett
**Subject:** Re: 2020 CV 0169 CH file 20-00349 Modification

Yes permanent modification. I ve made the December and January payment. The paperwork refers to 11/1/2020 as the effective date.

------ Original message------
**From:** Diane S. Bennett
**Date:** Mon, Jan 11, 2021 2:28 PM
**To:** aruckman419@neo.rr.com;
**Cc:**
**Subject:**RE: 2020 CV 0169 CH file 20-00349 Modification

Good Afternoon:

What updated documents are you referring to that you need to sign?

If you are referring to the permanent modification that was previously offered, I don't know if that is even still available to you.  Your first modified payment was due on 12/1/20, and the second payment was due on 1/1/21.   The monthly payment amount is $469.12.  The balloon pmt of $22,644.26 is due on 10/1/2035 in one lump sum.   In addition, the modification states that if your financial situation has changed the offer can be invalidated.

I checked our client's imaging system and our file, neither of us are showing any new application documents received from you.  Do you have proof of a fax, proof of an email, tracking information if sent by the US postal service?  If so, please advise when the documents were delivered and who signed for them.

1

EXHIBIT

6

**From:** aruckman419@neo.rr.com [mailto:aruckman419@neo.rr.com]
**Sent:** Monday, January 11, 2021 12:28 PM
**To:** Diane S. Bennett
**Subject:** Re: 2020 CV 0169 CH file 20-00349 Modification

I no longer receive $194 in EBT benefits. Still waiting on my PUA Unemployment benefits to be paid. I filed in May. I received an email in december stating they have received my application for benefits and its being processed. Im still working self employed, but not with all my clients due to covid. Which entitles me to PUA benefits.

The balloon payment was what i was trying to get reduced. In reality my house payment is $578 still, when you calculate what needs to be added in for the balloon payment each month, for 15 years.

If PHH doesn't have my paperwork and your office doesn't have it, where could it have gone this time? This is what took place before.  Everyone claimed no paperwork was received and could not explain to myself or the credit counselor what happened.

At this point and with court fast approaching, I'm kinda stuck. Payment is still $578 which currently is high with current circumstances, but this house is the only thing I have connecting me to my deceased daughter.

Will you be sending updated documents for me to sign?

------ Original message------

**From:** Diane S. Bennett

**Date:** Thu, Jan 7, 2021 2:06 PM

**To:** 'aruckman419@neo.rr.com';

**Cc:**

**Subject:**RE: 2020 CV 0169 CH file 20-00349 Modification

Hello:

If your financial situation has not changed, it is not likely to result in a different outcome.

2

They might offer you another trial plan, but the end result will likely be similar because our client has to stay within the investor guidelines on this loan.  The balloon payment is the only way to get you into an affordable payment.

Our office has not received any financials from you and I didn't see anything in PHH's imaging system that was received. Last thing I see is the perm mod offer.

You can fax financials to our office at <u>330-436-0301</u> or email pdf attachments only to our office at <u>keepmyhome@clunkhoose.com.</u>

**From:** aruckman419@neo.rr.com [mailto:aruckman419@neo.rr.com]
**Sent:** Thursday, January 07, 2021 1:07 PM
**To:** Diane S. Bennett
**Subject:** 2020 CV 0169 CH file 20-00349 Modification

I sent another request for a modification approximately

3 1/2weeks ago to PHH. With the holidays im not sure if that put things behind? I have not received any responce. Will it come from your office or directly from PHH? The next court date is not that far away.

Angela Ruckman

**The JDC Family of Companies®:**
Clunk, Hoose Co., LPA
Omega Title Agency, LLC

**Confidentiality Notice:**

Federal and State Law requires that we inform you that this firm is a debt collector attempting to collect a debt and any information we obtain may be used for that purpose. The information contained in this email is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message.

**The JDC Family of Companies®:**
Clunk, Hoose Co., LPA
Omega Title Agency, LLC

**Confidentiality Notice:**

Federal and State Law requires that we inform you that this firm is a debt collector attempting to collect a debt and any information we obtain may be used for that purpose. The information contained in this email is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination,

distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message.



Loan Number: ███████
Investor Loan Number: ███████████

This document was prepared by PHH Mortgage Corporation

**After Recording Return To:**
PHH Mortgage Corporation
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838

_____ [Space Above This Line For Recording Data] _____

# LOAN MODIFICATION AGREEMENT

Borrower (s):  ANGELA RUCKMAN

**THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $22,644.26, TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.**

**BALLOON PAYMENT DISCLOSURE**
**THIS MODIFICATION AGREEMENT INCLUDES A BALLOON PAYMENT, WHICH MEANS THAT EVEN IF YOU MAKE ALL THE SCHEDULED PAYMENTS WHEN DUE, THE LOAN WILL NOT BE PAID IN FULL AT THE END OF ITS TERM. AS A RESULT, ON THE MATURITY DATE OUTLINED WITHIN THIS AGREEMENT, YOU WILL BE REQUIRED TO REPAY, IN  A SINGLE PAYMENT, THE ENTIRE REMAINING PRINCIPAL BALANCE PLUS ALL ACCRUED BUT UNPAID INTEREST AND ALL OTHER AMOUNTS OWING ON THAT DATE (INCLUDING BUT NOT LIMITED TO  ALL ADVANCES MADE BY LOAN SERVICER UNDER THE TERMS OF THE SECURITY INSTRUMENT).**

_CAUTION TO BORROWER: NO OBLIGATION TO REFINANCE_ **– LOAN SERVICER HAS NO OBLIGATION TO REFINANCE THIS LOAN OR MAKE YOU A NEW LOAN ON THE MATURITY DATE. IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST THE PROPERTY TO MAKE THE BALLOON PAYMENT. ASSUMING ANOTHER LENDER MAKES YOU A NEW LOAN ON THE MATURITY DATE, YOU WILL PROBABLY BE CHARGED INTEREST AT THE MARKET RATE PREVAILING AT THAT TIME.  SUCH INTEREST RATE MAY BE HIGHER THAN THE INTEREST RATE PAID ON THIS LOAN.  YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN.  IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE PROPERTY AND ALL OF THE EQUITY THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING WHETHER TO AGREE TO THE TERMS OF THIS LOAN MODIFICATION.**

Page 1

EXHIBIT

7

The debtor, ANGELA RUCKMAN, and HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 through the servicer of the underlying mortgage loan agreement, PHH Mortgage Corporation, have agreed to modify the terms of said underlying mortgage loan agreement. HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 is the owner of the loan and retains all rights to collect payments as per the underlying mortgage loan agreement. PHH Mortgage Corporation, remains servicer for said underlying mortgage loan agreement.

This Loan Modification Agreement ("Agreement"), made this 6th day of November, 2020 ("Modification Agreement Date"), between ANGELA RUCKMAN ("Borrower") and PHH Mortgage Corporation, Lender/Servicer or Agent for Lender/Servicer ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 08/24/2005 and recorded in the Records of Richland County, OH and (2) the Note, bearing the same date as, and secured by, the Security Instrument (collectively, "Loan Documents"), which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at



837 S MAIN ST
MANSFIELD, OH 44907

The real property described being set forth as follows:

**(Legal Description Attached, if applicable, for Recording Only)**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

**Representations:**

1. Borrower is experiencing a financial hardship and as a result, 1) is or will be in default under the Loan Documents and 2) does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Loan Documents.
2. Under penalty of perjury, if required by the Lender, borrower provided Lender with full and complete information that, when provided, accurately stated borrower's income, expenses, and assets. To the extent requested by Lender, borrower provided documents that supported that information.
3. Borrower has made any and all required trial period plan payments or down payments.
4. Borrower currently has sufficient income to support the financial obligations under the Loan Documents, as modified by this Agreement.
5. Borrower understands that property title may be reviewed as a precondition to the modification.

**Acknowledgements and Preconditions to the Modification:**

1. Lender has no obligation to make any modification of the Loan Documents if any of the requirements under this Agreement are not met.
2. Prior to the Modification Effective Date (defined as 11/01/2020), if Lender determines that any of the representations above are no longer true and correct, 1) the Loan Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Loan Documents.
3. The Loan Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

**Modified Loan Terms:**

1. If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Loan Documents will automatically become modified on 11/01/2020. If Borrower has failed to make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

   The new Maturity Date will be 10/01/2035.

   Borrower understands that in order to reach an affordable payment under this modification, the loan may have been re-

9-814-BJZ58-0000094-001-19-000-001-000-000

amortized beyond the maturity date. This means that if all payments are made in accordance with the loan terms, when Borrower reaches the maturity date, there will be an outstanding amount still due.

This amount includes an interest-bearing balloon payment in the amount of $22,644.26 ("Balloon Payment") which is due when the loan reaches maturity, sold, refinanced or otherwise accepted by the Lender as paid in full. Borrower specifically acknowledges that this is a balloon modification and therefore Borrower will have a balloon payment due at maturity in the approximate amount of $22,644.26.



**BALLOON PAYMENT: THIS MORTGAGE LOAN CONTAINS A BALLOON PAYMENT PROVISION. A BALLOON PAYMENT IS A SCHEDULED LUMP SUM USUALLY DUE AT THE END OF THE MORTGAGE LOAN TERM THAT IS SIGNIFICANTLY LARGER THAN THE OTHER REGULARLY SCHEDULED PERIODIC PAYMENTS. IF YOU CANNOT PAY THE BALLOON PAYMENT WHEN DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN TO MAKE THE BALLOON PAYMENT OR YOU MAY LOSE YOUR PROPERTY THROUGH FORECLOSURE. BEFORE DECIDING TO TAKE THIS LOAN, CONSIDER YOUR ABILITY TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE.  THE BALLOON PAYMENT ON THE MORTGAGE LOAN YOU HAVE APPLIED FOR IS DUE 179 MONTHS FROM THE DATE YOUR MORTGAGE LOAN BEGINS.**

**CAUTION TO BORROWER: IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN DUE, IT MAY BE NECESSARY FOR YOU TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY FOR THIS PURPOSE AND YOU MAY BE REQUIRED TO AGAIN PAY COMMISSION AND EXPENSES FOR ARRANGING THE LOAN. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THE LOAN THAT YOU OBTAIN AT THIS TIME.**

2.   The current Unpaid Principal Balance is $51,720.69. The New Principal Balance of the Note will be $58,552.36 (the "New Principal Balance"). This includes amounts and arrearages that are past due as of the Modification Effective Date (including, but not limited to, unpaid and any previously deferred principal and interest, fees, escrow advances and other costs, collectively, "Unpaid Amounts") excluding any fees, costs and/or corporate advances not added to the account as of the Modification Agreement Date and amounts not added to the New Principal Balance due to investor and/or mortgage insurer restrictions less any amounts paid to the Lender but not previously credited to the Loan.  Any amounts not added to the New Principal Balance will remain on the account until paid and will become due when the interest-bearing balance is paid in full or upon maturity as applicable pursuant to State or Federal law.

3.   The New Principal Balance may represent the sum of the "Deferred Principal Balance" (if applicable), the "Principal Forgiveness" (if applicable) and the "Interest Bearing Principal Balance." The Interest Bearing Principal Balance is $58,552.36. Borrower understands that by agreeing to add the Unpaid Amounts to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement.  Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the New Principal Balance, which would not happen without this Agreement.

4.   Borrower promises to pay the New Principal Balance, plus interest, and any future fees/costs to the order of the Lender. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 2.875%, beginning 11/01/2020. Borrower promises to make monthly payments of principal and interest of U.S. $301.17, beginning on 12/01/2020 and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.  Borrower promises to also pay any applicable monthly escrow payments as outlined in this Agreement.  The initial monthly escrow amount is $167.95. The yearly rate of 2.875% will remain in effect until principal and interest are paid in full.  If on 10/01/2035 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full all amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

The initial monthly escrow amount is $167.95. The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total

monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate (%) | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* (adjusts periodically) | Total Monthly Payment* (adjusts periodically) | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 14.92 | 2.875 | 11/01/2020 | $301.17 | $167.95 | $469.12 | 12/01/2020 | 179 |



*The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

## Additional Agreements:

1. **Transfer of Property.** If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

2. **Original Loan Document Conditions.** Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument and Note, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument and Note; however, if applicable, the following terms and provisions are forever canceled, null and void, as of 11/01/2020:

   a. all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

   b. all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

3. Borrower understands and agrees that:
   a. **Default Under the Modification.** All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

   b. **Original Loan Document Conditions.** All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender. Borrower agrees that the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

c. **Modification Does Not Constitute Release.** Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

d. **Costs and Expenses.** All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender or not permitted per State or federal law.

e. **Agreement to Provide Any Additional Modification Documents.** Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower. Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement. Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement.

f. **Agreement of Use of Non-Public Information.** Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

g. **Consent to Contact.** Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

4. **Escrow Account.** By this section, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked and Borrower has been advised of the amount needed to fully fund the Escrow Account.

Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all



purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.



The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

5. **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

6. **Inclusion of Exhibits.** Borrower authorizes Lender to attach an Exhibit A to this Agreement, which may include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk (or other recordation office) to allow for recording if and when Lender seeks recordation.

7. **Errors and Omissions.** That if any documents related to the loan documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. All documents the Lender requests of Borrower under this section shall be referred to as "Documents." Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement. At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

8. **Final Agreement.** This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower. This Modification constitutes the entire agreement between the Lender

9-514-BIZ58-0000094-001-23-000-001-000-000

and Borrower and supersedes all previous negotiations and discussions between the Borrower and the Lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms. There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

9. **Additional Events of Default**.  Without limiting the other events of default set forth in the Loan Documents, Borrower will be in default under this Agreement and under the Loan Documents upon the occurrence of any one or more of these events:

   a. Any material representation or warranty made by you in the Loan Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

   b. Borrower fails to make the New Monthly Payments as required by this Agreement.

   c. Borrower sells or conveys any interest in the Property without Lender's prior written consent.

   d. Breach of any of the terms or provisions of this Agreement.



10. **Consequences of Default.**  If Borrower defaults under this Agreement or the Loan Documents after the Modification Effective Date (your "Default"), Lender may, in addition to the remedies provided by the Loan Documents, subject only to applicable law, institute any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against Borrower under the Loan Documents and/or this Agreement.

11. **Mortgage Insurance.** Borrower understands that the mortgage insurance premiums on the Loan, if applicable, may increase as a result of the capitalization which may result in a higher total monthly payment.  Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

12. **Credit Reporting.** Lender is required to report factual information to the credit reporting agencies. Lender may report information about the account to credit bureaus. Late payments, missed payments, or other defaults on the account may be reflected in the credit report.

13. **No Novation.**  Borrower expressly agrees that this Agreement is not a new loan from Lender but simply the modification of the existing obligations under the Loan Documents.  Neither Borrower nor Lender has any intention to extinguish or discharge the indebtedness or the liens evidenced by the Loan Documents.

14. **Discharged Bankruptcy.** Notwithstanding anything to the contrary contained in this Agreement, Borrower and Lender acknowledge the effect of a discharge in bankruptcy that has been granted to Borrower prior to the execution of this Agreement and that Lender may not pursue Borrower for personal liability.  However, Borrower acknowledges that Lender retains certain rights, including but not limited to the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances.  The parties agree that the consideration for this Agreement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of Borrower's default thereunder.  Nothing in this Agreement shall be construed to be an attempt to collect against Borrower personally or an attempt to revive personal liability.

