UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA L. RUCKMAN, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.  5:21-cv-00923 |
| | ) | |
| v. | ) | |
| | ) | |
| PHH MORTGAGE CORPORATION | ) | JUDGE BRIDGET M. BRENNAN |
| *d/b/a* PHH MORTGAGE SERVICING, | ) | |
| | ) | |
| and | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| CLUNK, HOOSE CO., L.P.A., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Angela L. Ruckman ("Ruckman") filed this action against the servicer of her residential mortgage loan, PHH Mortgage Corporation *d/b/a* PHH Mortgage Servicing ("PHH"), under 12 C.F.R. § 1024.1 *et seq.* (known as "Regulation X"), which implements the federal Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA"), and under the Ohio Residential Mortgage Lending Act, Ohio Rev. Code § 1322.01 *et seq.* ("RMLA").  (Doc. No. 1 at PageID# 14-16 & 17-19, Counts I and III.)

Also named as a defendant is the law firm of Clunk, Hoose Co. L.P.A. ("Clunk").  Ruckman seeks relief against Clunk under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA").  (*Id*. at PageID# 16, Count II.)

PHH moved for summary judgment on Counts I and III.  (Doc. Nos. 38-42 & 61-62.)  Ruckman filed materials in opposition.  (Doc. Nos. 52-53 & 68.)  For the reasons stated herein, PHH's motion is DENIED.

1

I. **Facts**

From the pleadings and evidence on file, the Court finds that the following facts are undisputed, unless otherwise stated.

The pleadings in this case include: Ruckman's Complaint (Doc. No. 1); Clunk's Answer (Doc. No. 10); and PHH's Answer (Doc. No. 12).[1]  Evidence in the record includes, *inter alia*: affidavits and deposition testimony from Ruckman (Doc. Nos. 1-2, 41, 51-2, 53); an affidavit and deposition testimony from Howard Handville of PHH's parent company (Doc. Nos. 39, 42); an affidavit from Clunk employee Diane Bennett (Doc. No. 40); and additional exhibits (*e.g.,* Doc. Nos. 61 & 63).

A. **The Home Loan**

Ruckman owns a home in Mansfield, Ohio (the "Property"), subject to a mortgage with a monthly payment obligation.  (Doc. No. 1 at ¶¶ 2-3; Doc. No. 10 at ¶ 2; Doc. No. 12 at ¶ 2; Doc. No. 41 at PageID# 465 11:5-16.)  Exhibit 1 to the Complaint contains correct copies of the promissory note and mortgage signed by Ruckman when she purchased the Property on August 24, 2005.  (Doc. No. 1-1; *see also* Doc. No. 1 at ¶ 4; Doc. No. 10 at ¶ 4; Doc. No. 12 at ¶ 4.) Ruckman's note and mortgage are referred to collectively herein as the "Home Loan."  (*See* Doc. No. 39 at PageID# 369 ¶ 6.)

At all times relevant to this dispute, PHH serviced the Home Loan. (*See* Doc. No. 1 at ¶¶ 6-7; Doc. No. 10 at ¶¶ 6-7; Doc. No. 12 at ¶¶ 6-7; Doc. No. 39 at PageID# 368-369 ¶¶ 3-6; Doc. No. 52-1 at PageID# 750 ¶ 7.)   PHH serviced the Home Loan on behalf of HSBC Bank USA, N.A. ("HSBC").  (*Id.*)  HSBC is an assignee of the original mortgage lender and trustee for

---

[1] "[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.  …  Factual assertions in pleadings ..., unless amended, are considered judicial admissions conclusively binding on the party who made them."  *Kay v. Minacs Grp. (USA), Inc*., 580 F. App'x 327, 331 (6th Cir. 2014) (quotations and citations omitted).

certain mortgage-backed securities.  (*Id.*)  HSBC was neither named nor joined as a party to this federal action.

### B.  The Foreclosure Action in State Court

At some point, Ruckman fell behind on her payments and was delinquent under the terms of the Home Loan.  (Doc. No. 1 at ¶ 31; Doc. No. 10 at ¶ 31; Doc. No. 12 at ¶ 31; Doc. No. 39 at PageID# 369 ¶ 7; Doc. No. 41 at PageID# 655 RFA No. 1.)  On March 5, 2020, HSBC (represented by Clunk) filed a foreclosure action against Ruckman in state court in Richland County, Ohio (Case No. 2020 CV 0169).  (Doc. No. 1 at ¶¶ 8, 32; Doc. No. 10 at ¶¶ 8, 32; Doc. No. 12 at ¶¶ 8, 32; Doc. 39 at PageID# 369 ¶ 8; Doc. No. 40 at PageID# 447 ¶ 1.)

Later, on August 30, 2021, that foreclosure case was dismissed voluntarily by settlement, as reflected on the docket of the Richland County Court of Common Pleas.  (*See* Doc. No. 39 at PageID# 370 ¶ 18; Doc. No. 62-1 at PageID# 1240.)  The foreclosure case was dismissed following the parties' agreement to modify the Home Loan.  (*See* Doc. No. 39 at PageID# 370 ¶¶ 17-18; Doc. No. 38 at PageID# 357.)  Ruckman continued to reside at the Property and to make payments on the Home Loan.  (*See* Doc. No. 1 at ¶ 3.)

### C.  PHH and Ruckman Agreed to Modify the Home Loan

The Home Loan was modified by a contract called the Loan Modification Agreement, the fully executed version of which is attached to the Handville affidavit at Exhibit G.  (Doc. No. 39 at PageID# 370 ¶ 17; *id.* at PageID# 436-46.)  PHH acknowledges that this Loan Modification Agreement remains in effect.  (Doc. No. 38 at PageID# 357.)

A few provisions from the Loan Modification Agreement are pertinent to the present motion and are reproduced below:

> This Loan Modification Agreement ("Agreement"), made this 6th day of November, 2020 ("Modification Agreement Date"), between ANGELA RUCKMAN ("Borrower") and PHH Mortgage Corporation, Lender/Servicer or

3

Agent for Lender/Servicer ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 08/24/2005 and recorded in the Records of Richland County, OH and (2) the Note, bearing the same date as, and secured by, the Security Instrument (collectively, "Loan Documents")….

* * *

Acknowledgements and Preconditions to the Modification:

1. Lender has no obligation to make any modification of the Loan Documents if any of the requirements under this Agreement are not met.

2. Prior to the Modification Effective Date (defined as 11/01/2020), if Lender determines that any of the representations above are no longer true and correct, 1) the Loan Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Loan Documents.

3. The Loan Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

Modified Loan Terms:

1. If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Loan Documents will automatically become modified on 11/01/2020.  If Borrower has failed to make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

(Doc. 39 at PageID# 438.)  Section 3.e. of the Loan Modification Agreement provides:

Agreement to Provide Any Additional Modification Documents.  Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.  Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement.  Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature.  At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement.  Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement.

(*Id.* at PageID# 441.)

4

Section 7 of the Loan Modification Agreement provides:

> Errors and Omissions.  That if any documents related to the loan documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the lender any documentation the Lender deems necessary.  All documents the Lender requests of Borrower under this section shall be referred to as "Documents."  Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement.  At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

(*Id.* at PageID# 442.)

Section 8 of the Loan Modification Agreement provides:

> Final Agreement.  This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower.  This Modification constitutes the entire agreement between the Lender and Borrower and supersedes all previous negotiations and discussions between the Borrower and the lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms.  There are no promises, terms, conditions, or obligations other than those contained in this Agreement

(*Id*. at PageID# 442-43.)  Additional integration and non-reliance language also appears on PHH's signature page, called the "Lender Acknowledgement."  (*See id*. at PageID# 446.)

Although PHH signed on September 17, 2021, the Loan Modification Agreement plainly sets its effective date in November 2020.  (Compare *id.* with *id.* at PageID# 438.)

### D.  The Federal Action

This federal action centers on events that occurred from the Fall of 2020 to the Spring of 2021, while the state court foreclosure case was pending.  (Doc. No. 1 at ¶¶ 31-63.)  Ruckman contends that PHH violated RESPA, its implementing Regulation X, and the Ohio RMLA's prohibition on false or misleading statements and dishonest dealings.  (Doc. No. 1 at ¶¶ 70-85, 96-109.)

5

The genesis of this dispute was a loss mitigation application, which begat the Loan Modification Agreement discussed *supra*.[2]  The Court turns to the loss mitigation application, and the events which followed.

### E.  Loss Mitigation Application

"In July 2020, Ruckman submitted a loss mitigation application to PHH through Clunk." (Doc. No. 1 at ¶ 33; Doc. No. 10 at ¶ 33; Doc. No. 12 at ¶ 33; *see also* Doc. No. 39 at PageID# 369 ¶ 9; Doc. No. 52-1 at PageID# 750 ¶ 4.)  On August 4, 2020, PHH acknowledged in writing that Ruckman's application had been received and was complete.  (Doc. No. 1 at ¶ 35; Doc. No. 1-2 at PageID# 47 ¶ 5; Doc. No. 10 at ¶ 35; Doc. No. 12 at ¶ 35; Doc. No. 39 at PageID# 369 ¶¶ 9-10; *id.* at PageID# 374.)

