# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| ANGELA L. RUCKMAN, | ) |
| *Plaintiff* | ) ) Case No. 5:21-cv-00923-BMB |
| vs. | ) ) Judge Bridget Meehan Brennan |
| PHH MORTGAGE CORPORATION d/b/a PHH MORTGAGE SERVICING, et al., | ) ) ) |
| *Defendants*. | ) ) |

## DEFENDANT PHH MORTGAGE CORPORATION'S TRIAL BRIEF

Defendant, PHH Mortgage Corporation d/b/a PHH Mortgage Servicing, through its undersigned counsel, in support of its Trial Brief, states as follows:

## STATEMENT OF FACTS

On August 24, 2005, plaintiff Angela Ruckman ("Plaintiff") executed a promissory note in the amount of $83,000.00 and a mortgage securing to note for the property located at 837 South Main St. in Mansfield, Ohio. (Doc. 1 ¶¶ 2-4). Defendant PHH is the current servicer of the Loan. (Doc. 1 ¶ 6; Handville Aff. ¶ 6).

Plaintiff experienced a financial hardship and became delinquent on her loan around April 1, 2019, which led to a foreclosure action being filed on March 5, 2020 in the Richland County Court of Common Pleas. (Doc. 1 ¶¶ 31-32). In July 2020, Ruckman completed a loss mitigation application. (Doc. 1, ¶ 33). PHH acknowledged the complete application on August 5, 2020. (Doc. 1 ¶ 35; Handville Aff. ¶ 9). On August 12, 2020, PHH offered Ruckman a trial modification plan. (Doc. 1 ¶ 36; Handville Aff. ¶ 10). The trial modification plan documents included the reason for the non-approval of a Helping Homeowners Modification program, as well as an explanation of

Ruckman's ability to appeal the non-approval. (PHH 000175-76.) Ruckman made all three trial payments under the trial modification plan. (Doc. 1 ¶ 37).

On November 6, 2020, PHH offered Ruckman a permanent modification which included a Loan Modification Agreement. (Doc. 1 ¶ 36, Doc. 1-2 PageID #57; Handville Aff. ¶ 11; Handville Dep. at 16). To accept the Permanent Loan Modification Offer, Ruckman was to provide payment and the executed Loan Modification Agreement to PHH no later than November 24, 2020. (Handville Aff. ¶12; Handville Dep. at 17). On November 16, 2020, PHH also emailed Ruckman a copy of the permanent modification documents. (Bennett Aff. ¶ 6.)

In late November, 2020, Ruckman expressed concern about the balloon payment in the loan modification and asked for additional time to review the modification documents. (Ruckman Dep. at 17.) On December 1, 2020, PHH told Ruckman that she had been granted an extension until December 31, 2020, to return the signed modification documents. (Ruckman Dep. Ex. 5; Bennett Aff. ¶ 6.) Ruckman's proposed changes to the permanent modification were ultimately rejected. (Handville Dep. Ex. F at 111.)

Ruckman stated that she sent in the notarized and executed permanent loan agreement "in December 2020." (Ruckman Aff. ¶ 14.) Ruckman concedes that she does not have a copy of the permanent modification that was executed in December of 2020. (Ruckman Dep. at 21:8.) She stated that she does not know who notarized the agreement, and she does not have a copy of the notary log because the bank at which she purportedly executed the agreement does not keep them. (Ruckman Dep. at 21:1.)

On January 7, 2021, Ruckman emailed foreclosure counsel at Clunk Hoose and stated that she sent in another request for a loan modification, and asked about its status. (Handville Dep. Ex.

2

F at 115.) The same day, Clunk Hoose responded that it didn't see anything in PHH's imaging system that was received, and that the last thing it saw was the offer for the permanent modification. (Handville Dep. Ex. F at 115.) On January 11, 2021, Ruckman asked via email if Clunk Hoose would be sending updated documents for her to sign. (Handville Dep. Ex. F at 114.), and clarified on January 12, 2021, that she was referring to the permanent modification documents. (Handville Dep. Ex. F at 113.) She stated that she made the payments under the modification, but did not refer to sending the documents in December. (*Id.*) The same day, Clunk Hoose stated that it was waiting on a response from PHH to see if the permanent modification was still available to Ruckman, and if she still wished to accept the permanent modification she needed to sign, notarize, and return the original signed documents as soon as possible "via overnight mail". (Handville Dep. Ex. F at 113.) Despite this instruction, PHH did not receive the executed permanent modification until January 19, 2021—a week later. (Handville Aff. ¶ 16; Handville Dep. at 44.)