## Borrower Acknowledgement

**IMPORTANT – Do NOT sign this Agreement unless you are in the presence of a notary. If extenuating circumstances prevent one notary signature, separately signed and notarized agreements will be accepted; however, the agreements must be returned in the same package to PHH Mortgage Corporation.**

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

_1-12-2021_
Date

_Angela Ruckman_
ANGELA RUCKMAN

9-814-BIZ58-0000094-001-25-000-001-000-000

State of __Ohio__

County of __Richland__

On this 12 day of __January 2021__ , before me, the undersigned, a Notary Public in and for said county and state, personally appeared __Angela Ruckman_____personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.



JILL MONTGOMERY
Notary Public
State of Ohio
My Comm. Expires
December 7, 2024

_Jill Montgomery_
Notary Public

My Commission Expires: __Dec 7, 2024__

# LENDER ACKNOWLEDGEMENT

### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein.  This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.



PHH Mortgage Corporation

_____

Authorized Signer




_____

Date




State of _____

County of _____

On this __ day of _____, ____, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of PHH Mortgage Corporation., said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _____

9-814-BIZ58-0000094-001-27-000-001-000-000

REPRESENTATION OF PRINTED DOCUMENT

Case: 5:21-cv-00923-JRA  Doc #: 12-2  Filed:  06/23/21  1 of 12.  PageID #: 204

8-814-BKO20-0000052-001-01-000-000-000-000



ANGELA RUCKMAN
837 S MAIN ST
MANSFIELD OH 44907-2036

EXHIBIT
8

REPRESENTATION OF PRINTED DOCUMENT

# NewRez



01/14/2021                                                    Account Number: ▇▇▇▇

ANGELA RUCKMAN
837 S MAIN ST
MANSFIELD, OH 44907

## DECISION ON THE REQUEST FOR MORTGAGE ASSISTANCE
### PLEASE READ CAREFULLY

Dear Customer(s),

Thanks for the request for mortgage assistance. Unfortunately, the account is no longer eligible for the loan modification offer that was sent due to the reason listed below.

- You failed to return the final modification agreement within the required timeframe.

Below, please find important information about our decision regarding mortgage assistance, with additional details on the following pages.

---

### Account Information

**Account Number:** ▇▇▇▇

**Property Address:**
837 S MAIN ST
MANSFIELD, OH 44907

We are here to help!

Account Relationship Manager:
Steven Siegel
RMA@mortgagefamily.com
Online:
www.mortgagequestions.com

---

**The following additional documents are enclosed for information:**

- Legal Disclosures
- Additional Assistance Available
- Understanding Net Present Value

Although the account is no longer eligible for the loan modification offer, it may be eligible for a Short Sale or Deed in Lieu of foreclosure, **with both options satisfying the account.** A Short Sale is the process of listing and selling the home to a third party, even if more is owed than the property's current market value. A Deed in Lieu is the process of transferring ownership of the property to PHH Mortgage Services by executing a deed. These options allow transition out of the home while avoiding foreclosure.

**Benefits of a Short Sale or Deed in Lieu include:**

- Foreclosure can be avoided by exiting the property, even if more is owed than the property is worth.
- The account may be eligible for relocation assistance.

**NOTE:** To be reviewed for a Short Sale or Deed in Lieu of foreclosure, additional information and/or documents may be required.

---

▇▇▇▇                                                    *OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT                                    NMLS # 2726

REPRESENTATION OF PRINTED DOCUMENT



We are here to help! Steven Siegel has been assigned as the account relationship manager and will be the designated representative for resolution, inquiries and submission of documents.

**For any questions**, we can be reached toll free Monday through Friday 8:00am to 9:00pm ET at 800-750-2518, to speak with the assigned Relationship Manager Steven Siegel. If Steven Siegel is not available, another dedicated member of our Home Retention Department will be available to answer any questions.



Our Customer Care Center may also be contacted at 800-449-8767, Monday through Friday 8:00 am to 9:00 pm, Saturday 8:00 am to 5:00 pm ET.

Sincerely,

*Loan Servicing*

8-814-BKO20-0000052-001-03-000-000-000-000

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT                    NMLS # 2726

REPRESENTATION OF PRINTED DOCUMENT



# UNDERSTANDING NET PRESENT VALUE ("NPV")

During the application process, we calculate the Net Present Value ("NPV") of a modification. The NPV calculation requires us to input certain financial information about the accountholder's income and mortgage account, including the factors listed below. The estimated cashflow to the owner of the account is currently $0.00, whereas the estimated cashflow of the highest-value modification we could have offered is $0.00.

The NPV input values we used in this NPV evaluation are listed in the NPV Data Input Fields and Values chart in this notice.



8-814-BKO20-0000052-001-04-000-000-000-000

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT                    NMLS # 2726

REPRESENTATION OF PRINTED DOCUMENT



# NPV INPUT DATA FIELDS AND VALUES

This table includes the information we used in the NPV calculation.

**Please Note:**

Fields that are blank may not apply to the account modification evaluation.

| Input Data Fields | Explanation | Value used in NPV calculation |
|---|---|---|
| **I. Borrower Information** | | |
| 1. **Current Borrower Credit Score** | This field identifies your credit score as provided by one or more of the three national credit reporting agencies. | ██ |
| 2. **Current Co-Borrower Credit Score** | If a co-borrower is listed on the mortgage, this field identifies the co-borrower's credit score as provided by one or more of the three national credit reporting agencies. | |
| 3. **Monthly Gross Income** | This field identifies the monthly gross income of all borrowers on the mortgage before any payroll deductions or taxes. | N/A |
| **II. Property Information** | | |
| 4. **Property State** | This field identifies the 2-letter state code of the property securing the mortgage for which a loan modification is being applied. | OH |
| 5. **Property Zip Code** | This field identifies the ZIP code of the property securing the mortgage for which a loan modification is being applied. | 44907 |
| 6. **Property Value** | This field identifies the estimated fair market value of the property for which a loan modification is being applied that was used for this analysis. | $106,000.00 |
| 7. **Property Valuation Type** | This field identifies the method by which the property for which a loan modification is being applied was valued (as noted in Field 6, Property Value)<br>1. Automated Valuation Model (AVM)<br>2. Exterior Broker Price Opinion (BPO) /Appraisal (as-is value)<br>3. Interior BPO/Appraisal (as-is value) | 1 |
| 8. **Occupancy** | This field uses codes to identify the occupancy of the property for which a modification is being applied.<br><br>The servicer will use a code of 1, 3 or 4 for owner-occupied properties and will use a code of 2 for non-owner-occupied properties. | 1 |
| **III. Mortgage Information** | | |
| 9. **Data Collection Date** | This field identifies the date on which we collected the Unpaid Principal Balance and other data used in the NPV analysis. | 11/04/2020 |

*OCWN_STND_ALNE_DENL*

██████

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT

NMLS # 2726

REPRESENTATION OF PRINTED DOCUMENT





| Input Data Fields | Explanation | Value used in NPV calculation |
|---|---|---|
| 10. **Investor Code** | This field identifies the owner of the mortgage for which a loan modification is being applied.<br>1. Fannie Mae<br>2. Freddie Mac<br>3. Owned by a private investor other than us, your servicer<br>4. Owned by us, your servicer, or an affiliated company<br>5. Ginnie Mae | 3 |
| 11. **Unpaid Principal Balance at Origination** | This field identifies the amount of the mortgage for which a modification is being applied at the time it was originated (i.e., the amount borrowed). | $83,400.00 |
| 12. **First Payment Date at Origination** | This field identifies the date the first payment on the mortgage for which a modification is being applied was due after it was originated. | 10/01/2005 |
| 13. **Product Before Modification** | This field uses codes to identify the type of mortgage held prior to the most recent application for a modification:<br>1. Adjustable Rate Mortgage (ARM) and/or Interest Only<br>2. Fixed Rate | 2 |
| 14. **Adjustable Rate Mortgage (ARM) Reset Date** | This field applies only if the type of mortgage held prior to the most recent application for a modification is an Adjustable Rate Mortgage (ARM) loan.<br><br>This field identifies the date on which the next ARM reset was due to occur, as of the Data Collection Date (Field 9). | |
| 15. **Next Adjustable Rate Mortgage (ARM) Reset Rate** | This field identifies the rate at which the mortgage was expected to change based on when the next reset date (Field 14) is scheduled to occur. Please review the mortgage documents for information on how your mortgage's rate is recalculated at its reset date.<br><br>If the reset date on the ARM loan is within 120 days of the Data Collection Date, the value in this field is the expected interest rate on the mortgage at the next reset date.<br><br>If the reset date on the ARM loan is more than 120 days from the Data Collection Date, the value in this field is the current interest rate at the time of NPV evaluation. | |

8-814-BKO20-0000052-001-06-000-000-000-000

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.



NMLS # 2726



NewRez



| Input Data Fields | Explanation | Value used in NPV calculation |
|---|---|---|
| 16. **Unpaid Principal Balance Before Modification** | This field identifies the unpaid amount of principal (amount borrowed) on the mortgage for which a loan modification is being applied as of the Data Collection Date. It does not include any unpaid interest or other amounts that may be owed. | $51,720.69 |
| 17. **Remaining Term (# of Payment Months Remaining)** | This field identifies the remaining number of months left to pay under the term of the mortgage for which a modification is being applied as of the Data Collection Date. Please review the mortgage documents (including any permanent modification documentation, if previously modified) for information about the term of the mortgage. | 196 |
| 18. **Principal and Interest Payment Before Modification** | This field shows the amount of principal and interest scheduled to be paid each month as of the Data Collection Date.<br>a. If the loan had an adjustable rate scheduled to reset within 120 days, this field will reflect the principal and interest payment associated with the new interest rate.<br>b. If the loan had an adjustable rate scheduled to reset after 120 days, this field will reflect the current scheduled monthly mortgage payment and the note interest rate in effect at the time of evaluation.<br>c. If the mortgage is an Interest Only loan and is still in the interest-only period, the value in this field is the interest payment that was due each month.<br>d. If the mortgage is a negative-amortizing loan, the value in this field is the greater of:<br>a) the principal and interest payment sent on the most recent payment date; or<br>b) the minimum payment required on the loan.<br><br>If there was a prior modification trial period plan or permanent modification, the value in this field is the modified payment. | $419.48 |
| 19. **Monthly Real Estate Taxes** | This field identifies the monthly cost of the real estate taxes. If taxes are paid annually, this amount will be 1/12th of the annual cost. | $96.36 |
| 20. **Monthly Hazard and Flood Insurance** | This field identifies the monthly cost of the hazard and flood insurance coverage. If the premium is paid annually, this amount will be 1/12th of the annual cost. | $58.67 |
| 21. **Homeowners Association Dues/Fees** | This field identifies the monthly homeowner's or condominium association fee payment. If your homeowner's or condominium association fees are paid annually, this will be 1/12th of the annual cost.<br><br>If the property has no association fee payments, this field is blank. | $0.00 |
| 22. **Escrow Shortage** | This field identifies the future monthly escrow shortages, if any.<br><br>If the property has no future monthly escrow shortages, this field is | $775.07 |

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT                                NMLS # 2726

REPRESENTATION OF PRINTED DOCUMENT



**NewRez**



| Input Data Fields | Explanation | Value used in NPV calculation |
|---|---|---|
| | blank. | |
| 23. **Months Past Due** | This field identifies the number of mortgage payments required to the mortgage current, as of the Data Collection Date. | ■ |
| 24. **Mortgage Insurance Coverage Percent** | This field identifies the percentage of private mortgage insurance coverage on the mortgage requested to be modified. If there is no private mortgage insurance applicable, this field is blank. | ■ |
| 25. **Capitalized UPB Amount** | This field identifies the capitalized unpaid principal balance, including all outstanding principal, accrued interest and escrow advances as of the Data Collection Date. | ■ |
| **IV. Proposed Modification Information** | | |
| The fields below describe the proposed modification that was calculated by the servicer according to the program guidelines (subject to investor restrictions) that were used in the Net Present Value (NPV) evaluation. | | |
| 26. **NPV Date** | This field identifies the initial date that the Net Present Value evaluation was conducted on the mortgage for which a modification is being applied. | 11/04/2020 |
| 27. **Modification Fees** | This field identifies the total amount of costs and fees that would have been paid by the investor (owner) of the loan, if this account is approved for a modification. It includes expenses such as notary fees, property valuation, credit report and other required fees. | $0 |
| 28. **Unpaid Principal Balance under proposed Streamline Modification (Net of Forbearance & Principal Reduction)** | This field identifies the beginning principal balance on which the applicant would have been required to pay interest if a **Streamline** modification had been received.<br><br>It is likely to be different than the current principal balance because it includes amounts owed for missed mortgage payments and unpaid expenses that are allowed to be added (capitalized) to the principal balance. Additionally, it may be reduced by proposed principal forbearance (Field 32) or proposed principal forgiveness (Field 33). | ■ |
| 29. **Interest Rate under proposed Streamline Modification** | This field identifies the starting interest rate of the proposed **Streamline** modified mortgage. This rate is fixed for at least the first five years after modification. | 2.875% |
| 30. **Amortization Term under proposed Streamline Modification** | This field identifies the number of months left to pay the proposed **Streamline** modified mortgage. | 179 |
| 31. **Principal and Interest Payment under** | This field identifies the amount of the monthly principal and interest payment on the proposed **Streamline** modified mortgage. | $301.17 |

■

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT

NMLS # 2726



![NewRez]

REPRESENTATION OF PRINTED DOCUMENT

| Input Data Fields | Explanation | Value used in NPV calculation |
|---|---|---|
| **proposed Streamline Modification** | | |
| 32. **Principal Forbearance under proposed Streamline Modification** | This field identifies the amount of principal the loan's investor was willing to forbear on the proposed **Streamline** modified mortgage. You would still owe this amount, but would not be charged interest on it, and no payments would have been due on this amount until the loan was paid off. | $0.00 |
| 33. **Principal Forgiveness Amount under proposed Streamline Modification** | This field identifies the amount of principal the loan's investor was willing to forgive under the proposed **Streamline** modified mortgage. | $0.00 |



8-814-BKO20-0000052-001-09-000-000-000-000

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

REPRESENTATION OF PRINTED DOCUMENT



**What should be done if there is disagreement with the reason(s) for non-approval?**

If there is disagreement with the reason(s) for non-approval, please contact us at:



PHH Mortgage Services
Escalations Department
P.O. Box 5432
Mount Laurel, NJ 08054
Email: EscalatedCases@mortgagefamily.com

8-814-BKO20-0000052-001-10-000-000-000-000

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property.  It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT                                                                 NMLS # 2726

REPRESENTATION OF PRINTED DOCUMENT

**NewRez**

## ADDITIONAL ASSISTANCE IS AVAILABLE

If financial hardship is being experienced, housing counseling may be a way to help manage finances. We recommend contacting a HUD-approved agency for assistance in keeping the home. This assistance is available at no charge.



| | | |
|---|---|---|
| HUD Approved Housing Counseling | (800) 569-4287 | www.HUD.gov |
| Homeowner's HOPE Hotline Number | (888) 995-4673 | https://995hope.org/ |
| Fannie Mae Assistance Program | (800) 232-6643 | www.knowyouroptions.com |
| Consumer Financial Protection Bureau (CFPB) | (855) 411-2372 | www.consumerfinance.gov/mortgagehelp/ |
| Freddie Mac Assistance Program | | http://myhome.freddiemac.com/ |

To submit a qualified written request, a notice of error or a request for information, the following address must be used:

PHH Mortgage Services
PO Box 66002
Lawrenceville, NJ 08648

8-814-BKO20-0000052-001-11-000-000-000-000

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

INTERNET REPRINT
NMLS # 2726



## ALTERNATIVES TO FORECLOSURE

- Account Refinance option:  This an option to apply for a new mortgage and pay off the existing lien, if favorable terms are obtained making the current payment more affordable.