A Clunk employee named Diane Bennett ("Bennett") communicated directly with Ruckman multiple times in 2020 and 2021 regarding Ruckman's delinquency on the Home Loan, the status of payments on the Home Loan, and loan modification options and issues.  (*See* Doc. No. 1 at ¶¶ 46-56; Doc. No. 22 at PageID# 278 & 280; *e.g.,* Doc. No. 1-2 at ¶¶ 21, 23-38; Doc. No. 52-1 at PageID# 781-804; *cf.* Doc. No. 10 at ¶¶ 46 – 56; Doc. No. 40 PageID# 447 ¶¶ 5-9.)

PHH offered Ruckman a trial loan modification, which required Ruckman to make three payments of $469.15 for September, October, and November 2020.  (Doc. No. 1 at ¶ 36; Doc. No. 1-2 at PageID# 47 ¶ 5; Doc. No. 10 at ¶ 36; Doc. No. 12 at ¶ 36.)  Ruckman did, indeed,

---

[2] Regulation X, which implements the RESPA, contains helpful definitions: "Loss mitigation option means an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower."  12 C.F.R. § 1024.31.  "Loss mitigation application means an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option."  *Id.*

make all three trial payments timely and as required.  (Doc. No. 1 at ¶ 37; Doc. No. 10 at ¶ 37; Doc. No. 12 at ¶ 37; Doc. No. 42 at PageID# 666 21:16-25.)

PHH sent Ruckman a document dated November 6, 2020 and titled "Approval for Permanent Modification."  (*See* Doc. No. 1 at ¶ 38; Doc. No. 10 at ¶ 38; Doc. No. 12 at ¶ 38; Doc. No. 1-2 at PageID# 56-67.)  That loan modification document indicated a November 24, 2020 deadline to be executed and returned.  (*See id.*)  The November 24, 2020 deadline was extended by PHH and Ruckman by agreement to December 31, 2020.  (Doc. No. 1 at ¶ 40; Doc. No. 12 at ¶ 40; Doc. No. 10 at ¶ 40; Doc. No. 61-6 at PageID# 971 ¶ 7.)

In late November or early December 2020, Ruckman was concerned about the proposed balloon payment as indicated in the loan modification document.  (Doc. No. 41 at PageID# 466-67 17:20-18:12; *see also* Doc. No. 41 at PageID# 656 RFA Nos. 7, 8.)  So she inquired whether the balloon terms could be changed.  (*Id.*)  Bennett handled many of the communications with Ruckman.  (Doc. No. 40 at PageID# 447-48 ¶¶ 5-10; Doc. No. 61-6 at PageID# 970-72 ¶¶ 5-15.)

### F.  Clunk Communicates Regarding the Loan Modification

Affidavits from Bennett include emails she exchanged with Ruckman.  (Doc. No. 40 at PageID# 453, 457; Doc. No. 61-6 at PageID# 1005, 1008.)

On November 16, 2020, Bennett emailed Ruckman with a copy of the offered loan modification agreement.  (Doc. No. 61-6 at PageID# 971 ¶ 6 & PageID# 973-1000.)  On November 23, 2020, Bennett emailed Ruckman to advise, *inter alia*: "Our client has put a request in for an extension on returning the signed modification documents; however, the first payment still needs to be received by 12/1/20."  (Doc. No. 41 at PageID# 566 (underlining in original); Doc. No. 61-6 at PageID# 1001.)

On November 30, 2020, Bennett emailed Ruckman to advise: "Just a reminder that the permanent mod docs need to be returned to our client by 12/1/20.  At the very least, you need to

7

get your payment sent in so they know you plan to accept."  (Doc. No. 41 at PageID# 566; Doc. No. 61-6 at PageID# 1001.)

On December 1, 2020, Bennett emailed Ruckman to advise: "The investor has granted an extension until 12/31/20 for PHH to receive the signed permanent mod docs from you."  (Doc. No. 61-6 at PageID# 971 ¶ 7 & PageID# 1001.)

On December 7, 2020, Bennett advised that Ruckman's suggested changes to the balloon payment had been rejected.  (Doc. No. 61-6 at PageID# 971 ¶ 8 & PageID# 1001.)  Bennett revealed in an affidavit that Ruckman had made counteroffers during a settlement conference, which were rejected.  (*See id.* at PageID# 971 ¶ 8.)

### G.  Fact Dispute as to the Return of the Loan Modification Agreement

Ruckman alleged that she executed the loan modification agreement and mailed it to PHH in December 2020.  (Doc. No. 1 at ¶ 42.)[3]  Defendants answered that Ruckman did not return the loan modification agreement by December 30, 2020.  (Doc. No. 10 at ¶ 42; Doc. No. 12 at ¶ 42.)

PHH contends that it did not receive the loan modification agreement from Ruckman by December 31, 2020, and offers Handville's affidavit and deposition testimony to that effect. (Doc. No. 39 at PageID# 369-70 ¶ 14; *see also* Doc. No. 42 at PageID# 667-68 23:2-6 & 27:1-6.) Ruckman submits an affidavit swearing that she signed and had notarized the loan modification agreement and mailed it back to PHH in December 2020.  (Doc. No. 1-2 at PageID# 48 ¶ 14; Doc. No. 52-1 at PageID# 751 ¶ 14; Doc. No. 53 at PageID# 814 ¶ 14.)  Ruckman provided deposition testimony to that effect.  (Doc. No. 41 at PageID# 466-67 17:23-18:12, 19:12-21:25; *see also id.* at PageID# 655 RFA Nos. 2 & 3.)

---

[3] Ruckman offered to file an amended pleading with additional detail related to this factual dispute.  (*See* Doc. No. 28 at PageID# 324 n.1.)

8

The Court cannot make a finding on this particular point given the directly conflicting affidavits and deposition testimony.

### H. Ruckman's Tender of Payments

The loan modification papers provided to Ruckman directed that the first modified monthly payment due date would be December 1, 2020.  (Doc. No. 1-2 at PageID# 56-67.)  The monthly amount due would be $469.12.  (*Id.*)  All parties agree and admit:

> On November 30, 2020, Ruckman timely remitted a payment in the amount of $470.00 in satisfaction of the payment due under the Modification for December 1, 2020 via money order in compliance with PHH's express written instructions for the same.

(Doc. No. 1 at ¶ 41; Doc. No. 10 at ¶ 41; Doc. No. 12 at ¶ 41; *see also* Doc. No. 42 at PageID# 21:16-25.)  Ruckman made this November 30th payment using a service called CheckFreePay at a Kroger supermarket store in Mansfield, Ohio, her receipt indicates.  (Doc. No. 52-1 at PageID# 773-74; Doc. No. 41 at PageID# 656 RFA No. 5.)

Further, Ruckman submitted receipts showing four more subsequent payments of $470.00 dated January 4, February 11, February 22, 2021[4], and March 30, 2021 – each made using CheckFreePay at Kroger supermarkets in Mansfield, Ohio.  (Doc. No. 52-1 at PageID# 775-80 & 811-12; Doc. No. 41 at PageID# 656 RFA No. 5.)

PHH and Clunk admit that Ruckman's January 4, 2021 payment was received and accepted.  (*See* Doc. No. 1 at ¶ 44; Doc. No. 10 at ¶ 44; Doc. No. 12 at ¶ 44; Doc. No. 42 at PageID# 675 57:9-12.)  However, PHH apparently refused to accept one or more payments thereafter on the ground that the loan modification purportedly had been denied on January 14, 2021.  (*See* Doc. No. 1 at ¶¶ 43-45; Doc. No. 10 at ¶¶ 43-45; Doc. No. 12 at ¶¶ 43-45; Doc. No.

---

[4] This was not the first calendar month in which Ruckman delivered an amount that would cover two monthly payments.  On October 26, 2020, PHH received an amount of $1,000 from Ruckman, which was applied to two monthly payments.  (*See* Doc. No. 40 at PageID# 458.)

39 at PageID# 369 ¶ 14; *see also* Doc. No. 42 at PageID# 667-68 23:2-6, 27:1-6 & PageID# 675 55:15-17.)

The Court finds that because Defendants aver that the February 11, 2021 payment was intentionally rejected, it follows *ipso facto* that: (i) Ruckman must have tendered such payment; and (ii) PHH must have received notification that Ruckman tendered the payment. Further, there is no evidence contradicting or disputing the authenticity of any of Ruckman's payment receipts.

With no evidence to the contrary in the record, the following facts regarding payments are deemed to be established in this case. Fed. R. Civ. P. 56(g). Ruckman tendered the following payments on the Home Loan:

| Date paid | Amount | |
|---|---|---|
| September 2, 2020 | $470.00 | |
| October 26, 2020 | $1,000.00 | (*i.e.,* to cover two monthly payments) |
| November 30, 2020 | $470.00 | |
| January 4, 2021 | $470.00 | |
| February 11, 2021 | $470.00 | |
| February 22, 2021 | $470.00 | |
| March 30, 2021 | $470.00 | |

(Doc. No. 40 at PageID# 448 ¶ 10; *id.* at PageID# 458; Doc. No. 52-1 at PageID# 807-10; Doc. No. 61-7.)

## I. Clunk Directs Ruckman on Resubmission of Loan Modification Agreement

Communications between Ruckman and Bennett beginning in early January 2021 indicated that PHH records did not show the receipt of a signed loan modification agreement. (*See* Doc. No. 41 at PageID# 568-70; Doc. No. 61-6 at ¶¶ 9-11 & PageID# 1003-06.)