Because PHH had not received an executed permanent modification, despite a prior extension and telling Ruckman to overnight the executed documents, on January 14, PHH created a denial letter for the permanent modification, and sent it to Ruckman via U.S. mail the next day. (Handville Aff. ¶¶ 14-15.)

On February 11, 2021, Ruckman made a $470 payment toward the loan. (Ruckman Aff. ¶ 19.) PHH refused this payment because the loan modification was denied and the denial had not yet been reversed. (Handville Dep. at 54.)

On February 22, 2021, Ruckman made another $470 payment toward the loan. (Ruckman Aff. ¶ 20.) Again, PHH refused this payment because the loan modification was denied and the denial had not yet been reversed. (Handville Dep. at 54.)

3

On March 3, 2021, Clunk Hoose emailed Ruckman and stated that the loan modification denial reversal had not yet been approved, and that Ruckman would need to make the February and March payments "immediately." (Ruckman Aff. Ex. G.) On March 6, Ruckman responded via email and stated that she learned the February 11, 2021 payment had been rejected, and that she had made the January, February, and March payments. (Ruckman Aff. Ex. G.) On March 8, 2021, Clunk Hoose reiterated that Ruckman was due for the February and March payments in the amount of $873.93, that if the payment was made PHH would "accept that amount and then reverse the denial", and that for the modification to go through, Ruckman would need to make the payment "immediately." (Ruckman Dep. at 137.) The email concluded by asking if Ruckman would be "sending the payment today." (Handville Dep. Ex. F at 117.)

On March 19, 2021, Clunk Hoose emailed Ruckman again and stated that the $873.93 was due "before the end of March". (Bennett Aff. at 13.) Clunk Hoose clarified in the same email that "End of March means we should receive funds **at least by 25th** so that mod team can modify loan before month end". (*Id.*) (emphasis in original).

On March 22, 2021, Ruckman submitted another $470 payment. (Ruckman Aff. ¶ 43.) The next day Clunk Hoose emailed Ruckman, provided a breakdown of the amounts due and showing that the February and March payments were still owing, and stated that the payment that Ruckman just made "has not yet shown as received or applied to your account and will likely be rejected because it is not the full amount of the [February and March payments] combined." (Bennett Aff. at 12.) The email ended by stating: "Please send in one lump sum $873.93 to cover the Feb and March payments." (*Id.*)

On March 29, 2021, Clunk Hoose filed a motion for summary judgment in the foreclosure lawsuit. (Ruckman 000043.)

On May 4, 2021, Ruckman filed this lawsuit. (Doc. No. 1.)

On August 5, 2021, PHH received all payments due under the loan modification agreement. (Handville Aff. ¶ 17.) On August 23, 2021, the loan modification was implemented. (*Id.*) The loan modification is still in effect and Ruckman is current on her payments. (Handville Aff. ¶ 18.)

On August 30, 2021, the foreclosure lawsuit was voluntarily dismissed due to the successful loan modification. (Handville Aff. ¶ 18.)

## CONTROLLING LAW

I. **Liability under the Real Estate Settlement Procedures Act and the Residential Mortgage Lending Act.**

    A.    *The Real Estate Settlement Procedures Act.*

The Real Estate Settlement Procedures Act ("RESPA") prohibits mortgage servicers from failing to comply with regulations implementing RESPA. *Wiggins v. Ocwen Loan Servicing, LLC*, 722 Fed. Appx. 415, 418 (6th Cir. 2018) (citing 12 U.S.C. § 2605(k)(1)(E)). "Dual tracking", where a lender actively pursues foreclosure while simultaneously considering the borrower for loss mitigation options, is prohibited by section 1024.41 of Regulation X, RESPA's implementing regulation. *See Gresham v. Wells Fargo Bank, N.A.*, 642 Fed. Appx. 355, 359 (5th Cir. 2016).

Specifically, one of three events must happen before a servicer proceeds with foreclosure if it receives a complete loss mitigation application. If a borrower submits a complete loss mitigation application after a servicer has made the first filing required by applicable law for any judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not move for judgment unless: (1) the servicer has sent the borrower a notice that the borrower is not

eligible for any loss mitigation option, and the appeal process either does not apply or the borrower has not requested an timely appeal; (2) the borrower rejects all loss mitigation options offered by the servicer; or (3) the borrower fails to perform under an agreement on a loss mitigation option. 12 C.F.R. § 1024.41(g).