- Account Modification option: An account modification may change one or more terms of the original mortgage agreement. This may include a change in interest rate, account balance or term, which may lower the mortgage payment and bring the account current. Contact us for more information on available modification programs, as this option may be limited based on the non-approval reason included in this notice.

- Sale of the property: If there is an inability to continue paying the mortgage payment, the best option may be to find more affordable housing. As an alternative to foreclosure, it may be possible to sell the property and use the proceeds to pay off the current lien.

- Short Sale: If the value of the property has declined, and the property cannot be sold for an amount sufficient to pay the current lien in full, it may be possible to sell it for less than the full payoff amount to satisfy the lien.

- Deed in Lieu of Foreclosure: If an attempt to sell the property has been unsuccessful, it may be possible to voluntarily return the deed to satisfy the lien and avoid foreclosure.

## LEGAL DISCLOSURES

**Notice regarding Credit Discrimination:** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract), because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

**Notice Regarding Bankruptcy:** Please be advised that if the account is part of an active Bankruptcy case or if the account has received an Order of Discharge from a Bankruptcy Court, this letter is in no way an attempt to collect either a pre-petition, post-petition or discharged debt.  If the bankruptcy case is still active, no action will be taken in willful violation of the Automatic Stay. If the account has received an Order of Discharge in a Chapter 7 case, any action taken by us is for the sole purpose of protecting our lien interest in the underlying mortgaged property and is not an attempt to recover any amounts from the accountholder(s) personally. Finally, if the account is in an active Chapter 11, 12 or 13 bankruptcy case and an Order for Relief from the Automatic Stay has not been issued, the accountholder(s) should continue to make payments in accordance with the plan.

*OCWN_STND_ALNE_DENL*

This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is purely provided to you for informational purposes only with regard to our secured lien on the above referenced property.  It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

NMLS # 2726

8-814-BKO20-0000052-001-12-000-000-000-000

## CheckFreePay

Store 836
1500 Lexington Ave
Mansfield, OHIO 44907

CheckFreePay
Terminal ID:                40000761
Date:                      02/22/2021
Time:                     05:59:55 PM
Trace-Nr.:                    883533
Biller:                  PHH Mortgage
Amount:                       470.00
Tender Type:                    CASH
Fee:                            1.50
Total:                        471.50

ACT#:
Reference Number:      0H0496:6154:22
CFP Terminal ID:               0H0496

Payment will be delivered no later than
02/23/21.

Keep your bill stub and receipt until
the payment has been completed as
instructed. The bill stub and receipt
must be presented for any inquiry or
change to the payment.

Payment Receipt Number: 0534300221

Protecting your privacy is very
important to us. That is why we want
to be clear and transparent about why
we collect information, the information
we collect and how we use that
information. By completing this
transaction, you agree that this
transaction and all data associated
with it, including personal information
collected as part of the transaction,
but excluding information about the
recipient of the money transfer, is
subject to Kroger Policy at
https://www.kroger.com/i/privacy-policy
/financial-products.



FRESH
FOR
EVERYONE.

1500 LEXINGTON r
419-756-6049
Your cashier was TAYLOR
KROGER PLUS CUSTOMER        *******5473
MR    CFP PAYMENTS       NP   470.00
MR    CFP FEE            NP     1.50
SC    HS .10 OFF PAY FEE        0.10-
      TAX                       0.00
**** BALANCE                  471.40
DEBIT Purchase
************4926 - SWIPED
REF#: 000000    TOTAL: 471.40
PURCHASE: 471.40   CASHBACK: 0.00
      DEBIT                   471.40
      CHANGE                    0.00
TOTAL NUMBER OF ITEMS SOLD =       0
KROGER SAVINGS            $     0.10
TOTAL COUPONS            $     0.10
TOTAL SAVINGS (0 %)      $     0.10
02/22/21 06:00pm 836 31 73 471
***********************************

EXHIBIT

9



## Account Error Report

Date : 02/25/2021
Agent Name : KROGER #836
Attention : COL-MONEY SVCS
Terminal ID : OH0496
Phone : (419) 756-6049
Fax : (614) 898-3507

Dear Agent,

CheckFreePay was unable to process the following customer payment(s). In order to correct the error, please locate the bill stub that corresponds to the payment(s) below. Attach the information to the bottom of this page and fax it to the CheckFreePay Research Department.

*Important: Customers will not receive credit for this payment until the correct bill information is provided. Receipts and counter slips are not acceptable.*

| Entry Date | Biller Name | Account Number | Amount |
| --- | --- | --- | --- |
| 2/11/2021 | PHH Mortgage-NextDay | | $470.00 |

**PLEASE ATTACH BILL STUB HERE.**   FAX TO 1-888-798-3015

**Ashley E. Mueller**

**From:** Diane S. Bennett
**Sent:** Monday, March 8, 2021 9:42 AM
**To:** 'aruckman419@gmail.com'
**Subject:** RE: 2020 CV 0169   Modification/Mediation   Ch file 20-00349

Good Morning:

I received the below email from you this morning.  Our client has advised that you are due for the February and March payments, for a total of $873.93.  If  you want the modification to go through, that payment needs to be made immediately.  Our client's modification team has confirmed they will accept that amount and then reverse the denial.

Also, I read down through all my notes, I have emails from you that you sent the December and January pmts, there is nothing mentioning that the February payment was sent (that was at the end of January).

If you have proof that you made the February payment and that it was accepted, please provide the proof and I will forward to our client.
Please let me know if you will be sending the payment today.

Thanks,
Diane S. Bennett
Loss Mitigation Department Coordinator
dbennett@clunkhoose.com
Clunk, Hoose Co., LPA
Attorneys At Law
495 Wolf Ledges Parkway
Akron, OH  44311
PH:  (330) 436-0300 FAX:  330-436-0301 or 855-770-4022



**From:** Angela Ruckman [mailto:aruckman419@gmail.com]
**Sent:** Saturday, March 06, 2021 10:23 PM
**To:** Diane S. Bennett
**Subject:** Re: 2020 CV 0169 Modification/Mediation Ch file 20-00349

Ive made all payments. Jan. Feb. March. However i was notified by krogers today. That PHH refused the payment dated Feb 11th which would have been for the month of March payment. Can you explain what the issue is and what to do?

**From:** Diane S. Bennett
**Sent:** Wednesday, March 03, 2021 9:31 AM
**To:** 'aruckman419@gmail.com'
**Subject:** 2020 CV 0169 Modification/Mediation Ch file 20-00349

Hello Angela:

The reversal has not yet been approved by management, our client is working to get it reversed; however, the last payment our client received from you was for the January payment, you will need to make the February and March payments immediately.

1

EXHIBIT
11

Do you still want the modification?  Has your financial situation changed and you no longer want the mod?

If the reversal is not approved, you will need to reapply, I have attached a copy of the financial packet in case we don't get the approval.

**This communication is provided pursuant to Ohio Evid. R. 408 and shall not be construed as an offer or acceptance of settlement or compromise.**

Thanks,
Diane S. Bennett
Loss Mitigation Department Coordinator
dbennett@clunkhoose.com
Clunk, Hoose Co., LPA
Attorneys At Law
495 Wolf Ledges Parkway
Akron, OH  44311
PH:  (330) 436-0300 FAX:  330-436-0301 or 855-770-4022



We <u>cannot</u> give you legal advice.  We represent your Lender and our Client's interest may be opposed to your own interests.  If you have questions regarding legal matters, we urge you to obtain your own attorney.

**PLEASE BE ADVISED THAT THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY AND ALL INFORMATION PROVIDED BY YOU WILL BE USED FOR THAT PURPOSE.**

**Important Notice to Mortgagors Involved in a Bankruptcy proceeding:** If you are a debtor involved in a bankruptcy proceeding, this e-mail or letter has been sent to you merely for informational purposes and may be disregarded as an attempt to collect the debt (unless your mortgage is subject to an in rem order). If the automatic stay is in effect, we will not act to collect the debt owed until the stay has been lifted or the case has been discharged, please be assured that we are not attempting, and will not attempt, to collect this debt as a personal obligation, except in those circumstances when we may have the right to do so under applicable bankruptcy law. Otherwise, we will seek recovery of the debt from the property securing this debt.

**Ashley E. Mueller**

**From:** Diane S. Bennett
**Sent:** Tuesday, March 23, 2021 3:51 PM
**To:** 'Angela Ruckman'
**Subject:** Breakdown of pmts   20-00349

Angela, below is the breakdown of your payments received.

Trial plan pmts were $469.15

09/02/20 $470 received - $469.15 September's pmt = .85

10/26/20 $1,000 received +.85 = $1,000.85 - $469.15 for October's pmt = $531.70

$531.70 - $469.15 for November's pmt = $62.55

12/03/20 $470 received + $62.55 = $532.55 - $469.12 (perm mod pmt for Dec) = $63.43

01/05/21 $470 received + $63.43 = $533.43 - $469.12 (perm mod pmt for Jan) = $64.31

Loan is due for the Feb an March pmts as of 3/23/21

The payment that was being sent today, 3/23/21 has not yet shown as received or applied to your account and will likely be rejected because it is not the full amount of the Feb & Mar pmts combined.
$469.12 Feb + $469.12 Mar = $938.24 - $64.31 = **$873.93.**

Please send in one lump sum $873.93 to cover the Feb and March payments.

**This communication is provided pursuant to Ohio Evid. R. 408 and shall not be construed as an offer or acceptance of settlement or compromise.**

Thanks,
Diane S. Bennett
Loss Mitigation Department Coordinator
dbennett@clunkhoose.com
Clunk, Hoose Co., LPA
Attorneys At Law
495 Wolf Ledges Parkway
Akron, OH  44311
PH:  (330) 436-0300 FAX:  330-436-0301 or 855-770-4022

CLUNK
HOOSE CO., LPA



4/13/2021                                        Gmail - 2020 CV 0169 ch file 20-00349

 Gmail

                                                        Angela Ruckman <aruckman419@gmail.com>

## 2020 CV 0169 ch file 20-00349
4 messages

**Diane S. Bennett <dbennett@clunkhoose.com>**
To: Angela Ruckman <aruckman419@gmail.com>                    Fri, Mar 19, 2021 at 11:24 AM

Our client cannot confirm receipt of payments from you.  The following amount is due before the end of March or the modification is denied.

We have still not received $873.93. Mod team has given time to receive funds till end of march, if funds not received, mod will be denied again and then we will not be able to reverse mod denial.

End of March means we should receive funds **at least by 25th**, so that mod team can modify loan before month end, **otherwise they will also ask for the payment of April.**

The receipts that  you provided do not show that payment was sent to and received by PHH.

It appears you may need to go back to Kroger to obtain your funds.

**From:** Diane S. Bennett
**Sent:** Wednesday, March 10, 2021 11:00 AM
**To:** 'Angela Ruckman'
**Subject:** RE: Progress

Your receipts were received and sent to PHH for review. .

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA L. RUCKMAN, | : | Case No.: 5:21-cv-00923-JRA |
| | : | |
| Plaintiff, | : | Judge John R. Adams |
| | : | |
| v. | : | **PLAINTIFF ANGELA RUCKMAN'S** |
| | : | **RESPONSES TO DISCOVERY** |
| PHH MORTGAGE CORPORATION d/b/a | : | **DIRECTED TO PLAINTIFF** |
| PHH MORTGAGE SERVICING, *et al.*, | : | **ANGELA RUCKMAN** |
| | : | |
| Defendants. | : | |

Plaintiff Angela L. Ruckman ("Plaintiff"), through counsel, pursuant to Fed. R. Civ. P. 26, 33, 34, and 36, hereby responds to the Discovery Requests (the "Requests") propounded by Defendant PHH Mortgage Corporation, d/b/a PHH Mortgage Servicing ("PHH").

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Requests, including any and all definitions and instructions, to the extent they seek to impose obligations in addition to, or inconsistent with, the Federal Rules of Civil Procedure. Plaintiff will respond to the requests in accordance with the obligations imposed by the applicable rules and law.

2.      Plaintiff objects to the Requests to the extent they seek information protected from disclosure by the attorney client privilege, the work-product doctrine, or any other applicable privileges, protections, or immunities from discovery. If, and to the extent Plaintiff inadvertently discloses in the litigation protected information, such inadvertent disclosure is not intended and does not waive any privilege, protection, or immunity.

140383.06796/127004385v.6

EXHIBIT
12

3.      Plaintiff objects to the Requests to the extent they are overly broad, vague, unduly burdensome, or seek a narrative response relating to a given subject. Plaintiff objects to providing responses of such breadth on the grounds of undue burden.

4.      Plaintiff objects to the interrogatories to the extent they seek information that is not relevant, not reasonably calculated to lead to relevant information, will not lead to the discovery of admissible evidence, or not proportional to the needs of the case.

5.      Plaintiff objects to the interrogatories to the extent they seek legal conclusions or would require Plaintiff to reach a legal conclusion in order to prepare a response.

6.      Pursuant to Fed. R. Civ. P. 26, the Requests are deemed to be continuous in nature until the date of the trial. Plaintiff's investigation of this matter is ongoing, and Plaintiff reserves the right to amend, supplement, or alter the response to any interrogatory at any time as allowed by applicable law.

## INSTRUCTIONS FOR ANSWERING

1.  You should provide all information which is in your possession or control or within the possession and control of your attorneys, investigators, agents, employees or other representatives of you or your attorney.

2.  Where an Interrogatory calls for an answer in more than one part, each part should be separated in the answer so that the answer is clearly understood.

3.  You are reminded that all answers must be made separately and fully and that an incomplete or evasive answer is a failure to answer.

4.  You are under a continuing duty to seasonably supplement your responses with respect to any question, pursuant to Federal Rule of Civil Procedure 26(E), if you learn that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

## DEFINITIONS

1.      The word "Plaintiff" "you," and/or "your" shall mean Angela Ruckman.

2.      The word "person(s)" shall mean all individuals and entities, including, without limiting the generality of the foregoing, all individuals, sole partnerships, associations, companies, partnerships, joint ventures, corporations, trusts and estates.

3.      "Identify" with respect to a person shall mean to provide the name, last known address, and last known telephone number for such person.

4.      "Real Property" means the real property and improvements located at 837 South Main Street, Mansfield, OH 44907.

## FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

Identify the person(s) answering these Interrogatories and include the relationship, if any, to Plaintiff.

**ANSWER:**

Angela L. Ruckman, who can be contacted through counsel Dann Law, 15000 Madison Avenue, Lakewood, OH 44107. Ms. Ruckman is the Plaintiff in this matter and is a party to whom these interrogatories are directed. Her counsel at Dann Law assisted Ms. Ruckman in the preparation of her responses.

### INTERROGATORY NO. 2

Identify all communications (whether written or oral, and including but not limited to the phone calls, faxes and emails referenced in your Complaint) concerning any topic that is relevant to the subject matter of this case and/or the claims and defenses raised herein, which you have had with representatives of or persons affiliated with or employed by Defendant, and for each such communication, provide the name (or other identifying information if name unknown) for the person with whom the communication was had, the date and type of communication, and the substance of the communication, including but not limited to the communications referenced in your Complaint, including the claim for emotional distress.