On January 11, 2021, Bennett inquired: "What updated documents are you referring to that you need to sign?  If you are referring to the permanent modification that was previously offered, I don't know if that is even still available to you.  Your first modified payment was due on 12/1/20, and the second payment was due on 1/1/21.  The monthly payment amount is $469.12."  (Doc. No. 41 at PageID# 568.)

That same day, Ruckman responded: "Yes permanent modification.  I've made the December and January payment.  The paperwork refers to 11/1/2020 as the effective date."  (*Id.*)

Bennett replied the next day, on January 12, 2021:

> I am waiting on a response from our client if that is still available to you.  If you want to try to accept it, you need to sign, notarize (if required) and return the original signed documents to them as soon as possible via overnight mail - keep the tracking information or send it to me.  Documents are rarely redrafted.  Nov first would be the correct effective date.

(*Id.*)

### J.  Executed Loan Modification Agreement

On the same day that Bennett instructed Ruckman to sign, notarize, and return the original loan modification agreement, Ruckman did so.  PHH's evidence shows that Ruckman signed, and a notary attested, the Loan Modification Agreement on January 12, 2021.  (Doc. No. 39 at PageID# 444-45.)  PHH received the signed, notarized agreement from Ruckman by January 19, 2021.  (Doc. No. 39 at PageID# 370 ¶ 16; Doc. No. 42 at PageID# 672 43:24-44:2.)

This Ruckman-signed version of the Loan Modification Agreement, dated January 12, 2021, is the same one that PHH later countersigned and implemented, thereby modifying the Home Loan.  (*See* Doc. No. 39 at PageID# 370 ¶ 17 & PageID# 444-46.)

### K.  PHH Issues a Decision to Deny Loan Modification

Two days after Bennett instructed Ruckman to resubmit the LMA, PHH issued a "Decision on the Request for Mortgage Assistance" dated January 14, 2021.  (Doc. 39 at

11

PageID# 410-22.)  That document provided: "Unfortunately, the account is no longer eligible for the loan modification offer that was sent due to the reason listed below.  You failed to return the final modification agreement within the required timeframe."  (*Id.* at PageID# 411.)

According to Handville, PHH records indicate that this letter was sent via regular U.S. mail on January 15, 2021.  (*Id.* at PageID# 370 ¶¶ 14-15.)  According to Ruckman, she did not receive the letter at her home and saw it for the first time from her attorney in discovery.  (Doc. No. 41 at PageID# 469 28:16-29:20.)

### L.  January 29, 2021 Conference with the State Court Magistrate

PHH filed evidence in the form of an email from the Magistrate Andrea Clark of the Richland County, Ohio Court of Common Pleas, where the foreclosure case was pending. Magistrate Clark wrote: "Counsel and Ms. Ruckman, We last spoke about this case on January 29, 2021.  At that time, it was represented to me that a permanent loan modification had been reached and that the case was likely to be dismissed within two weeks."  (Doc. No. 61-9 at PageID# 1026.)

During deposition, PHH's witness Howard Handville was shown: (i) a PHH servicing note dated January 26, 2021, indicating that the denial of loan modification had been reversed; and (ii) Magistrate Clark's email recounting the representations made to her on January 29th. (Doc. No. 42 at PageID# 673-75 49:9-54:16.)

Q:      So the denial was reversed?

A:      The decision to agree to reverse it had been approved the end of January, but they hadn't worked through all of the details to get the denial updated in the system, and you know, whatever processes are involved in that.

(*Id.* at PageID# 675 54:4-10.)

12

From Handville's testimony, a jury could infer that on or around January 26, 2021, PHH decided to: (i) reverse its January 14th denial of loan modification; and (ii) accept the signed LMA it had received from Ruckman on January 19th.

### M. PHH Rejected or Refused Payment(s) That Ruckman Tendered in February 2021

All parties agree and admit that PHH rejected the payment Ruckman tendered on February 11, 2021.  (Doc. No. 1 at ¶ 45; Doc. No. 10 at ¶ 45; Doc. No. 12 at ¶ 45.)

The Court notes for context – but does not make a finding given the rather muddled explanations – the following: PHH's witness Howard Handville surmised from his review of company records that either a person or a computer process rejected the payment because PHH's system showed that the loan modification had not occurred.  (*See* Doc. No. 42 at PageID# 674-75 53:25-55:23 & Page ID# 676 57:24-58:13.)  Apparently PHH did not inform Ruckman of this rejection at the time it occurred.  Handville suggested there was "confusion" and "problems that ensued thereafter," which Handville ascribed in part to Kroger supermarket "not letting her know or making her aware of the subsequent payment rejections."  (*See id.* at PageID #676 59:24-60:18.)  The same sort of rejection of the February 11th payment appears also to have occurred for the payment tendered on February 22nd.

### N.  Clunk's Communications to Ruckman in March 2021

PHH's purported refusal of money from Ruckman did not last long.

On March 3, 2021, Clunk, through Bennett, emailed urging that Ruckman "will need to make the February and March payments immediately."  (Doc. No. 1-2 at PageID# 79; Doc. No. 1 at ¶¶ 46-47; Doc. No. 10 at ¶¶ 46-47; Doc. No. 12 at ¶¶ 46-47.)  On March 8, 2021, Bennett emailed Ruckman asserting the following:

> Our client has advised that you are due for the February and March payments, for a total of $873.93.  If you want the modification to go through, that payment needs

to be made immediately. Our client's modification team has confirmed they will accept that amount and then reverse the denial.

(Doc. No. 1-2 at PageID# 81.) On March 19, 2021, Bennett emailed Ruckman asserting the following: "The following amount [$873.93] is due before the end of March or the modification is denied." (Doc. No. 1-2 at PageID# 94.)[5]

In these communications, Bennett did not acknowledge or explain the rejected payments Ruckman tendered on February 11th and 22nd that together totaled $940. Bennett asserted that "[o]ur client cannot confirm receipt of payments from you," but inexplicably did not acknowledge or explain that PHH had elected to reject payment(s). (*See* Doc. No. 53 at PageID# 860.) Meanwhile, Ruckman did not get a clear answer to her repeated inquiries throughout March 2021 on where her tendered payments had gone. (*See* Doc. No. 53 at PageID# 815-20 & 844-861; *cf.* Doc. No. 61-6.)

### O. Clunk Files a Motion for Summary Judgment in the State Court Foreclosure

Despite directing Ruckman that $873.93 was "due before the end of March," on March 29, 2021, Clunk filed a motion for summary judgment against Ruckman in the pending state court foreclosure action. (Doc. No. 1 at ¶ 61; Doc. No. 10 at ¶ 61; Doc. No. 12 at ¶ 61; Doc. No. 1-2 at PageID# 55 ¶ 50.)

## II.  Law and Analysis

### A.  Standard of Review

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories,

---

[5] Clunk confirmed the authenticity of this email and averred that this email speaks for itself. (Doc. No. 10 at ¶ 52.)

and affidavits show there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law. The moving party bears the burden of showing that no

genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)

(citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

*Mining Mach., Inc. v. Copley*, 145 F. App'x 149, 152 (6th Cir. 2005) ("The moving party bears

the initial burden of informing the court of the basis for its motion and identifying those portions

of the record that establish the absence of a genuine issue of material fact.").

> A party is entitled to summary judgment if she shows 'there is no genuine dispute
> as to any material fact and ... [she] is entitled to judgment as a matter of law.' Fed.
> R. Civ. P. 56(a). A 'material' fact is one that 'might affect the outcome of the suit
> under the governing law.' *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248
> (1986). And a genuine dispute of material fact exists if the evidence is such that a
> reasonable jury could return a verdict for the non-moving party.

*Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and

quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to

set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green,*

*Kentucky*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). "[O]n summary

judgment the inferences to be drawn from the underlying facts ... must be viewed in the light

most favorable to the party opposing the motion." *Id.*; *see also Kalamazoo Acquisitions, L.L.C.*

*v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005) ("The district court … must view the

facts and any inferences reasonably drawn from them in the light most favorable to the party

against whom judgment was entered.").

A party asserting (or disputing) a fact must cite evidence in the record or show that the

record establishes the absence (or the presence) of a genuine dispute. *See* Fed. R. Civ. P. 56(c)

and (e). "The court need consider only the cited materials, but it may consider other materials in

the record." Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co*., 886 F.2d 1472,

1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to

establish that it is bereft of a genuine issue of material fact.").