A servicer may deem a borrower that has not accepted an offer of a loss mitigation option within the deadline to have rejected the offer of a loss mitigation option. 12 C.F.R. § 1024.41(e)(2)(i). "The plain language of the provision gives a servicer the right to treat a borrower as if she rejected an offer for a loss mitigation option if the borrower does not accept it by the validly set deadline." *Schoen v. Bank of Am., N.A.*, No. 2:17 cv 648, 2019 U.S. Dist. LEXIS 23460, at *27 (S.D. Ohio Feb. 13, 2019).

Although part of this section speaks of allowing a reasonable time past the deadline to comply with non-payment requirements, this *only* applies to trial loan modification plans. Regulation X states that a "borrower who does not satisfy the servicer's requirements for accepting *a trial modification plan*, but submits the payments that would be owed pursuant to any such plan within the deadline established pursuant to paragraph (e)(1) of this section, shall be provided a reasonable period of time to fulfill any remaining requirements of the servicer for acceptance of *the trial loan modification plan* beyond the deadline established pursuant to paragraph (e)(1) of this section." 12 C.F.R. § 1024.41(e)(2)(ii) (emphasis added).

"Trial modification plan" is a specific term under Regulation X and does not apply to all loss mitigation options generally. Congress's intent is expressed by the plain language of the statute and the regulation. *Meeks v. Ocwen Loan Servicing LLC*, No. 16 cv 81003, 2016 U.S. Dist. LEXIS 97505, at *15 (S.D. Fla. July 25, 2016) (citing *U.S. v. Fisher*, 289 F.3d 1329, 1338 (11th

Cir. 2002)) (noting that if Congress had intended a response letter under section 1024.36(c) to state more than the fact that the servicer was in receipt of the information, the statute would have said so). "Where Congress uses different language within the same statute, it presumably does so intentionally for the purpose of conveying different meanings." *Doyle Homes, Inc. v. Signature Grp. Of Livingston, Inc.*, 69 F. Supp. 3d 674, 679 (E.D. Mich. 2014) (citing *Gozlon-Peretz v. U.S.*, 498 U.S. 395, 404 (1991)). The supplement to Regulation X refers to trial modification as one "type" of loss mitigation option, and is distinct from a "permanent modification". 12 U.S.C. § 1024.31, Supp. I. That is, section 1024.41(e)(2)(i) states that an unaccepted "loss mitigation option" may be deemed rejected, and section 1024.41(e)(2)(ii) specifies that a reasonable period past the deadline must be given "for accepting a trial modification plan"—a distinct type of loss mitigation option that is not the same as a permanent modification.

Finally, the requirement for a loss mitigation appeal only applies when a servicer determines that a borrower is not eligible for loss mitigation options. A servicer must permit a borrower to appeal the "servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower." 12 C.F.R. § 1024.41(h)(1). For example, in *Rupli v. Ocwen Loan Servicing, LLC*, the plaintiff was offered a trial period plan by the servicer. No. 16-0181, 2016 U.S. Dist. LEXIS 102262, at *5 (Dist. Md. Aug. 4, 2016). The plaintiff did not accept the offer, but instead requested additional information via a letter. *Id.* The plaintiff argued that the servicer violated Regulation X by failing to provide the plaintiff with an opportunity to appeal the denial of her loan modification application. *Id.* at *16. The Court explained that the "problem with Plaintiff's claim is that the RESPA regulation requires a servicer to entertain an appeal only upon *denial* of an application." *Id.* at *17-18

7

(emphasis in original). The trial period plan at issue "was not a denial of her loan modification application. Plaintiff fails to cite any authority requiring a servicer to permit an appeal of an offer rejected by the borrower." *Id.* at *18.

A servicer may proceed to a foreclosure judgment if the borrower has previously failed to perform under a loss mitigation option agreement. For instance, in *Malcom v. Seterus, Inc.*, the borrower was offered a trial period plan, but failed to make the second payment because, due to an error in the mailroom in the borrower's workplace, the servicer did not receive the payment until after the deadline. No. 5:18 cv 1937, 2020 U.S. Dist. LEXIS 50397, at *2-3 (N.D. Ohio Mar. 24, 2020). Two months later, the borrower submitted another loss mitigation application, and one month after that the servicer filed a foreclosure lawsuit. *Id.* at *4. The borrower argued that the servicer violated Regulation X's prohibition on filing a foreclosure when a loss mitigation application was pending. *Id.* at *10. The court rejected this argument, and held that the borrower "failed to perform under an agreement on a loss mitigation option before the foreclosure action was filed, and the foreclosure filing was therefore permitted" under Regulation X. *Id.* at *11-12. In its analysis, the court relied on cases examining section 1024.41(g) and determining that failing to perform under an agreement allows a servicer to proceed to judgment. *Id.* at *12-13.