**ANSWER:**

Plaintiff objects to this request because it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, is overly broad, unduly burdensome, oppressive, and not proportional to the needs of the case.

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH

already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

/s/ Daniel M. Solar
_____

Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's document production.

## INTERROGATORY NO. 3

State any and all facts that support your allegations that you have suffered emotional distress, as a result of the conduct alleged in the Complaint.

**ANSWER:**

Plaintiff objects to this request because it seeks a narrative better suited for Plaintiff's testimony at deposition.

Signing as to objection:

/s/ Daniel M. Solar
_____

Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production. Further, Plaintiff provides the following narrative:

> 181 steps or 452 feet is what separated my daughter and I for a period of time from September of 2012 to February 2013. Not by choice. 181 steps from my back door to the inside of her building to her apartment door.  At one point seemed so close.

> She was diagnosed 7/2/2012 unexpectedly, out of nowhere when she was 18 with one of the rarest forms of Leukemia. While in the hospital for a mandatory stay to begin induction treatment for a clinical trial, I had to find her a safe and sterile place to live, as it's "her" body producing the cancer. Together we had rescue birds. She could not return to our home, due to their dust and bathroom habits. I began for the first time having panic attacks. Untreated, officially undiagnosed, but I knew, and had to be strong for her and had to keep it hidden the best I could from her. Crying and screaming in parking garages were common for cancer

mom's. Security guards carried lots of Kleenex for us, and would give gestures to clean your face when needed before going back in. Knowing she would be released in a few weeks, I was scrambling, one morning while standing at my kitchen window it dawned on me, cause I was staring at the apartments behind my house. I called the owner and she said she would have an apartment in a week or 2. I rushed to the hospital, the doctors approved the idea, my daughter was thrilled to be close to home. I rushed home and called the landlord back, made arrangements and then signed the lease. I had to watch my daughter quit her job because of Leukemia. Then had to watch her call her college and put her classes on hold because of Leukemia. Basically watched her put her life on hold. Now I have to watch her shop for her first apartment from a hospital bed on a cancer floor with a prepaid visa card. Everything from spoons to a couch and everything in between. Nothing like I ever pictured for her. I always pictured great things for her, as she was a rainbow baby as they call it these days. She was a high risk pregnancy. A pregnancy that they didn't think that I would ever conceive. Yet here she was.

Prior to her getting sick she had been staying with my mom briefly as she was a typical teenager with the I know everything about life and learned she didn't when things didn't go well with the boyfriend. So instead of coming home to I told you so, she was at my mom's. When she got sick though, it was me she needed. Wanted. Asked for. It was I that was there. She fought hard. I watched her endure poisons after poisons. I watched her hair fall out. Come in. Change colors. Then repeat. I watched her gain weight. Lose weight and repeat. Be admitted. Blood transfusions. Platelet transfusions. Bone marrow testing. Spinal chemo procedures. PICC line placement every 4-6 weeks as her body rejected a port placement 2x. I watched her go through hell. Inside I'm going through hell. Panic attacks along with her, but I'm mom so I have to be stronger. Eventually she got discharged and got to come home. 181 steps from me. She came in, cried, loved her apartment. Was there 45min, then I had to rush her back to Columbus as her PICC line started leaking when I flushed it. Something I would have to do everyday for her. She had to be admitted to have it changed and cultured to ensure no infection. A few days later she returned home, 181 steps away. Every day I could stand at my kitchen window and see her living room window. At night if I was up, I could see if she was up, because I could see her living room or bedroom light on. I used to text or call and tell her to go to bed. In the evenings, it was nothing to just have my backdoor swing open and she would come bouncing in with her bald head or wearing one of her silly hats, a face mask on, a disposable gown, sometimes a Kroger bag and raid my fridge or cabinets. Sometimes just to see the birds for her daily limit of 15 mins if her ANC levels were high enough. If her levels were low, the birds would Skype with her and dance. She massively decorated for all holidays. That Christmas of 2012 she had snuck over while I was at work and took some of the Christmas decorations for her apartment to go with her first Christmas tree. As sick as she was she tried to put a few lights up here at the house even though I protested. I now wish I took pictures, or helped her put

them all up, even though this was her thing for years. Her rule was do not touch the decorations! But I didn't know this was the last Christmas. The doctors seemed confident rarest but easiest to treat. When it snowed, I made sure to snowblow and keep those 181steps clear for her to walk. She had ups and downs with treatment. Never knew what to expect. One day at a time. Then 2/6/2013 she was finally 3 months negative for Leukemia. The fight isn't over, but a huge battle won, faced another 2 1/2 yes of treatment. Knew Leukemia could return any day as it's her body that produces it. Her life can go back to some normal. She can go back to college part time. She will begin the next phase of chemo in a week. Planned a celebration party for the weekend. The next day when she didn't answer her phone most of the day, I went to her apartment and I found her deceased. Treatment killed her.

We may have had a few issues thanks to a boyfriend that quickly turned ex, and teenage growing pains. But the last 8 months of her life, we were closer than ever, inseparable, that was my best friend. I was eventually diagnosed with PTSD, Depression and Anxiety.

My house was our home. 181 steps briefly separated us. But she knew where home always was from 2005 on when we moved back from Michigan. This is where she recovered from her first surgery. This is where she had her first boyfriend. Parked her first car. Dressed up for every homecoming and prom. Planted every flowerbed. Buried every pet. Had yearly Halloween bashes. Fought with me every day on cleaning her room. Drove me crazy on insisting there needed to be 6 different kinds of shampoo and body washes in the shower at all times. Learned how to drive and almost hit the garage and house on several occasions. This is where she decorated the house for every holiday and one year got into a Christmas light war with a new neighbor and it resulted in her dragging out the Halloween lights to add more. The neighbor admitted defeat when she did that.  So many more memories. This house is all I have left. It's all I have left of her, it contains our memories. When she passed, her belongings were moved and stored here.

During the process of the unknowing outcome with the modification. Being Jan 29th 2021 it was said everything was being finalized to magistrate Clark. Then come March a payment was rejected, then having to hire an attorney. Everyday I had to pass her flower gardens I have maintained, worried will this spring be the last time I see them bloom. Worried who will take the birds who have behaviors from being abused. Nobody wanted them. That's why we started taking them to begin with. Her little rhubarb patch planted so I would bake her pies. Where do I put her stuff I haven't touched since she passed. Plus my stuff. My grandsons stuff. This is where his room is now when he comes. How do I explain this to him? How will this affect work?  How do I afford to move? I've been making my payments so I have money to spare. How do we go from it's a done deal to now foreclosure status? Part of PTSD, Depression and Anxiety is you isolate and stay to yourself. So you keep symptoms low. I don't have anyone to help. All alone. I

have severe health issues going on. No extra money. Now might lose my house that was said in court in January that I've done everything I need to do, but now the mortgage company is changing their mind. Mixed with my diagnosis, combined with the last connection to my deceased daughter, I was extremely mentally, and emotionally overwhelmed from learning the first payment was rejected in March until August when my lawyer got the judgment dismissed. If it wasn't for the strong connect of the house to my daughter I may have just given up the house. But that's why I fought so hard to keep it. There is still an after effect of damage. It's not like an instant sigh of relief it's over. With my diagnosis it's something that stays and is a process that has to be worked through in my brain. As we process safety, relief, comfort and things of this stressful nature differently. It takes time, faith and patience. Someday we come to realize the damage is done and is now over, we are safe and we can finally heal. I hope my time is near.

Physically, mentally and emotionally overall, I became more isolated. My depression became worse. I stopped going to church. Lost my faith in God and humanity. I became less attentive with upkeep around my home. Repairs and upgrades I no longer had interest in. I didn't attend to the flower beds as normal due to the increased depression. My stress level and anxiety was and still is worse. The pets/rescues who already had behaviors picked up on it, which caused their behaviors to be worse. I no longer was the fake it til you make it provider for my clients. Had more of the " hurry up and get my hours in with each client and due the bare minimum". We're as before I went out of my way and would eat hours and mileage to make sure needs were met. I didn't spend much time with my grandson anymore for fear of breaking down in front of him and having to explain I was losing my home. My anxiety was now worse. I only would go to places on my own where I knew certain staff would be working. I no longer was working as much as I could because of my anxiety and depression. My ulcer became worse at times when my anxiety and stress levels were high. Then I didn't want to eat. I have low blood sugar, so I have to eat, so there were days it hurt to eat. Sleeping became almost impossible. I was only sleeping 2-3 hours a night. I started having severe headaches from stress and anxiety. I cried a lot. Got angry a lot. Which neither is good for anxiety and depression. My medications were changed several times with no success. Eventually it has now led to my overall health declining. It is true, stress can make you sick. Long term damage this has hurt me financially. Has damaged my credit. Which in turn affects my mental and emotional well being.

## INTERROGATORY NO. 4

State the name and address of each and every person you will or may call as an expert

witness at the trial of this case and for each such person, state:

    (A)    Their area of purported expertise.

    (B)    All information or facts provided to each such expert, including identification of each photograph, video tape, drawing, specification, catalog, brochure, report, diagram or any other document used or expected to be used by each such expert witness to support their respective opinions, findings and/or conclusions.

    (C)    All findings, opinions and/or conclusions reached by each such expert witness.

**ANSWER:**

Plaintiff has not identified any such expert to date. Plaintiff reserves the right to supplement this response.

## INTERROGATORY NO. 5

Identify each and every person known by you or your attorney who you believe does or may possess any discoverable information or knowledge whatsoever that is or may be relevant to the subject matter of this lawsuit and/or the claims and defenses raised herein, and for each such person, state their knowledge and/or discoverable information.

**ANSWER:**

Angela L. Ruckman, who can be contacted through counsel Dann Law, 15000 Madison Avenue, Lakewood, OH 44107. Ms. Ruckman is the Plaintiff in this matter and is a party to whom these interrogatories are directed. Ms. Ruckman has personal knowledge as to the facts of this matter including damages she has suffered.

Representative(s) of PHH, to be identified through discovery, who directly worked on the Loan in any capacity related to the allegations contained in the Complaint, or representative(s) who have adequate knowledge of such representatives' actions. The foregoing includes, but is not limited to individuals who performed work, or have knowledge as to such work, in regard to the

Loan, related to:
1. The servicing file and payment history on the Loan;
2. The receipt, drafting, application, crediting, or handling otherwise, of payments issued to PHH by Plaintiff;
3. The application or handling otherwise, of fees and charges made to the Loan;
4. PHH's standards, policies, and procedures relative to evaluating and responding to loss mitigation applications and appeals thereof from borrowers, including Plaintiff, pursuant to investor requirements and guidelines, including those for Plaintiff's loan or the evaluation of Plaintiff's loan for loss mitigation options;
5. PHH's communications with Plaintiff concerning the evaluation of Plaintiff's loan for loss mitigation options or the evaluation of Plaintiff's loan for loss mitigation options
6. PHH's communications with any third parties concerning the evaluation of Plaintiff's loan for loss mitigation options including, but not limited to non-party HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 ("HSBC"); and,
7. PHH's computer system, database, and software used in conjunction with the receipt, review, drafting, and mailing of responses to Plaintiff's loss mitigation submissions or the evaluation of Plaintiff's loan for loss mitigation options otherwise;
8. PHH's communications with any third parties concerning the fees and charges made to the Loan;
9. PHH's communications with Plaintiff concerning the fees and charges made to the Loan;
10. Making and/or approving decisions related to the initiation and prosecution of any foreclosure action related to the mortgage loan at issue; and,
11. PHH's communications with any third parties concerning the fees and charges made to the Loan including but not limited to any outside counsel or HSBC.

Representative(s) of Clunk, Hoose Co., LPA ("Clunk"), to be identified through discovery, who directly worked on Plaintiff's mortgage loan account in any capacity related to the allegations contained in the Complaint, or representatives who have adequate knowledge of such representatives' actions. The foregoing includes, but is not limited to individuals who performed work, or have knowledge as to such work, in regard to the Loan related to:
1. Any communications between PHH and HSBC or any other third-party concerning loss mitigation efforts for the Plaintiff's loan at issue in the Complaint;
2. The servicing file and payment history on the Loan;
3. Clunk's communications with Plaintiff or any third party concerning the receipt, drafting, application, crediting, or handling otherwise, of payments issued to PHH by Plaintiff;
4. Clunk's communications with any third parties concerning fees and charges made to the Loan;
5. Clunk's communications with Plaintiff concerning the fees and charges made to the Loan;
6. Clunk's communications with Plaintiff concerning the evaluation of Plaintiff's loan for loss mitigation options or the evaluation of Plaintiff's loan for loss mitigation options
7. Clunk's communications with any third parties concerning the evaluation of Plaintiff's loan for loss mitigation options including, but not limited to PHH and HSBC; and,

8. Clunk's policies and procedures to ensure and maintain compliance with the Fair Debt Collections Practices Act, 15 U.S.C. § 1692, *et seq.* (FDCPA).

Taryn Allied, a personal friend of Ms. Ruckman with whom Ms. Ruckman has discussed the facts and damages of this matter on occasion.

Unknown employee of Park National Bank, formerly Richland Bank, who notarized permanent modification in December 2020.

Magistrate Andrea Clark of the Richland County Court of Common Pleas, who has knowledge of the foreclosure filings and representations at issue in this case.

## INTERROGATORY NO. 6

Identify each and every way you have been damaged by Defendant's alleged wrongful actions set forth in your Complaint, and state the amount of damages you are seeking for each and every item of alleged damages and causes of action, and the underlying bases for the damages amounts.

**ANSWER:**

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production. See also, Plaintiff's response to Interrogatory No. 3. Furthermore, Plaintiff seeks statutory damages for each and every alleged statutory violation, as well as actual damages resulting from such, and attorneys' fees and costs in an amount yet to be specifically determined. Plaintiff is still in the process of itemizing actual damages and will supplement pursuant to Court Order. Damages to date include, but are not limited to:

1. Statutory damages from PHH for each violation of the applicable provisions of Regulation X of the Real Estate Settlement Procedures Act (RESPA), as claimed in the Complaint, in the amount of Two Thousand Dollars ($2,000.00) per alleged violation.

Plaintiff has alleged by and through the Complaint that PHH committed at least one (1) violation of Regulation X of RESPA, specifically, of 12 C.F.R. § 1024.41(g) and 12 U.S.C. §§ 2605(k) as alleged by and through Count One of the Complaint;

2. Punitive damages from PHH pursuant to R.C. 1322.52 for violations of the Residential Mortgage Lending Act, R.C. 1322.01, *et seq*. (RMLA) as alleged by and through Count Three of the Complaint.

3. Actual damages in an amount yet to be specifically determined, including, but not limited to:

   a. Due to the delay in the implementation of the modification at issue (the "Modification"), Plaintiff was caused to incur improper fees and charges imposed on the loan at issue (the "Loan") including late fees as well as other similar such fees including other default servicing related fees for which Plaintiff is personally obligated or which otherwise negatively impacts any equity in her home to which she is entitled;

   b. Loss of time and money for continued defense of the related foreclosure which would have been dismissed much sooner but for PHH's actions in mishandling the loss mitigation processes concerning the Loan in violation of RESPA and Regulation X and mortgage servicing guidelines and otherwise misrepresenting the status of the Loan and the amounts due thereunder;

   c. Legal fees, costs, and expenses incurred in defense of the foreclosure action field in the Richland County Court of Common Pleas, Case No. 2020 CV 0169 (the "Foreclosure") since PHH's wrongful conduct including the preparation of and filing of motions in defense of the motion for summary judgment and in attempts to have the Court enforce the Modification—such fees total $21,872.50 and expenses total $179.42; and,

   d. Severe emotional distress driven by PHH's actions and by the tangible fear that PHH's refusal to properly handle the loss mitigation process related to the Loan will result in the imminent loss of her home to foreclosure sale, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress above and beyond the emotional distress caused by the Foreclosure from which she was suffering prior to the conduct alleged in this complaint.