 "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp*., 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility

determinations or 'weigh' conflicting evidence. *Payne v. Novartis Pharms. Corp*., 767 F.3d 526,

530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003).  "The ultimate

question is whether the evidence presents a sufficient factual disagreement to require submission

of the case to the jury, or whether the evidence is so one-sided that the moving parties should

prevail as a matter of law." *Payne*, 767 F.3d at 530.  "If the court does not grant all the relief

requested by the motion, it may enter an order stating any material fact … that is not genuinely

in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

### B. PHH Is Not Entitled to Summary Judgment on the RESPA Claim, 12 U.S.C. § 2605(k)(1) and 12 C.F.R. § 1024.41(g)

A concise history of the statute and regulation at issue in Count I is as follows:

RESPA is "a consumer protection statute that was enacted by Congress to 'insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges." *Galli v. Astoria Bank*, No. 16-CV-3549, 2017 WL 4325824, at *3 (E.D.N.Y. Sept. 27, 2017) (quoting 12 U.S.C. § 2601(a)). . . . RESPA was amended, effective July 21, 2011, by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank), Pub. L. No. 111–203, 124 Stat. 1376 (2010).  Dodd-Frank also created the Consumer Financial Protection Board (CFPB) and charged it with creating rules, regulations, and interpretations necessary to achieve RESPA's purpose. *See* 12 U.S.C. § 2617(a).  The CFPB, in turn, adopted a series of regulations, effective January 10, 2014, that servicers must follow after a payment default. *Galli*, 2017 WL 4325824, at *4.  One such regulation was "Regulation X," 78 Fed. Reg. 10696 (Feb. 14, 2013), now codified at 12 C.F.R. pt. 1024.  Regulation X contains provisions governing "dual tracking" that prohibit a servicer from commencing a foreclosure proceeding or conducting a foreclosure sale if the borrower has submitted a "complete loss mitigation

application" within specified timeframes.  12 C.F.R. §§ 1024.41(f)-(g).  Borrowers have a private cause of action to enforce the dual tracking provisions and to recover actual damages, costs, and attorneys' fees.  12 U.S.C. § 2605(f); 12 C.F.R. § 1024.41(a).

*Almazon v. JPMorgan Chase Bank, N.A.*, No. 19-cv-4871, 2020 WL 1151313, at *14 (S.D.N.Y.

Mar. 9, 2020), *appeal dismissed,* No. 20-1138 (2d Cir. Aug. 4, 2020).

RESPA provides in pertinent part:

A servicer of a federally related mortgage shall not--

* * *

(C) fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;

* * *

(E) fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter.

12 U.S.C. § 2605(k)(1).  Regulation X provides in pertinent part:

Prohibition on foreclosure sale. If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale, unless:

(1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

(2) The borrower rejects all loss mitigation options offered by the servicer; or

(3) The borrower fails to perform under an agreement on a loss mitigation option.

12 C.F.R. § 1024.41(g).  A private cause of action to enforce § 2605(k) of RESPA and § 41(g) of

Regulation X is available pursuant to § 2605(f) of RESPA.  *Ramirez v. Wells Fargo Bank, N.A.*,

No. 1:19-CV-05074, 2021 WL 9564023, at *6 (E.D.N.Y. Mar. 24, 2021).

17

"The Consumer Financial Protection Bureau's Official Interpretation of Regulation X can be found at https://www.consumerfinance.gov/rules-policy/regulations/1024/interp-41/#41-c-2-iv-Interp." *Hurst v. Caliber Home Loans, Inc*., 44 F.4th 418, 425 n.2 (6th Cir. 2022).  "The prohibition on a servicer moving for judgment or order of sale includes making a dispositive motion for foreclosure judgment, such as a motion for . . . summary judgment . . . ."  12 C.F.R. § 1024, Supp. I, cmt. 1024.41, ¶ 41(g)-1.  "A servicer is not relieved of its obligations because foreclosure counsel's actions or inaction caused a violation."  *Id.* ¶ 41(g)-3.  "The regulation requires mortgage servicers to make decisions on loan modification requests in a timely manner and prohibits servicers from foreclosing if a mortgagor submits a complete modification application more than 37 days before a scheduled sale."  *Brimm v. Wells Fargo Bank, N.A.*, 688 F. App'x 329, 330 (6th Cir. 2017) (citing 12 C.F.R. § 1024.41(b), (c), (g)).

## 1.  The Parties' Contentions

Count I of the Complaint asserts a claim against PHH for moving for summary judgment in the state court foreclosure case on March 29, 2021.  (Doc. No. 1 at ¶¶ 61, 80-81; Doc. No. 12 at ¶¶ 61, 80-81; Doc. No. 62-1 at PageID# 1235.)  Ruckman contends that filing the motion violated the prohibition on "dual tracking" in § 41(g) of Regulation X and RESPA.  (Doc. No. 1 at ¶¶ 70-85.)

PHH's motion rests on the premise that Ruckman did not return the signed loan modification in December 2020.  PHH argues that the prohibition on moving for summary judgment found in Regulation X at § 1024.41(g) did not apply because Ruckman had rejected the modification:

> Plaintiff's rejection of the Loan Modification Agreement by not executing it and timely returning it to PHH by December 31, 2020, allowed PHH to move forward with obtaining a foreclosure judgment.  Accordingly, any subsequent offers PHH made to Plaintiff after she rejected the Loan Modification Agreement to reverse the

18

denial of it were at PHH's discretion and were not subject to the requirements of 12 C.F.R.1024.41(g).

Further, even though it was under no obligation to do so, PHH provided Plaintiff with the option to again enter into the Loan Modification after Plaintiff rejected it by failing to return it by the deadline.

(Doc. No. 38 at PageID# 361 (citation omitted).)  PHH argues that all three of the exceptions in §41(g) apply here.  (*Id.* at PageID# 359-62.)

Ruckman counters the position based on three sources of evidence: (i) Ruckman's testimony; (ii) the "Errors and Omissions" clause in § 7 of the Loan Modification Agreement; and (iii) Defendants' representations to Ruckman and to Magistrate Clark.  (Doc. No. 52 at PageID# 742-43.)  Ruckman also argues that the payments she tendered prove that she performed.  (*Id.* at PageID# 743-45.)

## 2. There Is a Genuine Dispute Regarding Ruckman's Return of the Loan Modification Agreement in December 2020

PHH's summary judgment motion ignores a stark factual dispute on a material question. PHH asserts in reply: "The record is undisputed that Plaintiff failed to timely submit the complete initial loan modification agreement to Defendant by the agreed deadline of December 31, 2020."  (Doc. No. 62 at PageID# 1219.)

PHH's characterization is plainly disputed, as evidenced by, *inter alia*, Ruckman's testimony below:

> Q:  Okay.  In this top email, December 7th, it says, "Our client has reviewed your counteroffer and it has been rejected."  What was that counteroffer?  Do you recall?
>
> A:  I had asked if we could possibly discuss raising the monthly payments to try to get the balloon payment down a little bit so that I was not facing such a large balloon payment.  That was one of the suggestions.  And there was another suggestion.  I don't recall the second one but I was just trying to get the balloon payment down so that in 15 years it wasn't so large.  And their office -- I forget the gentleman out of the lawyer's office -- says that he had taken both offers to PHH and they refused.

(Doc. No. 41 at PageID# 466-67 17:23-18:12.)

Q:      Okay.  And then what did you do next after the counteroffer was denied?

A:      I had signed -- I don't know the exact date, but I went and I had no choice but to sign the papers and send them back -- back in if I wanted to keep my house.

Q:      And when did that occur?  I know you said you don't know the exact date but --

A:      Like I said, I -- I don't recall the exact date that I did it.  I went to the bank, had them notarized, and I sent them in.  I mailed them in.

Q:      And do you know what month that was?

A:      It would've been December 'cause they were due back before December 31st.

Q:      Where -- what bank did you go get them notarized at?

A:      At Richland Bank.

* * *

Q:      And how did you say you sent that back to PHH?

A:      United States Postal Service.

Q:      Regular mail?

A:      Yes.

Q:      Did you ask for any kind of tracking information?

A:      No.

(Doc. No. 41 at PageID# 467 19:12-21:25.)  While the Court does not reproduce all of it, the testimony cited, *supra*, provides a clear, understandable, and seemingly reasonable account.  (*See id.*)  Ruckman's affidavit is consistent with this testimony.  (*E.g.,* Doc. No. 52-1 at ¶ 14.)  PHH calls her testimony "self-serving."  (Doc. No. 62 at PageID# 1225.)

Without record evidence showing that testimony is either demonstrably false, contradicted by prior evidence, or totally implausible, "self-serving statements can create a

20

genuine dispute of material fact to be resolved at trial." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (holding that self-serving testimony created a genuine, material fact dispute); *see also Robinson v. Brege*, No. 1:20-CV-449, 2021 WL 1092638, at *2 n.1 (W.D. Mich. Mar. 5, 2021), *report and recommendation adopted*, 2021 WL 1091551 (Mar. 22, 2021) (rejecting argument that plaintiff's evidence should not be considered and noting that "labeling a party's testimony self-serving, absent, for example, prior contradictory deposition testimony, is an argument without traction, as testimony by a party is inherently self-serving").

Nothing in the record leads to the conclusion that Ruckman's testimony or affidavit "is demonstrably false or totally implausible." *Davis*, 951 F.3d at 750; *see also Fields v. Eli Lilly & Co.*, 116 F.Supp.3d 1295, 1301 (M.D. Ala. 2015). Ruckman put forward evidence sufficient to allow a jury to find credible and to find in her favor that her account of events in December 2020 is correct. A genuine factual dispute remains.

This dispute is not only material but also crucial to resolve PHH's arguments as to why it contends that there was no violation of § 41(g) of Regulation X. (*See* Doc. No. 38 at PageID# 359-60.) PHH's explanation regarding all three of the exceptions found at § 41(g) subsections (1) through (3) each expressly depend upon the factual assertion that Ruckman did not return a signed modification agreement and thereby rejected same. (*See id.*) Inasmuch as there is evidence that Ruckman did so, the Court cannot conclude that PHH is entitled to judgment as a matter of law regarding the exceptions in §41(g) of Regulation X.