    B.    *The Residential Mortgage Lending Act*

The Ohio Residential Mortgage Lending Act regulates mortgage lending or servicing activities. No person can transact the business of a mortgage servicer in Ohio without having first obtained a certificate of registration. Ohio Rev. Code § 1322.07(A)(1). No registrant under the RMLA shall: (1) "Make false or misleading statements of a material fact, omissions of statements required by state or federal law, or false promises regarding a material fact, through advertising or

other means, or engage in a continued course of misrepresentations;" or (2) "Engage in conduct that constitutes improper, fraudulent, or dishonest dealings". *Id.* § 1322.40(B), (C). The statute does not define the term "improper", *see id.* § 1322.01, so "undefined terms are to be accorded their common, everyday meaning", *FV1, Inc. v. Goodspeed*, 2012 Ohio 3001, ¶ 56.

## II. Damages under RESPA and RMLA.

### A. *RESPA.*

Whoever fails to comply with any provision of RESPA shall be liable to the borrower for each such failure. *Schoen v. Bank of Am., N.A.*, No. 2:17 cv 648, 2019 U.S. Dist. LEXIS 23460, at *8 (S.D. Ohio Feb. 13, 2019) (citing 12 U.S.C. § 2605(f)). If liability is established, "an individual may recover actual damages, and any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of RESPA and Regulation X, in an amount not to exceed $2,000." *Id.* "RESPA recognizes two types of damages: (1) actual damages the borrower sustained as a result of the RESPA violation, and (2) 'any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.'" *Id.* at *14 (citing 12 U.S.C. § 2605(f)(1)). "An individual also may be awarded the costs of the action and reasonable attorneys' fees." *Id.*; *see also* 12 U.S.C. § 2605(f)(3).

"The plaintiff must suffer actual, demonstrable damages, and the damages must occur as a result of the specific violation." *Justice v. Ocwen Loan Servicing*, No. 2:13 cv 165, 2015 U.S. Dist. LEXIS 5665, at *50-51 (S.D. Ohio Jan. 16, 2015). Actual damages are an "amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *Id.* at *51-52. Although actual damages under RESPA may include emotional damages, "a plaintiff must

9

present evidence to establish a causal link between the servicer's noncompliance and the claimed damages." *Schoen*, 2019 U.S. Dist. LEXIS 23460 at *16 (citing *Miller v. Caliber Home Loans, Inc.*, No. 3:16 cv 621, 2018 U.S. Dist. LEXIS 25504, at *11 (W.D. Ky. Feb. 16, 2018)).

Statutory damages under RESPA can only be awarded if the plaintiff has suffered actual harm. *See Lanton v. Ocwen Loan Servicing, LLC*, 793 Fed. Appx. 398, 401 (6th Cir. 2019) (noting that the statute requires a plaintiff to prove actual damages "relating to any alleged violation of RESPA."); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1247 n.4 (11th Cir. 2016) ("[T]he use of 'additional' seems to indicate that a plaintiff cannot recover pattern-or-practice damages [under RESPA] in the absence of actual damages."). Moreover, statutory damages are only available under RESPA "in the case of a pattern or practice of noncompliance." *Malcom v. Seterus, Inc.*, No. 5:18 cv 1937, 2020 U.S. Dist. LEXIS 50397, at *18 (N.D. Ohio Mar. 24. 2020) (citing 12 U.S.C. § 2605(f)(1)(B)). To show a pattern or practice, a plaintiff must show that noncompliance with the statute "was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* (quoting *Necak v. Select Portfolio Servicing, Inc.*, No. 1:17 cv 1473, 2019 U.S. Dist. LEXIS 71147, at *6 (N.D. Ohio Apr. 26, 2019)). "To establish a pattern or practice of noncompliance, 'one or two violations alone are insufficient.'" *Id.* (quoting *Schoen v. Bank of Am., N.A.*, No. 2:17 cv 648, 2019 U.S. Dist. LEXIS 23460, at *10 (S.D. Ohio Feb. 13, 2019)).