**INTERROGATORY NO. 7**

Identify all medical providers or providers of psychological/mental health services who you have seen or consulted with from 2015 to present and identify any of such providers from whom you received treatment for any of your claims for damage, including emotional distress.

**ANSWER**:

Plaintiff has sought such treatment from the following providers:

1. Providers affiliated with OhioHealth:
   a. Dr. N. Mangat
   b. Dr. C. Molina Arriola
   c. Dr. U. Pagedar

As of November 3, 2021, Plaintiff has also sought counseling from Holly Hutyera, LCSW, in Mansfield, Ohio.

Further, see Plaintiff's document production. Any medical records not provided therein have been requested and Plaintiff will supplement such production as applicable.

## INTERROGATORY NO. 8

Provide an itemized summary of all damages alleged in your Complaint.

**ANSWER:**

Plaintiff objects to this request as it is duplicative in nature and thereby unnecessary, unduly burdensome, and oppressive.

Signing as to objection:

*/s/ Daniel M. Solar*
_____

Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production. See also, Plaintiff's responses to Interrogatory Nos. 3 and 6.

## INTERROGATORY NO. 9

When did you send your loan modification application to PHH as referenced in

Paragraph 33 of the Complaint?

**ANSWER:**

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, to the best of Plaintiff's recollection, Plaintiff states that she sent such loss mitigation application in July 2020 and knows that the application was complete on or about August 4, 2020.

## INTERROGATORY NO. 10

How many times have you applied for a loan modification with PHH and when did you submit complete applications?

**ANSWER:**

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, to the best of Plaintiff's recollection, Plaintiff sent one application—referenced in Interrogatory No. 9—in or around July 2020 and, to the best of Plaintiff's recollection, one other partial application, consisting of a request for mortgage assistance form in December 2020 after having submitted a signed and notarized copy of a permanent modification agreement to PHH.

## INTERROGATORY NO. 11

Please state all facts that serve as the basis for Count One of your Complaint in which you allege that PHH violated RESPA.

**ANSWER:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint.

## INTERROGATORY NO. 12

Please state all facts that serve as the basis for Count Three of your Complaint in which you allege that PHH violated the RMLA.

**ANSWER:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint.

## INTERROGATORY NO. 13

Please provide the name(s) of the notary, contact information for the notary and location

where the modification agreement was notarized for both the alleged December 2020

modification agreement (referenced in paragraph 14 of Ex. 2 to the Complaint) that you claim

you sent to PHH and the modification agreement that you executed, had notarized on January 11,

2021 and then sent to PHH (the "Modification").

**ANSWER:**

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Plaintiff objects to this interrogatory as Plaintiff did not have any modification agreement notarized on January 11, 2021.

Without waiving such objections, the notary that notarized the modification agreement on January 12, 2021 was Jill Montgomery. At the time of such notarization, Ms. Montgomery was working for Park National Bank, previously Richland Bank, and to the best of Plaintiff's recollection, performed her notarial acts at the branch located at either 460 West Cook Road, Mansfield, OH 44907 or 50 Marion Avenue, Mansfield, OH 44903.

As to the modification notarized in December 2020, Plaintiff had her signature notarized atPark National Bank, previously Richland Bank, branch located at either 460 West Cook Road, Mansfield, OH 44907 or 50 Marion Avenue, Mansfield, OH 44903. Due to COVID-19 protocols, Plaintiff was not able to enter the interior of the bank branch to meet with the notary face-to-face and had the agreement notarized through the drive-thru.  Plaintiff is unable to identify the notary who notarized the modification. Plaintiff did not maintain a copy of the executed modification for her records and sent her only copy to PHH in December 2020 immediately upon having her signature notarized. Plaintiff made attempts to obtain the identity of the specific notary, but was informed that each notary working at the bank branches maintains their own individual notary journals and the bank has been experiencing higher than usual turnover.

## INTERROGATORY NO. 14

Please state the date that you sent the Modification that you executed on January 11, 2021

referenced in Interrogatory #13 above to PHH.

**ANSWER:**

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

140383.06796/127004385v.6

Plaintiff objects to this interrogatory as Plaintiff did not have any modification agreement notarized on January 12, 2021, but rather January 11, 2021.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objections, after executing the Modification on or about January 12, 2021, to the best of Plaintiff's recollection, Plaintiff sent the Modification to PHH that same day via priority or overnight mail through the United States Postal Service.

## INTERROGATORY NO. 14

In your January 7, 2021, email to Diana Bennett attached as Exhibit A to the Affidavit of Diane Bennett filed June 4, 2021 in the foreclosure action in (Richland County, Ohio Court of Common Pleas Case Number 2020CV0169), you claim that you sent in "another request for a modification approximately 3 ½ weeks ago". What documents did you submit, when did you submit them, and to whom did you submit the documents. Please provide copies of all such documents.

**ANSWER:**

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Plaintiff objects to this interrogatory as there is no such email to "Diana Bennett".

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's response to Interrogatory No. 10.  To the best of

Plaintiff's recollection, Plaintiff states that after having sent a signed and notarized copy of a permanent modification agreement to PHH in December 2020, at the suggestion of Ms. Diane Bennett of Defendant Clunk, Hoose Co., L.P.A., Plaintiff submitted a new "Request for Mortgage Assistance" (RMA). Plaintiff sent in the RMA form, but not any of the supporting documentation necessary to constitute a complete loss mitigation application. Plaintiff does not have a copy of this document as she sent the only copy directly to PHH.

**<u>FIRST SET OF REQUESTS FOR ADMISSION</u>**

1.      Admit that you did not make payments in 2021 to PHH using Western Union Quick Collect.

Admit.

2.      Admit that your payments from January 2021-April 2021 were made using MyCheckFree through Kroger.

Admit.

3.      Admit that the payment referenced in paragraph 16 of your Affidavit (Ex. 2 to Complaint) was not made via Western Union Quick Collect.

Admit.

4.      Admit that you did not sign the Modification and have it notarized until January 11, 2021.

Deny. See Plaintiff's response to Interrogatory Nos. 10, 13, and 14.

5.      Admit that you sent the executed and notarized Modification referenced in #4 above to PHH on or after January 11, 2021.

Admit to the extent that a copy of such Modification was sent to PHH on or about January 12, 2021, pursuant to the "Errors and Omissions" section of the agreement, upon written request from PHH's counsel. Plaintiff denies any allegation or implication that January 12, 2021 was the first time Plaintiff executed and sent in an executed copy of the Modification to PHH as she previously sent a copy of the same in December 2020. See

Plaintiff's response to Interrogatory Nos. 10, 13, and 14. See Plaintiff's response to Request for Admission No. 4.

6.      Admit that the Modification referenced in #4 above was denied by PHH in a letter

to you dated January 14, 2021.

Plaintiff objects to this request as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Plaintiff objects to this request as it seeks or otherwise calls for a legal conclusion.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objections, denied. Plaintiff does not dispute that such a letter exists, but denies ever having received a copy of this letter until a copy was produced in litigation in the Foreclosure and/or the instant matter. Moreover, to the extent that a "denial" letter was ever sent, it was subsequently repudiated in writing.

7.      Admit that the Modification referenced in #4 above was to be returned to PHH by

December 31, 2020.

Plaintiff objects to this request as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Plaintiff objects to this request as it seeks or otherwise calls for a legal conclusion.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objections, Plaintiff admits that the Modification was to be returned to PHH by December 31, 2020, but denies any allegation or implication that Plaintiff did not comply with such deadline or that PHH did not agree to modify this term

through subsequent agreements and actions.  See Plaintiff's response to Interrogatory Nos. 10, 13, and 14. See Plaintiff's response to Request for Admission Nos. 4 and 5.

8.      Admit there is no permanent modification agreement executed by you and

notarized prior to January 11, 2021.

Denied. See Plaintiff's response to Interrogatory Nos. 10, 13, and 14. See Plaintiff's response to Request for Admission Nos. 4 and 5.

9.      Admit that Kroger and not PHH was holding the payments you made in February

and March 2021.

Plaintiff objects to this request as it seeks or otherwise calls for a legal conclusion.

Plaintiff objects to this request as it is unduly vague as to the meaning of "holding".

Signing as to objection:

*/s/ Daniel M. Solar*

Daniel M. Solar (0085632)

Without waiving such objections, Plaintiff admits that PHH received the funds and failed to properly apply the funds towards Plaintiff's mortgage loan per the terms of the loan Modification.  Defendant also failed to take reasonable steps to return the funds to Plaintiff.  After receiving the funds, Defendant PHH chose to deliver the funds to Kroger, who did not immediately return them to Plaintiff.

10. Admit that you received a refund in July 2021 from Kroger for payments that had been

rejected and returned from PHH.

Plaintiff objects to this request as it seeks or otherwise calls for a legal conclusion.

Plaintiff objects to this request as it is unduly vague as to the meaning of "rejected and returned".

Signing as to objection:

*/s/ Daniel M. Solar*

Daniel M. Solar (0085632)

Without waiving such objections, Plaintiff admits that in July 2021, upon request of Plaintiff's counsel, PHH for the first time took steps to trace and identify the funds it had received, but refused to apply the same to Plaintiff's mortgage loan per the terms of the Modification. PHH had delivered the funds to Kroger, but did not take steps to ensure that the funds were refunded to Plaintiff.  In July 2021, PHH finally provided Plaintiff the tracking information necessary for Plaintiff to obtain access to the funds.

11. Admit your January 7, 2021 email to Diane Bennett attached as Exhibit C to the Affidavit

of Diane Bennett filed in the foreclosure complaint regarding this matter, Richland

County, Ohio Court of Common Pleas Case Number 2020CV0169, referred to your

request for a new modification without a balloon payment and did not reference the

November 2020 modification originally sent to you by PHH.

Objection. No such Affidavit of Diane Bennet was filed with or was otherwise attached to the foreclosure complaint in such foreclosure action.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, denied.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

Request is hereby made for the production by Plaintiffs of the following documents, all electronically stored documents or electronic data, or other materials presently in the custody, possession, or control of Plaintiff, her agents, attorneys and/or other representatives:

1. Produce each and every document, all electronically stored documents or electronic data, photographs, videotape, materials, emails or other real or demonstrative evidence, including summaries and data compilations that you intend to introduce as an exhibit, *or rely upon in any way,* at the Trial of this matter or in any deposition or motion, for this case.

The request for all documents upon with Plaintiff intend to "*rely upon in any way*" is overbroad.

Signing as to objection:

*/s/ Daniel M. Solar*

Daniel M. Solar (0085632)

Without waiving such objection, documents to be used at trial have not yet been selected as discovery is still ongoing. Further, see Plaintiff's document production. Plaintiff reserves the right to supplement this response.

2.      Produce each and every report, memorandum, correspondence, or other document that sets forth, in any way, the findings, opinions and/or conclusions of each expert identified in response to Interrogatory #4.

See Plaintiff's response to Interrogatory No. 4. No such experts have been identified. Plaintiff reserves the right to supplement this response.

3.      Produce any and all files, documents, all electronically stored documents or electronic data, or other materials utilized by or generated by each expert identified in response to Interrogatory #4.

See Plaintiff's response to Interrogatory No. 4. No such experts have been identified. Plaintiff reserves the right to supplement this response.

4.      Produce each and every document, all electronically stored documents or electronic data, or other materials to support or evidence your claims for alleged damages identified in response to the Interrogatories.

See Plaintiff's document production.

5.      Produce each and every discoverable document, all electronically stored

documents or electronic data, or other materials which support any of your claims and/or the defenses in this case and/or which in any way relate to the subject matter of this litigation, including but not limited to any evidence of payments made in connection with the Mortgage which is the subject of your Complaint.

> Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

> Signing as to objection:

> */s/ Daniel M. Solar*

> _____

> Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

6. Produce each and every discoverable document, notes, all electronically stored documents or electronic data and emails, or other materials which support, relate to, or evidence your responses to the foregoing Interrogatories, or which were utilized to prepare your responses thereto.

> The request for all documents upon which "relate to" Plaintiff's preparation of her Interrogatory responses is unduly vague and overbroad.

> Signing as to objection:

> */s/ Daniel M. Solar*

> _____

> Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

7. Produce each and every discoverable document, notes, all electronically stored

documents or electronic data and emails, or other materials which support, relate to, or evidence that you suffered emotional distress or duress due to the alleged actions of the Defendants, including but not limited to copies of any medical records pertaining to medical or psychological treatment received for emotional distress.

See Plaintiff's document production. Any medical records not provided therein have been requested and Plaintiff will supplement such production as applicable. See Plaintiff's response to Interrogatory No. 3.

8.    Provide a copy of all payments or proof of payment you made PHH in 2020.

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

9.    Produce all audio recordings you have of any conversations between you and PHH in 2020.

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*

_____

Daniel M. Solar (0085632)

Without waiving such objection, Plaintiff is not in possession of any such audio

recordings.

Respectfully submitted,

*/s/ Daniel M. Solar*

Daniel M. Solar (0085632)
Marc E. Dann (0039425)
Michael A. Smith Jr. (0097147)
Dann Law
15000 Madison Avenue
Lakewood, Ohio 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
*Counsel for Plaintiff Angela L. Ruckman*

## <u>CERTIFICATE OF SERVICE</u>

I certify that an exact copy of the foregoing document was sent via electronic mail on

November 22, 2021:

> Sarah A. Wilson
> Blank Rome, LLP
> 1700 PNC Center
> 201 East Fifth Street
> Cincinnati, OH 45202
> SWilson@blankrome.com
> Counsel for Defendant PHH Mortgage Corporation, d/b/a PHH Mortgage Servicing
>
> Ashley E. Mueller
> Laura C. Infante
> Attorneys for Defendant
> Clunk, Hoose Co., L.P.A
> 495 Wolf Ledges Pkwy
> Akron, OH  44311
> amueller@clunkhoose.com
> linfante@clunkhoose.com
> Counsel for Defendant Clunk, Hoose Co. LPA

*/s/ Daniel M. Solar*

Daniel M. Solar (0085632)

IN THE COURT OF COMMON PLEAS
RICHLAND COUNTY, OHIO

| | |
|---|---|
| HSBC BANK USA N.A. AS TRUSTEE FOR OWNIT MORTGAGE | Case No. 2020 CV 0169 |
| Plaintiff, | Judge Brent N. Robinson |
| v. | |
| ANGELA L. RUCKMAN, *et al*, | **Affidavit of Angela Ruckman** |
| Defendant. | |

I, Angela Ruckman, being first duly sworn as if upon oath, do swear and affirm as follows:

1.    I am not a minor, I have personal knowledge of the facts in this affidavit, and I am competent to testify to these facts.

2.    I am a Defendant and homeowner in this foreclosure case.

3.    I participated in the court's mediation program and reached a settlement settlement agreement with the Plaintiff.

4.    In July I submitted a complete loan modification application to PHH through their counsel. This was my first loan modification application to this loan servicer.

5.    On August 13, 2020, I received a notice dated August 5, 2020 stating that my loan modification application was complete as of July 31, 2020, and under review.