### 3. Evidence in the Record Would Support a Conclusion of Compliance with § 7 of the Loan Modification Agreement.

The dual track foreclosure prohibition is not the only regulation requiring servicers to evaluate a borrower's loan modification application. The commentary on the Final Rules implementing Regulation X clarifies that even when a loan modification is submitted fewer than thirty-seven days before a foreclosure sale, a servicer is still 'required separately . . . to properly evaluate a borrower who submits

an application for a loss mitigation option for all loss mitigation options for which the borrower may be eligible pursuant to any requirements established by the owner or assignee of the borrower's mortgage loan.' Final Rules, 78 Fed. Reg. 10696, 10834 (Feb. 14, 2013) (agency commentary to the rules to be codified at 12 C.F.R. pt. 1024), https://www.gpo.gov/fdsys/pkg/FR–2013–02–14/pdf/2013–01248.pdf.

*Wilkins v. Wells Fargo Bank, N.A.*, 320 F.R.D. 125, 129 n.3 (E.D. Va. Mar. 8, 2017). In this case, the loan owner HSBC established a rule for lost or missing documents associated with loan modification. Ruckman asserts that she complied with that rule.

Effective as of November 1, 2020, all parties to the Home Loan were subject to the Loan Modification Agreement ("LMA"), as PHH's witness Howard Handville acknowledges. (Doc. No. 39 at PageID# 369 ¶ 17 & PageID# 438.) Section 7 of the LMA provides in pertinent part that "if any documents related to the loan documents and/or this Agreement is lost, misplaced, . . . or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the lender any documentation the Lender deems necessary. . . . Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement." (*Id.* at PageID# 442.)

The evidence in the record would allow a jury to find that the parties invoked and complied with § 7 of the LMA. Ruckman contends that she returned the signed, notarized LMA in December 2020. (Doc. No. 1-2 at PageID# 48 ¶ 14; Doc. No. 52-1 at ¶ 14; Doc. No. 53 at ¶ 14; Doc. No. 41 at PageID# 466-67 17:23-18:12, 19:12-21:25; *see also id.* at Page ID# 655 RFA Nos. 2, 3.) There is no dispute that Ruckman began making the payments prescribed by the LMA. (Doc. No. 1 at ¶ 41; Doc. No. 10 at ¶ 41; Doc. No. 12 at ¶ 41; *see also* Doc. No. 42 at PageID# 666 21:16-25.) From that evidence the jury *might* infer it more probable than not that Ruckman also would have returned the signed LMA given her payment conduct.

In any event, if the signed LMA was lost or otherwise missing, there is no dispute as to the following facts: On January 12, 2021, Bennett advised Ruckman to print again, sign, and

have notarized the original LMA.  (Doc. No. 40 at PageID# 451.)  Ruckman signed and

notarized the LMA that same day.  (Doc. No. 39 at PageID# 370 ¶ 16 & PageID# 444.)  PHH

received that signed, notarized LMA on January 19, 2021, *i.e.,* within ten days as prescribed by §

7 of the LMA.  (Doc. No. 39 at ¶ 16.)[6]  Together, these facts allow (if not require) a finding that

PHH invoked and Ruckman complied with § 7 of the LMA in January 2021.

As noted, *supra*, PHH's explanation regarding all three of the exceptions found at § 41(g)

subsections (1) through (3) of Regulation X each expressly depend upon the factual assertion that

Ruckman did not return a signed LMA and thereby rejected same.  Inasmuch as there is evidence

that Ruckman did so in accord with § 7 for lost or missing documents, the Court cannot conclude

that PHH is entitled to judgment as a matter of law regarding the exceptions in §41(g).

### 4.  PHH's Argument Based on Regulation X § 41(e) Is Mistaken

PHH notes that § 41(e) of Regulation X indicates that a servicer may require a borrower

to accept or reject a loss mitigation option within a specified deadline.  (Doc. No. 38 at PageID#

360.)  From § 41(e), PHH argues that Ruckman "rejected the loss mitigation option offered to

her by PHH."  (*Id.*)

PHH excerpts § 41(e) in its summary judgment motion, but PHH omits from that excerpt

the portion of § 41(e) that undermines PHH's position.  (*See id.*)  We begin with a full recitation

of the pertinent regulatory language:

**(2) Rejection -**

**(i) In general.**  *Except as set forth in paragraphs (e)(2)(ii)* and (iii) of this section,
a servicer may deem a borrower that has not accepted an offer of a loss mitigation
option within the deadline established pursuant to paragraph (e)(1) of this section
to have rejected the offer of a loss mitigation option.

---

[6] PHH later countersigned and approved that version of the LMA, which Ruckman had signed on
January 12, 2021.  (*Id*. at PageID# 445.)

**(ii) Trial Loan Modification Plan.**  A borrower who does not satisfy the servicer's requirements for accepting a trial loan modification plan, but submits the payments that would be owed pursuant to any such plan within the deadline established pursuant to paragraph (e)(1) of this section, *shall be provided a reasonable period of time* to fulfill any remaining requirements of the servicer for acceptance of the trial loan modification plan *beyond the deadline* established pursuant to paragraph (e)(1) of this section.

12 C.F.R. § 1024.41(e)(2) (emphases added).

As the Court reads § 41(e), it offers little help to PHH here.  Assuming *arguendo* that Ruckman missed the December 30, 2020 deadline to return the signed LMA, there is no dispute that Ruckman made the payment required by the LMA and its accompanying documents.  (Doc. No. 1 at ¶ 41; Doc. No. 10 at ¶ 41; Doc. No. 12 at ¶ 41; *see also* Doc. No. 42 at PageID# 666 21:16-25; Doc. No. 53 at PageID# 837-39 (receipts for December 2020 and January 2021 payments).)

Given that Ruckman made the payments required under the LMA, even assuming that she failed to return a signed version of the LMA in December 2020, § 41(e)(2)(ii) instructs that PHH afford her 'a reasonable period of time' in which to do so.  From the evidence in the record – which shows that PHH had Ruckman's signed, notarized LMA in hand no later than January 19, 2021 – a jury could conclude that Ruckman did, indeed, accept the offered LMA as permitted under § 41(e)(2) of Regulation X.[7]  For this reason, the Court cannot conclude that PHH is entitled to judgment as a matter of law on Count I.

---

[7] For context, the Court notes that PHH's witness Howard Handville observed during his deposition testimony that: "There was extensive communications going on here so, obviously, all parties concerned were trying to work through the resolution issues."  (Doc. No. 42 at PageID# 667 24:8-11.)

### 5. PHH's Description Is Contrary to the Text of the LMA, a Representation Made to Magistrate Clark, and an Admission of Handville

PHH contends that "at all relevant times PHH considered the Loan Modification to be denied." (Doc. No. 38 at PageID# 362.) That position faces three obstacles, one legal and two factual.

#### a) Section 7 of the LMA, Allowing for Re-Execution of Missing Documents, Was Effective as of November 2020

On the legal front: This Court is obliged to read the LMA according to its plain language. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) ("Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract.") (citation omitted). (Doc. No. 39 at PageID# 442-43 § 8.) The LMA constitutes the final agreement between the parties. The LMA indicates that it was prepared by PHH. (*Id.* at PageID# 437.) And the LMA plainly provides that it was effective as of November 2020. (Doc. No. 39 at PageID# 438.) PHH could have had this document revised or amended had it wished to do so, but elected not. (*See id.* at PageID# 441 § 3.e.) For events from November 2020 to the present, then, the LMA governs.

If PHH wanted the LMA to be effective solely going forward from the date of PHH's countersignature, then PHH could have modified the contract accordingly. Having elected *not* to do so – and having reaped the fruit of Ruckman's payments pursuant to the terms of the LMA from November 30, 2020 onward – PHH may not circumvent the plain language of the LMA for the purpose of constructing a defense to Ruckman's claim under RESPA and Regulation X.

        **b)**        **Clunk Told the State Court Magistrate on January 29, 2021 That a Permanent Loan Modification Had Been Reached**

On the factual front: Not only does evidence in the record indicate compliance with § 7 of the LMA, as discussed *supra.*, the apparent statement of Clunk to Magistrate Clark on January 29, 2021, would allow the inference that Defendants themselves thought that there was a signed, viable LMA for the Home Loan as of that date.  There is circumstantial evidence from late January 2021 indicating that Defendants themselves considered Ruckman to have signed, returned, and thereby complied with the LMA execution requirement.

PHH filed evidence in the form of an email from the Magistrate Clark, who wrote: "Counsel and Ms. Ruckman, We last spoke about this case on January 29, 2021.  *At that time, it was represented to me that a permanent loan modification had been reached* and that the case was likely to be dismissed within two weeks."  (Doc. No. 61-9 at PageID# 1026 (emphasis added).)

All parties agree and admit that communications were had with Magistrate Clark on January 29, 2021.  (Doc. No. 1 at ¶ 44; Doc. No. 10 at ¶ 44; Doc. No. 12 at ¶ 44.)  All parties further agree and admit that on January 29, 2021, HSBC and Clunk acknowledged that receipt of: (i) the signed loan modification agreement; (ii) the December 2020 payment; and (iii) the January 2021 payment.  (*Id.*; *see also* Doc. No. 52-1 at PageID# 751 ¶ 17.)