B.   *The RMLA.*

A buyer injured in violation of section 1322.40 of the RMLA may bring an action for recovery of damages. Ohio Rev. Code § 1322.52(A)(1). Damages under the RMLA "shall not be less than all compensation paid directly and indirectly to a registrant or mortgage loan originator

10

from any source, plus reasonable attorney's fees and court costs." *Id.* § 1322.52(A)(2). The buyer may also be awarded punitive damages. *Id.* § 1322.52(A)(3).

The purpose of punitive damages is to "punish and deter certain conduct." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, No. 2:08 cv 390, 2014 U.S. Dist. LEXIS 146816, at *29 (S.D. Ohio Mar. 4, 2014 (citing *Dardinger v. Anthem Blue Cross & Blue Shield*, 781 N.E.2d 121, 144 (Ohio 2002)); *see also Wightman v. CONRAIL*, 640 N.E.2d 1160, 1172 (Ohio Ct. App. 1994) (citing *Villella v. Waikem Motors, Inc.*, 543 N.E.2d 464, 469 (Ohio 1989)) (stating that the purpose behind an award of punitive damages is punishment of the guilty party and the deterrence of similar conduct in the future). When considering whether to award punitive damages, the court should consider a number of factors, including: the nature of the conduct that resulted in the injury; the financial condition of the defendant; the amount necessary to deter future similar conduct, and prior or similar acts by the defendant; and the amount of actual or compensatory damages. *Wightman*, 640 N.E.2d at 1172 (citing *Villella*, 543 N.E.2d at 469).

Courts "should not go beyond what is necessary to achieve the stated goals of punitive damages." *Kendall Holdings, Ltd.*, 2014 U.S. Dist. LEXIS 146816 at *29 (citing *Dardinger*, 781 N.E.2d at 144) (internal quotations omitted). Although States possess discretion over the imposition of punitive damages, "it is well established that there are procedural and substantive constitutional limitations on these awards." *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2002) (citing *Cooper Indus., Inc. v. Letherman Tool Grp., Inc.*, 532 U.S. 424 (2001)). This is because "elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also

of the severity of the penalty that a State may impose." *Id.* at 417 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996)).

The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. *Id.* at 419 (citing *Gore*, 517 U.S. at 575). The Supreme Court has explained that in determining reprehensibility, courts should consider whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* (citing *Gore*, 517 U.S. at 576-77). And regarding recidivist conduct, the court must "ensure the conduct in question replicates prior transgressions." *Id.* at 423 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462 n.28 (1993)). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 419 (citing *Gore*, 517 U.S. at 575).

**EVIDENTIARY ISSUES**

1. To the extent that Ruckman will attempt to introduce evidence about PHH's servicing platform or consent orders discussing the reliability of PHH's servicing platform, such

evidence has not been produced in discovery, is not relevant to any party's claims or defenses, and would unduly prejudice the fact finder during the trial.

2. In discovery, Ruckman produced voluminous medical records in support of her claim. (RUCKMAN 000301-1047; 001204-2038.) However, many of the records either predate the events on which Ruckman bases her claim, or are unrelated to her identified damages in discovery. Thus, they are not relevant to any party's claims or defenses.

3. In discovery, Ruckman produced medical records relating to mental health treatment in support of her claim. (RUCKMAN 001198-1203.) However, the treatment occurred on November 23, 2021, well after the events on which Ruckman bases her claim, and after she obtained a successful loan modification that is still in effect. Thus, they are not relevant to any party's claims or defenses.

4. Broadly, Ruckman has produced a significant amount of evidence in discovery about her mental, emotional, and physical health that is not relevant to any party's claims or defenses and would be prejudicial to PHH. This evidence should be excluded, and is the subject of a Motion in Limine that PHH is filing pursuant to this Court's trial order.

## ESTIMATED LENGTH OF TRIAL

PHH estimates that the trial in this case will take 2-3 days.

Dated: February 28, 2023

PHH MORTGAGE CORPORATION

By: /s/ *Simon Fleischmann*
Simon Fleischmann (
Locke Lord LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-0462
Facsimile: (312) 896-6471
*sfleischmann@lockelord.com*

**CERTIFICATE OF SERVICE**

I certify that an exact copy of the foregoing document was electronically filed and served via the ECF system on February 28, 2023.

/s/ *Simon Fleischmann*