6.    After reviewing my loan modification, PHH offered me a trial loan modification.

7.    Per the agreement, after I made three trial modification payments in September, October, and November, Plaintiff, through its servicer PHH Mortgage Services Inc., offered me a permanent loan modification.

8.    The loan modification agreement provided that the loan would be modified effective November 1, 2020, and that my new modified monthly payment would be

1

**EXHIBIT**

13

$469.12. A true and correct copy of the loan modification agreement is attached hereto as Exhibit A.

9. I did not receive the written permanent modification agreement from PHH until late November, 2020.

10. I requested, and received, an extension of time to accept the loan modification agreement.

11. I was informed that if I made the first payment by December 1, 2020, then I could have until the end of December to return the paperwork.

12. The loan modification agreement included specific payment remittance instructions for payments via electronic money order. The instructions included a unique receiver code for PHH with Western Union Quick Collect Payments, and instructions to include my account reference number on each payment. A true and correct copy of the payment instructions is attached hereto as Exhibit B.

13. On November 30, 2020, I made a payment of $470 to Plaintiff's servicer PHH via money order according to the servicer's payment instructions. A true and correct copy of the November 30, 2020 money order receipt is attached hereto as Exhibit C.

14. I notarized and mailed the loan agreement paperwork to Plaintiff's loan servicer to the address designated by Plaintiff's loan servicer in December 2020.

15. I continued to make monthly payments according to the agreement.

16. On January 4, 2021, I made my January monthly payment of $470 to Plaintiff's servicer PHH via a Western Union Quick Collect Payment money order at my local Kroger, according to the servicer's payment instructions. A true and correct copy of the January 4, 2020 money order receipt is attached hereto as Exhibit D.

17. On January 29, 2021, at a hearing with Magistrate Andrea Clark, Plaintiff acknowledged that it had received the loan modification documents and also my December and January payments.

18. By February 2021, I had not yet received the signed loan modification from PHH, but I also had not received any notice that the loan modification had been denied.

19. On February 11, 2021, although I had not yet received any assurance that

2

PHH had implemented the loan modification agreement, I made my February monthly payment of $470 to Plaintiff's servicer PHH via money order according to the servicer's payment instructions. A true and correct copy of the February 11, 2021 money order receipt is attached hereto as Exhibit E.

20. On February 22, 2021, I made my March monthly payment of $470 to Plaintiff's servicer PHH via money order according to the servicer's payment instructions. A true and correct copy of the February 22, 2021 money order receipt is attached hereto as Exhibit F.

21. On March 3, 2021, I received an email from Diane Bennett, Loss Mitigation Department Coordinator for Plaintiff's attorney, Clunk Hoose Co. LPA, stating as follows:

> The reversal has not yet been approved by management, our client is working to get it reversed; however, the last payment our client received from you was for the January payment, you will need to make the February and March payments immediately.

A true and correct copy of my email correspondence is attached hereto as Exhibit G.

22. On March 4, 2021, I received a notice dated February 25, 2021 that PHH had rejected my February 11, 2021 payment. A true and correct copy of the notice is attached hereto as Exhibit H.

23. On March 6, 2021, I sent an email in response to Ms. Bennett informing her that I had made all the payments, but that I had just learned PHH had rejected at least one payment:

> Ive made all payments. Jan. Feb. March. However i was notified by krogers today. That PHH refused the dated Feb 11th which would have been for the month of March payment. Can you explain what the issue is and what to do?

See Exhibit G.

24. On March 8, 2021, Ms. Bennett responded to my email and confirmed that the loan modification was approved; however she also claimed that her client had not received the two payments for February and March that I had made the previous month:

> I received the below email from you this morning. Our client has advised that

3

you are due for the February and March payments, for a total of $873.93. If you want the modification to go through, that payment needs to be made immediately. **Our client's modification team has confirmed they will accept that amount and then reverse the denial.**

Also, I read down through all my notes, I have emails from you that you sent the December and January pmts, there is nothing mentioning that the February payment was sent (that was at the end of January).

If you have proof that you made the February payment and that it was accepted, please provide the proof and I will forward to our client.

Please let me know if you will be sending the payment today.

*Id.* (emphasis added).

25. I responded to Ms. Bennett's email the same day with receipts showing my February and March payments had already been made:

I made both payments for February and march. Payment made on February 11th was refused and i was notified by krogers. See attached for receipts and pic of email krogers gave me.

*Id.*

26. Even though Ms. Bennett had previously acknowledged that her client had already received the January 2021 payment, she responded to my email by asserting that the February payment had been applied towards the January payment rather than February:

Based on the receipts you sent, looks like you are due for Feb and March to me.

You have a receipt purchase for $470 on 2/11 – which would be your January pmt (can you produce a separate receipt for Jan?)

You have a notification on 2/25 that the 2/11 pmt can't be processed

You have a receipt for $471.50 purchased on 2/22 – this would make the January pmt – making you due for Feb and March.

I didn't see any extra receipts in your file indicating that a Jan pmt was made other than the receipt above that you purchased on 2/22 almost one month behind.

4

*Id.*

27.     The same day, on March 8, 2021 I responded to Ms. Bennett with an email and receipts documenting my payments to PHH on January 4, 2021, February 11, 2021, February 22, 2021, and the notice that PHH had refused my February 11, 2021 payment. A true and correct copy of my March 8, 2021 email is attached hereto as Exhibit I.

28.     On March 10, 2021, I emailed Ms. Bennett to request an update on my loan payments:

> Has there been any further updates and any tracking as to where my payments where deposited? Did you receive the January receipt?

A true and correct copy of my March 10, 2021 email is attached hereto as Exhibit J.

29. Ms. Bennett responded the same day with an email stating: "Your receipts were received and sent to PHH for review." *Id.*

30.     Nine days later, on March 19, 2021, Ms. Bennett sent me an email claiming that PHH did not receive my February payments:

> Our client cannot confirm receipt of payments from you. The following amount is due before the end of March or the modification is denied.
>
> We have still not received $873.93. Mod team has given time to receive funds till end of march, if funds not received, mod will be denied again and then we will not be able to reverse mod denial.
>
> End of March means we should receive funds at least by 25th, so that mod team can modify loan before month end, otherwise they will also ask for the payment of April. The receipts that you provided do not show that payment was sent to and received by PHH.
>
> It appears you may need to go back to Kroger to obtain your funds.

A true and correct copy of my March 19, 2021 email is attached hereto as Exhibit K.

31.     On March 19, 2021, I responded to Ms. Bennett via email:

> I would like to know where my money is! I have receipts. I paid per their instructions western union. No clue how long it will take to file an investigation with western union to track my money to show it was paid. Where do i come

5

up with extra money in the mean time?

*Id.*

32.    Later in the day on March 19, 2021, I sent a second email to Ms. Bennett: "What was the last payment received from western union?" *Id.*

33.    On March 20, 2021, I sent a third email to Ms. Bennett: "The receipts show the biller as PHH Mortgage. The account # is on each receipt. The amount due, how was the calculated?" *Id.*

34.    On March 22, 2021, I sent a fourth email to Ms. Bennett, informing her that I had resubmitted the February 11, 2021 payment that PHH had rejected, and that my account was therefore current:

> I went to Krogers yesterday. Spoke with Jackie who has been the contact person since the denial of the 2/11/21 payment. She is the one who contacted me and gave me the copy of the email. That payment was resubmitted yesterday. Per her instructions, the recipient needs to use the reference number to track payment and deposits. If a payment is not accepted an email will be sent instructing Krogers to contact the sender. Then the money is refunded. Or the money can be resubmitted to the recipient again. Krogers is notified within 7-11 business days if there is an issue.
>
> **I have used the same payment for all payments since the modification process started. There has only been 1 issue, and that was 2/11/21 payment which would have been Februarys payment. Why it was denied or refused? I do not have an answer, PHH would have to answer that question. Being no other payments have been refused or declined, including the 2/22/21 payment which was the payment for March. There should be only 1 payment issue and thats the 2/11/21 payment declined by PHH. That payment was resubmitted yesterday. Receipt is attached. This would make my account current. All receipts show the biller as PHH. Contains the account number and a reference number.**

A true and correct copy of my March 22, 2021 email is attached hereto as Exhibit L (emphasis added).  A true and correct copy of my payment resubmission receipt is attached hereto as Exhibit M.

35.    Ms. Bennett replied with an email stating that she would forward my receipt of my resubmission of the February 11, 2021 payment to PHH, but she also stated erroneously that she expected the modification to be denied because "signed

documents and payments were all due in November 2020."

> I will send the receipt to PHH, but if PHH doesn't have the funds in hand by 3/25/21, I expect the modification to be denied. After all, signed documents and payments were all due in November 2020.

Exhibit L.

36.    I responded to Ms. Bennett's email by addressing her false statements about my payments:

> Per krogers, phh needs to use the reference numbers on the receipts to track payments received. Maybe it was posted to another account? **You claim 2 payments were missing, but the only denied payment was the February payment paid on 2/11. That was resubmitted yesterday. No other payments have been returned which means all other payments were received and accepted by PHH. I have made every payment. All paperwork was signed. Krogers can not track a payment that was sent after it was received. The other alleged missing payment has not been applied to my or was applied to another account. I have my receipts showing I paid. I dont know what more I can do.**

*Id.* (emphasis added).

37.    Ms. Bennett responded by telling me to request a payment history directly from her client:

> Please call PHH and request a payment history if you believe all payments have been made, that way you can see what payments came in and how they were applied.

*Id.*

38.    On March 23, 2021, Ms. Bennett sent me an email that she claimed was a payment breakdown for my trial payments, but it did not account for my February and March 2021 payments:

> Angela, below is the breakdown of your payments received.
>
> Trial plan pmts were $469.15
>
> 09/02/20 $470 received - $469.15 September's pmt = .85
>
> 10/26/20 $1,000 received +.85 = $1,000.85 - $469.15 for October's pmt =

7

$531.70

$531.70 - $469.15 for November's pmt = $62.55

12/03/20 $470 received + $62.55 = $532.55 - $469.12 (perm mod pmt for Dec) = $63.43

01/05/21 $470 received + $63.43 = $533.43 - $469.12 (perm mod pmt for Jan) = $64.31

Loan is due for the Feb an March pmts as of 3/23/21

The payment that was being sent today, 3/23/21 has not yet shown as received or applied to your account and will likely be rejected because it is not the full amount of the Feb & Mar pmts combined.

$469.12 Feb + $469.12 Mar = $938.24 - $64.31 = $873.93.

A true and correct copy of the March 23, 2021 email is attached hereto as Exhibit N.

39.    On March 30, 2021, I made my April monthly payment of $470 to Plaintiff's servicer PHH via money order according to the servicer's payment instructions. A true and correct copy of the March 30 2021 payment receipt is attached hereto as Exhibit O.

40.    I made each and every payment to Plaintiff via money order per the written remittance instructions provided by its servicer, PHH.

41.    I have never received any notice from Plaintiff not to use the payment instructions that were previously provided, or changing those payment instructions.

42.    I made each and every payment as instructed via wire transfer.

43.    I only received notice that a single payment, the February 11, 2021 payment, was rejected by the recipient, PHH. I resubmitted the February 11, 2021 payment on March 22, and have not received any notification that the resubmitted payment was rejected.

44.    Neither Plaintiff, its counsel, nor its loan servicer have ever provided me written notice that the permanent loan modification was denied, or the reason for the denial.

45.    I have fully performed under the loan modification agreement. I have submitted the signed modification agreement and I have made all monthly payments under the agreement in full, and on time.

8

46.     Plaintiff has failed to fulfill its requirements under the loan modification agreement.

47.     Plaintiff has failed to implement the loan modification agreement, and it has improperly applied my monthly payments towards the unmodified loan balance.

48.     Plaintiff's loan servicer PHH wrongfully rejected the February 11, 2021 payment I made per the remittance instructions it provided as part of the loan modification agreement.

49.     Plaintiff's law firm has misrepresented the amount due on the loan under the loan modification agreement in its communications with me and with the Court.

50.     On March 30, 2021, Plaintiff filed a motion for summary judgment in this foreclosure action, even though I had fully performed under the loan modification agreement.

51.     As a consequence of Plaintiff's breach of the loan modification agreement, and the misrepresentations of Plaintiff's counsel, it has been necessary for me to hire a lawyer to enforce the settlement agreement and save my home from foreclosure.

Angela Ruckman

Sworn to and subscribed before me by Angela Ruckman, April 20, 2021.

[seal]

AMBER HICKMAN
Notary Public
State of Ohio
My Comm. Expires
December 9, 2024

Notary Public
State of Ohio

9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANGELA L. RUCKMAN, | Case No. 5:21-cv-00923-JRA |
| Plaintiff, | Judge John R. Adams |
| v. | |
| PHH MORTGAGE CORPORATION d.b.a. PHH MORTGAGE SERVICES, *et al*., | |
| Defendants. | |

---

**PLAINTIFF ANGELA RUCKMAN'S RESPONSES TO DEFENDANT'S (CLUNK, HOOSE CO., L.P.A) FIRST SET OF COMBINED INTERROGATORIES, REQUEST FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION**

---

Plaintiff Angela L. Ruckman ("Plaintiff"), through counsel, pursuant to Fed. R. Civ. P. 26, 33, 34, and 36, hereby responds to the Discovery Requests (the "Requests") propounded by Defendant Clunk Hoose Co., L.P.A. ("Clunk").

## GENERAL OBJECTIONS

1.     Plaintiff objects to the Requests, including any and all definitions and instructions, to the extent they seek to impose obligations in addition to, or inconsistent with, the Federal Rules of Civil Procedure. Plaintiff will respond to the requests in accordance with the obligations imposed by the applicable rules and law.

2.     Plaintiff objects to the Requests to the extent they seek information protected from disclosure by the attorney client privilege, the work-product doctrine, or any other applicable privileges, protections, or immunities from discovery. If, and to the extent Plaintiff

EXHIBIT
14

inadvertently discloses in the litigation protected information, such inadvertent disclosure is not intended and does not waive any privilege, protection, or immunity.

3.     Plaintiff objects to the Requests to the extent they are overly broad, vague, unduly burdensome, or seek a narrative response relating to a given subject. Plaintiff objects to providing responses of such breadth on the grounds of undue burden.

4.     Plaintiff objects to the interrogatories to the extent they seek information that is not relevant, not reasonably calculated to lead to relevant information, will not lead to the discovery of admissible evidence, or not proportional to the needs of the case.

5.     Plaintiff objects to the interrogatories to the extent they seek legal conclusions or would require Plaintiff to reach a legal conclusion in order to prepare a response.

6.     Pursuant to Fed. R. Civ. P. 26, the Requests are deemed to be continuous in nature until the date of the trial. Plaintiff's investigation of this matter is ongoing, and Plaintiff reserves the right to amend, supplement, or alter the response to any interrogatory at any time as allowed by applicable law.

**[This space intentionally left blank.]**

## <u>GENERAL INSTRUCTIONS</u>

Plaintiff shall not claim lack of information or knowledge as a reason for failing to admit or deny Defendant's Discovery Requests unless Plaintiff has made reasonable inquiry and the information known or readily obtainable is insufficient. Further, Plaintiff may not object to any of the Discovery Requests simply because a request presents a genuine issue for trial.  Finally, these Discovery Requests are ongoing in nature and are subject to supplementation as required by Rule 26(e) of the Federal Rules of Civil Procedure. Nothing contained herein is intended to be, nor shall it be construed as, an admission by the Defendant, Clunk, Hoose Co., L.P.A.