No party has submitted evidence to dispute, contradict, or correct the accuracy of Magistrate Clark's account of what she was told on January 29, 2021 – which PHH filed with this Court as an exhibit.  (*See* Doc. No. 61-9 at PageID# 1025-26.)  As indicated therein, Clunk responded to the Magistrate by email and did *not* dispute, contradict, or correct what the Magistrate wrote that she had been told.  (*Id.*)  Rather, Clunk replied that "[t]he permanent loan modification fell through," and went on to describe the PHH/Clunk version of events.  (*See id.*)

26

### c)     The Record Does Not Support PHH's Suggestion that the January 29, 2021 Communication was Confidential

There are several problems with the argument in Part II.c. of PHH's reply brief asserting the confidentiality of settlement communications as a barrier to consideration of communications related to January 29, 2021.  (*See* Doc. No. 62 at PageID# 1222-23 n.2.)   First, PHH (not Ruckman) filed Magistrate Clark's communication with this Court as evidence – albeit tardy evidence.[8]  (Doc. No. 61-9 at PageID# 1026.)  Second, PHH filed the April 7, 2021 communication from Clunk to Magistrate Clark presumably because it seemed to support PHH's defense against Count I.  Having introduced that email chain, PHH cannot escape its unhelpful facets.  Third, PHH went further and filed another tardy document (*i.e.,* after its reply brief and without seeking leave of Court) characterizing what occurred as part of mediation.  (*See* Doc. No. 63.)  Fourth, the Court does not treat the email in Document 61-9 as evidence of a deal struck on January 29th but rather as circumstantial evidence consistent with Handville's admission regarding a prior approval of the LMA that occurred on January 26th.

PHH's characterization of a confidential mediation is not supported by the record.  The events of January 29, 2021 appear not to have been either a mediation or confidential.  The state court foreclosure case docket (a matter of public record, which PHH filed in this Court) indicates that what occurred on January 29th was a "status conference with Andrea Clark."  (Doc. No. 62-

---

[8] On June 24, 2022, PHH filed as additional evidence the exhibits to the Handville deposition. That filing occurred four months after the Handville deposition transcript was filed.  (*Compare* Doc. No. 42 *with* Doc. No. 61.)  Document No. 61 does not indicate that PHH asked for or received leave of Court to file additional evidence four months after PHH had filed its motion for summary judgment and two months after Ruckman had already filed her response to that motion. The disparity of time between PHH's filings is odd, as it filed the Handville deposition transcript on February 25, 2022 – on which date PHH undoubtedly also had in its possession the exhibits to that transcript.

1 at PageID# 1235.)  PHH elsewhere admitted that what occurred was actually a "hearing."  The Complaint alleged:

> On January 29, 2021, at a hearing with Magistrate Andrea Clark in the Foreclosure, HSBC and Clunk acknowledged receipt of the executed Modification and the payments for the months of December 2020 and January 2021.

(Doc. No. 1 at ¶ 44.)  PHH answered:

> PHH admits Paragraph 44 of the Complaint. Further answering, PHH also states that at the same hearing Plaintiff was informed that the modification had been denied.

(Doc. No. 12 at ¶ 44.)  Defendant Clunk also admitted the truth of Paragraph 44.  (Doc. No. 10 at ¶ 44.)

Moreover, PHH filed in this Court additional evidence (albeit after the reply brief and without leave of Court) where PHH admits that the state court mediation occurred in April 2020 – long before the representation made by Clunk to Magistrate Clark on January 29, 2021.  (*See* Doc. No. 63 at PageID# 1242 & 1244.)

Even assuming *arguendo* that a mediation had occurred on January 29th, PHH broke confidentiality when it affirmatively introduced in Paragraph 44 of its Answer the content of communications made on January 29th.  (*See* Doc. No. 12 at ¶ 44.)  Because all parties plead or admit facts regarding the content of communications that occurred on January 29th, Ohio's confidentiality rule for mediation does not apply.  *See* Ohio Rev. Code §§ 2710.04(B) & 2710.07.[9]

---

[9] A potential complication that this Court need not reach is that at least one Ohio court has suggested that Ohio's mediation confidentiality privilege "would not be applicable to the court-run mediation proceeding . . . ."  *See Kuhn v. 21st Century Ins. Co*., 2012-Ohio-2598, ¶ 27; *see also* Ohio Rev. Code § 2710.02(B)(3) ("Sections 2710.01 to 2710.10 of the Revised Code do not apply to a mediation in which any of the following apply: . . . The mediation is conducted by a judge *or magistrate* who might make a ruling on the case.") (emphasis added).

There is little traction for PHH's assertion that "at the time of the hearing on January 29, 2021, the loan modification had been denied and *any agreement to reverse the denial of the loan modification had not been reduced to writing* (especially as the borrower's tendered loan modification received by PHH on January 19th, 2021, had not been executed by PHH, the party to be charged under contract law)."  (Doc. No. 62 at PageID# 1223 (emphasis in original).)  PHH *chose* to make the LMA effective as of November 2020 and later *chose* not to revise the effective date.  (*See* Doc. 39 at PageID# 438.)  PHH had the contractual authority to make that decision and later to make a correction or revision to the LMA if needed.  (*Id.* at PageID# 441-42 §§ 3.e & 7.)  Given the integration clause in the LMA, the Court is precluded from going outside the four corners of the LMA or going back in time to understandings that preceded the written contract.  (*Id.* at PageID# 442-43 § 8.)

With no evidence to the contrary in the record, a jury could conclude: On January 29, 2021, HSBC through its counsel Clunk represented to Magistrate Clark that it received both a signed modification agreement and payments from Ruckman *and* that a permanent modification of the Home Loan had been reached.  (*See* Doc. No. 61-9 at PageID# 1025-26; Doc. No. 1 at ¶ 44; Doc. No. 10 at ¶ 44; Doc. No. 12 at ¶ 44.)  Even without the email from Magistrate Clark recounting what she was told on January 29th, a jury might reach the same conclusion in light of Handville's admission in his deposition testimony regarding PHH's decision on January 26th, discussed *infra*.

### d)  On January 26, 2021, PHH Approved the Loan Modification and Reversed Its Prior Denial Letter

PHH's own records apparently confirmed that on January 26, 2021, PHH approved the reversal of its prior January 14th denial letter.  (Doc. No. 42 at PageID# 673-75 49:9-54:16.)

PHH's witness Howard Handville admitted in deposition that as of late January, PHH had, indeed, reversed its prior denial and accepted the LMA that Ruckman submitted.

> Q:      So the denial was reversed?
>
> A:      *The decision to agree to reverse it had been approved the end of January*, but they hadn't worked through all of the details to get the denial updated in the system, and you know, whatever processes are involved in that.

(*Id.* at PageID# 675 54:4-10 (emphasis added).)

Given this testimony along with Clunk's apparent representation to Magistrate Clark on January 29, 2021, PHH's assertion on brief that "at all relevant times PHH considered the Loan Modification to be denied" is disputed.  (*See* Doc. No. 38 at PageID# 362.)

### e)      PHH's Argument Regarding Mediation Confidentiality Is Misplaced

PHH argues in reply that Ruckman's suggestion that the parties reached a settlement agreement on January 29, 2021 is inadmissible for two reasons.  First, the Home Loan is subject to the statute of frauds, and so no oral agreement could modify it.  (Doc. No. 62 at PageID# 1222-23.)  Second, any discussions on January 29, 2021 were part of a mediation with Magistrate Clark and therefore are inadmissible under Rule of Evidence 408.  (*Id.* at PageID# 1223 n.2.)

The Court agrees with PHH's first point.  This Court does not consider the discussions that occurred with Magistrate Clark on January 29, 2021 to be the source of any agreement violative of the statute of frauds.  Rather, as discussed *supra*, here is what the evidence would allow a jury to infer: PHH received a signed LMA from Ruckman by January 19th.  So on January 26th PHH approved the reversal of its prior denial letter which PHH had issued on January 14th and mailed out on January 15th.  The agreement to modify the Home Loan, then, was not a settlement reached during mediation but instead was the acceptance of the written

30

LMA, which had occurred a few days prior to the January 29th mediation.  (*See* Doc. No. 39 at PageID# 370 ¶¶ 16-17 & PageID# 444-46; Doc. No. 42 at PageID# 672 43:24-44:2.)[10]

As to the second point, PHH itself introduced evidence disclosing the content of mediation communications with Magistrate Clark.  (*See* Doc. No. 61-9 at PageID# 1026.)  In any event, the Court does *not* make a finding that an agreement was reached on January 29th.  Instead, the Court notes solely for purposes of resolving the present motion what Magistrate Clark recounted and what PHH filed in this Court, *i.e.*¸ that the parties represented to her on January 29th that a permanent loan modification had been reached.

As noted, *supra*, PHH's explanation regarding all three of the exceptions found at § 41(g) subsections (1) through (3) each expressly depend upon the premise that Ruckman did not return a signed LMA and that modification was therefore denied.  Inasmuch as there is evidence suggesting that Defendants acknowledged the existence of an accepted, viable LMA – both internally on January 26, 2021 and externally to Magistrate Clark on January 29, 2021 – the Court cannot conclude that PHH is entitled to judgment as a matter of law regarding the exceptions in §41(g) of Regulation X.