## <u>DEFINITIONS</u>

The following terms shall have the meaning indicated:

1. **"Document"** means agreements, contracts, memorandum, telephone logs, reports, records, microfilms, letters, books, pamphlets, brochures, circulars, manuals, drawings, invoices, receipts, sales slips, charge slips, minutes of meetings or other relevant materials.

2. **"The parties hereto"** shall mean Defendant, Clunk, Hoose Co., L.P.A, and Plaintiff, Angela L. Ruckman.

3. **"Subject Property"** or **"Property"** refers to the real estate commonly known as 837 South Main Street, Mansfield, OH 44907.

4. **"Promissory Note"** (or **"Note"**) refers to the Promissory Note originally executed by Plaintiff, Angela L. Ruckman, in favor of Ownit Mortgage Solutions, Inc. on August 24, 2005, attached hereto as Exhibit "A."

5. **"Mortgage Deed"** (or **"Mortgage"**) refers to the Mortgage recorded as Book 1556, Page 91, in the Richland County Recorder's Office, originally executed by Defendant, Angela L. Ruckman, on August 24, 2005, in favor of Mortgage Electronic Registration Systems, Inc. solely as nominee for Ownit Mortgage Solutions, Inc., and recorded on August 26, 2005, attached hereto as Exhibit "B."

6. **Loan Account"** refers to the account associated with the Note and Mortgage held by non-party HSBC Bank USA, National Association, As Trustee For Ownit Mortgage Loan Trust, Mortgage Loan Asset Backed Certificates, Series 2005-5 wherein Defendant, PHH Mortgage Corporation ("PHH") performs credits, debits, advances, refunds, repayments,

and other similar monetary transactions in accordance with the terms of the Note and Mortgage specifically pertaining to the repayment of the funds loaned to Plaintiff at the time the Note and Mortgage were executed.

7. **Identify the/each/all person(s)** shall mean to state the person's name, address, title, and telephone number.

8. **"Federal Case"** shall refer to Case Number 5:21-CV00923 in the United States District Court for the Northern District of Ohio, styled as *Angela L. Ruckman v. PHH Mortgage Corporation, et al.*

*9.* **"Foreclosure Case"** shall refer to Case Number 2020 CV 0169 in the Richland County Court of Common Pleas, styled as *HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 v. Angela L. Ruckman, et al.*

10. **"Permanent Modification"** shall refer to the document attached hereto as Exhibit "C."

11. **"Trial Modification"** shall refer to the document attached hereto as Exhibit 'D."

12. The statements **"a complete response shall include"** or **"including but not limited to"** are not intended to be subparts of the Interrogatory or Request itself; rather, those phrases have been included to provide clarification to those responding to the Request, for the purpose of limited ambiguity.

## I.      INTERROGATORIES

*Interrogatory No. 1.*

Identify all person(s) answering or responding in any way to Defendant's Interrogatories, Request for Production of Documents and Requests for Admission propounded to Plaintiff pursuant the definitions listed above.

**Answer:**

Angela L. Ruckman, who can be contacted through counsel Dann Law, 15000 Madison Avenue, Lakewood, OH 44107. Ms. Ruckman is the Plaintiff in this matter and is a party to whom these interrogatories are directed. Her counsel at Dann Law assisted Ms. Ruckman in the preparation of her responses.

*Interrogatory No. 2.*

Identify all persons having testimonial knowledge concerning or relating to the subject matter of Plaintiff's claims and/or defenses and for each person so identified state the specific subject of the information, whether the information is based upon personal knowledge or hearsay, and

identify any documents relating to or used to refresh the recollection of that persons knowledge or information.

**Answer:**

Angela L. Ruckman, who can be contacted through counsel Dann Law, 15000 Madison Avenue, Lakewood, OH 44107. Ms. Ruckman is the Plaintiff in this matter and is a party to whom these interrogatories are directed. Ms. Ruckman has personal knowledge as to the facts of this matter including damages she has suffered.

Representative(s) of PHH, to be identified through discovery, who directly worked on the Loan in any capacity related to the allegations contained in the Complaint, or representative(s) who have adequate knowledge of such representatives' actions. The foregoing includes, but is not limited to individuals who performed work, or have knowledge as to such work, in regard to the Loan, related to:

1. The servicing file and payment history on the Loan;
2. The receipt, drafting, application, crediting, or handling otherwise, of payments issued to PHH by Plaintiff;
3. The application or handling otherwise, of fees and charges made to the Loan;
4. PHH's standards, policies, and procedures relative to evaluating and responding to loss mitigation applications and appeals thereof from borrowers, including Plaintiff, pursuant to investor requirements and guidelines, including those for Plaintiff's loan or the evaluation of Plaintiff's loan for loss mitigation options;
5. PHH's communications with Plaintiff concerning the evaluation of Plaintiff's loan for loss mitigation options or the evaluation of Plaintiff's loan for loss mitigation options
6. PHH's communications with any third parties concerning the evaluation of Plaintiff's loan for loss mitigation options including, but not limited to non-party HSBC Bank USA, National Association, as Trustee for Ownit Mortgage Loan Trust, Mortgage Loan Asset-Backed Certificates, Series 2005-5 ("HSBC"); and,
7. PHH's computer system, database, and software used in conjunction with the receipt, review, drafting, and mailing of responses to Plaintiff's loss mitigation submissions or the evaluation of Plaintiff's loan for loss mitigation options otherwise;
8. PHH's communications with any third parties concerning the fees and charges made to the Loan;
9. PHH's communications with Plaintiff concerning the fees and charges made to the Loan;
10. Making and/or approving decisions related to the initiation and prosecution of any foreclosure action related to the mortgage loan at issue; and,
11. PHH's communications with any third parties concerning the fees and charges made to the Loan including but not limited to any outside counsel or HSBC.

Representative(s) of Clunk, Hoose Co., LPA ("Clunk"), to be identified through discovery, who directly worked on Plaintiff's mortgage loan account in any capacity related to the allegations contained in the Complaint, or representatives who have adequate knowledge of such representatives' actions. The foregoing includes, but is not limited to individuals who performed work, or have knowledge as to such work, in regard to the Loan related to:

1. Any communications between PHH and HSBC or any other third-party concerning loss mitigation efforts for the Plaintiff's loan at issue in the Complaint;
2. The servicing file and payment history on the Loan;
3. Clunk's communications with Plaintiff or any third party concerning the receipt, drafting, application, crediting, or handling otherwise, of payments issued to PHH by Plaintiff;
4. Clunk's communications with any third parties concerning fees and charges made to the Loan;
5. Clunk's communications with Plaintiff concerning the fees and charges made to the Loan;
6. Clunk's communications with Plaintiff concerning the evaluation of Plaintiff's loan for loss mitigation options or the evaluation of Plaintiff's loan for loss mitigation options
7. Clunk's communications with any third parties concerning the evaluation of Plaintiff's loan for loss mitigation options including, but not limited to PHH and HSBC; and,
8. Clunk's policies and procedures to ensure and maintain compliance with the Fair Debt Collections Practices Act, 15 U.S.C. § 1692, *et seq.* (FDCPA).

Taryn Allied, a personal friend of Ms. Ruckman with whom Ms. Ruckman has discussed the facts and damages of this matter on occasion.  Ms. Allied's contact information is 798 ½ Abri Lane, Mansfield, OH 44905, (419) 982-0099.

Unknown employee of Park National Bank, formerly Richland Bank, who notarized permanent modification in December 2020.

Magistrate Andrea Clark of the Richland County Court of Common Pleas, who has knowledge of the foreclosure filings and representations at issue in this case.


### *Interrogatory No. 3.*
State the name, address, telephone number and substance of the testimony of each potential fact witness for the Plaintiff.

**Answer:**

See Plaintiff's response to Interrogatory No. 2.


### *Interrogatory No. 4.*
State the name, address, telephone number and substance of the testimony of each potential expert witness for the Plaintiff.

**Answer:**

Plaintiff has not identified any such expert to date. Plaintiff reserves the right to supplement this response.

***Interrogatory No. 5.***

Describe, in detail, each exhibit Plaintiff will be relying on at trial.

**Answer:**

Plaintiff has not yet selected or otherwise identified exhibits to be used at trial as discovery is still ongoing. Further, see Plaintiff's document production. Plaintiff reserves the right to supplement this response.

***Interrogatory No. 6.***

Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her FDCPA claim against Defendant.

**Answer:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion or otherwise requires Plaintiff to reach a legal conclusion in order to prepare a response.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint.

***Interrogatory No. 7.***

Identify the date, form and subject matter of all communications between Plaintiff and Defendant, Clunk, Hoose Co., L.P.A.

**Answer:**

Plaintiff objects to this request because it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, is overly broad, unduly burdensome, oppressive, and not proportional to the needs of the case.

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's document production.

**Interrogatory No. 8.**
Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her complaint stating that Defendant's actions in moving for summary judgment in the Foreclosure Case constitutes the use of false representations or deceptive means to collect or attempt to collect on the Loan.

**Answer:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion or otherwise requires Plaintiff to reach a legal conclusion in order to prepare a response.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint and Plaintiff's document production. Further, Plaintiff had executed and accepted the Permanent Modification and had remitted all payments due thereunder to PHH as of the filing of the motion for summary judgment in the Foreclosure Case. There was therefore no basis to move for summary judgment as any payments that PHH or Clunk may claim Plaintiff failed to make were refused or otherwise rejected by PHH.

**Interrogatory No. 9.**
Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her complaint stating that Defendant's actions in moving for summary judgment in the Foreclosure Case constitutes the use of unfair or unconscionable means to collect or attempt to collect on the Loan.

**Answer:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion or otherwise requires

Plaintiff to reach a legal conclusion in order to prepare a response.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint and Plaintiff's document production. Further, Plaintiff had executed and accepted the Permanent Modification and had remitted all payments due thereunder to PHH as of the filing of the motion for summary judgment in the Foreclosure Case. There was therefore no basis to move for summary judgment as any payments that PHH or Clunk may claim Plaintiff failed to make were refused or otherwise rejected by PHH.

**Interrogatory No. 10.**
Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her complaint stating that Defendant's actions in moving for summary judgment in the Foreclosure Case constitutes the use of conduct, the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt of unfair or unconscionable means to collect or attempt to collect on the Loan.

**Answer:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion or otherwise requires Plaintiff to reach a legal conclusion in order to prepare a response.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint and Plaintiff's document production. Further, Plaintiff had executed and accepted the Permanent Modification and had remitted all

payments due thereunder to PHH as of the filing of the motion for summary judgment in the Foreclosure Case. There was therefore no basis to move for summary judgment as any payments that PHH or Clunk may claim Plaintiff failed to make were refused or otherwise rejected by PHH.

**_Interrogatory No. 11._**

Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her complaint stating that Defendant made misstatements and misrepresentations regarding the status of her payments.

**Answer:**

Plaintiff objects to this interrogatory as it calls for a legal conclusion or otherwise requires Plaintiff to reach a legal conclusion in order to prepare a response.

Plaintiff objects to this interrogatory as it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

_/s/ Daniel M. Solar_____
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's Complaint.

**_Interrogatory No. 12._**

Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her complaint stating that she has suffered actual damages in association with the Federal and Foreclosure Cases. A complete response would include a list of the nature and amount of each actual damage Plaintiff's alleges she has suffered.

**Answer:**

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

_/s/ Daniel M. Solar_____
Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production. See also, Plaintiff's response to Interrogatory No. 3. Furthermore, Plaintiff seeks statutory damages for each and every alleged statutory violation, as well as actual damages resulting from such, and attorneys' fees and costs in an amount yet to be specifically determined. Plaintiff is still in the process of itemizing actual damages and will supplement pursuant to Court Order. Damages to date include, but are not limited to:

1. Statutory damages from PHH for each violation of the applicable provisions of Regulation X of the Real Estate Settlement Procedures Act (RESPA), as claimed in Count Two of the Complaint, in the amount of One Thousand Dollars ($1,000.00).

2. Actual damages in an amount yet to be specifically determined, including, but not limited to:

    a. Due to the delay in the implementation of the modification at issue (the "Modification"), Plaintiff was caused to incur improper fees and charges imposed on the loan at issue (the "Loan") including late fees as well as other similar such fees including other default servicing related fees for which Plaintiff is personally obligated or which otherwise negatively impacts any equity in her home to which she is entitled;

    b. Loss of time and money for continued defense of the foreclosure action filed in the Richland County Court of Common Pleas, Case No. 2020 CV 0169 (the "Foreclosure") which would have been dismissed much sooner but for Clunk's actions in mishandling the loss mitigation processes concerning the Loan and otherwise making misrepresentations about the status of Plaintiff's payments remitted under the Loan;

    c. Legal fees, costs, and expenses incurred in defense of the Foreclosure since Clunk's wrongful conduct including the preparation of and filing of motions in defense of the motion for summary judgment and in attempts to have the Court enforce the Modification—such fees total $21,872.50 and expenses total $179.42; and,

    d. Severe emotional distress driven by Clunk's actions and by the tangible fear that Clunk's and PHH's refusal to properly handle the loss mitigation process related to the Loan will result in the imminent loss of her home to foreclosure sale, which has resulted in frustration, loss of sleep, anxiety, depression, embarrassment, and other significant emotional distress above and beyond the emotional distress caused by the Foreclosure from which she was suffering prior to the conduct alleged in this complaint.

*Interrogatory No. 13.*

Describe, in detail, the factual basis behind Plaintiff's allegations set forth in her complaint stating that she has incurred attorney's fees and costs in association with the Federal and Foreclosure Cases. A complete response would include a list of the nature and amount of each cost and the attorney's fee that Plaintiff alleges she has incurred.

**Answer:**

See Plaintiff's document production.

    *Interrogatory No. 14.*
Describe, in detail, the factual basis behind Plaintiff's allegations that she has suffered severe emotional distress as a result of Defendant filing a motion for summary judgment in the Foreclosure Case.

**Answer:**

Plaintiff objects to this request because it seeks a narrative better suited for Plaintiff's testimony at deposition.

                                Signing as to objection:

                                */s/ Daniel M. Solar*         
                                Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production. Further, Plaintiff provides the following narrative:

> 181 steps or 452 feet is what separated my daughter and I for a period of time from September of 2012 to February 2013. Not by choice. 181 steps from my back door to the inside of her building to her apartment door.  At one point seemed so close.

> She was diagnosed 7/2/2012 unexpectedly, out of nowhere when she was 18 with one of the rarest forms of Leukemia. While in the hospital for a mandatory stay to begin induction treatment for a clinical trial, I had to find her a safe and sterile place to live, as it's "her" body producing the cancer. Together we had rescue birds. She could not return to our home, due to their dust and bathroom habits. I began for the first time having panic attacks. Untreated, officially undiagnosed, but I knew, and had to be strong for her and had to keep it hidden the best I could from her. Crying and screaming in parking garages were common for cancer mom's. Security guards carried lots of Kleenex for us, and would give gestures to clean your face when needed before going back in. Knowing she would be released in a few weeks, I was scrambling, one morning while standing at my kitchen window it dawned on me, cause I was staring at the apartments behind my house. I called the owner and she said she would have an apartment in a week or 2. I rushed to the hospital, the doctors approved the idea, my daughter was thrilled to be close to home. I rushed home and called the landlord back, made arrangements and then signed the lease. I had to watch my daughter quit her job because of Leukemia. Then had to watch her call her college and put her classes on hold because of Leukemia. Basically watched her put her life on hold. Now I have to watch her shop for her first apartment from a hospital bed on a cancer

floor with a prepaid visa card. Everything from spoons to a couch and everything in between. Nothing like I ever pictured for her. I always pictured great things for her, as she was a rainbow baby as they call it these days. She was a high risk pregnancy. A pregnancy that they didn't think that I would ever conceive. Yet here she was.