### 6.  PHH's Argument Relies on a Disputed Factual Assertion That Ruckman Failed to Make Payments

PHH argues that even if the LMA was agreed upon, "PHH could still have proceeded with the foreclosure under §1024.41(g)(3) as Plaintiff failed to perform under the loss mitigation

---

[10] PHH's argument appears to respond to page 13 of Ruckman's brief in opposition to the summary judgment motion.  (*See* Doc. No. 52 at PageID# 743.)  If Ruckman's brief could be construed as seeking to enforce an agreement reached during the January 29th mediation, the Court need not do so.  Handville's testimony suffices for present purposes to support a jury finding that, after receiving the signed LMA on January 19th, PHH management decided on January 26th to approve that LMA and reverse the prior denial letter.

agreement that PHH would reverse the denial if two payments in the amount of $873.93 were made by March 25th." (Doc. No. 38 at PageID# 362.)

The problem with PHH's version of events is that PHH selectively ignores what the undisputed evidence shows: *i.e.,* that Ruckman *tendered* payments sufficient to comply with the LMA. *See* Part I.H., *supra.* Now it may be true that not all of those payments were credited to Ruckman's Home Loan account, but that is (by Defendants' admission) because PHH "rejected" certain of Ruckman's payments tendered in February 2021. (*See* Doc. No. 1 at ¶ 45; Doc. No. 10 at ¶ 45; Doc. No. 12 at ¶ 45; Doc. No. 22 at PageID# 280; *see also* Doc. No. 42 at PageID# 668 27:1-6.)

PHH's witness admitted that its payment rejections not only caused confusion but also resulted in Ruckman's tendered monies remaining in some electronic abyss either at Kroger or in the CheckFreePay system. (*See* Doc. No. 42 at PageID #676 59:24-60:18.) On March 10, 2021, Ruckman was still inquiring where her prior payments had gone. (Doc. No. 52-1 at PageID# 795.) During her deposition, Ruckman recalled months of inquiries and lawyer involvement to get a refund of payment from Kroger – the result of PHH's rejections. (*See* Doc. No. 41 at PageID# 472 38:6-40:20.)

Neither affidavit from Handville and Bennett includes or describes any notification from PHH in February 2021 of payment rejections. The Court must infer for purposes of the present motion that PHH did not notify Ruckman of the rejections at the time those occurred.

From the evidence in the record, the Court cannot find that Ruckman had failed to tender enough money to support loan modification as of March 29, 2021, *i.e.,* the date when Defendants filed a summary judgment motion in the state court foreclosure case. PHH has not demonstrated that it is clearly entitled to judgment as a matter of law under § 1024.41(g)(3) of Regulation X.

*Cf. Jones v. Planet Home Lending, LLC*, No. 1:19-CV-01003, 2020 WL 7395151, at *6 (N.D. Ga. Feb. 3, 2020).

### 7. Defendants' Representations Prior to Moving for Summary Judgment Suggest "Dual Tracking"

A final reason why the Court cannot conclude that PHH is entitled to judgment as a matter of law on Count I stems from the communications sent by Ms. Bennett of Clunk in March 2021. Just days before Clunk filed a summary judgment motion seeking foreclosure in state court, Bennett had indicated that loan modification was still offered and available to Ruckman.[11] "A mortgagor engages in dual tracking by pursuing foreclosure on the mortgagee's property while simultaneously considering the mortgagee for a mortgage loan modification." *See Hunt v. Nationstar Mortg., LLC,* 684 F. App'x 938, 943 (11th Cir. 2017) (citing *Chadwick v. Bank of Am., N.A.*, 616 Fed. App'x 944, 949 (11th Cir. 2015)).

#### a) RESPA Regulation X Prohibits Dual-Tracking

"There is little doubt as to the remedial nature of RESPA's provisions given Congress's finding that 'significant reforms in the real estate settlement process are needed,' and that it specifically enacted RESPA 'to effect certain changes in the settlement process for residential real estate' that would result, in part, 'in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.'" *In re Carter*, 553 F.3d 979, 985 n.5 (6th Cir. 2009) (quoting 12 U.S.C. § 2601(a), (b)(1)). "According to 'traditional canons of statutory interpretation, remedial statutes should be construed broadly to extend coverage and their exclusions or exceptions should be construed narrowly.'" *Id.* (quoting *Cobb v. Contract Transport, Inc.*, 452 F.3d 543, 559 (6th Cir. 2006)).

---

[11] Clunk has argued to this Court that Bennett's communications were at PHH's direction and contained information coming from PHH. (*See* Doc. No. 22 at PageID# 279-80.)

33

> RESPA Regulation X, 12 C.F.R. § 1024.41, imposes certain obligations on servicers to consider delinquent borrowers for available loss mitigation options and to provide information about those options to borrowers. Of particular relevance here, the regulation restricts, in certain circumstances, a servicer's ability to proceed with foreclosure while simultaneously working with a borrower to avoid foreclosure through a loan modification — a process known as "dual tracking." Section 1024.41 can be privately enforced under Section 6(f) of RESPA. 12 U.S.C. § 2605(f); 12 C.F.R. § 1024.41(a).

*Covin v. FCI Lender Services Inc*., No. 1:15-CV-0594, 2015 WL 13777210 at *3 (N.D. Ga. June 29, 2015).

"Dual tracking occurs when a lender 'actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options.' Section 1024.41(g) prohibits dual tracking, and § 1024.41(a) expressly provides for a private right of action if a lender engages in prohibited dual tracking." *Beam v. Caliber Home Loans, Inc.*, No. 3:19-CV-01201, 2021 WL 4445351 at *3 (N.D. Tex. Sept. 7, 2021) (quoting *Gresham v. Wells Fargo Bank, N.A.*, 642 F. App'x 355, 359 (5th Cir. 2016)); *see also Wilkins*, 320 F.R.D. at 129 n.1; *Weisheit v. Rosenberg & Assoc., LLC*, No. 17-CV-0823, 2017 WL 5478355 at *4 (D. Md. Nov. 15, 2017) ("Dual-tracking is the practice of moving towards foreclosure while the loss mitigation process is ongoing, and it is prohibited under RESPA.").

"To be sure, it may be possible in some circumstances for a creditor's dual-tracking to give rise to a cause of action, such as when the creditor 'affirmatively represent[s] that it would not pursue foreclosure, and then later sandbag[s] the borrower.'" *Wardford v. Carrington Mortg. Svcs*., No. 1:17-CV-4936, 2018 WL 6362654 at *6 (N.D. Ga. Sept. 19, 2018) (quoting *Chadwick v. Bank of Am., N.A.*, 616 F. App'x 944, 950 (11th Cir. 2015)); *e.g., Joseph v. Fed. Home Loan Mortg. Corp.*, No. 1:12-CV-1022, 2012 WL 5429639, at *3 (N.D. Ga. Nov. 6, 2012); *Stimus v. CitiMortgage, Inc*., No. 5:10-CV-435, 2011 WL 2610391, at *5 (M.D. Ga. July 1, 2011).

**b)** **Bennett's Communications Immediately Before the Summary Judgment Motion Indicate that Loss Mitigation and Loan Modification Are Still in Play**

Bennett sent emails in March 2021 indicating that loss mitigation and loan modification were still available.  On March 8, 2021, Bennett wrote that "[i]f you want the modification to go through, that payment needs to be made immediately."  (Doc. No. 52-1 at PageID# 784.)  On March 19, 2021, Bennett wrote that "[t]he following amount is due before the end of March or the modification is denied."  (Doc. No. 51-2 at PageID# 797.)

Just days later – and before the end of March – Clunk filed the motion for summary judgment in the state court foreclosure case.  (Doc. No. 1 at ¶ 61; Doc. No. 10 at ¶ 61; Doc. No. 12 at ¶ 61.)   Assuming *arguendo* that Bennett's pronouncement was binding as to when modification was available and when it would be deemed denied, Clunk moved for summary judgment before the end of March, *i.e.,* before Bennett indicated that loan modification would be off the table.

A jury might conclude that Bennett's representations regarding the need for payment by end of March to mean that April would have been the earliest that a summary judgment motion would be filed.  Moreover, a jury might conclude that Bennett's representations in March 2021 pressing Ruckman to pay $873.93 were inherently misleading and confusing, inasmuch as Ruckman had indeed already tendered more than that sum (*i.e.,* $940).  Moreover, PHH's *unannounced* payment rejections were the cause of at least $940 previously tendered by Ruckman being unaccounted for at this time.

In any event, given the express, repeated indication that loan modification was still available during March 2021, a jury may find that the filing of summary judgment on March 29, 2021 was the sort of sandbag violation that could sustain a verdict under § 41(g) of RESPA

Regulation X.  PHH has not, therefore, assured this Court that it is entitled to judgment as a matter of law on Count I.