Prior to her getting sick she had been staying with my mom briefly as she was a typical teenager with the I know everything about life and learned she didn't when things didn't go well with the boyfriend. So instead of coming home to I told you so, she was at my mom's. When she got sick though, it was me she needed. Wanted. Asked for. It was I that was there. She fought hard. I watched her endure poisons after poisons. I watched her hair fall out. Come in. Change colors. Then repeat. I watched her gain weight. Lose weight and repeat. Be admitted. Blood transfusions. Platelet transfusions. Bone marrow testing. Spinal chemo procedures. PICC line placement every 4-6 weeks as her body rejected a port placement 2x. I watched her go through hell. Inside I'm going through hell. Panic attacks along with her, but I'm mom so I have to be stronger. Eventually she got discharged and got to come home. 181 steps from me. She came in, cried, loved her apartment. Was there 45min, then I had to rush her back to Columbus as her PICC line started leaking when I flushed it. Something I would have to do everyday for her. She had to be admitted to have it changed and cultured to ensure no infection. A few days later she returned home, 181 steps away. Every day I could stand at my kitchen window and see her living room window. At night if I was up, I could see if she was up, because I could see her living room or bedroom light on. I used to text or call and tell her to go to bed. In the evenings, it was nothing to just have my backdoor swing open and she would come bouncing in with her bald head or wearing one of her silly hats, a face mask on, a disposable gown, sometimes a Kroger bag and raid my fridge or cabinets. Sometimes just to see the birds for her daily limit of 15 mins if her ANC levels were high enough. If her levels were low, the birds would Skype with her and dance. She massively decorated for all holidays. That Christmas of 2012 she had snuck over while I was at work and took some of the Christmas decorations for her apartment to go with her first Christmas tree. As sick as she was she tried to put a few lights up here at the house even though I protested. I now wish I took pictures, or helped her put them all up, even though this was her thing for years. Her rule was do not touch the decorations! But I didn't know this was the last Christmas. The doctors seemed confident rarest but easiest to treat. When it snowed, I made sure to snowblow and keep those 181steps clear for her to walk. She had ups and downs with treatment. Never knew what to expect. One day at a time. Then 2/6/2013 she was finally 3 months negative for Leukemia. The fight isn't over, but a huge battle won, faced another 2 1/2 yes of treatment. Knew Leukemia could return any day as it's her body that produces it. Her life can go back to some normal. She can go back to college part time. She will begin the next phase of chemo in a week. Planned a celebration party for the weekend. The next day when she didn't answer

her phone most of the day, I went to her apartment and I found her deceased. Treatment killed her.

We may have had a few issues thanks to a boyfriend that quickly turned ex, and teenage growing pains. But the last 8 months of her life, we were closer than ever, inseparable, that was my best friend. I was eventually diagnosed with PTSD, Depression and Anxiety.

My house was our home. 181 steps briefly separated us. But she knew where home always was from 2005 on when we moved back from Michigan. This is where she recovered from her first surgery. This is where she had her first boyfriend. Parked her first car. Dressed up for every homecoming and prom. Planted every flowerbed. Buried every pet. Had yearly Halloween bashes. Fought with me every day on cleaning her room. Drove me crazy on insisting there needed to be 6 different kinds of shampoo and body washes in the shower at all times. Learned how to drive and almost hit the garage and house on several occasions. This is where she decorated the house for every holiday and one year got into a Christmas light war with a new neighbor and it resulted in her dragging out the Halloween lights to add more. The neighbor admitted defeat when she did that.  So many more memories. This house is all I have left. It's all I have left of her, it contains our memories. When she passed, her belongings were moved and stored here.

During the process of the unknowing outcome with the modification. Being Jan 29th 2021 it was said everything was being finalized to magistrate Clark. Then come March a payment was rejected, then having to hire an attorney. Everyday I had to pass her flower gardens I have maintained, worried will this spring be the last time I see them bloom. Worried who will take the birds who have behaviors from being abused. Nobody wanted them. That's why we started taking them to begin with. Her little rhubarb patch planted so I would bake her pies. Where do I put her stuff I haven't touched since she passed. Plus my stuff. My grandsons stuff. This is where his room is now when he comes. How do I explain this to him? How will this affect work?  How do I afford to move? I've been making my payments so I have money to spare. How do we go from it's a done deal to now foreclosure status? Part of PTSD, Depression and Anxiety is you isolate and stay to yourself. So you keep symptoms low. I don't have anyone to help. All alone. I have severe health issues going on. No extra money. Now might lose my house that was said in court in January that I've done everything I need to do, but now the mortgage company is changing their mind. Mixed with my diagnosis, combined with the last connection to my deceased daughter, I was extremely mentally,  and emotionally overwhelmed from learning the first payment was rejected in March until August when my lawyer got the judgment dismissed. If it wasn't for the strong connect of the house to my daughter I may have just given up the house. But that's why I fought so hard to keep it. There is still an after effect of damage. It's not like an instant sigh of relief it's over. With my diagnosis it's something that stays and is a process that has to be worked through in my

brain. As we process safety, relief, comfort and things of this stressful nature differently. It takes time, faith and patience. Someday we come to realize the damage is done and is now over, we are safe and we can finally heal. I hope my time is near.

Physically, mentally and emotionally overall, I became more isolated. My depression became worse. I stopped going to church. Lost my faith in God and humanity. I became less attentive with upkeep around my home. Repairs and upgrades I no longer had interest in. I didn't attend to the flower beds as normal due to the increased depression. My stress level and anxiety was and still is worse. The pets/rescues who already had behaviors picked up on it, which caused their behaviors to be worse. I no longer was the fake it til you make it provider for my clients. Had more of the " hurry up and get my hours in with each client and due the bare minimum". We're as before I went out of my way and would eat hours and mileage to make sure needs were met. I didn't spend much time with my grandson anymore for fear of breaking down in front of him and having to explain I was losing my home. My anxiety was now worse. I only would go to places on my own where I knew certain staff would be working. I no longer was working as much as I could because of my anxiety and depression. My ulcer became worse at times when my anxiety and stress levels were high. Then I didn't want to eat. I have low blood sugar, so I have to eat, so there were days it hurt to eat. Sleeping became almost impossible. I was only sleeping 2-3 hours a night. I started having severe headaches from stress and anxiety. I cried a lot. Got angry a lot. Which neither is good for anxiety and depression. My medications were changed several times with no success. Eventually it has now led to my overall health declining. It is true, stress can make you sick. Long term damage this has hurt me financially. Has damaged my credit. Which in turn affects my mental and emotional well being.

### *Interrogatory No. 15.*

Describe, in detail, any medical provider's diagnosis of Plaintiff's emotional distress, mental health or any other related diagnosis that was a result of Defendant filing the motion for summary judgment in the Foreclosure Case.

**Answer:**

See Plaintiff's document production. Any medical records not provided therein have been requested and Plaintiff will supplement such production as applicable.

### *Interrogatory No. 16.*

Describe, in detail, any medical provider's diagnosis of Plaintiff's emotional distress, or any other related diagnosis, relating to Plaintiff's emotional and mental health in the five years leading up to the filing of the Foreclosure Case.

**Answer:**

See Plaintiff's document production. Any medical records not provided therein have been requested and Plaintiff will supplement such production as applicable.

   ***Interrogatory No. 17.***
Describe, in detail, the factual basis behind Plaintiff's allegations that she properly executed the Permanent Modification and submitted it to PHH in December 2020. A complete response will state what date she executed the Permanent Modification, what method she used to send the Permanent Modification to PHH, and what date she sent the Permanent Modification to PHH.

**Answer:**

Plaintiff had her signature notarized in early December 2020 at a Park National Bank, previously Richland Bank, branch located at either 460 West Cook Road, Mansfield, OH 44907 or 50 Marion Avenue, Mansfield, OH 44903. Due to COVID-19 protocols, Plaintiff was not able to enter the interior of the bank branch to meet with the notary face-to-face and had the agreement notarized through the drive-thru. Plaintiff is unable to identify the notary who notarized the modification. Plaintiff did not maintain a copy of the executed modification for her records and sent her only copy to PHH in December 2020 via the United States Postal Service immediately upon having her signature notarized. Plaintiff made attempts to obtain the identity of the specific notary, but was informed that each notary working at the bank branches maintains their own individual notary journals and the bank has been experiencing higher than usual turnover.

   ***Interrogatory No. 18.***
Identify the date that Plaintiff allegedly got the Permanent Modification notarized in December 2020 along with the physical location Plaintiff went to get the Permanent Modification notarized and the identity of the notary public who notarized the Permanent Modification.

**Answer:**

See Plaintiff's response to Interrogatory No. 18.

## II.     REQUEST FOR PRODUCTION OF DOCUMENTS

*__Request for Production No. 1.__*

Produce any and all documents tending to support Plaintiff's claims for damages, if made, regardless of how they are asserted against Defendant, Clunk, Hoose Co., L.P.A.

**Answer:**

See Plaintiff's document production.

*__Request for Production No. 2.__*

Produce any and all documents that were utilized in any way by Plaintiff to respond to Defendant's Discovery Requests.

**Answer:**

The request for all documents upon which Plaintiff "utilized in any way" is overbroad.

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's document production.

*__Request for Production No. 3.__*

Produce any and all documents related in any way to the Plaintiff's responses to Defendant's Discovery Requests.

**Answer:**

The request for all documents "related in any way" to Plaintiff's responses is overbroad.

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's document production.

### Request for Production No. 4.

Produce any and all written communications, transcripts of communications and notes from oral communications between Plaintiff and Defendant, Clunk, Hoose Co., L.P.A.

**Answer:**

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH already has possession, custody, control, and/or access to the requested information and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

### Request for Production No. 5.

Produce any and all documents tending to support Plaintiff's allegations set forth in her complaint stating that she has suffered actual damages in association with the Federal and Foreclosure Cases.

**Answer:**

Plaintiff objects to this request as it is unduly vague as to the meaning of "tending to support".

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

### Request for Production No. 6.

Produce any and all documents tending to support Plaintiff's allegations set forth in her

complaint that she has incurred attorney's fees and costs in association with the Federal and Foreclosure Cases.

**Answer:**

Plaintiff objects to this request as it is unduly vague as to the meaning of "tending to support".

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

#### *Request for Production No. 7.*

Produce any and all documents tending to support Defendant's allegations that she has suffered severe emotional distress as a result of Defendant filing a motion for summary judgment in the Foreclosure.

**Answer:**

Plaintiff objects to this request as it is unduly vague as to the meaning of "tending to support".

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objection, see Plaintiff's document production.

#### *Request for Production No. 8.*

Produce any and all medical reports relating to Plaintiff within the past five years.

**Answer:**

See Plaintiff's document production. Any medical records not provided therein have been requested and Plaintiff will supplement such production as applicable.

#### *Request for Production No. 9.*

Produce a copy of the Permanent Modification that Plaintiff allegedly executed in December 2020.

**Answer:**

Plaintiff objects to this request because it seeks information and/or documents that are obtainable from some other source that is more convenient, less burdensome, or expensive, since PHH presumably already has possession, custody, control, and/or access to the requested information

and/or documents.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Without waiving such objections, see Plaintiff's response to Interrogatory Nos. 17 and 18. Plaintiff does not have a copy of this document as she sent the only copy directly to PHH.

    ***Request for Production No. 10.***
Produce a copy of any exhibits Plaintiff will be relying on at trial.

**Answer:**

Plaintiff has not yet selected or otherwise identified exhibits to be used at trial as discovery is still ongoing. Further, see Plaintiff's document production. Plaintiff reserves the right to supplement this response.

### III.    REQUESTS FOR ADMISSION

*Request for Admission No. 1.*

Admit that Plaintiff was in default of the Note and Mortgage when the Foreclosure was filed.

**Answer:**

Admit.

*Request for Admission No. 2.*

Admit that Plaintiff did not execute and/or send to PHH an executed Permanent Modification in December 2020.

**Answer:**

Deny. See Plaintiff's response to Interrogatory Nos. 17 and 18.

*Request for Admission No. 3.*

Admit that Plaintiff did not execute and/or send to Defendant an executed Permanent Modification in December 2020.

**Answer:**

Plaintiff admits that she did not send an executed Permanent Modification directly to Clunk in December 2020 as she sent such Permanent Modification directly to PHH, Clunk's client in the Foreclosure.

*Request for Admission No. 4.*

Admit that Plaintiff did not send payments relating to the Trial Modification or Permanent Modification through one of the payment methods set forth in the Trial Modification or Permanent Modification documents.

**Answer:**

Admit to the extent that the payments were sent through CheckFreePay rather than Western Union or MoneyGram, but denied to the extent that the funds were not remitted with the appropriate reference information, codes, and otherwise necessary information listed in the Trial Modification and Permanent Modification through CheckFreePay so as to effectuate a proper transfer of funds.

### *Request for Admission No. 5.*
Admit that Plaintiff sent payments through CheckFreePay and not Western Union.

**Answer:**

Admit.

### *Request for Admission No. 6.*
Admit that Plaintiff reviewed the terms of the Permanent Modification with an attorney in December 2020.

**Answer:**

Admit.

### *Request for Admission No. 7.*
Admit that Plaintiff made a counteroffer to the terms contained within the Permanent Modification in December 2020.

**Answer:**

Plaintiff objects to this request as it calls for a legal conclusion or otherwise requires Plaintiff to reach a legal conclusion in order to prepare a response.

Signing as to objection:

*/s/ Daniel M. Solar*
Daniel M. Solar (0085632)

Subject to and without waiving such objections, admit to the extent that Plaintiff inquired as to the possibility of obtaining a modification without a balloon payment, but denied to the extent that any such inquiry constituted a counteroffer that precluded Plaintiff's acceptance of the Permanent Modification and denied as to any implication that Plaintiff did not properly accept the Modification.

### *Request for Admission No. 8.*
Admit that, in December 2020, Plaintiff stated her intention of re-applying for a loan modification that did not include a balloon payment.

**Answer:**

Admit.

Respectfully submitted,

_/s/ Daniel M. Solar_

Daniel M. Solar (0085632)
Marc E. Dann (0039425)
Michael A. Smith Jr. (0097147)
Dann Law
15000 Madison Avenue
Lakewood, Ohio 44107
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com
_Counsel for Plaintiff Angela L. Ruckman_

## <u>CERTIFICATE OF SERVICE</u>

I certify that an exact copy of the foregoing document was sent via electronic mail on

December 10, 2021:

      Sarah A. Wilson
      Blank Rome, LLP
      1700 PNC Center
      201 East Fifth Street
      Cincinnati, OH 45202
      SWilson@blankrome.com
      Counsel for Defendant PHH Mortgage Corporation, d/b/a PHH Mortgage Servicing

      Ashley E. Mueller
      Laura C. Infante
      Attorneys for Defendant
      Clunk, Hoose Co., L.P.A
      495 Wolf Ledges Pkwy
      Akron, OH  44311
      amueller@clunkhoose.com
      linfante@clunkhoose.com
      Counsel for Defendant Clunk, Hoose Co. LPA

                       */s/ Daniel M. Solar*
                       Daniel M. Solar (0085632)