### 8.  The Cases PHH Relies Upon Are Distinguishable

In *Rupli v. Ocwen Loan Servicing, LLC*, No. 16-0181, 2016 WL 4141013 (D. Md. Aug. 4, 2016), the plaintiff did not allege that she had accepted the trial period plan (or "TPP").  *See id.* at \*2.  Accordingly, the borrower was deemed to have rejected the TPP under Regulation X § 1024.41(e)(2)(i), from which there would be no appeal.  *See id.* at \*6.  That is unlike the situation here where Ruckman contends that she did accept the LMA in December 2020, thereby rendering inapplicable § 1024.41(e)(2)(i).  Moreover, Ruckman made payments thereby rendering her eligible under § 1024.41(e)(2)(ii).

In *Schoen v. Bank of America, N.A.*, No. 2:17-CV-648, 2019 WL 590882 (S.D. Ohio Feb. 13, 2019), the court analyzed § 1024.41(e).  *Id.* at \*9-10.  The court there held that § 1024.41(e)(2)(i) "provides an option to the servicer but requires nothing of the servicer."  *Id.* at \*10.  The *Schoen* court's reasoning quoted by PHH plainly would not apply to § 1024.41(e)(2)(ii), which *does* require something of a servicer, *i.e.,* to afford reasonable additional time past a deadline to return signed loan modification documents where the borrower has made tendered payment prescribed by the loan modification.  (*See* Doc. No. 38 at PageID# 361.) *Schoen* also did not involve circumstances like those here, where Ruckman (i) claimed to have returned a signed LMA indicating her acceptance in December 2020, and (ii) later re-executed and returned the LMA in January 2021.

*Son v. Wells Fargo Bank*, *N.A.*, No. 1:18-CV-488, 2019 WL 317251 (W.D. Tex. Jan. 24, 2019) is inapposite because there the borrower conceded that she did default by failing to make the payments prescribed for the modified loan.  *See id.* at \*3.  Ruckman, as detailed *supra*,

tendered payments prescribed by the LMA.  PHH's assertion in its summary judgment brief that Ruckman admitted "she did not provide the payment necessary to reverse the denial of the modification" is inaccurate and misleading.  (*See* Doc. No. 38 at PageID# 362.)  Ruckman did not immediately pay *again* only because she *had already paid* a larger sum – monies which went missing for a while due to PHH's unannounced rejection of two payments.

Such facts distinguish this case from *Malcolm v. Seterus, Inc.*, No. 5:18-CV-01937, 2020 WL 1434496 (N.D. Ohio March 24, 2020), where there was no factual dispute that the borrower's payment was not timely received due to issues at the borrower's workplace mailroom.  *See id.* at *1.  The problems with payments in this case resulted from PHH's unannounced rejection of those in February 2021, with monies missing into March 2021 and beyond.

*Brimm v. Wells Fargo Bank, N.A*, 688 F. App'x 329 (6th Cir. 2017) is wholly inapposite because there the borrower failed to respond to the servicer's communication regarding missing material and filed bankruptcy while a loan modification was under consideration.  *Id.* at 331.

In *Dent v. Inv. Corp. of Am*., No. 15-CV-11268, 2015 WL 9694807, at *3 (E.D. Mich. Dec. 23, 2015), *report and recommendation adopted*, 2016 WL 125864 (E.D. Mich. Jan. 12, 2016), the borrower failed to put forward any evidence and instead relied solely on pleading allegations.  The court therefore granted summary judgment in favor of the servicer on the RESPA claim.  *Id.* at *4-5.  Ruckman's opposition to PHH's summary judgment motion is supported by evidence.

**C.  PHH Has Not Shown That the Ohio RMLA Is Inapplicable as a Matter of Law.**

There is no dispute that PHH, as a mortgage servicer, is registered under the RMLA,

Ohio Rev. Code § 1322.  (Doc. No. 1 at ¶¶ 98-99; Doc. No. 12 at ¶¶ 98-99.)  A registrant may

not:

> (B) Make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations;
>
> [or]
>
> (C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings[.]

Ohio Rev. Code § 1322.40.  A registrant must, "in addition to duties imposed by other statutes or

common law," *inter alia*:

> (1) Safeguard and account for any money handled for the buyer;
>
> (2) Follow reasonable and lawful instructions from the buyer;
>
> (3) Act with reasonable skill, care, and diligence;
>
> (4) Act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan . . . .

Ohio Rev. Code § 1322.45(A).

PHH requests that in the event that the RESPA claim in Count I is dismissed, the Court

should decline to exercise supplemental jurisdiction over the Ohio RMLA claim in Count III.

(Doc. No. 38 at PageID# 363.)  In light of the Court's ruling in Part II.B., *supra.*, this argument

is moot.

PHH argues that the facts here do not fit into the eleven examples of "improper,

fraudulent, or dishonest dealings" described in Ohio Admin. Code § 1301:8-7-16.  (*Id.* at

PageID# 364.)  That observation is of no consequence because the regulation indicates that the

prohibited conduct "includes, but is not limited to" those eleven examples.  *See* Ohio Admin.
Code § 1301:8-7-16.  It also is not surprising "because the regulation was created in 2016, before
the RMLA was expanded in 2019 to cover mortgage loan servicers."  (Doc. No. 38 at PageID#
364.)

PHH next argues that "PHH followed the federal regulation regarding the loan
modification process, so Plaintiff's allegations simply do not fit into the everyday meaning of
improper, fraudulent, or dishonest dealings."  (*Id.* at PageID# 365.)  However, for the reasons
discussed in Part II.B., *supra*, PHH has not proven compliance with Regulation X.  For example,
if (as PHH argues in its summary judgment motion) PHH treated the loan modification as having
been denied at all relevant times, then the record here indicates that PHH violated § 41(e) of
Regulation X.  *See* Part II.B.4., *supra*.  A jury also may conclude that Defendants sandbagged
Ruckman in violation of § 41(g) when they filed a summary judgment motion before the
expiration of the deadline communicated to Ruckman (*i.e.*, "before the end of March or the
modification is denied").  *See* Part II.B.7., *supra.*

In addition, the record includes facts and evidence from which a jury could conclude that
PHH failed to act with reasonable care and diligence, in good faith, to safeguard and account for
money tendered by Ruckman during February and March 2021.  *See* Ohio Rev. Code §
1322.45(A).  Further, the record includes facts and evidence from which a jury could conclude
that PHH violated Ohio Rev. Code § 1322.40.

Suffice to say for present purposes, the Court is not assured that PHH is entitled to
judgment as a matter of law on the Ohio RMLA claim in Count III.

### D.  Ruckman Has Identified Plausible Damages.

A claimant must allege actual pecuniary damages as a result of a RESPA violation.  *See*
12 U.S.C. § 2605(f)(1)(A) (allowing recovery of "any actual damages to the borrower").  These

"actual damages" can take the form of financial damages, emotional damages, or other damages which might flow from a servicer's wrongful act. *Dent*, 2015 WL 9694807, at *3*; Houston v. U.S. Bank Home Mortg. Wis. Servicing*, 505 F. App'x 543, 548 n.6 (6th Cir. 2012) (holding that emotional damages may constitute "actual damages" under RESPA); *Austerberry v. Wells Fargo Home Mortg.*, No. 15-CV-13297, 2015 WL 8031857, at *6 (E.D. Mich. Dec. 7, 2015) (noting the availability of statutory damages where "a pattern or practice of noncompliance" with RESPA can be shown); *Claxton v. Orlans Associates, P.C.*, No. 10-11813, 2010 WL 3385530, at *5 (E.D. Mich. Aug. 26, 2010) (noting that "actual damages" must "be damages suffered as a result of the failure to satisfy the RESPA duty at issue").

PHH argues that the state court foreclosure action was already pending since the spring of 2020, so any purported damages were not caused by a RESPA violation. (Doc. No. 38 at PageID# 366.)

But Ruckman swore under oath that she was forced to retain counsel following the summary judgment motion filed in the state court foreclosure, which Ruckman contends was impermissible dual-tracking. (*See* Doc. No. 53 at PageID# 821 ¶ 51.) She also testified regarding other resulting pecuniary damages. (Doc. No. 41 at PageID# 473-74 44:11-23 & 45:23-47:1.) Ruckman also claimed and testified regarding emotional distress. (*Id.* at PageID# 473-75 at 44:11-13 & 47:2-53:12.) In light of Ruckman's "deposition testimony and affidavit in the light most favorable to her, there is sufficient evidence for her to proceed on her claim that she suffered emotional damages as a result of the RESPA violation. This remains a material fact in dispute." *Cameron v. Ocwen Loan Servicing, LLC*, No. 2:18-CV-428, 2020 WL 467686, at *2 (S.D. Ohio Jan. 29, 2020).

Finally, PHH argues in reply that statutory damages are not available because Ruckman did not show a "pattern or practice of noncompliance," 12 U.S.C. § 2605(f)(1)(B).  (Doc. No. 62 at PageID# 1226.)  That argument is waived, as it was *not* a ground on which PHH sought summary judgment.  (*See* Doc. No. 38 at PageID# 365-66.)  *See generally Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived.").

In any event, the record *does* include some evidence showing a pattern or practice of PHH's noncompliance (which PHH's motion and reply entirely ignore and fail to refute). (*See* Doc. No. 1-3 at PageID# 110 *et seq*.)

### III. <u>Conclusion</u>

For the reasons above, PHH's motion for summary judgment is DENIED.  (Doc. No. 38.)


**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
Date:  November 1, 2022          UNITED STATES DISTRICT JUDGE